**Exhibit F to Memorandum in Support of The Mayor and Aldermen
of the City of Savannah's Motion for Summary Judgment**

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

MARQUIS RAQUEL PARRISH and       )
TYESHA LOVE,                     )
                                 )
    Plaintiffs,                  )
                                 )
v.                               )    CIVIL ACTION NO.
                                 )    4:23-CV-00261
ASHLEY WOOD, in her individual   )
capacity and in her official     )
capacity as an employee of the   )
Savannah Police Department;      )
NICOLE KHAALIS, in her individual )
capacity and in her official     )
capacity as an employee of the   )
Savannah Police Department; and  )
THE MAYOR AND ALDERMEN OF THE    )
CITY OF SAVANNAH,                )
                                 )
    Defendants.                  )
_____

DEPOSITION
OF
ALAN BROOKS SAMMONS

August 15, 2024
1:05 p.m.

Manly Shipley, LLP
301 Habersham Street
Savannah, Georgia  31401

Victoria L. Root, Certified Court Reporter, B-1691

**Gilbert & Jones**
Certified Court Reporters

P. O. Box 1894 (31521)
1607 Norwich Street
Brunswick, GA 31520

*gilbertandjones1@gmail.com*
**912.264.1670**

P. O. Box 14515 (31416)
7505 Waters Avenue, F3
Savannah, GA 31406

2

1                    APPEARANCES OF COUNSEL

2

3     On behalf of Plaintiffs:

4          JAMES E. SHIPLEY, JR., Esquire
           Manly Shipley, LLP
5          301 Habersham Street
           Savannah, Georgia  31401
6          (912) 495-5360
           jim@manlyshipley.com
7

8

      On behalf of Ashley Wood:
9
           CHARLES E. COX, JR., Esquire
10         Charles E. Cox, Jr., LLC
           484 1st Street, Suite 1
11         Macon, Georgia  31202
           (478) 757-2990
12         charles@cecoxjr.com

13

14    On behalf of City of Savannah and Nicole Khaalis:

15         TAYLOR L. DOVE, Esquire
           HunterMaclean
16         200 East Saint Julian Street
           Savannah, Georgia  31401
17         (912) 236-0261
           tdove@huntermaclean.com
18

19

20

21

22

23

24

25

3

1                      INDEX TO EXAMINATIONS

2

3          Examination                              Page

4
      By Mr. Shipley                                  5
5
      By Mr. Dove                                     95
6
      By Mr. Cox                                     132
7
      By Mr. Dove                                    162
8
      By Mr. Shipley                                 164

9

10

11                        -   -   -

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

INDEX TO EXHIBITS

EXHIBIT NUMBER                                    PAGE IDENTIFIED

          P-1                                               7

          P-2                                              48

          P-3                                              68

          P-4                                              70

          P-5                                              78

          P-6                                              81

          P-7                                              94


                              -   -   -


          D-8                                             106

          D-9                                             110

          D-10                                            113

          D-11                                            119

          D-12                                            125

5

1          (Reporter disclosure made pursuant to

2     Article 8.B. of the Rules and Regulations of the

3     Board of Court Reporting of the Judicial Council of

4     Georgia.)

5               MR. SHIPLEY:  All right.  This is going to

6          be the deposition of Alan Sammons taken pursuant

7          to notice and by agreement of counsel.  I

8          suggest we reserve all objections except form of

9          the question, responsiveness of the answer, if

10         that's agreeable with you guys.

11              MR. DOVE:  That's fine with me.

12              MR. COX:  Yes.

13              MR. SHIPLEY:  Okay.  Any other kind of

14         stipulations y'all want to put on the record?

15              MR. COX:  No.

16              MR. SHIPLEY:  Okay.

17                   ALAN BROOKS SAMMONS,

18    having been duly sworn, was examined and testified as

19    follows:

20                      EXAMINATION

21    BY MR. SHIPLEY:

22         Q.    Mr. Sam- -- or is it Detective Sammons?

23         A.    Investigator is the title they use --

24         Q.    Okay.

25         A.    -- at the D.A.'s office.

6

1      Q.    Okay.  Investigator -- I'm just going to

2   call you -- can I call you Mr. Sammons?

3      A.    You may.

4      Q.    All right.  Mr. Sammons, my name is

5   Jim Shipley.  Along with my partner, John Manly, we

6   represent Marquis Parrish and his wife in a civil

7   action that has been filed against a number of

8   parties, including Detective -- or ex-Detective

9   Ashley Wood, Nicole Khaalis, and the mayor and the

10   aldermen of the City of Savannah.

11         All of this is stemming from Mr. Parrish's

12   arrest following the murder of Charles Vinson.  And

13   Mr. Parrish, I believe, was arrested on May 7th of

14   '21.  He was later -- subsequently indicted and later

15   released, I believe, and the charges were dropped --

16   or nolle pros'd on June 16th of '23.

17         The 30,000-foot view of this case is that

18   we are seeking damages for his -- what we have

19   alleged is wrongful arrest and imprisonment for 2

20   years stemming from that arrest.

21         Have you ever had your deposition taken

22   before?

23      A.    No depositions, no.

24      Q.    Okay.  We have a court reporter here.

25   She's taking down everything that we say.  It's going

7

1    to come out in a question-and-answer format.  There

2    will be a question and then -- it'll have my question

3    or any of the other lawyers' questions and then your

4    answer.

5         A.    Right.

6         Q.    You will have an opportunity to get a copy

7    of that transcript before it is officially submitted.

8    If you don't -- want, you can go ahead and waive

9    signature on that.  That means that, you know, you

10   feel like you testified truthfully or there's no

11   errors to fix.

12              That's your choice.  You can tell me now,

13   or you can wait till after the deposition's over and

14   make that decision.

15        A.    I really have no concern either way, so I

16   guess I'd waive it --

17        Q.    Okay.

18        A.    -- yeah.

19        Q.    Okay.  And the reason we ask that is just

20   that the court reporter would need to send you the

21   copy first.

22        A.    Yeah.

23        Q.    And you've got 30 days to look at it.

24        A.    All right.

25              (Plaintiffs' Exhibit Number 1 was marked

8

1    for identification.)

2         Q.    (By Mr. Shipley)  All right.  The first

3    thing I want to do is just show you some

4    administrative things to get out of the way.  This is

5    just a copy of, I'll represent to you, the subpoena

6    that we provided at your request.

7              Could you take a look at that and . . .

8         A.    I remember receiving a copy of this

9    subpoena.

10        Q.    Okay.  And my understanding is you have

11   requested that you not be compensated for your

12   appearance time here; is that --

13        A.    That's correct.

14        Q.    And that -- you are currently on the clock

15   with the D.A.'s office?

16        A.    Yes.  This all stems from work.

17        Q.    Okay.  Gotcha.  I'm going to put these in

18   front of you so that you have them.

19              A couple other things I should have said

20   is I don't think the deposition is going to go too

21   long.  But we do have three lawyers here, so you

22   never know.  But if you need a break at any time --

23   this isn't a marathon session -- just let us know,

24   and we will go off the record, and you can take a

25   break and do whatever you need to do.  Then we'll

9

1    resume.

2          A.    Got you.

3          Q.    The only thing I ask is if I do have a

4    question that's been asked of you, you need to

5    provide an answer, and then we can go off the record.

6          A.    Okay.

7          Q.    Is that fair?

8          A.    That works.

9          Q.    Okay.  If I ask you a question you don't

10   understand or if I've said it in a bad way, please

11   let me know, and I'll just -- I'll rephrase it.

12         A.    Got you.

13         Q.    And, you know, you don't have a lawyer

14   here.  But, you know, as any lawyer would tell you,

15   you know, I don't want you to guess or speculate on

16   anything.  If you know the answer, please provide it.

17   If you don't, then don't guess.

18         A.    I understand.

19         Q.    All right.  Could you state your full name

20   for the record.

21         A.    Alan Brooks Sammons.  So that's A-l-a-n

22   B-r-o-o-k-s S-a-m-m-o-n-s.

23         Q.    All right.  And, kind of, before we get

24   into the substance of the deposition, I'm just going

25   to ask you some questions because I -- we've never

10

1   met until today.

2       A.    Yes.

3       Q.    Where are you from originally?

4       A.    Savannah.

5       Q.    Savannah, Georgia?

6       A.    Born and raised.

7       Q.    Okay.  And where did you go to high

8   school?

9       A.    Benedictine.

10      Q.    And what year did you graduate

11  Benedictine?

12      A.    1994.

13      Q.    '94.  Okay.

14            And after Benedictine, did you go to

15  college or any secondary schools, or did you start

16  working or --

17      A.    Yes.  I went to Young Harris College for

18  1 year and then came back to Savannah and went to

19  what was then Armstrong Atlantic State University.

20      Q.    Okay.  And did you graduate from

21  Armstrong?

22      A.    I graduated with general studies with a

23  minor in law and legal process, I think is what it

24  was named.

25      Q.    Okay.  Was that around '98, '99, something

11

1    like that?

2        A.    Yeah.  I want to say December of '98 was

3    when I graduated.

4        Q.    Okay.  And upon graduation, did you begin

5    working with law enforcement, or did you --

6        A.    No.

7        Q.    Tell me what happened.

8        A.    For about 5 to 6 years, I worked for

9    BellSouth Telecommunications.

10       Q.    Okay.

11       A.    And so it was -- September of 2004, I was

12   hired by the -- well, yeah, by the City of Savannah

13   and employed as an officer with the then

14   Savannah-Chatham Metropolitan Police Department.

15       Q.    Okay.  So you're -- the first position you

16   had with law enforcement was with Chatham County

17   Police Department; is that correct?  It was before

18   the merger took place?

19       A.    No.  It -- well, the merger was in effect.

20   I don't know that it was officially paperwork in

21   effect, but the -- personnelwise, county officers

22   were coming into Savannah property, Savannah

23   buildings.

24       Q.    Yes, sir.

25       A.    So I was -- that's why I paused, because I

1   was making sure I remembered who exactly hired me.  I

2   was hired by the City of Savannah.

3       Q.    Okay.

4       A.    So at that time, they split so many

5   officers to be hired by the City, so many to be hired

6   by the County until after it all fell apart.  And the

7   County hires its own people.  The City hires its own

8   people.  So I was a City of Savannah employee.

9       Q.    Okay.  And when you were first hired, were

10  you -- tell me what your position was for the City of

11  -- or the police department here in Savannah.

12      A.    Once I completed mandate -- the City of

13  Savannah put me through mandate training at the

14  Georgia Public Safety Training Center, which was

15  housed at Armstrong back then.  Then went through

16  more field training with the department.  I was

17  assigned to the downtown precinct as a patrol

18  officer.

19      Q.    Okay.  So your first real role as a police

20  officer, you were a patrol officer downtown?

21      A.    Yes.

22      Q.    All right.  And just -- could you describe

23  just in summary -- you don't have to go into all the

24  details -- just a little bit about your progression

25  through the police force here in Savannah.

13

1        A.    So I spent several years in uniform

2    capacity as a patrol officer.  I went to the mounted

3    patrol for a couple years, which is a uniform

4    capacity as well.  From the mounted patrol, I went

5    back to the downtown precinct as a patrol officer.

6              Around 2010, I moved into property crimes

7    investigation, so detective work.  That also was

8    within the downtown precinct.

9        Q.    Uh-huh.

10       A.    By August of 2012, I was assigned to the

11   violent crimes office, the homicide unit.  I was

12   there from August of 2012 till around August,

13   September of 2015.

14             And I went into a unit they call SARIC,

15   Savannah Area Regional Intelligence Center.  That's

16   part of the police department.  It's the intelligence

17   office.  And in there, I was tasked as an

18   investigator doing intel work on gangs and criminal

19   organizations.  It was kind of their first step into

20   trying to create a gang unit.

21             They had an end gun violence program

22   working at that time --

23       Q.    Uh-huh.

24       A.    -- so I was tasked to help collect

25   information and generate these groups that were going

14

1    to be identified and looked at for both social

2    services, if they would take it, and any

3    vulnerability to legal action as well -- criminal

4    legal action.

5            And then in August of 2016, I left

6    employment with the Savannah-Chatham Police

7    Department and was hired by the district attorney's

8    office as an investigator, and I've been there since.

9        Q.    Okay.

10       A.    Currently, I am the major case supervisor.

11   So we focus on follow-up investigative work related

12   to primarily serious child crimes, murders,

13   kidnappings, rapes, stuff of that nature.

14       Q.    Okay.  When did you become the major case

15   supervisor with the D.A.'s office here in Chatham

16   County?

17       A.    I believe it was 2022.  I can't tell you

18   what month for sure.

19       Q.    Before that, were you working in the same

20   division with --

21       A.    Yeah.

22       Q.    -- major cases?

23       A.    Yes, yes.  I was already working the same

24   cases.

25       Q.    Okay.

15

1    A.    Through progression -- I can't remember if

2    someone left or retired.  But anyway, a void

3    presented itself, and they asked me if I wanted to

4    take the supervisory role, and I was promoted to

5    that.

6    Q.    I got you.  So is it fair to say that --

7    obviously, the incident that kind of started this

8    entire case, obviously, the arrest of Marquis Parrish

9    back in May, I believe, of '21, you were working in

10   the major crimes division at the D.A.'s office --

11   A.    Yes, I was.

12   Q.    -- is that right?

13         All right.  Okay.  You just weren't the

14   head of it; is that right?

15   A.    20- -- I don't believe so.

16   Q.    '21.

17   A.    Yeah.  I don't believe so in '21.

18   Q.    Okay.  What were -- tell me now:  What

19   were your -- kind of your responsibilities as an

20   investigator or the -- I guess the head of

21   investigations there for the Chatham County D.A.?

22   A.    My responsibilities are not much different

23   now than they were when I was just -- had the

24   nonsupervisory role.  As a supervisor, my role is to

25   handle the case assignments to my investigators

16

1    regarding major cases and make sure that they're

2    doing their jobs.  Beyond that, I also continue to

3    work cases because manpower is not enough --

4        Q.    Uh-huh.

5        A.    -- so I work my own cases.

6              What we do day to day has a lot to do with

7    what's coming through the office and what's being

8    requested by individual assistant district attorneys.

9        Q.    Okay.

10       A.    So we don't generate our own cases.  We

11   are assigned requests.  Those requests are originated

12   by assistant district attorneys or by the D.A.

13   herself.

14             So, in other words, if they're assigned a

15   case for prosecution, they may look through it and

16   say, "Hey, I believe I have some issues here.  Will

17   you look at this and address these issues?"

18             And whatever those issues are that they've

19   identified or that we identify, we start the

20   communication of strengths, weaknesses, or any

21   follow-up work that we think we might be able to

22   accomplish at such a date after the original arrest.

23   And that's what we do.  Primarily, that's what we do.

24       Q.    Okay.  So when a case comes to you,

25   there's already been -- and you tell me if this is

17

1    true or not -- there's already been a subject and --

2    who's been arrested and/or indicted, and the case has

3    been handed over to the D.A.'s office; is that right?

4        A.    Yes.  On rare occasions, we may be

5    requested by an agency --

6        Q.    Uh-huh.

7        A.    -- any agency in this county.  Our circuit

8    is Chatham County.  So if another agency in this

9    county asks for assistance, we may assist them --

10       Q.    Uh-huh.

11       A.    -- on an open and active investigation,

12   but those are rare occasions.

13       Q.    Okay.

14       A.    The standard is an arrest has been made.

15   The acc- -- the criminal accusation has been made.

16   The paperwork now is going through the court system.

17   The D.A.'s office is involved.  All these things are

18   headed towards some type of solution within the court

19   system.

20       Q.    Okay.  And your job would be to assist the

21   D.A.'s office, the assistant D.A.s in properly making

22   -- prosecuting cases or making decisions on which

23   cases to prosecute or not; is that right?

24       A.    Well, not so much on what to prosecute.

25       Q.    Yeah.

18

1      A.      That's a little outside of my lane.

2      Q.      Yeah.  Okay.

3      A.      I -- obviously, I'll offer my opinion, if

4  asked, on the strength of a case but more to either

5  identify or deal with already identified issues

6  within the investigation that need to be addressed,

7  whether -- an example would be, "Hey, we realize

8  there's a claim of an alibi here that was never

9  followed up."  We would go follow up that alibi.  Or

10  "There's information that's contained in this case

11  file, like maybe digital evidence of phone -- a phone

12  dump.  It doesn't appear that it's ever been

13  reviewed."  We'll go through all that data and find

14  is there any evidence that exists within this phone

15  extraction, this dump --

16      Q.      Uh-huh.

17      A.      -- that would be viable towards a

18  prosecution of this defendant.

19          That's our role, not so much to tell them

20  you should or -- yeah, that should go in the

21  prosecution file.  That should go in the kick file.

22  No, that's not us.

23      Q.      I got you.  I got you.  I got you.

24          But the majority of the cases, there's

25  always -- there's been an arrest made at that point?

19

1          A.    99.9 percent, there's been an arrest made.

2          Q.    Okay.  And that kind of leads me -- my

3     next line of questioning is -- I think you said you

4     began with the homicide department within Chatham --

5     or within the police department with Savannah-Chatham

6     County back in 2012; is that right?

7          A.    Yeah.  It was August of 2012 when I moved

8     in there.

9          Q.    Okay.  Tell me just -- like, your

10    experience -- when you started working there in 2012,

11    how many different units did the Savannah Police

12    Department have?

13         A.    Well -- so back then, we had five

14    precincts, so --

15         Q.    Uh-huh.

16         A.    -- that's five different locations that

17    would have patrol officers.  And at that time, you

18    still would have property crimes, detectives assigned

19    to those different precincts.

20         Q.    Uh-huh.

21         A.    Within CID, you had violent crimes,

22    homicide, which, when I was there, we worked pretty

23    much all violent crimes against persons with the

24    exception of robberies, so all your -- and sex

25    crimes, so all your kidnappings, aggravated

20

1    batteries, aggravated assaults, homicides, every

2    unattended death, suicides, child deaths.  All that

3    stuff went to the violent crimes homicide office.

4            Violent crimes robbery addressed all

5    robberies of persons.  You had an SVU unit, a special

6    victims unit, that --

7        Q.    Uh-huh.

8        A.    -- handled all sex crimes and child

9    crimes, and you had a financial crimes unit that

10   investigated all financial crimes.  Occasionally,

11   depending on, maybe, the importance given to a case,

12   whether it really fit in our wheelhouse or not,

13   basically, that would be something directed via the

14   chief for us --

15       Q.    Okay.

16       A.    -- to do the investigation.  And then

17   those would be things that weren't typically

18   homicides or shootings.  But whatever the nature of

19   it would be, they would send it to us.

20           I -- for whatever reason, they put a lot

21   of importance on the detectives within the homicide

22   unit and the expectations they had for your ability

23   to do your job.

24       Q.    Okay.  Okay.  That makes sense.

25           You know, as part of your -- you were -- I

21

1    guess your title was detective --

2         A.    Detective --

3         Q.    -- at that point?

4         A.    -- yes.

5         Q.    Okay.  And as part of your job as being a

6    detective within the homicide unit of the police

7    department here in Savannah, you would have regularly

8    created case files; is that correct?

9         A.    Yes.

10        Q.    Tell me, you know, what -- what is -- is

11   it the correct colloquial -- do they call it a case

12   file, or is there a different term?  I just want to

13   make sure --

14        A.    No.

15        Q.    -- I'm right.

16        A.    That's the catch-all, "case file."

17        Q.    It's the -- it's case file?

18        A.    Yeah.

19        Q.    Okay.  And I've heard that term through

20   other depositions.

21              And is it -- you -- like, when you were

22   working there as a detective, would you be the one

23   who was charged with creating your own case files, or

24   was there a supervisor who started it and you -- or

25   did you have your own case files?

22

1          A.    The production of that case file was the

2     duty of the lead detective on the case.

3          Q.    Okay.

4          A.    So no matter how many people helped me

5     work a case and how many reports another detective

6     may produce in helping me work that case, it would

7     have been my responsibility to compile all that

8     information and put it in a file.  So that's where

9     the case file comes from.

10         Q.    Uh-huh.

11         A.    And that case file should contain

12    essentially a record of everything you've done in the

13    investigation, so not only the reports, any recorded

14    interviews.  There should be copies -- those are part

15    of a case file.

16              If I've completed search warrants, there

17    would be copies of the search warrants in the case

18    file.  If there was documentation that was of

19    evidentiary value -- now, I would make sure there was

20    a copy of the document in the case file, but that's

21    another one of those things that could be mentioned

22    in the reports or documented in some way, but it's

23    actually logged in as evidence.

24         Q.    Uh-huh.

25         A.    That was kind of a "it's up to you" type

23

1    thing.

2         Q.    Yeah.

3         A.    The reason I would put all that stuff --

4    as much things as I could reflect inside those

5    binders as possible is because I know that, when it

6    gets to the prosecutors, they need to see it.  And

7    they can't see things that we log into a property

8    room with ease --

9         Q.    Right.

10        A.    -- so you would make a copy of it.

11        Q.    And you kind answered a few of my next

12   questions.  And let me just see if I can go back and

13   --

14        A.    Okay.

15        Q.    -- summarize it.  And I appreciate that.

16             So when you -- the lead detective is going

17   to be in charge of the case file --

18        A.    Yes.

19        Q.    -- looking at a potential crime, and their

20   job, ultimately, is to complete it.

21             It's in an actual -- at the time when you

22   were there, would it be in a binder?  Would it be in

23   a computer format or --

24        A.    It would -- everything that I could get in

25   the binder would be there.  Now, that would also

24

1    include any media that would be on a disc or --

2         Q.    Okay.

3         A.    If I had large amounts of data, it might

4    be on a thumb drive.

5         Q.    Right.

6         A.    But that would be in the case file.  So

7    there would be -- I would take an evidence envelope,

8    write on the evidence envelope what's inside of it,

9    slide the thumb drive inside of that, and make sure

10   that a copy of whatever's on that, whatever that data

11   is, that that copy is going to be part of the case

12   file.

13              And to even go further, we had to create,

14   back then, two physical case files.  One was the

15   department's copy.  The other was for the district

16   attorney's office.  So one would be maintained by the

17   City of Savannah.  The other one would be sent to the

18   district attorney's office.  That's how it worked.

19        Q.    Were they always identical?

20        A.    Yeah.  They should be.

21        Q.    Okay.  So you would take copies of

22   whatever was in your case file for your --

23        A.    Yeah.

24        Q.    -- police division and make the exact --

25        A.    Yeah.

25

1    Q.    -- duplicate --

2    A.    Yeah.

3    Q.    -- for the D.A.s?

4    A.    So the binders -- if you had to use a big

5    binder or small binder, it didn't matter.

6    Q.    Uh-huh.

7    A.    You know, some things could be handled in

8    a report --

9    Q.    Uh-huh.

10    A.    -- depending on what it was.  But they

11    would be duplicates.  One's maintained by the

12    department and filed away in case file management.

13    The other would be sent to the district attorney's

14    office.

15    Q.    Okay.  And you mentioned, too, like, you

16    may have things, like, on a drive, like, for

17    instance, body cam recordings --

18    A.    Well --

19    Q.    -- things like that?

20    A.    So body cameras didn't exist when I was

21    there.

22    Q.    Uh-huh.

23    A.    But what did start causing problems were

24    things like phone extractions.  So --

25    Q.    Okay.

26

1      A.     -- as cell phones became larger and larger

2   in their capacity to hold data, you would have more

3   and more information in the extractions.  It would

4   take larger thumb drives or larger discs or even --

5   even by the time I was leaving, at times, we were

6   having to buy larger drives to download all that

7   stuff to.

8            Now, that may not -- in those moments, may

9   not have been physically attached to the case file --

10     Q.     Uh-huh.

11     A.     -- but it would be my responsibility to

12  make sure that a copy of all that data made it to the

13  district attorney's office.

14     Q.     Okay.

15     A.     Does that make sense?  So it would it be

16  like supplementing.

17     Q.     Yeah.

18     A.     If I can't get it all in here today --

19     Q.     Yeah.

20     A.     -- I'll -- somehow I'm going to make sure

21  that this gets saved and goes -- so my process would

22  be, back then, the evidence room.

23     Q.     Okay.

24     A.     So if I have a bunch of digital evidence

25  that I can't print out on paper because it's --

27

1    Q.    Uh-huh.

2    A.    -- that's not what it is, then I'm going

3    to burn it to a disc or put it on a drive and put it

4    in the property room, and that's where we would

5    maintain that part of it.

6    Q.    Okay.

7    A.    But at the same time, I still have to get

8    that information to the prosecutors, so I need

9    another thumb drive or another disc to put all that

10   information on and make sure that they have it.

11   Q.    And then that would be included in the

12   binder that you supplied to --

13   A.    Yeah.  And if it --

14   Q.    -- the D.A.'s office?

15   A.    Yeah.  And if it wasn't in there

16   immediately -- let's say we're waiting on something

17   --

18   Q.    Right.

19   A.    -- it would be supplemented.

20   Q.    Okay.

21   A.    It would still be my responsibility to

22   make sure that -- if I have to -- let's say I

23   continue an investigation after an arrest.

24   Q.    Right.

25   A.    2 or 3 months down the road, for some

28

1    reason, something else comes up, and I've created

2    more documents.  It's my responsibility to make sure

3    those documents find their way to the case file and

4    find their way to the prosecutor's office.

5        Q.    Like, for instance, if there was, like, a

6    -- you know, a piece of evidence, let's say, that was

7    larger that couldn't be fit into any binder that, you

8    know, any of us have here, like, say, a shotgun, I

9    mean, that's going into the --

10       A.    Yeah.  It's in the --

11       Q.    -- evidence room; right?

12       A.    It's in the evidence room, and the only --

13   the way I would tell the department or the

14   prosecutor's office it exists is through

15   documentation in the reports.

16       Q.    Okay.  Like a list to say --

17       A.    Yeah.

18       Q.    -- here's, you know --

19       A.    Yeah.

20       Q.    -- 1 through 15 --

21       A.    Right.

22       Q.    -- is a shotgun, shell casings --

23       A.    One of the easiest ways is my

24   investigative narrative is -- should -- mine would --

25   tell you that, at some point, we took possession of

29

1    said shotgun in your --

2         Q.    Uh-huh.

3         A.    -- description.  Then you're going to find

4    an evidence form that shows that that shotgun was

5    logged into the property room and that that's where

6    it exists --

7         Q.    Okay.

8         A.    -- unless we've moved it to the GBI for

9    examination or something like that.  But that

10   property form might even reflect that at that point.

11        Q.    Okay.  And was it your understanding --

12   and if you don't know the answer to this -- but,

13   like, you know -- you probably do because you work in

14   the office now.

15             But, like, the D.A.'s office, if they get

16   a -- you know, your case file and they look on it and

17   say, "Oh, look.  They pulled in a double-barrel

18   shotgun" and they need that, do they have access to

19   the evidence room, or would they make a request to

20   the --

21        A.    They would --

22        Q.    -- police department?

23        A.    -- make a request because it's technically

24   the property of the department.  So if you --

25        Q.    Okay.

30

1      A.     -- wanted to see it, you would just have

2    to make a request to get access to it to view it.

3      Q.     What about, like, for instance, with that

4    shotgun or any shell casings?  Whose responsibility

5    would it be, either the police department or the

6    A.D.A.s, to send that to the GBI for forensic

7    testing?

8      A.     Well, my initial answer to that is it

9    would be the police department's.

10     Q.     Uh-huh.

11     A.     And I can expand on why there's a little

12   -- my -- why I'm saying my initial reaction.  When I

13   was there, that's part of your investigation.

14     Q.     Okay.

15     A.     And the reason it's part of my

16   investigation is because, if I'm trying to match a

17   suspected weapon used in the crime to suspected

18   ballistic evidence recovered at a crime scene,

19   there's only one way that happens, and it's not me

20   telling you that, "Oh, yeah.  That's the gun."

21     Q.     Uh-huh.

22     A.     It's me sending it to a scientist for them

23   to perform a scientific evaluation to say that's the

24   gun.  That becomes more evidence leaning it- --

25   leading itself to probable cause against your

1    defendant.  So that -- it was an everyday, expected,

2    done, and performed duty.  It was an expectation.

3         Q.    Uh-huh.

4         A.    Over the last few years, there has

5    developed this pause from within what we were seeing

6    from the violent crimes office where we're months out

7    of cases going to trial and ballistic evidence has

8    not made it to the GBI.  And that started to become

9    problematic because the GBI, like every other law

10   enforcement organization, is hampered by lack of

11   personnel.

12        Q.    Uh-huh.

13        A.    And the more work they're requested to do,

14   the longer it takes them to get stuff done.  So the

15   quicker you take ballistic evidence to them, the

16   quicker they can evaluate that evidence.

17             I can tell you that -- I can -- I know the

18   GBI came out at one point and said, "Hey, if you have

19   a suspect, someone arrested, or a suspect and can

20   explain the need to test this evidence" --

21        Q.    Uh-huh.

22        A.    -- "let us know," because there was a

23   habit of police departments, to include the Savannah

24   Police Department, to go to, say, a shots fired call

25   --

32

1    Q.    Uh-huh.

2    A.    -- collect shell casings from the street

3    -- there's never going to be an arrest.  No one's

4    ever been identified as shooting it -- but take those

5    shell casings out to the GBI and submit them as

6    evidence for examination.

7    Q.    Uh-huh.

8    A.    That began creating an enormous backlog of

9    evidence for GBI ballistic examiners to look at.

10    Well, they have to prioritize stuff, too,

11    so they started saying, "Wait.  Don't bring us this

12    stuff unless you -- unless it will lead you to the

13    suspect, in other words, you" --

14    Q.    Right.

15    A.    -- "you have determined it's that

16    important, or you have arrested a suspect and now

17    need us to perform an evaluation because this -- we

18    know this will be moving forward in trial

19    proceedings."  That's basically what happened.

20    Q.    Okay.

21    A.    So somewhere in the last -- somewhere

22    since the time I left there, I don't know what

23    conversations happened in there.  I can just tell you

24    that we would be -- A.D.A.s would be headed to trial

25    --

33

1      Q.    Uh-huh.

2      A.    -- and go, "Oh, none of this ballistics

3  has made it to the lab" --

4      Q.    Okay.

5      A.    -- and have to start asking for

6  continuances in a lot of cases to get that stuff

7  tested before trial.  So trials would have to be

8  pushed back for those testing -- for the testing to

9  be done.

10     Q.    I got you.

11     A.    And then we would have to start

12  communicating with SPD about "We need to get this to

13  the lab.  You can give it to us.  We'll take it, or

14  will you take it?"  Negotiating those things out,

15  getting it done.

16     Q.    Okay.  So --

17     A.    But that's something that's developed

18  since I left, that delay of getting ballistic

19  evidence examined --

20     Q.    Uh-huh.

21     A.    -- developed after I left.  When I was in

22  that office, it was -- it was an -- automatic.

23     Q.    Uh-huh.

24     A.    Like, during the course of the

25  investigation, if you had ballistic evidence and you

34

1    know you had suspects, you went to the lab with it.

2         Q.    Right.  So that's what I'm saying.  You

3    needed a little bit more in order to get ahead of the

4    queue at GBI?  Like --

5         A.    Yeah.

6         Q.    -- for instance, we know we've got a

7    9-millimeter.  We've got a suspect name.  We've got

8    evidence that he was there on video --

9         A.    Yeah.

10        Q.    -- footage.

11        A.    Yeah.

12        Q.    We've got, you know -- we've examined,

13   like, maybe burned hands on -- or burn marks on a

14   hand.

15        A.    Yes.

16        Q.    That may get you --

17        A.    Yes.

18        Q.    -- ahead of the -- to the head of the

19   line?

20        A.    A more simple thing would be "I have a

21   weapon that I believe was in the possession of this

22   man."

23        Q.    Uh-huh.

24        A.    "I've now gotten his DNA.  It's a

25   controlled sample of his DNA" --

35

1    Q.    All right.

2    A.    -- "and I want this gun examined for

3    contact DNA to see if it can be recovered and matched

4    to him."  It doesn't mean he's necessarily arrested.

5    Q.    Uh-huh.

6    A.    But what it means is I have something

7    viable for the lab to process that gun for.

8    Q.    Got you.

9    A.    And that's because I have a suspect and

10   I've collected his DNA.

11   Q.    Right.  There's a purpose for it?

12   A.    There's a purpose for it.

13   Q.    I got you.

14   A.    Yeah.

15   Q.    I got you.  As far as, like, in your -- I

16   guess, in the case files, would you have cop- -- back

17   when you were at the police department, did you have

18   copies of interviews with certain suspects that were

19   obtained, you know, whether through -- I know you

20   said there was a body cam, but -- I guess, maybe in

21   interview rooms and things like that?  Would that go

22   in your case files?

23   A.    Yeah, they would be.  Before body cams,

24   the habit was audio recorders for --

25   Q.    Uh-huh.

36

1      A.      -- detectives in the field.

2      Q.      Uh-huh.

3      A.      And if it was interviews at headquarters,

4    those rooms were audio/video recorded.

5      Q.      Okay.

6      A.      So you would download copies of your

7    interviews and burn them to a disc and make them part

8    of a case file.

9      Q.      Okay.  Do you have any understanding of

10   how that's done now?  Like, for instance --

11     A.      Now they -- for the most part, SPD

12   utilizes evidence.com.  So it's a cloud-based storage

13   system --

14     Q.      Uh-huh.

15     A.      -- that's protected.  And they now have

16   pretty much fully gone to that.  So now what they do

17   is they would upload.  So, in fact --

18     Q.      Okay.

19     A.      -- I think evidence.com is part of Axion

20   [sic].  When -- Axon or Axion, whatever the name is,

21   probably is the provider of their body cameras, so

22   it's almost automatic.  They just need to go back and

23   tag it with the appropriate case number, and then it

24   goes into the evidence.com system under that case

25   number.

37

1      Q.      Okay.

2      A.      Now, I don't know all the ins and outs of

3  --

4      Q.      Right.

5      A.      -- evidence.com, so I can't speak to,

6  like, how case files are created within it --

7      Q.      Uh-huh.

8      A.      -- as far as how they do it, but they

9  would all be associated with the case number --

10     Q.      Okay.

11     A.      -- for the incident.  So, in particular

12 for this case that Mr. Parrish was involved in, I

13 have access to SPD's evidence.com.

14     Q.      Uh-huh.

15     A.      They granted us that for ease of use to

16 look at things --

17     Q.      Uh-huh.

18     A.      -- and further investigate things.  So

19 what I would do is go in and type in the case report

20 number for Charles Vinson's murder, and it should pop

21 up, which it does.  It's there.  There is a case

22 under that number.

23     Q.      Uh-huh.

24     A.      And then that'll show me everything that's

25 been uploaded for that case.

38

1       Q.      Okay.

2       A.      Now, if it's something that's never been

3   uploaded, you wouldn't know it's there.

4       Q.      Okay.

5       A.      You wouldn't even know it exists.

6       Q.      I got you.  Would there be a directive,

7   like, in your -- in the officer's case file that says

8   -- you know, if it had five interviews here down at

9   the station, you know, with Bob, Tom, Sally, or

10  whatever, that would inform the D.A.'s office that

11  these interviews took place on a certain date or

12  so-and-so?  That would tip them off that, hey, I need

13  to go to evidence.com and listen to these things?

14      A.      Yeah.

15      Q.      Or was there some kind of a map that

16  directed you guys there, or was it just something

17  that the D.A.'s office would just, you know, know to

18  first log in and just check it?

19      A.      The only way that I know for sure that you

20  can begin to determine what should exist is to read

21  the reports.

22      Q.      Okay.  Within the case files?

23      A.      Within the case files.

24      Q.      I got you.  I got you.

25              Within those case files, would you also

1    expect -- well, as an officer, would you put copies

2    of search warrants in the case files?

3         A.    Yes.

4         Q.    Would you put copies -- as an officer,

5    would you expect to see copies of search warrant

6    returns within an officer's case file?

7         A.    I expect that.  That was my habit at the

8    time when I was there.

9         Q.    Okay.  Tell me a little bit about, like,

10   as far as -- with a search warrant return, what would

11   you expect to see on -- what is the purpose of a

12   search warrant return?  Let me ask you that.  Scratch

13   that.

14        A.    Well, one, it's required by law.  But the

15   purpose of it is to return the search warrant to the

16   Court advising them whether or not it's been

17   executed.

18             If it has been executed and evidence has

19   been taken, then there has to be an inventory, which

20   is part of that return.

21             So you're telling the Court, yes, I

22   executed or, no, I didn't execute it.  And if you

23   didn't execute it, here is the inventory of the items

24   that were seized.  It gives almost an immediate

25   ability for a judge, if they want to really look at

1    it, to determine whether or not the items listed in

2    your inventory actually fit the scope of the warrant

3    or not.

4         Q.    Uh-huh.

5         A.    And there's been times where they asked

6    for a little more explanation, a little more detail

7    of what the inventory is to be sure of that.  That's

8    happened to me before.

9               So, obviously, if I execute a search

10   warrant, most especially taking someone's physical

11   property, they have a right to contest that.  Well,

12   if they go petition the Court to contest the

13   execution of the search warrant and we have not

14   returned the search warrant with an inventory to the

15   Court, the Court has no idea what's going on.

16        Q.    Okay.

17        A.    There's no ability to have a hearing about

18   returning property that might have been seized

19   outside the scope of the search warrant.

20              As things move forward for trial

21   proceedings and all the motions to suppress evidence,

22   that same problem can come up.  If you haven't

23   returned a search warrant, the Court has no record of

24   it because, right or wrong, the original warrant is

25   placed back in your hands as a detective.

41

1    Q.    Okay.

2    A.    So until I take that back to the Court,

3    have the judge sign the return, swear in the return,

4    and swear in the inventory and then go to the clerk's

5    office, it's not maintained by the Court.  It's all

6    in my possession.

7    Q.    So in that -- that's a good reason --

8    that's a good question.

9          So, for instance, if -- you know, a

10    detective, they have to go to a judge, generally, to

11    get a search warrant signed off --

12    A.    Yes.

13    Q.    -- on; correct?

14    A.    Yes.

15    Q.    And they have to present some basis of why

16    they need this particular search warrant?

17    A.    Right, probable cause that a crime has

18    occurred and the articulation of why I need to search

19    and seize these things related to this crime.

20    Q.    Okay.  And that's -- usually, the basis of

21    that is a sworn affidavit; is that --

22    A.    It is.

23    Q.    -- correct?

24          Okay.  And the detectives are not required

25    to supply, like, physical evidence or anything like

42

1    that?  It's just, I guess, a sufficient enough reason

2    that's under oath to a judge --

3        A.    Yes.

4        Q.    -- is that right?

5        A.    Yes.

6        Q.    All right.  And so the judge would sign

7    off. That warrant would come back to the detective at

8    that point.

9        A.    Yes.

10        Q.    Would the detective carry that with them?

11    Like, for instance if you were going to come in and

12    search my house --

13        A.    Uh-huh.

14        Q.    -- would you show up with the actual

15    signed search warrant, or would it be, like, a copy

16    of it or --

17        A.    I would show up with a copy of it.

18        Q.    Okay.

19        A.    I can tell you my -- my reading of the law

20    is that the judge should sign two copies of the

21    warrant.

22        Q.    Okay.

23        A.    So the affidavit and the warrant are two

24    separate things.  Right?

25        Q.    Right.

43

1      A.    Most judges sign one, but I need to make a

2   copy of that warrant.

3      Q.    Okay.

4      A.    I'm not leaving the original when I

5   execute that warrant, and -- I'm not leaving the

6   original copy at the scene of the execution.  I'm

7   leaving a copy of the warrant at the scene of the

8   execution of the warrant.  You're required by law to

9   provide a copy of the warrant to --

10     Q.    I got you.

11     A.    -- whoever of authority is there when you

12  execute the warrant.  It's not always the subject of

13  the warrant.

14     Q.    Right.

15     A.    They may not be there.

16     Q.    Yeah.

17     A.    But if I come to your house and you're not

18  there and we search the house and we go to leave,

19  somewhere in a place where it can be located, whether

20  it's tacked to the door or set inside the door on the

21  floor where you would have to step on it, that -- a

22  copy of that warrant must be left.

23     Q.    Right.  To let you know that you guys were

24  there and --

25     A.    Right.

44

1      Q.     -- you had authority to do --

2      A.     Right.

3      Q.     -- so?

4      A.     Right, that we -- we're not breaking the

5  law; we were here under the authority of the Court to

6  do this.

7      Q.     Okay.  And one of those copies, would you

8  just keep that in your case file?  Is that generally

9  --

10     A.     So --

11     Q.     -- how it worked?

12     A.     So what would happen in a situation -- and

13 it doesn't matter whether it's a house or whether I'm

14 sending this to a phone company or whatever it is.

15 Once I have the warrant signed by the judge, I have

16 10 days, in the State of Georgia, to execute the

17 warrant.

18     Q.     Okay.

19     A.     If I can't execute it within 10 days, I

20 have to go back to the judge and submit another

21 affidavit and request to execute the warrant again.

22 Now, that's to -- that's a safeguard to prevent

23 staleness of information.  That's what that 10 days

24 is for.

25     Q.     Okay.

1      A.     So -- I lost my train of thought -- once

2   I'd -- once we've executed the warrant --

3      Q.     Uh-huh.

4      A.     -- now what I'm required to do -- there is

5   no defined timeline in the statutes, but what I'm

6   required to do is submit the returns.  So I have to

7   return the originally signed affidavit --

8      Q.     Uh-huh.

9      A.     -- the originally signed search warrant to

10  the judge -- that's part of the return -- with an

11  inventory of any items seized, swear that in, that --

12  "Your Honor, this is what we took" --

13     Q.     Uh-huh.

14     A.     -- and then the judge will sign it.  The

15  affiant will sign it.  And then we take it to the

16  clerk's office, and it gets filed.

17     Q.     Under that particular --

18     A.     Under --

19     Q.     -- case?

20     A.     Under that case, yeah.

21     Q.     And is it -- and I appreciate this because

22  I, you know, am not in criminal law.

23            But, like, for instance, at that point,

24  like, there's usually some kind of State versus, you

25  know, Taylor Duff.

46

1        A.    Well, your --

2        Q.    And you would -- would you go to that

3    particular file, you know, and --

4        A.    So --

5              MR. DOVE:  Object to form.

6              THE WITNESS:  So there may or may not be

7        at that point.

8        Q.    (By Mr. Shipley)  Well, he found

9    everything at my house.  I don't know what was up.

10       A.    There may or may not be at that point.

11   The filing -- I can't speak to exactly how the

12   clerk's office handles the filing and case numbers.

13   If there's no indictment number --

14       Q.    Okay.

15       A.    -- then there -- I don't know how they

16   file it.  They'll have a method.  Right?

17             If there's an indictment -- let's say

18   someone's been accused, they've been indicted, and

19   this search warrant comes -- gets returned or is even

20   executed well after the investigation is continuing.

21   Then they will tag it with that indictment number.

22   And I think, at some point, they probably go back and

23   tag everything with the indictment number.  But until

24   there's been an indictment --

25       Q.    Yeah.

47

1      A.    -- or an accusation, they don't have a

2   court number to --

3      Q.    Right.

4      A.    So how they file prior to indictments or

5   prior to accusations, I do not know.

6      Q.    I got you.

7      A.    They have a method, because they can find

8   what you've done.  So they have a method to do it.

9      Q.    Yeah.  I'm in the dark on what a lot --

10     A.    Yeah.

11     Q.    -- of the clerk does down there, and they

12  will not tell you either.

13     A.    Yeah.

14     Q.    I got you.  So it could be under an

15  indictment number --

16     A.    Yeah.

17     Q.    -- when it's filed?

18     A.    Yeah.

19     Q.    Okay.  I got you.

20           Tell me again -- I think you touched on it

21  briefly.  But, if you could, just explain.

22           Why is it so important that a search

23  warrant return is filed after a warrant is executed

24  and evidence taken?

25     A.    Well, part of it is the law says I must.

48

1       Q.      Correct.

2       A.      It doesn't explain why.

3       Q.      Okay.

4       A.      So I infer why.  I infer the why because

5   it is a document that was issued by the Court.

6       Q.      Uh-huh.

7       A.      It is -- obviously, we have -- we have

8   walked or gone somewhere that normally we could not

9   do without the Court allowing us to do it, the whole

10  purpose of the search warrant.  We have taken things,

11  and we need to justify to the Court that we took the

12  things that we requested as authorized by the search

13  warrant.

14          And then it gets into, obviously, I know

15  everything seized can be contested.

16      Q.      Uh-huh.

17      A.      And it will be.

18      Q.      Uh-huh.

19      A.      Most of it will be at some point as trial

20  proceedings move forward.  So there has to be a

21  record on file somewhere for the Court to know what's

22  going on.  And I think, really, the main purpose of

23  the law saying it's got to be returned is because

24  that is a court order.

25              (Plaintiffs' Exhibit Number 2 was marked

49

1    for identification.)

2         Q.    (By Mr. Shipley)  Okay.  And then -- let

3    me show you what I've marked as Exhibit 2.  And I'll

4    represent to you this is City of Savannah Police

5    Department's orders on search and seizures.  Let me

6    show you that.

7              Have you ever seen that before?

8         A.    (No response.)

9         Q.    And, really, I just kind of want to take a

10   look through it.  I'm going to ask you about Page 2

11   of 13.

12        A.    Yeah.  It looks -- you know, it's been a

13   long time since I would have read policy --

14        Q.    Uh-huh.

15        A.    -- obviously --

16        Q.    Uh-huh.

17        A.    -- but the wording in -- it all sounds

18   very familiar to the policy that would have existed.

19   So if they've -- I mean, I see they have revision

20   dates, but --

21        Q.    Yeah.  I think the last -- I mean, the --

22        A.    I don't know what the changes would be.

23        Q.    They're 2010 through '20.  If you would

24   look on Page 2 of 13, I have it highlighted for you.

25   It says "Requirements for a Search Warrant Return.

50

1    A, must list" --

2         A.    Uh-huh.

3         Q.    -- "everything seized; B, must be made in

4    a timely manner (No legal limit Metro police [sic]

5    time limit of 5 days."

6         A.    Uh-huh.

7         Q.    "Must be sworn before a judge or [sic] the

8    same court that issued the warrant; and, D, Must be

9    made available the subject of warrant upon request."

10        A.    Yes.

11        Q.    You know -- and I know you don't remember

12   -- you may not remember, but was your recollection --

13   and I'll ask you -- that those had to be -- the

14   search warrant returns filed within 5 days upon its

15   execution?

16        A.    I have no memory of that wording existing

17   in my time there.

18        Q.    Okay.  Were you given directives from

19   anybody in a supervisory role or within the

20   department on a time period during your time when you

21   were there?  I mean --

22             MR. DOVE:  Object to form.

23             MR. SHIPLEY:  Okay.

24             THE WITNESS:  Okay.

25        Q.    (By Mr. Shipley)  You can answer.  I can

51

1    rephrase that.  He can -- I mean, I understand the

2    objection.

3        A.    I have no memory of what the policy may

4    have said at that time.  The only verbal direction

5    would have been, "Make sure that your search warrants

6    are returned when you're putting a case file

7    together."

8              So, in other words, if we've arrested

9    somebody and the adversarial process is going to

10   begin, you need to get that documentation back to the

11   Court.

12       Q.    Okay.

13       A.    So that would be -- I can't remember any

14   specific policy that said anything.  And to be honest

15   -- and I've been asked this before, and I'll just

16   keep expanding on this unless you don't want me to.

17             I've been asked what do I think is

18   appropriate.  Well, I don't really have an answer for

19   that, what's an appropriate time to get it back to

20   the Court.

21       Q.    Uh-huh.

22       A.    I've seen warrants returned as quick as a

23   couple weeks.  I've seen warrants that take months to

24   get back.

25       Q.    Uh-huh.

52

1          A.    But --

2          Q.    Following the obtain -- following the

3     execution of the warrant or --

4          A.    Yeah.

5          Q.    Okay.

6          A.    Yeah, yeah, because one of the things

7     that's -- that I take into consideration is when

8     you're dealing with a busy office that's working

9     active investigations, it's -- the convenience of

10    tying down the judge to get back and every -- all the

11    other things you're doing, I can only speak to what I

12    saw done and what I did myself when I was there.

13             And that would be that once I've arrested

14    somebody, I know I must complete a case file.  I know

15    I must turn reports, evidentiary material over to the

16    district attorney's office.  And I know those search

17    warrants must get returned to the Court because

18    someone, at some point down the road, is going to

19    start asking for them.

20         Q.    Okay.

21         A.    So -- and that could be -- so if it took

22    me 2 months to make an arrest --

23         Q.    Uh-huh.

24         A.    -- it might be 2 months that I have all my

25    warrants together.  I'm going back to that judge that

53

1    signed, you know, 15 warrants for me --

2        Q.    Uh-huh.

3        A.    -- "Your Honor, I need to return all

4    these."

5            And we'd sit down and do all the returns

6    on those warrants, and I'd take them to the clerk's

7    office and file them.

8        Q.    Okay.  Let me ask you this.

9            As a police -- when you were -- as a

10   police officer, was it your understanding that you

11   were required to follow the rules and procedures of

12   the Savannah Police Department?

13       A.    Oh, absolutely.  So --

14           MR. DOVE:  I'm going to object to form.

15       But --

16           MR. SHIPLEY:  Okay.

17           THE WITNESS:  Yes.  And I freely admit if

18       there was -- if, within the policy, it told me

19       to do it within so many days, then I obviously

20       would have been violating the policy.

21       Q.    (By Mr. Shipley)  Okay.

22       A.    And I would have been doing that knowingly

23   at the time.  I don't know if we had a policy that

24   dictated days.  I don't remember this 5 days.

25       Q.    That's fair.

54

1          A.      That may be something new.

2          Q.      Fair enough.

3          A.      Yeah.

4          Q.      And I just want to touch briefly on the

5     effect of these search warrant returns and their

6     filing with the Court.  You obviously take out a

7     search warrant.  You obtain evidence.

8               And without that search warrant return, is

9     there any evidence that that -- or -- that's a bad --

10    that's kind of a duplicative word, but is there any

11    evidence that the evidence that you obtained through

12    that search warrant exists?

13         A.      No.

14         Q.      Okay.

15         A.      No.  And that's -- I think I commented on

16    that earlier.  What's strange here is they're handing

17    the -- back the warrant that was signed.

18         Q.      Uh-huh.

19         A.      There's no copy that's remaining with the

20    judge or the clerk's office.  So I have the

21    originals, and I leave with the originals --

22         Q.      Uh-huh.

23         A.      -- and I execute them or don't execute

24    them.

25         Q.      Uh-huh.

55

1          A.    And the only way you know that I've

2    executed or not executed is I take it back.

3          Q.    Okay.

4          A.    It's not like the judge is going to

5    remember how many search warrants they signed --

6          Q.    What if --

7          A.    -- this week alone.

8                You see what I'm getting at?

9          Q.    Yeah.  What about the accused and the

10   accused's attorneys?  Would they have any record that

11   this evidence was taken?  What's your understanding

12   on that?

13         A.    Well, when you took evidence, more so

14   physical evidence than, say, something digital that

15   you don't yourself possess -- so cell records, you

16   don't possess.  The data within your phone, you may

17   not necessarily possess it.  You may get your phone

18   back.

19         Q.    Uh-huh.

20         A.    We might take your physical phone and

21   extract it and give you the phone back, but we may

22   keep the phone depending on the situation.

23                Physically, if I went to your house and

24   executed a search warrant and removed items from your

25   house, then, yes, by policy, that I remember back

56

1    then, we would leave a copy of the search warrant,

2    and we would also write down an inventory.  It could

3    be on the back of the search warrant, "These are all

4    the items seized in the execution of this search

5    warrant," and we --

6         Q.    Uh-huh.

7         A.    -- would make a list of everything that we

8    took.  And that's how you, the person either

9    responsible for the property or the person that's the

10   subject of the search warrant, would know what we

11   took at that time.

12             So you would know.  No one else would know

13   --

14        Q.    Right.

15        A.    -- except the officers involved in the

16   search warrant.  And the courts won't know, and the

17   D.A.'s office won't know until there's some type of

18   documentation or I tell you that these things were

19   done.

20        Q.    I got you.  So, you know, the person who

21   was searched -- the only possible way, without a

22   search warrant return, to know that, you know,

23   certain, you know, pieces of evidence were taken,

24   maybe, during a search of their home is if a search

25   warrant was left --

57

1     A.     Uh-huh.

2     Q.     -- with the items --

3     A.     Yeah, with an inventory.

4     Q.     The person who is accused -- and maybe

5  they go do a search warrant on, you know, a potential

6  witness or another potential codefendant or another

7  business.

8          They're not going to have any evidence

9  that, you know, that potential business or other

10  codefendant was searched, are they?

11    A.     I don't know that they would have any way

12  to directly know what else we're doing.

13    Q.     Okay.

14    A.     Somebody would have to tell them.

15    Q.     Okay.

16    A.     They'd have to find out.

17    Q.     But the filing of the return is the

18  trigger?  It just tells everybody, "Hey, we did it."

19    A.     Yeah.

20    Q.     "We completed the search.  Here's the

21  evidence that we got"?

22    A.     Yes.

23    Q.     Okay.  I understand.

24          All right.  We've talked a little bit

25  about -- and I appreciate everything.  I'm just

58

1    trying to understand the procedure --

2         A.    Okay.

3         Q.    -- on how case files and search warrants

4    and everything work, and I appreciate that

5    explanation.  I want to move a little bit now into

6    your interactions with Detective Wood.

7         A.    Okay.

8         Q.    And it's true you've had multiple

9    interactions with Detective Wood regarding Marquis

10   Parrish's case; is that --

11        A.    Yeah, yes.

12        Q.    -- correct?

13        A.    Yes.

14        Q.    Okay.  Can you just tell us a little bit

15   about how you got brought into dealing with --

16   interacting with Detective Wood about Marquis

17   Parrish's case.

18        A.    Yes.  So March 21st of 2023 --

19        Q.    Uh-huh.

20        A.    -- was the first time I had any

21   involvement in this case.  At that point, there was a

22   suppression hearing within a day or two --

23        Q.    Uh-huh.

24        A.    -- regarding evidence seized through

25   search warrants.  A.D.A. DeBlasiis directed me to go

59

1    through the case file.  This is the part I can't

2    answer.  I'm just telling you what I've been directed

3    to do.  I don't know what was going on before that.

4         Q.    Uh-huh.

5         A.    But they knew there seemed to be some

6    missing information, and they wanted me to go through

7    the case file, try to determine what we had and

8    didn't have --

9         Q.    Uh-huh.

10        A.    -- and then report back to them as soon as

11   possible on that.  And I knew some of this issue was

12   related to the search warrants, so that's when it

13   started.

14             I started looking at the search warrants

15   that day, and the first thing that caught my eye,

16   which wasn't really a big deal at first, was -- what

17   I was looking at was just copies of the affidavit and

18   the warrant themselves.  There was no stamp, so I

19   knew they hadn't been returned to the clerk.

20        Q.    Uh-huh.

21        A.    So there was no stamp where they had been

22   certified, returned to the Court, and there obviously

23   was no inventory attached to them.  So I was like,

24   well, have -- my first question then was:  Have these

25   been returned?

1          And I was notified they had not, and I

2     would later confirm that with the clerk's office,

3     that they had not.  I also confirmed it with

4     Detective Wood at the time.

5          A couple days later, SPD had told her to

6     contact our office.  I was told that she would be

7     calling me and that it was my responsibility to get

8     with her, figure out what, if anything, we were

9     missing related to this case.  I think it was set for

10    trial in May, so this is March running into April.

11         Q.    March 23rd; right?

12         A.    Yeah.  And so she called me and told me

13    her first availability.  So this is like a Wednesday

14    or a Thursday.  She called me and told me her

15    availability would be the following Monday, which we

16    met on March 27th.  She came to my office.

17         Prior to coming to the office, I asked

18    her, "Do you have everything?  Do you have a copy of

19    everything related to this case?"

20         She said, "Yes, I do."

21         I said, "Okay.  Because I have to sit down

22    now from the day we talk through the weekend and

23    figure out what it is that I expect to see "--

24         Q.    Uh-huh.

25         A.    -- "and then we'll compare notes come

61

1   Monday."

2          So I spent the weekend -- the rest of that

3   week and the weekend going through the report,

4   reading it, identifying all the things that I expect

5   to see.  So if you say you served a search warrant,

6   well, I -- now I need to account for the warrant.  I

7   need to account for anything seized.  If you

8   interviewed somebody and said it's recorded --

9   whether you say it's recorded or not, I'm going to

10  find out.  Do we have a recording of the interview?

11  Was it recorded, yes or no?  Do we have it?  Can you

12  get it?  All those things I had to figure out over

13  the weekend.

14          Come Monday -- she came to my office at

15  9:00 Monday, the 27th, met with me and a paralegal at

16  that time, Rashelle (phonetic) Wallace.  Rashelle

17  also was making sure that we had all the information

18  we needed for discovery to send to the defense

19  attorneys.

20          So by that point, I think she was just --

21  I won't say -- I don't need to say stuff I don't know

22  for sure, but we were double-checking everything --

23      Q.    Uh-huh.

24      A.    -- what we had in physical files that were

25  provided by Detective Wood, what was uploaded in

1    evidence.com, and then checking the list, making sure

2    do --

3        Q.    Uh-huh.

4        A.    -- we have this?  Do we have this?  Do we

5    have this?  Do we have this?

6            And at the end of that meeting, there were

7    several items related to search warrants that still

8    could not be accounted for, so, in other words, the

9    actual data that was sought through these warrants.

10   These all related to data maintained by a third-party

11   company, whether they be cell -- cellular data or

12   financial data or transaction-type data.

13           So she had no copies of that information,

14   so where is it?

15       Q.    Let me stop you right there.  We'll jump

16   back into it again.

17           I think you said this was the -- March

18   27th, the initial meeting you had --

19       A.    The initial --

20       Q.    -- with her?

21       A.    -- meeting was the 27th.

22       Q.    Okay.  And so when you sat down, did she

23   bring you any of the materials during that initial

24   meeting?

25       A.    She said everything would be on her

63

1    laptop, so she --

2        Q.    Uh-huh.

3        A.    -- brought her laptop.

4        Q.    Okay.

5        A.    So, yes, there were things that were

6    stored on her laptop that --

7        Q.    Right.

8        A.    -- she had.  And what we then would do

9    would be make a copy of that --

10        Q.    Make a copy then.

11        A.    -- make a copy of that, add it to -- at

12    that point, Rashelle was putting -- was basically

13    building a total new discovery packet all on a hard

14    drive --

15        Q.    I got you.

16        A.    -- a big travel drive --

17        Q.    Right.

18        A.    -- so that we could resubmit anything to

19    any defense attorney that wanted to ask for the

20    information again.  So, basically, at that point, we

21    were double-checking.

22        Q.    Okay.

23        A.    So what -- there were things that she had

24    that we didn't have --

25        Q.    Uh-huh.

1  A. -- that we then copied from her laptop.

2  Q. During that initial meeting?

3  A. During that initial meeting.

4  Q. Well, let me back up.

5  When you -- did you have an opportunity --

6 well, first of all, was there a case file with the

7 D.A.'s office when you were first asked, I think,

8 back in March -- early March -- March 21st or '2nd to

9 start looking into this --

10  A. Uh-huh.

11  Q. -- I guess to look -- start looking for

12 the evidence that Detective Woods [sic] had gathered

13 on Mr. Parrish?

14  A. Yeah.  So by that point, obviously, we --

15  Q. Before you had met with her?

16  A. Yeah.  Oh, yeah, yeah, yeah, yeah.  By

17 that point, we had already been provided two binders

18 --

19  Q. Uh-huh.

20  A. -- from SPD.  I can't tell you who brought

21 them over, but they were two binders that were case

22 file material related to the case.  Those actually

23 were delivered -- I made a note of what's in our . .

24 .

25  Q. I think it's February --

65

1      A.      February . . .

2      Q.      16th; is that right?

3      A.      16th, yeah.

4              So by February 16th, we had two large

5      binders delivered to our office that was case file

6      material related to Charles Vinson's murder.  And

7      that was given to A.D.A. Gibson.  She was assigned

8      the case at the time.  There was also information

9      already uploaded into evidence.com.

10              So by March of 2023 --

11      Q.      Uh-huh.

12      A.      -- when I'm asked to look at this, we have

13      the case file binders that had been delivered back in

14      February of 2022.  We also have already downloaded

15      any information that existed on evidence.com at that

16      time.  And so I was provided the binders and a copy

17      of that data.  So between a copy of the evidence.com

18      data and --

19      Q.      Uh-huh.

20      A.      -- reading through the binders -- and

21      there were some disks in the binders, too, of, like,

22      interviews and other things.

23      Q.      Uh-huh.

24      A.      I sat down, read the reports, made a list

25      identifying all the things that should exist based on

66

1    the investigative narratives, and started comparing

2    that to a list of all the things that I knew we had.

3        Q.    Okay.

4        A.    Then when we met with Detective Wood on

5    December 27th of 2023, it was, "Okay. Wood, I'm

6    missing this. Do you have this?"

7        Q.    Uh-huh.

8        A.    And so she would look and see if she did,

9    and then we'd go to the next thing.

10           "We're missing this. Do you have this?"

11       Q.    Okay.

12       A.    And we'd keep going.

13           And at the end of that day, we were still

14   dealing with information from six different search

15   warrants that there has to be -- there has to be an

16   answer.

17       Q.    Uh-huh.

18       A.    Right?

19           So if data doesn't exist, that's fine. It

20   doesn't exist. But there should have been an answer

21   from the company that you served the search warrant

22   to that this data doesn't exist.

23           So, basically, at the end of that day, for

24   six different search warrants, we were missing data

25   or a valid answer for whether or not that data

67

1    existed or didn't exist.

2        Q.    Okay.  And that just -- I wanted to ask

3    you about those search warrants.

4            When you first looked at these binders, do

5    you remember approximately how many search warrants

6    were taken out in regards to Charles Vinson's murder

7    case?

8        A.    My count was 36.

9        Q.    Okay.  And of --

10       A.    So --

11       Q.    Of those search warrants that were issued,

12   do you have any recollection about how many search

13   warrant returns were filed for those 36?

14       A.    Yeah.

15       Q.    Yes.  How many?

16       A.    None.

17       Q.    None.  Okay.

18           And I'm going to go ahead at this time and

19   just mark Plaintiffs' Exhibit 3, which is the notes,

20   I'll represent, that you brought today --

21       A.    Yeah.

22       Q.    -- kind of a timeline of the way the case

23   happened.  I just want to go ahead and put that into

24   the record so you can refer to it.

25       A.    Okay.

68

1      Q.    I know we're talking about it a lot, so we
2   might as well go ahead and get it in there.
3           (Plaintiffs' Exhibit Number 3 was marked
4   for identification.)
5      Q.    (By Mr. Shipley)  Okay.  So -- let's see.
6   So the first time -- your understanding is -- it
7   looks like, back in February of '22, two large
8   binders get delivered to the A.D.A.'s office.
9           That's the first time?
10     A.    Correct, correct.
11     Q.    Is that your understanding?
12     A.    Correct.
13     Q.    And around February 11th, an evidence.com
14  case was created; right?
15     A.    Yeah.  It -- there's -- under SPD's case
16  number --
17     Q.    Uh-huh.
18     A.    -- for this murder, there are actually two
19  case files that were created.  The first one was
20  created on February the 11th of 2022.
21     Q.    Uh-huh.
22     A.    Now, that's the date the -- the formal
23  case file was created within evidence.com.
24     Q.    Uh-huh.
25     A.    There had already been case-related

69

1  material uploaded --

2      Q.    Uh-huh.

3      A.    -- into evidence.com prior to that.  So

4  from the beginning of the investigation and in the

5  months moving forward, certain things had already

6  been uploaded under that case number.

7      Q.    Okay.

8      A.    It just had not -- evidence.com had not

9  been told to put it into a case file until February

10  11th.

11      Q.    It just hadn't been labeled?

12      A.    Yeah.

13      Q.    Okay.

14      A.    Yeah.

15      Q.    I got you.

16      A.    Yeah.

17      Q.    And I just want to mark what I have as --

18  it's actually a transcript from a motion hearing with

19  -- it looks like, actually, Shalena Cook herself

20  showed up.

21      A.    Yes.

22      Q.    And then there's Katherine Kelly on behalf

23  of Marquis Parrish.  It took place the 22nd of March,

24  2023, in front of the Honorable John Morse.  I just

25  want to show you a copy of that.

70

1      A.      Uh-huh.

2              (Plaintiffs' Exhibit Number 4 was marked

3      for identification.)

4      Q.      (By Mr. Shipley)  Is that the -- you had

5      referenced that there was a hearing, you know, that

6      had occurred, I think, right around or about the time

7      when you got involved in this case; right?

8      A.      Yes.

9      Q.      Did you have a conversation with somebody,

10     either an A.D.A. -- that said, "Hey, listen.  We just

11     got a -- we've got a suppression hearing coming up.

12     It looks like we're missing some things.  I need you

13     involved," or was it after the hearing that had

14     occurred?

15     A.      Yes.  That was part of when A.D.A.

16     DeBlasiis told me to start looking at this

17     information on March 21st.

18     Q.      Okay.

19     A.      That was part of that conversation.  I

20     knew that D.A. Jones was going to have to handle that

21     motion hearing the next day, and they already -- from

22     what they had looked at, I had been told, "We don't

23     know what has been seized through" --

24     Q.      Uh-huh.

25     A.      -- "these search warrants."

71

1    Q.    Okay.

2    A.    So that's kind of how it all started.    I

3    knew there may be an issue with documentation, at a

4    minimum, of what's been collected through these

5    search warrants.    And I remember that motion hearing

6    because D.A. Jones made me go to that motion hearing.

7    Q.    You were the -- you attended?

8    A.    So I was present.

9    Q.    Okay.    Yeah.    And I just want to ask you a

10   few questions about that.    If you could switch to

11   Page 3, and I'll just kind of direct you.

12            So, obviously, this was taken under oath.

13   Kind of in the middle of Line 14 with Ms. Kelly, who

14   is representing Mr. Parrish, it talks about two

15   motions.

16            "I have a motion to compel discovery that

17   is based on, well, the lack of discovery."

18            And the Court says, "Can you be more

19   specific, ma'am?"

20            And she kind of rattles off, over the next

21   couple of pages, a list of items.    And just for

22   brevity's sake, she mentions messages from the

23   victim's family from Facebook; body-worn cameras of

24   the traffic stop; camera footage of the rental car;

25   four, phone call of the codefendant; five, DNA swabs

72

1   and fingerprints; six, "I don't have a coroner's

2   report"; seven, "There was a map that was sent to the

3   victim's family"; eight, "There was Cash App that

4   were exchanged.  I do not have that"; nine, I don't

5   have search warrant returns, including any of the 11

6   -- or 10 cell phone dumps; and then another item, a

7   lot of the testing that's been done from the rental

8   car in the matter.

9        A.    Uh-huh.

10       Q.    And then, finally, on Page 5, they --

11   there's a discussion about the Walmart videos were

12   sent to us in excess of 67 hours --

13        A.    Uh-huh.

14       Q.    -- based on Detective Wood's affidavit,

15   the search warrant, and in her police report that she

16   alleges she saw my client on those, and they don't

17   know what portion of the tape.

18          Is that -- and I know it's been a little

19   bit of time, back in '22, and you said you attended

20   that hearing.

21          Is that somewhat your recollection of the

22   items that Mr. Parrish's attorney was looking for at

23   that point?

24       A.    Yes.  The -- I think the Walmart video was

25   one of those issues that I was already aware of, and

73

1    I had spent some time looking at it.  I couldn't tell

2    you the items Ms. Kelly was talking about during that

3    motion hearing.

4         Q.    Uh-huh.

5         A.    I couldn't tell you the status of all

6    those items at that time because I had not had --

7         Q.    Yes, sir.

8         A.    -- time to deep dive into it.

9              To be very specific in here, I would have

10   to go back and research a bunch of stuff.  But I can

11   tell you that some of the stuff Ms. Kelly was

12   claiming she couldn't find was a matter of navigating

13   files that she did have, just -- like having to go

14   back and point her to stuff she had.  And then some

15   of the things that -- especially related to the

16   search warrants --

17        Q.    Uh-huh.

18        A.    -- would be true.  You didn't have the

19   data because we didn't have the data.  Therefore, we

20   could not have provided it in discovery.  So we

21   didn't even know whether it existed or didn't exist.

22        Q.    Okay.  And would that have been some of

23   the recorded conversations or interviews or anything

24   like that or . . .

25        A.    Everything related to missing information

74

1   related to search warrants was all maintained by a

2   third party and was related to the things like the

3   Cash App or some of the Facebook stuff or Instagram

4   stuff --

5       Q.    Uh-huh.

6       A.    -- or cellular records, tower dumps, and

7   cell records.

8       Q.    Okay.  What about, like, physical evidence

9   such as fingerprinting, you know, shell casings?

10      A.    That, I would find out as I went through

11  the case.  You know, we had DNA swab -- or they --

12  the SPD had DNA swabs, ballistic evidence, things

13  like that that had never been delivered to the GBI.

14  So there was --

15      Q.    Uh-huh.

16      A.    There had been no scientific evaluation of

17  any of that, so the value of it was unknown.

18      Q.    Where was that held?  Did you later --

19      A.    Well --

20      Q.    Did you ever find out where all that

21  information was?

22      A.    Yeah.  Physically, it was still all in

23  Savannah's property room -- Savannah Police

24  Department's property room.

25      Q.    Okay.

75

1          A.    And then, eventually, I would get some of

2    it out to the GBI, and I think maybe Detective Wood

3    would get some of it to the GBI.  But we made

4    arrangements to make sure it all got to the GBI.  And

5    that became another continuance in this case was --

6    was -- "Your Honor, can we have time to test this

7    stuff?"  He granted it.

8          Q.    Okay.  And any of that evidence, that just

9    -- you know, shell casings, fingerprinting, things

10   like that, that obviously required a search warrant

11   to search these vehicles or people's homes to get

12   these particular items; correct?

13              MR. COX:  Objection to form.

14              THE WITNESS:  I'm -- let me think for just

15         a second, especially related to any of the

16         ballistic stuff.  I know there was a shell

17         casing that was recovered from the rental

18         vehicle that was involved in this.  This -- the

19         rental vehicle was the suspected crime scene for

20         Charles Vinson's death.

21              Now, I don't know -- I don't have

22         recollection of whether that was a search

23         warrant or not or whether that was volunteered

24         by the owner of the vehicle.  DNA swabs --

25         Q.    (By Mr. Shipley)  Uh-huh.

76

1       A.    -- especially from a person -- so that

2   would have been any one of the three defendants.  I

3   don't believe --

4       Q.    Uh-huh.

5       A.    -- they were all swabbed.  But that all

6   would have been done through search warrants.

7       Q.    Okay.  And the only way that anybody who

8   -- for instance, Mr. Parrish or his lawyers could

9   know that that material existed would -- I mean, you

10  tell me.  You said --

11      A.    So --

12      Q.    -- there's a combination --

13      A.    So you would have to be -- you would have

14  to be present for the execution of the warrant to

15  have knowledge that it was executed and that

16  something was seized --

17      Q.    Okay.

18      A.    -- or you would have to learn it through

19  some other means somehow.

20      Q.    Because there was no search warrant return

21  filed?

22      A.    Because I'm not leaving you -- I'm not --

23  one, I wouldn't be handing you an inventory and your

24  copy of the search warrant and I would not have

25  returned it to the Court --

77

1      Q.    Okay.

2      A.    -- to file.

3      Q.    Okay.

4      A.    So yeah.

5      Q.    Okay.  Did Detective Woods [sic] -- was

6   she maintaining any of the evidence that you sought

7   on her personal computer?

8      A.    It wasn't her personal computer.  It was

9   the department's computer.

10     Q.    Okay.  Was it a laptop?

11     A.    It was a laptop.  But I do know that some

12  of the stuff we were missing was on that computer.

13  We were able to make copies of it.

14     Q.    That particular computer, was she allowed

15  to take that home with her, or was it --

16     A.    I have no --

17     Q.    Don't know?

18     A.    No clue.

19     Q.    Did she provide that laptop to you guys so

20  that you were able to extract it, or did Detective

21  Woods [sic] just simply provide the information you

22  were looking for?

23     A.    She provided the information.  So she

24  brought the computer, sat down.  We had all our stuff

25  up on a big TV just like you have right here --

78

1      Q.      Yeah.

2      A.      -- going through our files and opening

3   them and exploring everything that was there,

4   double-checking ourselves.  Things that we didn't

5   have, she would search her computer for.  If she

6   found them, we would transfer them to our drive that

7   we were putting all discovery information on.

8      Q.      Okay.

9      A.      So that's what was happening.

10     Q.      I'm going to show you what I'm going to

11   mark as --

12          MR. SHIPLEY:  What number am I on?  This

13       will be 5?

14          COURT REPORTER:  5.

15          MR. SHIPLEY:  I should know that.

16          (Plaintiffs' Exhibit Number 5 was marked

17   for identification.)

18     Q.      (By Mr. Shipley)  This is an email that I

19   believe the defendants have provided.  It's between

20   Ashley Wood and Alan Sammons, and it is dated, I'll

21   represent to you, March the 22nd of 23rd [sic].  And

22   I think what -- I guess prior to this email, there's

23   an email from you to Ashley Wood at -- on March 22nd,

24   2023, at 1:15.  I know it's been some time now --

25     A.      Uh-huh, uh-huh.

79

1      Q.      -- a little over a year.

2              Do you remember sending that email to --

3      A.      Uh-huh.

4      Q.      -- Ashley Wood?

5      A.      I do.

6      Q.      Okay.  And that would have been 1 day

7   after the March 22nd suppression hearing; is that

8   correct?

9      A.      Yes.

10     Q.      Okay.  And it's got the -- a list of items

11  that -- apparently.

12              Is that what you're looking for from

13  Ashley Wood?

14     A.      So this comes from an email that -- the

15  contents of this email for March 22nd, 2023, at

16  1:15 p.m. is cut and pasted directly from an email

17  sent by D.A. Jones to me --

18     Q.      Uh-huh.

19     A.      -- saying this -- "I want answers to all

20  these questions."

21     Q.      Okay.

22     A.      These are questions only Detective Wood or

23  somebody at the police department could answer, so I

24  copied and pasted them and forwarded it to Detective

25  Wood.

80

1          And her response, which was on the --
2    let's see.  When did I -- yeah.  Her response, which
3    came the next day, the -- March 22nd, 2023, at 1:52
4    p.m., was "Copy.  Thank you."
5         Q.   Okay.  Was this -- do you remember if this
6    was the first email that you had sent to Detective
7    Woods [sic] about starting the process of trying to
8    retrieve the items that the D.A. was looking for?
9         A.   I -- it is very possible there may have
10   been another email prior to this.  I would have to go
11   back and look.
12        Q.   I understand.  I understand.  Okay.  Let
13   me see.
14             MR. SHIPLEY:  And I'm getting close to
15        being finished.  I mean, I'd say take a break,
16        but I think I only have a few more questions if
17        y'all just want to run through it or . . .
18             MR. DOVE:  Yeah.  I mean, that's fine.  If
19        you want to take a break when he's done, I may
20        just organize my thoughts a little bit because
21        I've got notes all over the place.
22             MR. SHIPLEY:  Yeah, yeah, yeah.  I
23        understand.
24             THE WITNESS:  I'm fine.
25             MR. SHIPLEY:  Yeah.  I think I may have 5

81

1      or 10 more minutes of questions.  Then --

2           MR. DOVE:  Yeah, yeah.

3           MR. SHIPLEY:  We might as well run through

4      it.

5      Q.    (By Mr. Shipley)  I think I'm going to

6  show you -- it's a series of emails.  And I apologize

7  if they're somewhat out of order, but I think I can

8  point you to them.  I'm going to mark them as

9  Plaintiffs' Exhibit 6.  And they were provided by

10 City of Savannah.  It's been a prior exhibit in one

11 of the depositions before.  Bear with me here.

12          (Plaintiffs' Exhibit Number 6 was marked

13 for identification.)

14     Q.    (By Mr. Shipley)  All right.  They're kind

15 of all over the place.  Let me see if I can direct

16 you.

17          Okay.  Could you look at -- and I've --

18 there's a Bates stamp number at the bottom of this --

19 no.  Excuse me.  Yeah, there is a Bates stamp number.

20 So let's go to -259.  Can you look in the bottom

21 right-hand corner.  It's SAV000259.

22     A.    Okay.

23     Q.    All right.  Do you remember -- let's see.

24 There is an email from -- and I apologize.  There's

25 something that's cut off from the top.  It's to Brian

82

1    from Kristen.

2           Do you know Brian and Kristen -- who

3    Kristen would be?

4        A.    All right.  I'm trying to . . .

5        Q.    I should have brought in -258, but I

6    neglected to.

7        A.    Sir, I don't have a -258.

8           Do you?

9        Q.    I don't either.  And, you know, I think

10   these things got cut and --

11       A.    So --

12       Q.    -- pasted.

13       A.    -- let me --

14       Q.    I just -- do you know -- Brian --

15       A.    All right.  So --

16       Q.    -- DeBlasiis, obviously.

17       A.    Brian is Brian DeBlasiis.

18       Q.    Uh-huh.

19       A.    Kristen -- because of the content of what

20   this email is talking about and it's signed

21   "Kristen," it would make me believe that's Kristen

22   Fripp, who --

23       Q.    Uh-huh.

24       A.    -- was the -- was a lab supervisor at the

25   GBI because they're -- especially since they're

83

1    talking about testing swabs and DNA.

2         Q.    Okay.  So -- and that's what I'm just

3    trying to figure out.  And I -- I'll -- I can find

4    -258 to know the exact person who it was sent to.

5         A.    Uh-huh.

6         Q.    Does it appear to you that -- this is from

7    Kristen Fripp with the GBI, and she's asking certain

8    specific and pointed questions about the evidence

9    that was just somehow submitted from, I guess, your

10   -- either the D.A.'s office or the Savannah Police

11   Department?

12        A.    Yes.  These -- basically, she's asking for

13   explanations on some of the things submitted.  So I

14   couldn't tell you who's -- without the full chain

15   here --

16        Q.    I know.  I apologize for that.  It --

17        A.    So I -- you know, I don't want to say who

18   submitted the evidence because I can't remember, so

19   what I'm going to say is what she's getting at is,

20   basically, "Hey, we have all this evidence dumped out

21   here."

22        Q.    Yeah.

23        A.    "What the hell is it?  What does it

24   pertain to?"

25        Q.    Okay.

84

1      A.    They like to have a little understanding

2    of this is a swab from what.

3      Q.    Right, right.  It gives them an idea of

4    what --

5      A.    Yeah.

6      Q.    -- they're looking for?

7      A.    Yeah.  "What do I need to compare it to?"

8      Q.    Let me ask you this general question.  As

9    far as -- you know, she's referring to a bunch of

10   evidence that's just been submitted to her in the

11   murder of Charles Vinson's case.

12         Do you know if -- and we can go back and

13   look at the date on this thing.  Don't guess.  It's

14   whether or not that this was evidence that was

15   obtained from Woods [sic] following your

16   investigation or . . .

17     A.    This evidence would have been submitted to

18   them, I think, prompted by -- after the March 27th,

19   2023, meeting when --

20     Q.    Suppression hearing?

21     A.    Yeah.

22         -- when it's like, "Hey, none of this

23   stuff's been to the lab."

24     Q.    Okay.

25     A.    Pretty much, I can remember I detailed an

85

1    email to at least Brian, perhaps my supervisor as

2    well -- maybe D.A. Jones was copied on it -- that

3    said -- that was an update like, "Hey, I've gone

4    through this case.  This is what I'm seeing that

5    needs to be addressed."

6            And a lot of it contained things related

7    to physical evidence that needed to be examined, so

8    it needed to get to the lab and needed to be

9    examined.  And this would be -- this would kind of be

10   a product of that, our efforts of trying to get stuff

11   out to the lab and get it tested.

12       Q.    Okay.

13       A.    And so it got there, and then the lab -- a

14   lab supervisor is trying to get an understanding of

15   what the evidence is and what its relevance is in the

16   case --

17       Q.    Uh-huh.

18       A.    -- so they can prioritize certain testing

19   or maybe even do comparison work to other items of

20   evidence.  But they have to have some type of

21   understanding, so there was no detail provided to

22   them, apparently.

23       Q.    Okay.  And I'm going to show you -- and

24   while we've got that open, you know, if you read

25   through there in some of the emails that you're

1    having -- there's a couple emails -- and if -- if I'm

2    incorrect in there -- where you're telling

3    recipients, hey, I reviewed interview tapes, and what

4    Detective Woods [sic] is saying, you know, in your

5    opinion, is a posit to what the suspect -- or the

6    witness who she's identifying has stated in the

7    report; is that correct?

8         A.    Uh-huh.

9         Q.    Okay.  Can you expand on that a little

10   bit?  Do you remember that, finding -- and I'll say

11   finding things -- did you find things that Detective

12   Wood pulled from recordings that were different than

13   what you heard and put into reports?

14        A.    Multiple things, yes.

15        Q.    Okay.

16        A.    You want me to expand?

17        Q.    Yeah, yeah.

18        A.    So the very first thing that I came across

19   was the weekend prior to meeting with Detective Wood,

20   there was a subsequent shooting that involved Javaris

21   Rountree.  And this occurred at the residence of

22   Marquis Parrish and Tyesha Love --

23        Q.    Uh-huh.

24        A.    -- Marquis and Tyesha being married, I

25   guess is the best way to put it.

87

1              And Detective Wood's report stated that

2    Tyesha Love identified Javaris Rountree as the person

3    that she looked out the window during this shooting

4    and saw standing outside shooting at the apartment.

5         Q.    Uh-huh.

6         A.    The way I stumbled onto this was because I

7    was reading and looking for interviews and playing

8    interviews to identify what they were.  And I had

9    reached a point where I didn't even understand -- I

10   had yet to come across the information to understand

11   why Javaris Rountree was charged for that shooting --

12        Q.    Uh-huh.

13        A.    -- so I was listening to the interview at

14   the time I was going through the reports trying to

15   find the documentation.

16              So when I read the portion that said

17   Tyesha Love looked out the window and saw Javaris

18   Rountree shooting, I was like, "Oh, I don't think

19   that's what I heard" and went back and replayed the

20   interview.  And what Ty- -- Tyesha Love never says

21   that she saw who did the shooting.

22        Q.    Yeah.

23        A.    She said someone was shooting and she hit

24   the ground.

25        Q.    Okay.

88

1      A.    So that was the first -- okay --

2    inconsistency.

3      Q.    Uh-huh.

4      A.    I don't -- I tried not -- I don't jump at

5    conclusions because I'm like, all right.  I don't

6    know how many interviews there are yet --

7      Q.    Yeah.

8      A.    -- of Tyesha Love, so I don't know

9    everything's that been said.  So I kept looking,

10   found the body cams, the other -- who was it? --

11   Detective Hildebrand's body cam that captures

12   portions of that interview.

13         There are no other interviews of Tyesha

14   Love.  That's the only statement she ever made --

15     Q.    Uh-huh.

16     A.    -- related to that shooting.  So there is

17   no statement made by her that she saw Javaris

18   Rountree, when she looked out the window, shooting.

19         And it became one of those things that we

20   would end up questioning Detective Wood about and she

21   would stick to it, that there was a recorded

22   interview where Tyesha said that.  And we -- there --

23   we cannot find one, and Detective Wood could never

24   present one.

25         So that was the first --

89

1          Q.      Uh-huh.

2          A.      -- you know, conflict in what's written as

3    opposed to what's actually recorded being said.

4          Q.      Yeah.  Let me ask you this and stop you

5    there.

6              On that particular instance, was it your

7    understanding that that recorded -- that recording

8    took place at the -- Tyesha Love's home or at an

9    apartment or --

10         A.      Yeah.  It was --

11         Q.      -- something like that?

12         A.      It was outside the apartment.  I think

13   that was -- I think that was Edgewater Trace

14   Apartments at the time.

15         Q.      Uh-huh.

16         A.      It may have changed names now.  But they

17   -- what you see on her body cam -- on Detective

18   Wood's body cam is what I would call a complete

19   interview.  It's -- the camera activated.  They're

20   walking out of the -- their unmarked patrol car.

21   They're approaching Tyesha Love.  They're introducing

22   themselves --

23         Q.      Uh-huh.

24         A.      -- to her.  They're asking to talk to her.

25   They step away from another female that's there so

90

1    that she doesn't overhear what they're talking about.

2              At some point, Detective Hildebrand will

3    go and talk to the other female, who I think,

4    actually, was Javaris Rountree's girlfriend at the

5    time.

6         Q.    Uh-huh.

7         A.    And then it's just Detective Wood speaking

8    with Tyesha Love.

9              And then it will conclude with, you know

10   -- I think her comments were, "If I need to talk to

11   you later, is that okay?"

12             "Yes."

13             "Okay.  Good-bye."

14             They walk away.  The camera goes off.  And

15   that's the end of it.

16        Q.    Okay.  Okay.  Any other conversations that

17   you listened to that you saw inconsistencies in what

18   Detective Woods [sic] wrote in her reports?

19        A.    Yeah.  And this is -- some of them, I can

20   generalize.  I wish I had that information sitting in

21   front of me because I've documented it.  Most of it

22   was related to Marquis Parrish's statements.  This is

23   reflected in the report.  It's also reflected in the

24   search warrants.

25             One in particular, Marquis is being

1  questioned about this rental car and had he ever been

2  in it --

3          Q.    Uh-huh.

4          A.    -- which he had.  He admitted that, "Yeah.

5  I mean, I drove them out to the airport.  I dropped

6  them off.  They pick up.  I came back to my

7  apartment."

8          And he would make -- and he would admit

9  that he and I can't remember who actually drove in

10  that rental car to the store at some point that night

11  --

12         Q.    Uh-huh.

13         A.    -- and then he would come home.  That was

14  his story.  He went home, and that was the end of his

15  night.  He doesn't know where everybody else went.

16         What Detective Wood reflected in

17  documentation -- in the report -- and it was also

18  copied in the search warrants -- was that Marquis

19  Parrish said he had never been in the red rental car.

20         Q.    Uh-huh.

21         A.    So that was a conflict.  There was

22  something -- the request to extend the rental on the

23  car -- Antwane Snipe -- Antwane Snipe -- I think

24  that's how she pronounces it -- she's the woman that

25  actually rented the vehicle.

92

1              Detective Wood attributed a request for

2    her to extend the rental -- and this would have been

3    after -- in context, this would have been after

4    Charles Vinson would have been killed.  The car

5    needed to be returned.  It was like a short-term

6    rental.

7              And so Antwane Snipe received a message to

8    extend the rental of the car.  Detective Wood

9    reflected that -- this is my memory.  And maybe this

10   is one of those things that I would have to go back

11   and look at to be 100 percent sure.

12        Q.    Yeah.  No.  Exactly.

13        A.    But what my memory is of this is -- the

14   way I figured out that conflict was in conversation

15   with Ms. Kelly --

16        Q.    Uh-huh.

17        A.    -- Katie Kelly.  We were talking to her

18   regarding a potential proffer with Marquis, and I

19   brought up to her that, "Well, you know, Mr. Parrish

20   asked to extend the rental on this car."

21              And she said, "No, he didn't.  That was

22   Carlos Rountree."

23              Well, I had -- at this point, I had only

24   been through -- I had not been through every

25   interview.  I had been through the report and several

93

1    interviews.

2            And I was like -- I didn't contradict her

3    on it.

4            She said, "I listened to the interview.

5    My client never said that."

6            I went back and watched the interviews,

7    and she was right.  Marquis never asked --

8        Q.    Uh-huh.

9        A.    -- Antwane to extend.  That request came

10   from -- I think it was Carlos Rountree, but it was

11   one of the Rountree brothers.

12       Q.    Okay.

13       A.    The connection to Antwane Snipe is Carlos

14   Rountree.  Marquis Parrish does not know Carlos

15   Rountree -- I mean, Antwane Snipe.

16       Q.    I got you.  I got you.

17       A.    So that was another inconsistency between

18   the recorded statement of Antwane Snipe and what is

19   documented in the report and the search warrant.  And

20   there -- there's at least one more.  And without the

21   information in front of me, I can't recall it.

22       Q.    That's fine.  And in closing, I just want

23   to show you and, just for the record, have

24   Plaintiffs' -- what I'm going to mark as Plaintiffs

25   Exhibit 7 -- I'll represent to you these are just

94

1    some -- what appears to be returns of service.

2         A.    Uh-huh.

3              (Plaintiffs' Exhibit Number 7 was marked

4    for identification.)

5         Q.    (By Mr. Shipley)  These are all -- is this

6    a search warrant return?

7         A.    Yeah, yeah.  Well, it's . . .

8         Q.    Or are these --

9         A.    Yes.  So --

10        Q.    -- examples of --

11        A.    Yeah.

12        Q.    -- search warrant returns?

13        A.    These are examples of search warrant

14   returns.

15        Q.    Okay.

16        A.    What you see -- sometimes you won't have a

17   -- the need for another attached inventory.  Like,

18   they'll just write in like was done here "Electronic

19   file downloaded to disc.  ID" -- I can't see the

20   whole thing.  But that -- this is the return form

21   that's sworn to the judge, signed, and --

22        Q.    Filed?

23        A.    -- by the judge and by the affiant.  And

24   she is noting the files.  Just penning it in is how

25   she's noting the inventory to the Court.

1      Q.    Okay.  And these all appear to be dated --
2  March 29th of '23 is the filing date as -- on the top
3  right-hand corner.
4      A.    I'm looking right now at the judge's
5  signature first.
6      Q.    Okay.
7      A.    29th, 29th.  Yeah.  So they were all
8  signed by the judge on the 29th, and they're all
9  stamped received on the 29th of March 2023.
10     Q.    Which would have been after the hearing on
11  the 22nd and after you started interacting with Judge
12  --
13     A.    Yes.
14     Q.    -- or -- excuse me -- Detective Woods
15  [sic]; is that --
16     A.    Yes.
17     Q.    -- correct?
18     A.    Yes.
19         MR. SHIPLEY:  Okay.  I think that's all
20     the questions I have for now.
21         (Off-the-record discussion.)
22         (Recess from 2:31 p.m. to 2:38 p.m.)
23                  EXAMINATION
24  BY MR. DOVE:
25     Q.    Good afternoon, Mr. Sammons.  We met

96

1    previously.  My name is Taylor Dove.  I represent the

2    City of Savannah as well as Sergeant Khaalis in this

3    lawsuit.  I'm not going to take a whole lot of time

4    because we've already covered a good bit of stuff.  I

5    just want to kind of do a little of cleanup.

6         A.    Okay.

7         Q.    It's my understanding you were in law

8    enforcement as a police officer or detective from

9    2004 to 2016; is that right?

10        A.    With Savannah-Chatham Metropolitan Police

11   Department.  And I'm still a law enforcement officer

12   with the D.A.'s office.

13        Q.    Sure.  Okay.  But you never were a law

14   enforcement officer for the Savannah Police

15   Department; is that correct?

16        A.    No.  The entity -- the entity didn't exist

17   when I started is the easiest way for me to put that.

18        Q.    Right.  And it came back into existence in

19   2017, 2018?

20        A.    That sounds about right.

21        Q.    Is it fair to say that you wouldn't know

22   -- or let me ask this.

23             Your knowledge about the Savannah Police

24   Department and its amount of units and its policies

25   and procedures, you wouldn't have gotten that

97

1    experience or knowledge while working as a police

2    officer; is that correct?

3         A.    Well, yeah.  The knowledge -- everything

4    I've expressed is the knowledge I have based on my

5    time there.  If you're talking about current policy,

6    current directives, no knowledge.  I don't work

7    there.

8         Q.    Right.  So -- well, I guess a better way

9    to ask it is:  Has all that knowledge you gained

10   dealt with the Savannah Metro Police Department and

11   its policies and procedures?

12        A.    Anything related to policies and

13   procedures I've spoken about is my experience at that

14   department.

15        Q.    Okay.  In reference to Plaintiffs' Exhibit

16   3, which I believe is the notes that you provided --

17        A.    Yes.

18        Q.    -- where did you go look to get this

19   information?

20        A.    So we have a digital case file system that

21   notes go into.  So A.D.A.s put in notes.  File

22   material can be uploaded.  Preparation material for

23   trial can be uploaded.

24               These are the dates reflected -- dates and

25   times reflected in there.  And then some of it, I

98

1    obviously was directly involved in, so I have other

2    documentation that is directly related to these

3    dates.

4        Q.    And what's the name of that program?

5        A.    It's called Tracker.

6        Q.    And would Tracker -- would there have been

7    a case file for this case in Tracker once the arrest

8    was made?  Like, when would Tracker get set up for

9    this particular --

10       A.    So it begins as soon as the office is

11   aware that an arrest has been made.  So whatever the

12   process is of an A&B, an arrest and booking form,

13   making its way into the courthouse, then notification

14   also makes its way to the D.A.'s office.

15             At that point -- I can't tell you if it's,

16   you know, the moment they get the piece of paper or

17   it's the next day -- someone will create a file

18   number that's specific to the D.A.'s office that

19   embodies any and all material related to the case.

20       Q.    Okay.  And what all gets inputted into

21   Tracker?

22       A.    Anything -- what -- anything that someone

23   wants to put in there.  You'll see notes by

24   prosecutors.  Those notes could be anything from

25   trial strategy or notes to themselves that they need

99

1    to document.  You might see email communication

2    between individuals loaded into Tracker as notes.

3    Documents related to the file may be uploaded -- to

4    the case may be uploaded into Tracker.  A whole

5    multitude of things could be in there.

6         Q.    Okay.  I want to talk a little bit more

7    about the process starting from when the D.A. gets a

8    file from the police department.

9         A.    Okay.

10        Q.    In this particular case, I believe Mr.

11   Parrish was arrested in late May or early June -- I

12   can't remember -- of 2021.

13        A.    That sounds right.

14        Q.    Is that the first point in time in which

15   the D.A.'s office would have gotten any information

16   about the case from the police department?

17        A.    As soon as our office is aware of the

18   arrest and the charges and in the process of building

19   our internal tracking file for the case, SPD -- even

20   when it was SCMPD -- has provided the D.A.'s office

21   with access to their Tiburon ARS system.

22             So one of the first steps that happens is

23   an admin will start downloading any available report

24   that exists under that case number with SPD now,

25   SCMPD then.  It's still the same to this day.  I have

100

1    access to their report system.  Now it's -- you know,

2    it's a little bit easier with the proliferation of

3    evidence.com.  Now they can go straight in there and

4    start just downloading stuff.

5          So, yeah, they would -- in this case, I

6    know for a fact they started downloading available

7    reports.  They made a request for any body camera

8    material that existed.  At some point, they would

9    have turned to the -- evidence.com and tried to

10   download anything that's in evidence.com.

11         It's largely a shotgun approach because,

12   again, until someone sits down and reads the entirety

13   of the documentation that the department provides to

14   say this is what we did, and these are the results of

15   what we did, you honestly have no idea what's been

16   done and what should exist.

17   Q.    And is that process, that review done as

18   -- is it supposed to be done as files get pulled off

19   of Tiburon or off of evidence.com?  Is somebody from

20   the D.A.'s office taking a look at it at that point

21   in time?

22   A.    I can't tell you what that process is.

23   Q.    Okay.  Are you not involved in --

24   A.    Huh-uh.  I -- right now, the only way I

25   would be involved in something similar to that would

1  be if a -- usually a homicide.  But it would be any

2  case where, for some reason, specifically they want

3  that case to come in front of my eyes and begin

4  looking at it immediately.

5       Q.    Okay.

6       A.    And so, yes, even today, it -- if I was

7  asked to do that today, it would not be uncommon for

8  me to find stuff that's missing and say, "Hey, I

9  would expect to see this.  We don't have it."

10           And that's not necessarily uncommon

11 either, because if you just made an arrest a month

12 ago, I'm not going to be shocked that, you know, your

13 report's not done yet.  I'm not going to be shocked

14 that maybe something hasn't made it the GBI yet.  I'm

15 not going to be shocked that the GBI has it and

16 hasn't completed a test result yet.  It's not going

17 to shock me.

18      Q.    And for a police officer, once an arrest

19 is made, do they typically continue their

20 investigation, or do they sort of hand it off to the

21 D.A.'s office to finish whatever investigation they

22 think they might need in order to meet the higher

23 burden other than probable cause?

24      A.    I can tell you what they'd like to do,

25 exactly what you just described.  I can offer you my

102

1    opinion on that.

2         Q.    Okay.  In your experience, is that what

3    happens with the Savannah Police Department?

4         A.    It actually depends on the detective --

5         Q.    Okay.

6         A.    -- individual detective.  There's

7    detectives over there I never touch their cases.

8    There's no need.  They do good work.  If -- it's --

9    again, it's not uncommon not to have something.

10             "Hey, we don't see this."

11             People are human.  They don't upload

12   stuff.  They forget to put it in a file.  I did it

13   the same way.

14             But you get a phone call or an email,

15   "Hey, I need this stuff."

16             They're like, "Okay."  They send it to

17   you.

18             There's detectives that I never talk to --

19   have never seen their cases and have never talked to.

20   And the reason why is because they do thorough and

21   complete work.  And if there is any communication,

22   it's between them and an A.D.A.  It never gets to me.

23        Q.    Okay.  And so that kind of brings me back

24   to -- I kind of want to go backward a little bit.

25             When that initial upload of documents or

1    receipt of documents comes in, you said you don't

2    review them typically.

3              But is an A.D.A. going to review that

4    stuff as they're coming in?

5         A.    At -- well, you know, I can't speak to

6    A.D.A.'s and case loads and how each make their

7    approach to preparing for trial, but what I'm going

8    to tell you is that if an SPD, Pooler, Port

9    Wentworth, Garden City, Tybee Island -- if they work

10   a case, again, there's no way for a prosecutor to

11   know what exists unless they provide it to the

12   prosecutor's office.

13             So let's say I'm lazy as a prosecutor or

14   my method is to prepare for a trial the night before.

15   We should have everything.  We shouldn't have to be

16   asking for anything at that point.  It should have

17   been provided.

18             That is the expectation, and that's been

19   the expectation since I've been a detective.  Since

20   2011, 2010, whenever I started doing investigative

21   work up to this day, that is the expectation.

22        Q.    Right.  I understand you think it's the

23   expectation.

24             Does the police officer have an

25   obligation, that you're aware of, to do that work for

104

1    the A.D.A.'s office?

2        A.    They're not doing it for us.  That's their

3    job.

4        Q.    Sure.

5        A.    Absolutely.  You -- absolutely, it's their

6    obligation.  You know why?  Because I possess the

7    investigative information.  I possess the evidence if

8    I'm the detective or the agency.

9        Q.    Right.

10       A.    I made the arrest.  I now have to be the

11   person that supplies the information to justify the

12   arrest, justify the charges, justify the indictment,

13   justify the trial.  So I don't -- like, yes, it is

14   their obligation.

15       Q.    Okay.

16       A.    What we try to do is work in some type of

17   coordination to get stuff.  We understand that

18   there's -- you know, everybody's busy.  That's

19   understandable.  And, again, if I was looking at

20   something in the early days of an arrest, it wouldn't

21   shock me not to see certain things, and I wouldn't --

22   but then you say, "We need this.  We need this.  We

23   need this.  We need this."

24             In this particular case, we're 2 years

25   out.  And this is highly strange to me to be 2 years

105

1    out and be missing a lot of information.

2          Q.    Right.  And that leads me to my point.

3                Why did it take so long for someone in the

4    D.A.'s office to take a look at the file?

5          A.    So our office has had turnover, too, so it

6    -- I think it had moved to a couple of prosecutors,

7    the last being Jillian Gibson.  She now works in the

8    Ogeechee Circuit, whatever Bulloch County contains.

9                Assignment after that, I don't know.  So

10   it may have sat for a period of time unassigned.  I

11   don't know.  That's a question that goes outside of

12   my knowledge.  So I -- I don't --

13               What was your question?

14         Q.    Why did it take 2 -- almost 2 years before

15   the D.A.'s office did its examination of --

16         A.    Oh, because --

17         Q.    -- the case file?

18         A.    Well, it took 2 years for this to come up

19   because that motion hearing had been filed and

20   someone had to respond to the motion hearing.  So

21   when D.A. Jones was preparing to respond to the

22   motion hearing to suppress evidence, that's when it

23   was discovered that, in the 2 years prior, none of

24   the information that had been uploaded by SPD to

25   evidence.com and/or provided to us physically

1    contained the information to successfully handle the

2    motion hearing.  So that's my only answer to that.

3        Q.    Okay.  Let me -- I'm going to hand you

4    some emails which I'm going to mark as Defendants'

5    Exhibit 8.

6            (Defendants' Exhibit Number 8 was marked

7    for identification.)

8        Q.    (By Mr. Dove)  If you'll take a look at

9    this email -- I understand you're not part of this

10   email, but if you look at the third, sort of, email

11   in this chain, it's from Ashley Wood to Jillian

12   Gibson.

13           Is that who was initially assigned as the

14   A.D.A. on this case?

15       A.    It was one of the early assigned A.D.A.s,

16   yes.

17       Q.    Okay.  And if you look at the email from

18   Ashley, she says, "Yes, ma'am.  You should get an

19   email.  If not, you can go to evidence.com and type

20   in the CRN as well."  "The only thing left I have to

21   do is make copies of disc from the autopsy and some

22   video/camera footage."

23           So this email sort of jibes with Exhibit 3

24   where you indicated that, on February 11th, access

25   was given to evidence.com to the D.A.'s office; is

1  that correct?

2      A.    On -- what I said was there was a file

3  that was created on February 11th, 2022, under SPD's

4  case number in evidence.com.  Obviously, she's

5  referencing that --

6      Q.    Yeah.

7      A.    -- in this email to Jillian Gibson.

8      Q.    And so on February 11th, the D.A.'s office

9  was aware that this had been done; is that right?

10     A.    Yeah.

11     Q.    And, actually, if you'll -- sorry.  If

12  you'll look at it again, the second, sort of, chain

13  on the email, Jillian says to Ashley Geez, "Sounds

14  like this will keep me busy!"

15          Do you see that?  It's the second set of

16  email exchange time-stamped 4:23:05.

17     A.    No.  I have one page.

18     Q.    Yeah, yeah.  It's on the second -- the,

19  sort of, second grouping of email exchange.

20          MR. SHIPLEY:  Do you have this?

21          THE WITNESS:  I have this.

22          MR. DOVE:  Oh, did I mark the wrong one?

23          MR. SHIPLEY:  I may have the -- I've got

24      --

25          THE WITNESS:  I have --

108

1       MR. SHIPLEY:  That's what it is.  I bet I

2   have the second part of this.

3       THE WITNESS:  I have a 3:48 p.m., a 1:10

4   p.m., and a 1:01.

5       MR. DOVE:  I may have just given you the

6   wrong one.

7       MR. SHIPLEY:  It could have been a

8   two-pager and you handed out one.

9       MR. DOVE:  Now I've got myself confused.

10      (Off-the-record discussion.)

11  Q.    (By Mr. Dove)  So on the first page, there

12  is an email exchange between Jillian and Ashley Wood

13  dated February 11, 2022.

14      Do you see that?

15  A.    Yeah.

16  Q.    Okay.

17  A.    And you were talking about the 4:23 p.m.?

18  Q.    Yes.

19  A.    That's what you were referencing earlier?

20  Q.    Initially, I was talking about the email

21  below that at 4:07 p.m. where Ashley tells Jillian

22  that you can go to evidence.com to get --

23  A.    Uh-huh.

24  Q.    -- the stuff.

25  A.    Uh-huh.

1    Q.    So you see that now?

2    A.    I do.

3    Q.    Okay.  Now I'm asking about the email

4    right above that where --

5    A.    Uh-huh.

6    Q.    -- Jillian tells Ashley, "Geez.  Sounds

7    like this will keep me busy."

8          Does that imply to you that there's a lot

9    of stuff on evidence.com?

10          MR. SHIPLEY:  Object to the form.

11          THE WITNESS:  It implies that Jillian is

12    going to be busy.  You'd have to ask her.

13    Q.    (By Mr. Dove)  Fair enough.  Now you can

14    put that aside.  Sorry for the confusion.

15          MR. SHIPLEY:  Did these get turned over in

16    discovery?

17          MR. DOVE:  Yes.  They were part of the

18    hard drive from the D.A.'s office.

19          MR. SHIPLEY:  Oh, they were from the

20    D.A.'s office --

21          MR. DOVE:  Yeah.

22          MR. SHIPLEY:  -- not the City of Savannah?

23          MR. DOVE:  No.

24    Q.    (By Mr. Dove)  I'm going to hand you

25    another email which I'm going to mark as Defendants'

1    Exhibit 9.  You can -- I will tell you that is my

2    scribble on there, so -- just for everyone's

3    reference.  It's my notes, but I don't -- it's fine.

4    I'm not worried about it.

5            (Defendants' Exhibit Number 9 was marked

6    for identification.)

7            MR. SHIPLEY:  It says Plaintiff is likely

8        to win.

9            MR. DOVE:  I want to clarify for the

10       record it says "Not scanned until 9/26/2022."

11       Q.    (By Mr. Dove)  All right.  This is an

12   email from Linda Kaapa.

13            Do you know who that is?

14       A.    She's an admin in the office --

15       Q.    Okay.

16       A.    -- the D.A.'s office.

17       Q.    And it's to Jillian Gibson and Ashley

18   Wood.

19            Is she Jillian's admin?

20       A.    No.

21       Q.    She isn't assigned to anyone in

22   particular?

23       A.    No.  She sits at the front desk.

24       Q.    Okay.  Anyways, it looks in this email, on

25   February 15th, that she is informing Jillian that

111

1    Detective Wood has dropped off two large notebook

2    binders.

3            Do you see that?

4        A.    Yeah.  And so this is the day prior to my

5    notations of February 16th, 2022, that two large

6    binders were presented -- or given to A.D.A. Gibson

7    related to this case.

8        Q.    And those two large notebook binders would

9    be her, quote, unquote, case file; correct?

10       A.    Yes.  So that -- yeah.  That would have

11   been a physical representation of the case file

12   material.

13       Q.    Okay.  And then she cc's a Marella Eaton.

14           Who is that?

15       A.    That's another admin within the office.

16       Q.    Okay.  Is she assigned to any particular

17   A.D.A.?

18       A.    No A.D.A. in particular, no.

19       Q.    Anyway, she is asked to potentially scan

20   the files.

21           Do you know if these were ever scanned in

22   anywhere?

23       A.    I don't know.

24       Q.    Do you typically scan files into Tracker

25   or . . .

1      A.    Sometimes yes, sometimes no.  Typically,

2    on these big cases like this, a lot of what you'll

3    see is -- if you brought me a big binder of files,

4    yeah, I'm going to scan them in and reduce things to

5    a PDF.  And then that -- everything may end up on a

6    hard drive, and then the hard drive ends up in the

7    possession of the prosecutor, and they work off that

8    hard drive as their medium --

9      Q.    Okay.

10      A.    -- for material.

11      Q.    So is it fair to say that, on February

12    15th of 2022, the D.A.'s office had what they

13    believed to be Detective Wood's full case file?

14      A.    No.  I would not say that anyone can

15    assume it's the full case file.  I'll tell you that

16    two binders were dropped off.

17      Q.    Okay.

18      A.    Again, I -- like I said earlier, you can

19    hand me a case file.  And until I've gone through it,

20    I cannot say whether or not I think everything exists

21    that should be there or should be reflected.

22      Q.    Okay.  And so that -- to my point, should

23    someone from the D.A.'s office, at this point, have

24    started to take a look at what was given to them?

25      A.    I -- that -- I'm not part of that process,

1    so I don't know.  You'd have -- they'd have to --

2    that's a question for somebody else in the D.A.'s

3    office.

4        Q.    So you don't know if anyone from the

5    D.A.'s office typically looks at files when they come

6    in?

7        A.    I -- so when files come in, investigators

8    only become involved if prosecutors request

9    involvement.  What -- how and what and why and when

10   and where prosecutors handle their files or prepare

11   for trials, that's a question for prosecutors.

12       Q.    Okay.  But is it fair to say Jillian

13   Gibson, at this point, had not asked an investigator

14   to do anything?

15       A.    No, not that I'm aware of.

16            (Defendants' Exhibit Number 10 was marked

17   for identification.)

18       Q.    (By Mr. Dove)  All right.  I'm going to

19   hand you what I've marked as Exhibit 10.  This is

20   from the criminal case involving Mr. Parrish.  It is

21   the State's discovery disclosure to Mr. Parrish's

22   defense counsel in May of 2022.

23            Have you seen this document before?

24       A.    No.

25       Q.    Okay.  Are you familiar with what a

1    discovery disclosure is?

2         A.    I know what it is, yes.

3         Q.    In your capacity as an investigator,

4    you've -- you may not have seen this particular one,

5    but you've seen other discovery disclosures made by

6    the D.A.'s office?

7         A.    No.  I have no involvement in discovery

8    disclosures.

9         Q.    Okay.

10        A.    Discovery and providing discovery has

11   never been an investigator's responsibility.  And --

12   I mean, I'm quite aware that discovery is provided.

13   In fact, there could be tons and tons of discovery

14   disclosures in cases.

15        Q.    Sure.  For this particular one, it appears

16   that A.D.A. Gibson provides a pretty detailed list of

17   items that are being provided to Mr. Parrish's

18   defense counsel.

19             Do you see that?

20        A.    Yeah.  There is quite a few things listed

21   here, yes.

22        Q.    Sure.  These items on here, do these

23   appear to be -- when you did your review -- let me

24   ask this a different way.  Sorry.

25             When you did your review of the file in

115

1    March of '23, did this -- these, sort of, screenshots

2    appear to be from the D.A.'s file of the hom- -- Mr.

3    Vinson's homicide?

4         A.    (No response.)

5         Q.    In other words, was this what you were

6    going to look at to cross-reference everything in

7    March of 2023?

8         A.    I can't tell you that -- I can tell you

9    that, yes, some of this looks like file names, folder

10   names that are familiar.  I can't attest to all of

11   it.  I also could not begin to tell you that

12   everything that's listed in here is everything that

13   we would eventually turn over in discovery to include

14   up to and after March 27th of 2023.

15        Q.    Sure.  And I'm not asking you to guess at

16   that.

17              But if you look at the first page on here,

18   there's a folder that's entitled "Walmart video."

19              Do you see that?

20        A.    Uh-huh.

21        Q.    So based on this filing, it -- is it fair

22   to say that the D.A.'s office, in May -- at least in

23   May of 2022, had a copy of the Walmart videos?

24        A.    Yeah.  I don't remember there being an

25   issue of not having a copy of the Walmart videos.

116

1       Q.    Okay.

2       A.    When I first looked at it, there were

3   Walmart videos.

4       Q.    Sure.  And the D.A. turned all that

5   footage -- Walmart footage over to Mr. Parrish's

6   counsel in May of 2022; correct?

7       A.    According to this discovery disclosure,

8   yes.

9       Q.    Okay.  And just under those two, there's

10  two PDFs labeled "Case file."

11           Do you recognize those two files?

12      A.    Not offhand.  My opinion of what they

13  would be would be from the two binders.  So that

14  would be -- since these are PDFs, then that would be

15  the documents.  Like, any physical report or whatever

16  document was in there, they would have been scanned

17  in.  And this was -- probably Volume I and Volume II

18  was a combination of those two binders.

19      Q.    And do you recall whether or not Ashley

20  Wood's case file had copies of the search warrants in

21  them?

22      A.    Yes.  There were copies of the affidavits

23  and the search warrants.  I do not recall -- I don't

24  think that we were -- in other words -- I'm trying to

25  figure out how to phrase this.

117

1          I don't think we were missing like, "Hey,

2     here's what I submitted to the judge and got signed."

3     So I could go through the reports and find that

4     search warrants were done.  I think I could match all

5     that stuff up.

6          Q.    Sure.  You just didn't have the warrant

7     returns?

8          A.    Yeah.  So -- right.  I would -- I did not

9     know until the questions started being asked that

10    they had not been returned to the Court.  So we

11    didn't have inventories.  We didn't know what was

12    taken.  I did not know that till then.

13         Q.    Okay.  But, you know, based on this

14    particular filing, it would be your understanding

15    that at least Mr. Parrish was aware or his counsel

16    was aware that Ashley Wood had at least applied for

17    and received search warrants for various things --

18    items?

19         A.    Yeah, because those were in the binders.

20    So if you had that information, if that was disclosed

21    through this, then you would have had a PDF that

22    would have contained copies of those search warrants.

23    If you'd have started reading through -- I don't know

24    who read through what, but you'd have to read through

25    it.

1          And then as you go along, you'd find that

2     multiple search warrants have at least been applied

3     for, so yes.

4          Q.    Okay.  And that would include the

5     affidavit that Ms. Wood drafted to obtain the search

6     warrants; correct?

7          A.    Yes.

8          Q.    Okay.  And they were, like, 8 pages long

9     or something?  I mean, they were long?

10         A.    Yeah, they were lengthy.

11         Q.    Yeah.  And very descriptive, although, as

12    you mentioned before, may have had some

13    inconsistencies; is that --

14              MR. SHIPLEY:  Objection to form.

15              THE WITNESS:  They did have some

16         inconsistencies, yes.

17         Q.    (By Mr. Dove)  And so, typically -- you

18    know, if you don't know the answer, that's fine.

19              Before the D.A. -- A.D.A. turns discovery

20    over to defense counsel, would you expect them to

21    have reviewed what they were going to be turning over

22    to the defense counsel?

23              MR. SHIPLEY:  Objection to form.

24              You can answer.

25              THE WITNESS:  I know that, just in

1      general, the process is to start turning over

2      information as soon as we get it, so -- even if

3      we don't have everything.  It's like automatic,

4      just (indicating).  And that's the approach.

5           At what point any individual prosecutor

6      sits down and begins preparing for a future

7      trial and digging deep into stuff, I don't know.

8      I'd say the same thing about defense attorneys.

9      I often wonder how -- when -- at what point they

10     started reviewing material before they went to

11     trial.  So I don't know.  That's up to each

12     individual attorney, I guess.

13     Q.    (By Mr. Dove)  Okay.  So as an

14  investigator in the D.A.'s office, you're not privy

15  to when an A.D.A. begins his or her investigation

16  into --

17     A.    Huh-uh.

18     Q.    -- the case?

19     A.    My involvement and depth of involvement in

20  the case depends on what I'm asked to do.  So day in

21  and day out, what's going on over there is not in my

22  wheelhouse.

23     Q.    Okay.  All right.  I think I've only got a

24  couple more documents to go through here.

25           (Defendants' Exhibit Number 11 was marked

1    for identification.)

2         Q.    (By Mr. Dove)  All right.  I'm going to

3    hand you what I've marked as Defendants' Exhibit 11.

4    This -- you are listed as a recipient of this

5    particular email.  It appears to be some sort of

6    notification from a software.

7              Is this from Tracker?

8         A.    No, it's not.

9         Q.    Okay.

10        A.    Do you see that

11   SharePoint@chathamcounty.org?

12        Q.    Uh-huh.

13        A.    So the way a request can automatically

14   funnel its way to the investigative unit is an A.D.A.

15   can go into SharePoint, fill out a request, and

16   submit it.  It comes up via the website, and then we

17   see those and assign them accordingly.

18              The reason I am on here is because I would

19   have been appointed to my supervisory position at

20   that time, obviously, when this was sent.  So the

21   names you see up here -- Kelvin Bryant, he no longer

22   works at the -- he wasn't even working at the D.A.'s

23   office at this time, I don't think.

24              Somewhere in there, he would have -- he

25   actually took a job with the City of Savannah.  I

121

1    don't know if he was still there or not, but they --
2    anyway, the County had not removed his name from the
3    email list.  Whether or not -- well, yeah, Kelvin
4    would have been there because he closed out this
5    request.
6              So Ricky Becker was the chief investigator
7    at the time, or he had already retired.  I think he
8    had already retired, which would make Vinson Jenkins
9    the chief investigator and Michael Murphy like the
10   assistant chief investigator.
11             So, basically, all our names are up there
12   because we were or had been in supervisory positions
13   and IT had -- just still has you in the email list.
14        Q.    Uh-huh.
15        A.    So . . .
16        Q.    All right.  So if you look at the subject
17   line, it says "Investigation of Marquis Parrish is
18   complete."
19        A.    Yeah.
20        Q.    So does that mean someone in your office
21   conducted an investigation of Marquis Parrish?
22        A.    That means something was requested and it
23   was tagged to the Marquis Parrish case.  Being that
24   this has got Kelvin Bryant's name on it, I -- and I
25   could go research this for you to tell you for sure

122

1    -- this was probably a request to pull the 9-1-1

2    recordings related to any one of these scenes, either

3    the body recovery or the Chatham County Police

4    Department's call to the crime scene vehicle.

5         But Kelvin Bryant did not conduct in-depth

6    investigations like I would do.  If it was something

7    related to in-depth stuff related to the murder, it

8    would be primarily either me or one other

9    investigator in the office that deals with murders.

10        But I would almost guarantee you this was

11   some -- they requested 9-1-1 recordings, and I'd be

12   happy to look into that if y'all need that

13   information.

14        Q.    That's fine.  But would this be indicative

15   of someone beginning to review --

16        A.    No.

17        Q.    -- Ms. Wood's case file?

18        A.    No.  If this is related to 9-1-1, again,

19   that's, like, almost an autonomic function.  We need

20   the 9-1-1 recordings.  Who asks for those?  Kelvin

21   Bryant does.  Send the request to Kelvin Bryant.  He

22   sends the request to the 9-1-1 center.  We wait for

23   them to generate any calls or radio traffic related

24   to it, and then they get picked up or delivered to

25   our office.

1           So what you're seeing here is -- it's just

2   kind of the way the structure is in the office about

3   getting stuff facilitated.  There's some things that

4   go into the investigative office, but they might be

5   what I consider administrative functions, like

6   requesting 9-1-1 stuff.

7           Kelvin Bryant handled all the 9-1-1

8   requests when he was there.  That's why I'm saying

9   that I'm about 99 percent sure that's what this was.

10  Q.    But the A.D.A. would be the one who

11  actually would have to go in there and make this

12  request; correct?

13  A.    Either the A.D.A. or -- even admins have

14  the ability to make that request as well.  So, again,

15  some of these functions are automatic.  It's like an

16  arrest is made.  Office is notified.  Somebody starts

17  building the Tracker file internally.  The case is

18  going to have a court assignment.  That court

19  assignment starts determining what A.D.A.s are

20  assigned to the case.

21          A.D.A.s have admins in some cases that are

22  assigned to be their admins.  The admins are now

23  notified that this case is coming your way.  The

24  admin starts an autonomic function, which is give me

25  all your reports.  Give me your case file.  Give me

124

1    all the body cams.  Whatever those mechanisms are --

2    and they're all different -- for -- all the

3    departments are different.

4            SPD, thank God, has evidence.com.  Chatham

5    County has evidence.com, but we -- they want to give

6    us physical files.  We can't dictate to them how to

7    deliver the stuff to us.  Most everybody else still

8    does a lot of physical files.  Some of them try to

9    compile stuff digitally as best as possible and send

10   us links to stuff.

11           But it -- all that collecting information

12   is a very automatic, everyday administrative

13   function.  It's like you do this on every case.  So

14   9-1-1 requests are requested almost automatically on

15   every case.  They may carve some things out that they

16   don't ask for it on, but for murders and rapes and

17   robberies and almost anything, they're going to ask

18   for that.

19           That's just a -- if I'm the admin and my

20   task is to make sure we get that, well, who -- how do

21   I get that?  Send that to Kelvin.  Put in a request.

22   Kelvin sees the request because it goes into our

23   investigative request system.

24       Q.    Sure.  And why -- does it typically take

25   4 months for that request to happen if it's

1    automatic?

2         A.    I don't know.  I mean, I don't know.  I

3    don't know how to answer that.  I can just say, at

4    whatever point that it crosses somebody's desk or

5    somebody has to address it, it gets addressed.  It's

6    -- I don't make those requests.  I don't know.

7              I can just tell you it's an everyday,

8    automatic-type request at whatever point it gets

9    done.  It should be done.  Does it get missed?  Yeah,

10   I'm sure it gets missed.

11        Q.    I'm going to hand you what I'm marking as

12   Defendants' Exhibit 12.

13             (Defendants' Exhibit Number 12 was marked

14   for identification.)

15        Q.    (By Mr. Dove)  I'll represent to you this

16   appears to be an internal email between Brian and, I

17   guess, the investigative department at the D.A.'s

18   office.

19             Does that look to be right?

20        A.    Uh-huh.

21        Q.    Okay.  Do you remember this email?

22        A.    Uh-huh.

23        Q.    Well, give me a little context on why this

24   email was sent.

25        A.    So this came out because -- well, a lot of

126

1    it has to do with this case being an example of

2    having cases -- all these are murder cases -- having

3    murder cases that -- you can see there's quite a --

4    so these numbers that you're looking at, the 21s,

5    22s, that would be the year -- maybe not necessarily

6    the year of the murder but the year that our office

7    would have started.  Some arrest has been made, so

8    our office has had to start building a Tracker file

9    for it.

10              So all of these are murder cases.  And at

11   this point, the office has made the decision that

12   every single murder case that comes into our office

13   will now go through a review process, the only

14   exception being if the A.D.A. in particular is well

15   informed on the case and doesn't need anything

16   further looked at.

17              But all murder cases will come into the

18   office and go through a review process much like was

19   -- had to be done in this case.  That's the idea.

20   You now need to sit down and start processing through

21   all the information and figure out what we have, what

22   we don't have, what needs to be done.

23        Q.    Sure.  And I think Brian even says, "It's

24   a work in progress, and we cannot fix everything

25   overnight.  This is the start."

127

1      A.    Yes.

2      Q.    So it's fair to say that this had been

3   happening for some time, this --

4      A.    You know, have there been problematic

5   cases where problems were found late in the game?

6   Yes.

7      Q.    Okay.

8      A.    Has it happened before this?  Yes.

9      Q.    Okay.  And I think you may have sort of

10  inferred this, but the Parrish case sort of broke --

11  was the straw that broke the camel's back to realize

12  we've got to make some changes?

13     A.    Yes.  Well, it's -- well, it certainly was

14  part of the impetus here, yeah.

15     Q.    Okay.

16     A.    Yeah.

17     Q.    And it all kind of stemmed back to -- I

18  think Brian is saying in this email -- and correct me

19  if I'm wrong -- that we've got to triage the cases

20  better?

21     A.    Uh-huh.  Well, what does he say?  What

22  line are you pointing to?

23     Q.    "I spoke with Vince, Mike, and Alan

24  earlier this week about a broader triage of cases

25  that was requested by the D.A."

128

1      A.    Yeah.

2      Q.    "We are working together to accomplish a

3    plan" --

4      A.    Yeah.

5      Q.    -- to get investigators and experienced

6    A.D.A.s --

7      A.    Right.

8      Q.    -- to look at these files.

9      A.    Right.

10     Q.    Okay.

11     A.    Right.

12     Q.    And is it -- during those [sic]

13   discussion, was there any talk about maybe starting

14   the triage process earlier in the case?

15     A.    Oh, there is.  And that's -- that is the

16   -- right now, that is the goal.  But the triage, even

17   to this day, cannot start until you can provide me

18   the data that you claim exists, the information that

19   you have.

20          So right now, I am waiting on information

21   from agencies that have arrested people, and we don't

22   yet have reports and interviews and things to look

23   at, so --

24     Q.    Sure.

25     A.    -- so I -- again -- and I think I

1    mentioned this earlier.  If I was asked to look at

2    one today and you made an arrest a month ago, I can

3    only look at what I have -- or what we have that

4    you've provided.

5         Q.    Sure.

6         A.    And from there, I can start -- whether

7    it's documented or not documented, I can start

8    thinking about what probably should exist or

9    shouldn't exist, and then we start questioning back

10   to the detectives and the agencies, Where is this?

11   Where is this?  Where is this?  Where is this?

12              And we wait on them to provide.  And then

13   they provide whatever they provide, and then we see

14   where we're at at that point.

15        Q.    Yeah.

16        A.    But, yeah, now the effort is to, as far

17   ahead of any potential trial dates as possible, start

18   trying to account for material from the police

19   departments.

20        Q.    And so had you applied this new process to

21   this particular case you would have been looking at

22   -- you would have been doing your March 2023 review

23   back in early 2022?

24        A.    Yeah.  Instead of it being March 2023, if

25   it had been March of 2022, we would have solved a lot

130

1    of these missing information problems in March of

2    2022, and they would not have existed in 2023.

3         Q.    When you worked for SARIC, did you ever

4    come across the name Marquis Parrish?

5         A.    So I don't know about SARIC; however -- I

6    didn't realize it the first time I saw Marquis.  We

7    had a proffer with Marquis, and his mom, in fact, was

8    looking at me kind of strangely.  And I was looking

9    at her, and I was like, "I know this lady.  I can't

10   remember why I know this lady."

11        And I had worked a murder case that

12   involved a defendant named Roderick Parrish, who is

13   now in prison.  And Roderick is like a half-brother

14   of Marquis's, so -- and I didn't remember it, and I

15   didn't put it all together.

16        But during that investigation, I think we

17   -- Marquis had been in jail previously, and we had --

18   I know we'd gone and interviewed him, asking him

19   about Roderick and Roderick's gang activity and if he

20   knew anything about it.  It was like 15 minutes, and

21   we didn't get anything much out of it.

22        So I didn't remember him until that

23   proffer day and then his mom looking at me.  And then

24   I went back and researched it.  I was like, "That's

25   why they look at me like they remember me."

1          So in SARIC, I can't say -- I don't know

2    specifically if I ever -- in that time frame, if I

3    ever had any encounters with him or came across his

4    name or did anything with him.

5          Q.    Okay.  Back to our particular case again

6    -- and I'm almost done -- I understand that search

7    warrants were not returned until, you know, after

8    March of 2023 -- right? -- almost -- probably almost

9    --

10          A.    Close to 2 years.

11          Q.    -- 2 years --

12          A.    Yeah.

13          Q.    -- from when the search warrants were

14    actually --

15          A.    Yeah.

16          Q.    -- executed?

17                That's atypical; correct?

18          A.    I've never seen this, no.  You're right.

19    I've -- this would be a first for me, to see this

20    much time.

21          Q.    Okay.  And are you aware of any other

22    members of the Savannah Police Department who have

23    not filed search returns 2 years plus?

24          A.    Not that I -- not -- no.  I have no direct

25    knowledge of any of that, no.

132

1      Q.    Okay.  Do you -- so do you have any

2  knowledge whether it's some policy or practice of the

3  Savannah Police Department to wait 2-plus years to

4  file search warrant returns?

5      A.    No.

6      Q.    In your experience, do they generally

7  return them timely?

8      A.    Again, my experience was always anything

9  from relatively quickly to, you know, you've made an

10  arrest, and now you're building a case file.  So it

11  would be -- it could be -- it could be months, but it

12  certainly was what you knew you had to provide for

13  the case to be prosecuted.  Those -- you've got to

14  get those search warrants back in.

15          So -- and that would be, you know,

16  somewhere in the -- like, you've got to turn in case

17  files.  Those case files are supposed to be reviewed

18  by supervision, so they should -- someone's going to

19  tell you -- or should be telling you you're missing

20  something.

21          MR. DOVE:  Okay.  I think that's it for

22      me.

23                    EXAMINATION

24  BY MR. COX:

25      Q.    Hello.  My name is Charlie Cox.  I

133

1    represent Ms. Wood in this matter.  Hopefully, I'll

2    just have a few questions.

3         A.    Okay.

4         Q.    Let me start initially with what you were

5    just talking about about being asked if you were

6    aware of any policy in the Savannah Police Department

7    about search warrant returns not being filed or made.

8              Are you aware of any Savannah Police

9    Department employee who was in a supervisory position

10   giving instructions that search warrant returns

11   should not be made or at least not be done until

12   asked to do so?

13        A.    My only knowledge of that has been things

14   reflect -- or -- or -- I'm trying to think if I've --

15   I've heard indirectly or maybe even read -- I'm

16   trying to think if any of that was in publication.  I

17   know that that has been said by Ms. Wood regarding

18   this.  I've learned all that.

19             I don't know whether that was said,

20   because I was asked to go to that -- one of the

21   review boards, the civilian review boards.  I don't

22   know if that was said or asked or brought up in

23   conversation in there.  It probably was, so I may be

24   inferring some things, but that's my knowledge of

25   that.

134

1          Q.    Other than Ms. Wood, where else have you

2     heard that that was the case, somebody in a

3     supervisory position giving directions not to make

4     search warrant returns?

5          A.    I'm not sure.  I know that that knowledge

6     is in our office.  And when I say "in our office," I

7     mean I -- like, I know Chief Assistant DeBlasiis is

8     aware of that.  So I don't know if that -- if we know

9     that because we've been told that by officials at

10    SPD, but I certainly know that that came up at some

11    point to my ears -- and I think it was part of that

12    review stuff.

13              And I was like, oh, well, she's -- because

14    I was probably asked if I had ever been directed that

15    way or if I had -- the same thing you're asking me.

16    So I kind of understood that, yeah, that must be what

17    she said.

18         Q.    And my question is:  Have you heard that

19    other people said the same thing?

20         A.    Oh, that?  Oh, other employees?

21         Q.    Yes.

22         A.    Oh, I don't know.

23         Q.    And do you know who the individual was

24    that Ms. Wood said had given that direction?

25         A.    Yeah.  She -- it was -- Sergeant Santoro

1    has allegedly -- or the prior Sergeant Santoro had

2    allegedly given that instruction or some variation of

3    that instruction.  That's my understanding.

4         Q.    And have you done anything to try to

5    verify that or run that to ground?

6         A.    No.  That's a --

7         Q.    Okay.

8         A.    -- policy issue for them.  It's not a

9    concern for me.

10        Q.    Okay.  And your word choice may not have

11   signified anything.

12             When you said "the prior Sergeant

13   Santoro," does that mean he's gone, or is there more

14   than one --

15        A.    Oh, yeah.

16        Q.    -- Sergeant Santoro?

17        A.    Sergeant Santoro left the Savannah Police

18   Department in March of 2020, like --

19        Q.    All right.

20        A.    -- a -- well over a year before --

21        Q.    But there's not another Sergeant Santoro

22   --

23        A.    Not --

24        Q.    -- that you're aware of?

25        A.    Not that I'm aware of.

1      Q.     Okay.  All right.  I just was trying --

2      A.     Yeah.

3      Q.     -- to make sure I was understanding what

4   you were telling me.

5             Right towards the end of your testimony --

6   or direct testimony, you mentioned that Tyesha Love

7   and Marquis Parrish were married, and then you said

8   "I guess that's the best way to put it."

9             What did you mean when you said "I guess

10  that's the best way to put it"?

11     A.     Well, customarily, I think, when people

12  are married, they share the same last name.  He

13  identified her as his wife.  Whether or not they're

14  actually married, I do not know for sure.

15     Q.     Okay.

16     A.     I think that's what I was trying to say.

17     Q.     All right.

18     A.     So I don't know if it was -- in my

19  experience in law enforcement and dealing with

20  people, there's a lot of claims, "This is my wife."

21  And it's -- it would be more like a common-law belief

22  that this is --

23     Q.     Right.

24     A.     -- your wife, not an actual, legitimate

25  marriage certificate.  So I don't know if they're

1    legally married or not.

2         Q.    Okay.  And so that was just based on they

3    don't have the same last name, and you actually have

4    no knowledge if --

5         A.    I --

6         Q.    -- they're legally married?

7         A.    I have no idea.

8         Q.    Okay.  When you began your review of the

9    evidence -- or case file in the Marquis Parrish case

10   --

11        A.    Uh-huh.

12        Q.    -- did you make notations in Tracker about

13   that review?

14        A.    I know there's an email.  I certainly

15   forwarded an email back to A.D.A. DeBlasiis probably

16   to -- maybe to D.A. Jones, maybe even to my

17   supervisor.  There is an email.

18        Q.    Right.

19        A.    And at some point -- at whatever point I

20   was at in that review, I documented everything that I

21   was seeing, things that I thought we were missing,

22   things that I thought needed to be addressed, yeah.

23   Now, if it's uploaded in Tracker, I don't know.  I'd

24   have to go look.

25        Q.    And so when you say you documented it, how

138

1    was that documented?

2         A.    Well, meaning I typed an email and said,

3    "Hey, here's where I'm at.  This is what I see.

4    Right now after reviewing this file, these are the

5    potential problems I see.  These are the things I see

6    that are missing."

7         Q.    Other than the email that you mentioned,

8    is there any other documentation that you're aware of

9    that exists that you created to document any problems

10   or shortcomings based on your review of the case

11   file?

12        A.    Yeah.  There will be another report that

13   is in Tracker that deals with the perjury issue.  So

14   there's report -- there's a report that exists with

15   that.  I don't know that -- there are probably some

16   follow-up emails regarding things related to the case

17   file missing materials like updates, "We have this

18   now," or "We're still missing this," or "This -- this

19   stuff's at the lab."  Obviously, you know, we have

20   these other things where the lab is talking to us.

21             So there's a lot of communication going

22   back and forth because I'm having to -- at this -- at

23   that point, I'm communicating with members of

24   Internal Affairs on any communication with Detective

25   Wood about stuff that needs to be taken care of.

1          She was on administrative duty at that

2     time, and I was instructed to copy them on emails.

3     So there are follow-ups when things are addressed or

4     handled, so there's -- and I don't think those are

5     all in Tracker, but they are in our emails.

6          Q.    Okay.  And is there information that the

7     folks over in Internal Affairs provided to you about

8     -- that relates to any shortcomings or deficiencies

9     in the Parrish investigation?

10         A.    I have never seen anything related to

11    their review of the investigation, no.  I do believe

12    that they probably provided our office with their --

13    and, in fact, I know they did -- their -- whatever

14    their -- whatever IA's initial investigation was,

15    that has been provided to our office.  Specifically

16    to a review of her work in the case file and any of

17    that stuff, I don't know.

18         Q.    Okay.

19               (An off-the-record discussion was held.)

20         Q.    (By Mr. Cox)  Do you have a -- do you

21    still --

22         A.    Yes, sir, I have it.

23         Q.    -- have a copy of your notes, Plaintiffs'

24    Exhibit 3, in front of you?

25         A.    Yes.

140

1       Q.    I just kind of wanted to go through here.

2   Some of these items, you've covered in your testimony

3   --

4       A.    Uh-huh.

5       Q.    -- but I want to kind of tick through the

6   entries.

7             The first one, "All arrested by early June

8   2021" --

9       A.    Yes.

10      Q.    -- what was the source of that entry, that

11  first --

12      A.    That's a notation in our Tracker file.

13      Q.    Okay.

14      A.    And what it is is -- so each time a

15  defendant was arrested, the date of the arrest is

16  tagged by their name.  I know that the -- let's see.

17  Three, four -- three -- my mind is escaping me.  Four

18  people were arrested in this case.  Those arrests

19  went through May, and the last one --

20      Q.    Okay.

21      A.    -- was the early part of June.  That's why

22  I just said all were arrested by early June of 2021.

23      Q.    And so that was just going back, looking

24  in the Tracker file, and figuring out --

25      A.    Yes.

141

1      Q.      -- when the last --

2      A.      Yeah, to see --

3      Q.      -- arrest was done?

4      A.      -- when did the -- yeah, when did all this

5      --

6      Q.      Okay.

7      A.      -- kick off, when did it start.

8      Q.      And the "June '21 -- 2021, complete report

9      requested," what was the source of that date?

10      A.      That was another notation made by an

11      administrative assistant that they had made a request

12      for a complete case file.

13      Q.      And that was something that came out of

14      Tracker as --

15      A.      Yeah.

16      Q.      -- well?

17      A.      Yeah.

18      Q.      Okay.  Do you recall who that request was

19      directed to specifically?

20      A.      I do not.  It would be logged in Tracker,

21      who made the request.

22      Q.      Okay.  And, again, the "June 22, 2021,

23      body camera requested," did that come from Tracker as

24      well?

25      A.      Yes.

142

1      Q.    And the specifics as far as who made that

2    request and to whom the request was directed, you'd

3    need to look in Tracker?

4      A.    I know it will -- it's going to tag who

5    entered that information, so that's how you know who

6    made the request.  Now, the contents of the request

7    -- so if I sent you an email that said, "Hey, can you

8    send me any available body camera of this case

9    number," that email may not be there.  I just went

10   into Tracker and made a note, "Made a request for

11   body camera."

12     Q.    Okay.

13     A.    That -- so I don't know that the contents

14   of that request exist.

15     Q.    And "July 8, 2021, indictments"?

16     A.    That's just a notation that all these

17   defendants were indicted on July 8th of 2021.

18     Q.    Okay.  And based on the review you did in

19   this case file, do you know what evidence had been

20   made available to the D.A.'s office at the point this

21   case was presented for indictment?

22     A.    I do not, no.

23     Q.    Okay.  Do you know who testified before

24   the grand jury for the indictments?

25     A.    Personally, no.

143

1      Q.     You know because somebody's told you; is
2    that --
3      A.     Yes.
4      Q.     And what have you been told?
5      A.     Detective Wood.
6      Q.     Okay.  Anybody else?
7      A.     Not that I'm aware of.
8      Q.     Okay.  Is it correct there's not a
9    transcript of that testimony?
10     A.     I don't believe there would be, no.  It's
11   -- that's not common.
12     Q.     The February 8th, 2022, Gibson email
13   request for case files, where did you obtain that
14   data?
15     A.     That's a note in Tracker as well.
16     Q.     And the entry right below it, February 11,
17   2022, is that a Tracker entry?
18     A.     No.  That's just noting that I looked in
19   evidence.com to look at the creation date of that
20   file, and that's the creation date for the file -- or
21   the first file --
22     Q.     All right.
23     A.     -- related to this case.
24     Q.     Then right below that, "February 16, 2022,
25   two large binders given to A.D.A. Gibson," is that a

144

1    Tracker entry, or what's the source for that?

2        A.    Yes.   That's a notation in Tracker that

3    two large binders were provided to A.D.A. Gibson.

4        Q.    And below that, "First discovery

5    disclosure," May 26, 2022?

6        A.    Yeah.   That's the first notation that I

7    saw in Tracker of us sending any discovery material

8    to any particular defense attorney.

9        Q.    Okay.  And so that's the source, again,

10   going into Tracker to pull that date?

11       A.    Uh-huh.

12       Q.    All right.

13       A.    Uh-huh.

14       Q.    Then you have "Somewhere after September

15   27, 2022, A.D.A. Gibson left office."

16       A.    Yeah.   I know that -- and that date comes

17   from either a note that she logged in or maybe even

18   an email exchange with Detective Wood.  I can't

19   remember.  But I don't remember when Ms. Gibson left

20   her employment with our office.  I know there are no

21   more notations after that time frame from her, so I

22   would assume, sometime after that, she left.

23       Q.    And why did you include that in your

24   notes, that --

25       A.    Well, because I'd be sitting here today

145

1     expecting questions about why? When? Where? Can you

2     answer this? Can you answer that?

3              I can.  I can tell you that Ms. Gibson had

4     the case at least up until September 27th, 2022, and

5     I can tell you that somewhere after that, because

6     there are no more notations of any kind by her, she

7     would have left her employment.

8        Q.    Okay.

9        A.    The assignment of this case for

10    prosecution or anything after that, I don't -- I

11    don't know.  I don't know that information.  I am not

12    able to answer it or --

13       Q.    Was it not in Tracker?

14       A.    Right.  There's no notations for me to

15    provide that information.  So tracking a history of

16    the case in our office after that date, I couldn't

17    tell you until I became involved in March of 2023.

18       Q.    Okay.  So let me make sure I'm

19    understanding what you just told me.

20              After A.D.A. Gibson left somewhere around

21    September 27, 2022, is it correct that, based on a

22    review of Tracker, you cannot tell who the case got

23    assigned to until March 21 of 2023 when you became

24    involved?

25       A.    Yeah.  I can't tell you.  I have no idea.

1      Q.    And I guess what I'm trying to make sure
2    I'm asking is:  Did you look in Tracker to try to
3    determine that?
4      A.    Yes.
5      Q.    And there was nothing in there to --
6      A.    Yes.
7      Q.    -- indicate that --
8      A.    So -- yeah.
9      Q.    -- it was assigned to anybody?
10      A.    Right.  So, you know, like most databases
11    --
12            (Off-the-record discussion.)
13            THE WITNESS:  Like most things, only what
14    you put in --
15      Q.    (By Mr. Cox)  Right.
16      A.    Only what you put in it is what you're
17    going to get out of it.
18        So A.D.A. Gibson had made some type of
19    notation, and that's the date, September 27, 2022.
20    After that, I didn't see another notation of any kind
21    from -- I don't think I did -- from a prosecutor that
22    I would say was assigned the case, so I don't know.
23            Now, had it been -- had all the case file
24    material been put in a box and put in somebody else's
25    office and they'd been told, "You're going to take

147

1    this case" and nobody had updated Tracker, don't

2    know.  That's a question I can't answer.

3         Q.    Do you recall if there were any Tracker

4    entries between September 27 of 2022 and March 21 of

5    2023 when you were directed to become involved?

6         A.    I don't recall.

7         Q.    How would one determine to whom a case has

8    been assigned -- to which A.D.A. a case has been

9    assigned at any point in time in the D.A.'s office?

10        A.    Well, the only way I would know, unless I

11   had firsthand personal knowledge of it, would be to

12   pull the case up in Tracker and see who's been

13   assigned the case or who Tracker claims is assigned

14   the case.

15        Q.    Okay.  I mean, is that the typical

16   process, that when an A.D.A. is assigned a case, that

17   assignment is also noted in Tracker?

18        A.    Yeah.  I mean, normally, at some point,

19   that notation will be made in Tracker.

20             Now, are there occasions where I've seen

21   Tracker still shows an A.D.A. assigned the case

22   that's not the A.D.A. that has the case and

23   prosecutes the case?  Yeah, absolutely.  And, again,

24   indication of if you don't put it in there, you don't

25   know.

148

1    Q.    March 21, 2023, the entry on Plaintiffs'

2    Exhibit 3 is you were directed to become involved.

3    A.    Yes, sir.  That was the day I was told by

4    A.D.A. DeBlasiis to start looking into the issues

5    with the case file and any missing material as well

6    as any investigative issues that might affect the

7    prosecution.

8    Q.    And what did A.D.A. DeBlasiis tell you

9    about when he took over some responsibility for this

10   case?

11   A.    Not much.  Whatever had occurred up to

12   that point, those conversations were between him and

13   D.A. Jones, and I was brought into the back end of

14   that and basically assigned the task of looking at

15   this stuff.

16   Q.    When you were brought in and given that

17   assignment, was anything said, or were you made aware

18   of anything that gave you any idea of how long

19   A.D.A. DeBlasiis had this case?

20   A.    I don't know that he's had the case.  I --

21   that's what I'm getting at.  No.

22   Q.    Okay.

23   A.    Yeah, yeah, yeah.  I see what you're

24   saying.  No.  I don't know whether he had just been

25   advised of problems and then it was -- they were

1    like, "Well, we need to get it handled" and now I'm

2    being advised there's problems.  I don't know what

3    his knowledge or involvement is before this date.

4         Q.    Because you were brought in literally the

5    day before the suppression hearing?

6         A.    Yes, sir.

7         Q.    And I guess what I'm trying to get at is:

8    Was there anybody in there going, "Good Lord.  I've

9    just been handed this case to handle tomorrow.

10   What's going on?"

11        A.    No.  I will know -- I mean, somewhere,

12   they figured out there was already an issue with the

13   search warrants.  At what point, I do not know.  I

14   know D.A. Jones was going to handle that suppression

15   hearing, those motions to suppress, so I would assume

16   it was in her process of preparing that she found

17   problems.  When, I don't know.

18        Q.    Okay.

19        A.    So my first knowledge is when she said,

20   "Come to the office and look at this."

21        Q.    And is it correct that, on March 21, you

22   started going through the case file that day?

23        A.    Yes.  I was handed all the materials that

24   we had or copies.  So anything that was already on a

25   drive, I made a copy off the drive to my drive so I

150

1    didn't have to take everything out of everybody's

2    possession.

3         Q.    And at what point after you began your

4    review did you begin to think -- or did you have some

5    concerns about what was not in the case file?

6         A.    So I knew -- by the end of that day before

7    that March 22nd suppression hearing, I knew that none

8    of these warrants had been returned to the Court, so

9    I knew that we would be unable to speak to the -- any

10   evidence that the Defense was trying to suppress,

11   which was a problem for the Defense, too.  They're

12   trying to suppress stuff.  They don't know what

13   exists.

14         So that -- at that point, that's the depth

15   of -- I knew there -- at least that's a problem.  I

16   did not come up with any other issues until I spent

17   the rest of that week and the weekend really deep

18   diving into the case.

19         Q.    All right.  The March 27, 2023, entry on

20   Plaintiffs' Exhibit 3 --

21         A.    Yes.

22         Q.    -- does that come from a Tracker entry or

23   --

24         A.    That's me.

25         Q.    Okay.

1      A.    That's my knowledge.

2      Q.    I mean, that's not based on you going back

3  and reviewing any records?

4      A.    I sent Detective Wood an email at the end

5  of that day, so I know it was that day.

6      Q.    Okay.  All right.  Earlier, Mr. Dove was

7  asking you about Defendants' Exhibit 12, the email

8  that lists a number of cases and the process of

9  trying to --

10     A.    Uh-huh.

11     Q.    -- triage --

12     A.    Uh-huh.

13     Q.    -- various cases.

14     A.    Yes.

15     Q.    And you had -- I think in response to some

16  of his questions, had said there have been other

17  cases where there were problems, meaning other than

18  this Parrish case; is that correct?

19     A.    Yes.

20     Q.    Do you have any way to quantify other

21  cases, when -- what they were?

22     A.    Well, primarily, you know, my involvement

23  is usually with murder cases.  So when -- I couldn't

24  speak to numbers, but I would not say that it is an

25  uncommon thing to -- somewhere down the road

152

1   pretrial, to find out that there is some type of

2   issue, whether it's -- there's investigative steps

3   that we feel should have been followed up on or

4   there's material that's not been analyzed in depth.

5   You get -- and the only way I can really explain this

6   is to give you examples.

7           I could have someone claim that I have

8   this individual's phone records and their phone

9   records showed them at the scene of the crime.  Well,

10  that's a very specific statement.  And I -- I know a

11  lot about phone records, and I look at a lot of them,

12  and I do a lot of testimony about them, and you can't

13  make that kind of definitive statement.

14          So that would -- that may be written in a

15  report, and a prosecutor may take it at face value

16  but then be looking for the data that supports the

17  claim to find out the detective isn't really

18  well-versed and probably won't be able to testify to

19  it.

20          You might have to be considered an expert

21  to testify to it, which then creates a scenario where

22  someone else now has to look at those cellular

23  records and actually be able to testify to their

24  content in a courtroom for it to be considered

25  evidence, stuff like that.

153

1          There could be claims that there's

2    evidence in a phone.  They don't tell us where --

3    phone dumps are massive, massive, ma- -- I'm sure you

4    know, you know, massive amounts of information.  And

5    they'll tell us that something exists, but they don't

6    tell us what page of the PDF.  They don't tell us

7    what file in the extraction it's in.  And someone's

8    got to go back and hunt that stuff down.  They don't

9    -- they may not have followed up on an alibi.  They

10   may not have followed up on another potential

11   suspect.

12          So I call those problems.  For me, those

13   are problems because, when I work cases, I'm always

14   thinking about what's going to happen in trial, not

15   about what do I need to arrest this guy.  What's

16   going to happen in trial?

17        Q.    All right.

18        A.    So that's what I'm getting at.

19        Q.    At some point in your testimony, you used

20   the phrase "investigative request system."

21          What is that?

22        A.    So county -- through -- I don't know how

23   it works.  County IT through SharePoint has set up a

24   -- basically, it's a web-based ability for requests

25   to be forwarded to the investigative office.  So they

154

1    go in, and they fill out a preformatted form.  They

2    hit submit, and then I or the other supervisors can

3    pull up the list of requests, open up the request,

4    see what it is.  Maybe even by the title, we already

5    know who to assign it to, what part of our units to

6    assign it to.  And then we can assign the request.

7    That's then forwarded to the investigator that's

8    assigned via email.  So they can pull it up via

9    email.  So it just -- it's -- instead of me handing

10   you a piece --

11        Q.    Sure.

12        A.    -- of paper, it's just forwarding it to me

13   electronically.

14        Q.    And is that something that the A.D.A.

15   would use or -- to make an investigative request?

16   Who would utilize that system?

17        A.    Both -- I could utilize it if I want to

18   create a request.  Like, to save somebody time, I

19   know what needs to be done, and we just need to

20   account for it.  The A.D.A. could do it themselves,

21   or they could ask their admin to do it.

22            So you see it both ways.  You see A.D.A.s

23   ask their admin, "Hey, can you put in a request to

24   get someone to look at this or do this?"  Then the

25   admin will actually generate it.  But you go by --

155

1    then you go by -- they'll usually put in there who

2    the prosecutor is assigned to the case, who's

3    actually requested this.

4            (Off-the-record discussion.)

5            THE WITNESS:  So who can access it?

6        Anyone can access it.

7        Q.    (By Mr. Cox)  Anyone in the D.A.'s office?

8        A.    Yeah.  There's no -- there's no

9    restrictions on it as far as anybody being able to

10   access it.

11       Q.    All right.

12       A.    It just cuts down on paper.

13       Q.    So am I understanding correct that, other

14   than maybe any entries you made in Tracker or emails

15   that you sent out, there would not be other documents

16   or records that you created that set out what you

17   viewed as the shortcomings or deficiencies or

18   problems based on your review of the Parrish case?

19       A.    No.  All those are -- all that

20   communication, I think, was all emails.

21       Q.    All right.  You testified earlier about

22   problems with ballistic evidence not being submitted

23   to the --

24       A.    Uh-huh.

25       Q.    -- GBI?

156

1        A.    Uh-huh, yes.

2        Q.    It sounded, the way you talked about that,

3   as if that was a fairly common problem that you --

4        A.    Yes.  I try -- usually, I think back, and

5   I reference stuff around COVID.  You know what I

6   mean?

7             As far back as COVID, maybe even before,

8   it started becoming routine where we would discover

9   ballistic evidence that was significant and should be

10  tested had not been delivered to the lab and tested.

11            When we inquired into that, the answer --

12  and I can't say that I heard this directly.  I can

13  say it's what I was told.  The answer we got back was

14  because it -- it had gotten to the point where we had

15  made it known to higher supervision levels within CID

16  at SPD, like, this is a repetitive thing, and it's

17  getting to be ridiculous.

18            The answer that we got back was that

19  Sergeant Khaalis had responded to that saying, "Well,

20  the D.A.'s office is responsible to tell us to submit

21  this evidence to be tested."

22            Never heard of such orders, policies,

23  procedures ever issued by the district attorney's

24  office to anybody to do that.  It's an investigative

25  function.  If you have evidence that you think is

157

1      going to produce more evidence that points guilt

2      towards a defendant, you take it to the lab.

3              Now, the only confusion I can see -- or

4      the only possibility I see to explain any of that in

5      an answer is, over the years, the GBI will change

6      their policies and procedures of handling evidence.

7      They got to the point where they were receiving so

8      much ballistic evidence where there was no arrest.

9      There was no suspect to identify.

10             They would have mountains upon mountains

11     of shell casings or guns unrelated to pending trials

12     or arrested subjects or potential suspects that they

13     changed their policy and procedures to "Please bring

14     us stuff that is either going to further your

15     investigation geared towards arresting a suspect, or

16     you have made an arrest."

17             And they know, too, that means -- an

18     arrest means trials down the road somewhere.  That's

19     what they're getting at, because they were getting

20     overwhelmed with the amount of evidence that had no

21     real value in the moment that it was delivered to

22     them, lots of times with no explanation about why

23     it's there.  And then they're having to figure out

24     "Why do I have this?  What's the relevance of it?"

25     So . . .

158

1    Q.    Regardless of whatever the GBI may have --

2    A.    Yeah.

3    Q.    -- told -- or whatever their issues were,

4    what you had experienced at least -- or at least

5    particularly with ballistic evidence was that

6    evidence was not being submitted on from the Savannah

7    Police Department to the GBI for processing?

8    A.    It wasn't just the Savannah Police

9    Department that we experienced that with.  I mean,

10   that happens with other agencies, too.  But as a

11   whole, it's not an agency as a whole.  It really --

12   again, there's -- I'll tell you, to this day, there's

13   detectives that I never, ever, ever touch their

14   cases.  They handle everything.

15   Q.    Sure.

16   A.    They know what needs to be done.  So they

17   kind of -- that stuff kind of starts falling back to

18   certain individuals keep repeating the same patterns.

19   Q.    Well, I guess my question about that was

20   because when you spoke about it earlier, you weren't

21   talking about individuals.  Your testimony seemed to

22   be directed to what the department was doing with not

23   submitting ballistic evidence.

24   A.    Yeah.  It was becoming common with SPD.

25   By that point, it was becoming common.  But there

1    still were detectives within that unit that it didn't

2    apply to them.

3         Q.    And apparently, at some point, you were at

4    least made aware that, supposedly, Sergeant Khaalis

5    had made some statement about when it should or

6    should --

7         A.    Yeah.

8         Q.    -- not be submitted?

9         A.    It had become so common that it was

10   addressed back to CID chain of command at SPD for --

11   that they literally had to -- I don't know whether it

12   was by email, verbal order, or whatever it was.

13        They had -- they inquired into it, and

14   they said, "Look, it's our ballistic evidence.  It

15   needs to go.  It's our responsibility to take it."

16        Somewhere in there, Sergeant Khaalis must

17   have been asked about it, and the answer back was

18   something to the effect of, "Well, we wait for the

19   D.A.'s office to tell us what to submit to the GBI

20   lab when it comes to ballistics."  And when I was

21   told that, I found that hard to believe.

22        Q.    Were you made aware of other evidence at

23   the Savannah Police Department that the practice was

24   to wait until the D.A.'s office told the police

25   department to submit the evidence before they

160

1   submitted it to the GBI crime lab --

2        A.    I'll --

3        Q.    -- or evidence lab?

4        A.    I'll -- you know, ballistics is what we

5   were talking about, but the same thing applied to a

6   lot of other things, like DNA evidence.  Again,

7   that's -- that can be time-consuming stuff for the

8   GBI to process.  It's the same problem with the

9   ballistic evidence.

10            You can't wait till the last minute to go

11  submit it, get it tested.  You end up having to delay

12  trials, if you're allowed to, to get it tested.  So

13  DNA evidence was also kind of mixed in there as well.

14       Q.    Would that be something that you would

15  have viewed as a systemic problem of -- the DNA

16  evidence not being submitted timely to the GBI crime

17  lab for processing?

18       A.    Yeah.  All -- to me, all relative evidence

19  -- regardless of what the nature of the evidence is,

20  if there's some scientific testing that would

21  typically be done, all of that would be a problem.

22  And it was becoming common.

23       Q.    Okay.  You testified at some length about

24  search warrant returns and at least what you viewed

25  as the purpose for why that --

161

1        A.    Uh-huh.

2        Q.    -- the law exists for why a return should

3   be made.

4             Is it correct that you're aware that the

5   mere failure to make a search warrant return does not

6   constitute a Fourth Amendment violation?

7        A.    Yeah.  I don't see how it would be a

8   violation of the Fourth Amendment.  It -- probably,

9   if there's a penalty, I would assume the penalty

10  would be the Court penalizing me.

11       Q.    Right.

12       A.    It's not defined in law, so I'm assuming

13  it would be a contempt issue with the Court.

14       Q.    And so I really was not asking you to

15  speculate about that.

16       A.    Oh, I don't know.

17       Q.    I was asking you if you were aware if

18  that, in fact, was the law.

19       A.    No.  I mean, no.  It wouldn't -- it

20  wouldn't -- I don't see how it would affect an

21  individual's Fourth Amendment rights.

22             MR. COX:  Okay.  I don't have any other

23       questions.

24             THE WITNESS:  Okay.

25             MR. COX:  Thank you.

162

1          MR. SHIPLEY:  No questions here.

2          MR. DOVE:  I just have one or two

3     questions.

4                    EXAMINATION

5   BY MR. DOVE:

6      Q.    You mentioned that -- an email from

7   Sergeant Khaalis about the ballistic evidence.

8          Have you actually seen that --

9      A.    No.  I didn't say email.  So if there's an

10  email, I don't know.

11     Q.    Okay.

12     A.    I said the issue was addressed.  When

13  things started becoming very commonplace, evidence

14  not getting to the lab, it was addressed, and it was

15  addressed with -- above the sergeant level of

16  homicide.  So who in particular, whether it was a

17  lieutenant or a captain, I don't know.

18          And that's when I heard that, you know,

19  they're going to handle it; it's not going to be a

20  problem any longer.  And it did fix itself.  From

21  whenever that was addressed, however long ago it was,

22  it has fixed itself with SPD.

23          But the -- but what came back in response

24  was that Sergeant Khaalis had made that comment of we

25  -- the D.A.'s office tells SPD what and when to take

163

1    evidence to the lab.

2         Q.    So your understanding was Sergeant

3    Khaalis's excuse, so to speak, to her higher-ups was

4    the reason this is happening is because the D.A.'s

5    office --

6         A.    Yes.

7         Q.    -- is supposed to tell us when we do it?

8         A.    That was my understanding of --

9         Q.    Is it your understanding that the

10   higher-ups said, "No.  You should be doing it, so go

11   do it"?

12        A.    Well, yeah.  They would say, "This is our

13   issue.  It's our responsibility.  We need to handle

14   it."

15             I know that's happened, so we don't have

16   that problem now --

17        Q.    Got you.

18        A.    -- at least not with the homicide office.

19   And, again, I don't see other cases, so I can't speak

20   to what's happening with those other units.

21        Q.    Sure.  And, again, this was all secondhand

22   knowledge; correct?

23        A.    Oh, yeah.  Yeah, yeah, yeah.

24        Q.    You were not a part of these

25   conversations?

164

1      A.      No.

2              MR. COX:   Okay.

3              MR. SHIPLEY:   I know I said I didn't have

4      anything.   I've just got a -- one or two more

5      questions.

6              (Off-the-record discussion.)

7                         EXAMINATION

8      BY MR. SHIPLEY:

9      Q.      All right.   As far as Detective Woods

10     [sic] goes, do you know of any other pending

11     accusations where Detective Woods [sic] has failed to

12     turn over -- certain evidence over to the D.A.'s

13     office where there's complaints that have been made

14     or a lawsuit filed?

15     A.      I'm not aware of other complaints.   If

16     there are, no one's advised me about them.

17     Q.      Okay.

18     A.      And you're -- I'm assuming you're asking

19     about external complaints not generated from within

20     the D.A.'s office or --

21     Q.      Well, that question.   But as far as

22     internally speaking, have you run into any other

23     issues, you personally or any of your other

24     associates, where Detective Woods [sic] has failed to

25     provide, you know, certain evidence to the D.A.'s

165

1    office in a timely fashion?

2         A.    This is the first case of hers that I've

3    ever looked at.  I know that there had been at least

4    one prior or maybe more that Investigator Jonathan

5    Puhala had looked at and had had issues.  Those

6    issues -- my memory is those issues being things

7    either not clearly expressed in the documentation or

8    couldn't be found.  And what couldn't be found, I

9    don't know.

10            I can remember -- no.  I don't want to say

11   that because I can't remember well enough to tell you

12   it's her case, so I would have to research that.

13   It's too far back for me to think.

14            But only Investigator Puhala could speak

15   more to any cases he's looked at before, but I do

16   remember -- because we work in the same office --

17        Q.    Uh-huh.

18        A.    -- I hear his conversations.  He tells me

19   things that are going on.  And there may have been

20   some prior issues where stuff was missing or it had

21   to be hunted down because it just -- something wasn't

22   either in the case file or was not fully expressed in

23   the reports inside the case file.

24            MR. SHIPLEY:  Okay.  Thank you.  No more

25        questions.

166

1          (Deposition concluded at 4:04 p.m.)

2          (Pursuant to Rule 30(e) of the Federal

3    Rules of Civil Procedure and/or O.C.G.A. 9-11-30(e),

4    signature of the witness has been waived.)

167

1                    CERTIFICATE OF COURT REPORTER

2

3      STATE OF GEORGIA:

4      COUNTY OF EFFINGHAM:

5

6           I hereby certify that the foregoing transcript
       was reported as stated in the caption and that the
7      questions and answers thereto were reduced to writing
       by me; that the foregoing 166 pages represent a true,
8      correct, and complete transcript of the evidence
       given on August 15, 2024, by the witness, ALAN BROOKS
9      SAMMONS, who was first duly sworn by me.

10          I certify that I am not disqualified for a
       relationship of interest under O.C.G.A. 9-11-28(c);
11     that I am a Georgia certified court reporter here as
       a representative of Gilbert & Jones, Inc. who was
12     contacted by Manly Shipley to take this deposition;
       that I will not be taking these proceedings under any
13     contract that is prohibited by O.C.G.A. 15-14-37(a)
       and (b) or Article 7.C. of the Rules and Regulations
14     of the Board.

15          By the attached disclosure form, I confirm that
       neither I nor Gilbert & Jones, Inc., are a party to a
16     contract prohibited by O.C.G.A. 15-14-37(a) and (b)
       or Article 7.C. of the Rules and Regulations of the
17     Board.

18          WITNESS MY HAND AND SEAL this 23rd day of
       September, 2024.

19

21          _____

22          VICTORIA L. ROOT, GEORGIA CCR

23

24

25

168

1                      DISCLOSURE OF NO CONTRACT

2

3        I, Debbie Gilbert, do hereby disclose pursuant to
    Article 10.B. of the Rules and Regulations of the
4   Board of Court Reporting of the Judicial Council of
    Georgia that Gilbert & Jones, Inc., was contacted by
5   Manly Shipley to provide court reporting services for
    these proceedings and there is no contract that is
6   prohibited by O.C.G.A.
    15-14-37(a) and (b) or Article 7.C. of the Rules and
7   Regulations of the Board for the taking of these
    proceedings.
8      There is no contract to provide reporting services
    between Gilbert & Jones, Inc., or any person with
9   whom Gilbert & Jones, Inc., has a principal and
    agency relationship nor any attorney at law in this
10  action, party to this action, party having a
    financial interest in this action, or agent for an
11  attorney at law in this action, party to this action,
    or party having a
12  financial interest in this action.  Any and all
    financial arrangements beyond our usual and customary
13  rates have been disclosed and offered to all parties.
       This, the 23td day of September, 2024.
14

15

16

17

19   _____
     Debbie Gilbert
20   FIRM REPRESENTATIVE
     Gilbert & Jones, Inc.
21

22

23

24

25

GILBERT & JONES

169

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25