**Exhibit G to Memorandum in Support of The Mayor and Aldermen of the City of Savannah's Motion for Summary Judgment**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | | |
|---|---|---|
| MARQUIS RAQUEL PARRISH and TYESHA LOVE, | ) ) ) | |
| Plaintiffs, | ) ) | CIVIL ACTION NO. 4:23-cv-00261 |
| vs. | ) ) | |
| ASHLEY WOOD in her individual capacity and in her official capacity as an employee of the Savannah Police Department, NICOLE KHAALIS, in her individual capacity and in her official capacity as an employee of the Savannah Police Department, and THE MAYOR AND ALDERMEN OF THE CITY OF SAVANNAH, | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

Deposition of MARQUIS RAQUEL PARRISH,
taken by counsel for the Defendants, Taylor L. Dove,
pursuant to notice and by agreement of counsel, under
the Georgia Civil Practice Act, reported by
Christopher M. Artman, Certified Court Reporter,
CCR B-2325, at the offices of Manly Shipley, LLP,
301 Habersham Street, Savannah, Georgia 31412, on
Friday, August 16, 2024, commencing at 10:14 a.m.

_____

Transcript Prepared By:

McKEE COURT REPORTING, INC.
P.O. Box 9092
Savannah, Georgia 31412-9092
(912) 238-8808

```
 1              APPEARANCES OF COUNSEL

 2   FOR THE PLAINTIFFS:

 3              JAMES E. SHIPLEY, JR., Esq.
                Manly Shipley LLP
 4              301 Habersham Street
                Savannah, Georgia 31401
 5              (912) 495-5360
                jim@manlyshipley.com
 6
                KATHERINE M. KELLY, Esq.
 7              Georgia Public Defender Council
                222 W. Oglethorpe
 8              P.O. Box 9176
                Savannah, Georgia 31412
 9              (912) 447-4901
                kmkelly@chathamcounty.org
10

11   FOR DEFENDANT ASHLEY WOOD:

12              CHARLES E. COX, JR., Esq.
                Charles E. Cox, Jr., LLC
13              484 1st Street
                Suite 1
14              Macon, Georgia 31202-0067
                (478) 757-2990
15              charles@cecoxjr.com

16

17   FOR DEFENDANTS CITY OF SAVANNAH AND NICOLE KHAALIS:

                TAYLOR L. DOVE, Esq.
18              HunterMaclean
                200 E. Saint Julian Street
19              Savannah, Georgia 31412
                (912) 236-0261
20              tdove@huntermaclean.com

21

     ALSO PRESENT:
22
                Tyesha Love, Plaintiff
23

24

25
```

1                    I N D E X

2                                              Page

3    Stipulation                               4

4    EXAMINATION

5         By Mr. Dove                          6

6    Signature of Deponent                     86

7    Certificate of Reporter                   87

8         (The Reporter's Disclosure Statement is
          attached at the back of the transcript.)
9

10    *    *    *    *    *    *    *    *    *    *    *    *

11                  E X H I B I T S

12   Defendant's
     Exhibit          Description                Page
13
         1    Plaintiff Marquis Raquel Parrish's    34
14            Supplemental Responses to Defendant
              The Mayor and Aldermen of the City
15            of Savannah's First Interrogatories

16       2    Handwritten Letter Sent to the Court  39
              from Plaintiff Marquis Raquel Parrish
17
         3    01-19-21 Dispossessory Warrant;       44
18            05-14-21 Dispossessory Warrant

19

20

21

22

23

24

25

1          (Whereupon an oath was duly administered.)

2          MR. DOVE:  This is going to be the

3     deposition of Marquis Raquel Parrish in the matter

4     styled Marquis Raquel Parrish and Tyesha Love versus

5     Ashley Wood, Nicole Khaalis, and the City of Savannah

6     that's pending in the United States District Court for

7     the Southern District of Georgia.

8          It is being taken for all purposes allowed

9     under the Federal Rules of Civil Procedure.  I would ask

10    that we go ahead and just stipulate that we reserve all

11    objections except for as to the form of the question or

12    responsiveness of the answer, if that's okay with

13    everybody.

14         MR. SHIPLEY:  Yeah.  Yeah.  I just wanted

15    to put on the record very quick, and Taylor, you and I

16    chatted about it yesterday.  Obviously, you know, any

17    kind of questions that pertain to the underlying crime

18    or incident, you know, I'm likely going to advise my

19    client -- and we'll have to listen to each question, but

20    to take -- to take the Fifth Amendment, his right to use

21    the Fifth on those questions just because I think double

22    jeopardy as far as the crime goes doesn't attach since

23    the case was nol-prossed.

24         You know, effectively, the City could go

25    out and arrest him again.  We sure don't want that, so

1  we're just going to -- I'm going to advise him to take

2  the Fifth.  You know, we can take those one by one.

3  But, you know, he's happy to answer any questions, you

4  know, that are unrelated to the crime.

5           MR. DOVE:  And that's fine.  And I wasn't

6  planning on really going down that path.  Charlie may.

7  But I may just generally ask him at the outset if he

8  plans on taking the Fifth, so...

9           MR. COX:  Specifically, what is it he plans

10  to assert the Fifth on?

11           MR. SHIPLEY:  I think -- and that's why

12  Katie is here, who is his criminal defense attorney,

13  throughout the matter.

14           MR. COX:  I didn't put that together.

15           MR. SHIPLEY:  Yeah, I've asked her to be

16  here because she represented Marquis throughout the

17  course of that.  You know, and the case was nol-prossed.

18  I've done my research on that.  During a nol-pros, I

19  mean, the City or the State still has the right to bring

20  another criminal action.

21           MR. COX:  As long as the statutes --

22           MR. SHIPLEY:  Yeah.  And so I think

23  anything that relates to the underlying crime, and I

24  know that's going to be subject to interpretation, but

25  I'm going to advise him to take the Fifth on those type

1    questions.  As much as I'm sure Detective Woods would

2    assert the Fifth in her deposition.

3              MR. DOVE:  That's fine.  I can't tell him

4    not to.

5              MR. SHIPLEY:  Yeah.

6              MR. DOVE:  It's his choice.

7              MS. KELLY:  No, you can't.

8              MR. COX:  And again, just to nail it down,

9    the underlying crime that you're referencing is the

10   killing of Charles Vinson?

11             MR. SHIPLEY:  Yes.  Correct.

12             MR. COX:  Okay.

13   MARQUIS RAQUEL PARRISH,

14     being first duly sworn, was examined and

15     testified as follows:

16   EXAMINATION

17   BY MR. DOVE:

18        Q.    All right.  Good morning, Mr. Parrish.

19        A.    Good morning.

20        Q.    My name's Taylor Dove.  I represent the

21   City of Savannah and Sergeant Khaalis in this case.

22   Have you ever had your deposition taken before?

23        A.    No, sir.

24        Q.    Okay.  I'm just going to go over some kind

25   of ground rules for today.  Obviously, we have a court

1  reporter here who's taking everything down.  To make his

2  job easier, there's a couple things we need to try to

3  avoid.  One is shaking of the head or nodding of the

4  head instead of yeses or nos.  So he needs yeses or nos

5  because he needs to be able to know what you said.  It's

6  hard to interpret when you're shaking your head or

7  nodding your head.

8        A.    Yes, sir.

9        Q.    Does that make sense?

10        A.    Yes, sir.

11        Q.    Okay.  The other thing is to make sure we

12  don't talk over each other.

13        A.    Okay.

14        Q.    It's going to happen because naturally,

15  people know where my question's going and they want to

16  go ahead and answer it.  But if you'll let me finish my

17  question before you start your answer, I will do the

18  same.  I won't start my next question until you're fully

19  complete with your answer.  Is that okay?

20        A.    Yes, sir.

21        Q.    Okay.  Also, this is not a marathon.  I

22  know I'm not going to take a lot of time today.  But if

23  you need a break for any reason, just let us know.

24  That's fine.  I would just ask that we finish whatever

25  question we were on before we take that break.  Is that

1  okay?

2       A.    Yes, sir.

3       Q.    I know you have one of your children here.

4  So if you need to take a break for any reason to go deal

5  with him, that's totally fine.  Just let us know.

6       A.    Okay.

7       Q.    Did you do anything to prepare for your

8  deposition today?

9       A.    No, sir.

10      Q.    Okay.  And I don't want to know what you

11  talked about with your attorney.  But did you meet with

12  your attorney at all?

13      A.    Today?

14      Q.    Just to prepare for this deposition

15  generally.

16      A.    Just to speak about the Fifth Amendment,

17  yes.  But other than that, he was trying to break to me

18  who all was going to be here and all.  But it wasn't no

19  major preparation.

20      Q.    Okay.  And that happened today?

21      A.    Yes, sir.

22      Q.    Okay.  Did you review any documents or

23  anything?

24      A.    I always do my research on anything.  I

25  always ask for updates.

1     Q.    Okay.

2     A.    Yeah.

3     Q.    I mean, just -- just in general for

4  preparing -- preparing for this deposition today, did

5  you review any documents that related to this case at

6  all?

7     A.    To the civil case?

8     Q.    Yes.

9     A.    Yes, sir.

10     Q.    Okay.  What documents did you review?

11     A.    The internal affairs review.  It was the

12  internal affairs review, the actual -- I don't know the

13  name of the paper.  But it lists all the charges and

14  stuff like that --

15     Q.    Okay.

16     A.    -- what we're accused and all the

17  accusations on it.  That's the paper that I read.

18     Q.    Okay.  And you read that all just to

19  prepare for today?

20     A.    No.  Not that -- I never knew nothing

21  about a deposition.  So I just always like to stay

22  ahead.  After what happened in that case, I always try

23  to stay knowing what's going on.

24     Q.    Got you.  So you just generally have

25  reviewed it just so --

1     A.     Yeah.

2     Q.     -- you can be familiar with your case.  Is

3  that accurate?

4     A.     Yes, sir.

5     Q.     Okay.  You didn't review it specifically

6  for today?

7     A.     No, sir.

8     Q.     Okay.  Got you.

9            You're currently married; correct?

10    A.     Yes.

11    Q.     And this is your wife right here?

12    A.     Tyesha Love, yes, ma'am -- yes, sir.

13    Q.     All right.  How long have y'all been

14  married for?

15    A.     We've been married for -- well, we've

16  known each other for 11 years now, but we've been

17  married I will say about six, seven years.

18    Q.     Okay.  And y'all have children together?

19    A.     Yes, sir.

20    Q.     How many?

21    A.     We've got five kids.

22    Q.     And if you could for me, list the names.

23    A.     You have Marquis Parrish.  You have Tyler

24  Love.  You have Elijah Love.  You have Amaya, Amaya

25  Love.  Then you have Kaylon Parrish.  That's it.

1    Q.    Okay.  And I'm not trying to pry or

2  anything.  I just need to know:  Is there a particular

3  reason why some of your children have the last name Love

4  and some have the last name Parrish?

5    A.    No.  It's just some of the -- like when I

6  was first starting off, I was trying to, you know, get

7  everything together.  I didn't really know too much

8  about parenthood.  So when we was at the hospital, we

9  would think that, okay, well, hey, you know, let us

10  just go like that.  I didn't think I have to literally

11  sign the birth certificate at the hospital.

12          So once kids started piling up, they

13  wanted to really -- my mom -- I'm not trying to make a

14  big paragraph.  But my mom, she's the one that told me

15  we have to go to the hospital -- no, the health

16  department to sign the birth certificate, that I was

17  supposed to do it at the thing.

18    Q.    Okay.  And -- but you are the biological

19  father of those --

20    A.    Yes, sir, I am.

21    Q.    -- children; correct?

22    A.    Biological father.

23    Q.    Okay.  And they're all under the age of 18?

24    A.    Yes, sir.

25    Q.    Do you have any other relatives that live

1    in the Savannah area?

2          A.    Yes, sir.

3          Q.    Okay.  Do you have any brothers or sisters?

4          A.    Yes, sir.

5          Q.    How many brothers and sisters do you have?

6          A.    Oh, that's a long question.  I think I

7    got -- I have seven on my mom's side.  I got six on my

8    daddy's side.

9          Q.    Okay.  And these are all either half

10   brothers, stepbrothers, sisters?

11         A.    On my dad's side, they're half brothers.

12         Q.    Okay.  Are they all over the age of 18?

13         A.    Not all.

14         Q.    Okay.  Do they all live in the Savannah

15   area still?

16         A.    Yeah.

17         Q.    Okay.

18         A.    They all live in Savannah.

19         Q.    Could you give me the -- the reason I'm

20   asking for these names is because if we go to a trial, I

21   want to make sure that they're not on the jury, because

22   they've got, obviously, a connection to you.

23         A.    Yeah.

24         Q.    So I want to just be able to get their

25   names while we're here.  So if you could, just list off

1    the siblings that are over the age of 18 that live here

2    in the Savannah area.

3           A.    Okay.  You have my brother Malik Simmons.

4    You have Rod Parrish, but Rod Parrish is in prison

5    right now.

6           Q.    Okay.

7           A.    That's it as far as -- oh, Romel Allen and

8    Chloe Allen.

9           Q.    Okay.  So these four are the ones who are

10   over the age of 18 that live here?

11          A.    That's on my mom's side.

12          Q.    Okay.

13          A.    On my dad's side, you have Malik Parrish,

14   and you have Kori Parrish, K-o-r-i.

15          Q.    Okay.  And I didn't ask earlier, but what

16   are your mom and dad's names?

17          A.    You have Samantha Simmons, and you have

18   Roderick Parrish.

19          Q.    And do you have a stepdad or stepmom?

20          A.    My stepmom is Ann Parrish.

21          Q.    Okay.

22          A.    And my stepdad's name is Romel Allen.

23          Q.    All right.  I think that's good for now.

24                Where do you currently reside?

25          A.    I'm in between houses right now.

1    Q.    Okay.

2    A.    Right now, you can put down 10 Austin

3 Drive.

4    Q.    Okay.  Who resides at 10 Austin Drive with

5 you?

6    A.    My wife's mother.

7    Q.    Okay.  Does your wife live there as well?

8    A.    Yes.

9    Q.    And all your children?

10    A.    Yes, sir.

11    Q.    Okay.  You said you were in between houses.

12 Where did you live prior to 10 Austin Drive?

13    A.    Back in 2021, it was -- what's the name of

14 those apartments?  Ascend Apartments, Apartment 14-C.

15 Sorry.  It's been a minute.

16    Q.    You're fine.  So you said since 2021,

17 you've been living at 10 Austin Drive?

18    A.    Yes, sir.

19    Q.    Okay.  And when you were at Ascend

20 Apartments, were you there with your wife and all of

21 your children?

22    A.    Yes, sir.

23    Q.    Okay.  Anybody else that was living there

24 with you?

25    A.    No, sir.

1    Q.    And where did you go to high school?

2    A.    I went to Windsor Forest.

3    Q.    Did you graduate?

4    A.    No, sir.

5    Q.    What was the last year you were at Windsor

6  Forest?

7    A.    The last year was twelfth grade -- oh,

8  year.  I'm sorry.

9    Q.    No, that's fine.  That was a bad question.

10  You answered it the way I wanted you to.  12th grade was

11  your last grade?

12    A.    Yes, sir.

13    Q.    Okay.  Did you go get a GED or anything

14  afterwards?

15    A.    No.  No, sir.

16    Q.    Okay.  Any other education past dropping

17  out of Windsor Forest?

18    A.    No, sir.

19    Q.    Okay.  Where are you current --

20    A.    Oh, I'm sorry.  I'm sorry.  Yes, you have

21  Savannah Impact.  I was going to Savannah Impact, but I

22  didn't achieve that.

23    Q.    What is Savannah Impact?

24    A.    It's a GED course.

25    Q.    Okay.  And you didn't complete it?

```
 1          A.     Yes.

 2          Q.     Any particular reason why?

 3          A.     Oh, no.  I didn't pass the test.  That's

 4    all it is.

 5          Q.     Okay.  And are you currently employed

 6    today?

 7          A.     Yes, sir.  Well, I work for myself.

 8          Q.     Okay.  I see you're wearing a reflective

 9    vest.

10          A.     Yes, sir.

11          Q.     You do something out at the port or

12    anything?

13          A.     I have -- right now I do remodeling.  But

14    I'm working into the landscaping field right now.

15          Q.     Okay.  And you said this is your own

16    business?

17          A.     Yes, sir.

18          Q.     Do you have a name for the business?

19          A.     Little Fellas.

20          Q.     Okay.  And is there anybody else that works

21    with you?

22          A.     No, sir.

23          Q.     So when you go do a remodeling job, it's

24    just you by yourself?

25          A.     Yeah.
```

1      Q.    Or if you go do landscaping, it's you by

2  yourself?

3      A.    It's me by myself, yes, sir.

4      Q.    Okay.  And how do you go about getting

5  business?

6      A.    It's a couple of different things.

7  Internet, like social media.  Social media,

8  door-to-door service.  Sometimes it's through mutual

9  friends.  It's all types of ways.

10     Q.    Okay.  And do you know about how much

11  you've made this year, 2024?

12     A.    2024?  Not being able to -- I've got to go

13  to the bank for that one.  But I probably made close

14  to -- I'm going to just say close to ten.  Close to

15  $10,000.

16     Q.    But you would be able to confirm that via

17  bank records?

18     A.    Yeah.  I could find out with the bank

19  records.

20     Q.    Okay.  Do you have a separate bank account

21  for the business?

22     A.    Yeah, just for the business itself.

23     Q.    Okay.  And is it -- do you have any sort of

24  LLC or company, or is it just -- is it just a d/b/a at

25  this point?

1    A.    Yeah.  Yes, sir.

2    Q.    How long have you been operating Little

3  Fellas?

4    A.    Since 2017, I think, I believe.

5    Q.    Okay.  Before you were working at

6  Little Fellas, post incarceration -- let me ask you

7  this.  Strike that question.

8          Have you had any other jobs post your I

9  guess May 2021 incarceration other than working for

10  Little Fellas?

11    A.    Yes, sir.

12    Q.    Okay.

13    A.    Oh, you're talking about during that time

14  prior, like 2021, 2022?

15    Q.    Yeah.  Since you've gotten released from

16  jail, have you had any other jobs?

17    A.    There was -- there were some guys I've

18  been working for like -- I don't know their last name.

19  One dude, I don't know his last name.  But he cleaned

20  up parking lots in Savannah and Walmart.

21    Q.    Okay.

22    A.    I did that.  I have Ranco special events.

23  I was doing Snelling.  That's a temp agency, Snelling.

24  Passing out Obamacare fliers.  I always stay with some

25  type of work.

1       Q.      Sure.  Do you know the name of the company

2   that cleans up the parking lots?

3       A.      I don't know his -- the name of it, but

4   I'm pretty sure I can call him and get that

5   information.

6       Q.      You don't remember any of the guys' names?

7       A.      No.

8       Q.      Not a first name or anything?

9       A.      Oh, no, not -- but I literally -- not on

10  that.  I always try to stay on myself, working for

11  myself.

12      Q.      Okay.  So I kind of just want to put a

13  little bit of a timeline together.  After you got out of

14  jail related to this incident, where did you go work

15  first?

16      A.      I went to Texas Roadhouse.

17      Q.      And how long did you work there for?

18      A.      I worked at Texas Roadhouse for two

19  months -- no.  Was it two months?  I think it was two

20  months.  I'm sorry.

21      Q.      Do you recall what you were getting paid?

22      A.      $15 an hour.

23      Q.      And what was your job?

24      A.      It was fryer.

25      Q.      What was the reason for leaving that job?

1       A.      I actually ran into the family members of

2  Charles Vinson.

3       Q.      Okay.

4       A.      Yes.  So I did not -- once that location

5  had been exposed, I didn't feel safe being there.

6       Q.      When you said you "ran into" them, were

7  they dining there and you ran into them?

8       A.      They was workers there.

9       Q.      They were workers there?

10      A.      Yes, sir.

11      Q.      Okay.  So you were having to work at the

12  same time as some of Charles Vinson's family members?

13      A.      Yes.

14      Q.      Okay.  So after Texas Roadhouse, where did

15  you go to work?

16      A.      I went to myself -- it was hard to find

17  jobs there.  Because that's still on my background, on

18  my record.  So it's hard to find a job kind of doing --

19  that's why I went back and just stayed focus on myself.

20      Q.      So after you left Texas Roadhouse, you just

21  started focusing on Little Fellas?

22      A.      Yes, sir.

23      Q.      When you were working at Texas Roadhouse,

24  were you still doing some remodeling and landscaping on

25  the side?

1      A.      On the side, yes, sir.

2      Q.      So these jobs earlier you talked about, you

3    know, cleaning up parking lots, Ranco and Snelling, that

4    was all prior to your incarceration?

5      A.      Oh, yeah.  That was before.

6      Q.      Okay.  Okay.  Sorry.

7              There was some reference in your tax return

8    to a Pacific Construction Company.  What's that about?

9      A.      Oh, James.  When I wasn't working for

10   myself, I worked for him.  So if I -- let's say work

11   was slow on a Monday.  I would go to work with him.

12     Q.      Okay.

13     A.      But I worked for him every week.  I worked

14   for him every week throughout the year.

15     Q.      Okay.  So were you doing that job with him

16   while you were also doing stuff for Snelling or Ranco?

17     A.      Yes, sir.

18     Q.      Okay.  So you were working two jobs?

19     A.      Oh, no, not dealing with Snelling and

20   Ranco.  That was just -- when I don't work for

21   myself -- when I'm not working with myself, I'm working

22   with him.

23     Q.      Okay.  So when did you work for Snelling?

24   When were you doing the temp stuff at Snelling?

25     A.      Snelling was in -- I could say that was

1    probably 2017 through 2018.

2            Q.    Okay.

3            A.    If you ever need records, I can get that

4    for you.

5            Q.    What were the approximate dates you worked

6    for Ranco?

7            A.    Ranco, around the same time.

8            Q.    And what about with the Walmart parking

9    lots?

10           A.    Walmart, for years.  I did that -- I did

11   that for I would say like between 2017 through -- I

12   think that was 2020.  Yeah, through 2020.

13           Q.    And those jobs were all kind of just off

14   and on?

15           A.    Yes, sir.

16           Q.    Okay.  You weren't, you know, steady

17   working for the guys cleaning up Walmart?  It's just

18   when --

19           A.    Oh, I had steady work for him, yes, sir.

20   On him, yes, sir.

21           Q.    So you had a typical workweek where you

22   would every week be doing the same job?

23           A.    Every week, yes.  Every night.

24           Q.    Okay.  Do you recall how much you made

25   doing that work?

1      A.    It was 12, I think.  $12 an hour.

2      Q.    And then do you recall how much you were

3  getting paid by the temp service?

4      A.    No.  It was different jobs.

5      Q.    So depending on what job you got assigned

6  to, it was different pay?

7      A.    Yes, sir.

8      Q.    Do you have a ballpark kind of a range of

9  hourly --

10     A.    I know I was making around $500 a week.

11     Q.    Okay.  And then what about for Ranco?

12     A.    Ranco was actually a good job.  It was $18

13  an hour.

14     Q.    Okay.  Any particular reason you stopped

15  working for Ranco?

16     A.    There was an incident with me and another

17  employee.

18     Q.    Okay.  What happened?

19     A.    The employee -- I guess we got into it.

20  He didn't feel like we was working fast enough, and

21  there was a dispute.

22     Q.    Did it get physical, or was it just verbal?

23     A.    No, no, no, not physical.  It was just an

24  argument that led to the manager saying both of us can

25  leave.

1      Q.    Okay.  Same question for Snelling.  Any

2   reason you stopped doing temp jobs?

3      A.    No.  There wasn't no reason.  I just hate

4   the on and off.  It's like I work this for three days,

5   work that for two days.  I don't like that.  I like

6   steady money.

7      Q.    And then same question for the parking lot

8   job.  Why did you stop doing that job?

9      A.    Like I say, I always have little things.

10   So it's just like I branched off from that.

11      Q.    Okay.  So at the time you got arrested in

12   2021, was your sole source of income Little Fellas?

13      A.    Yes, sir.

14      Q.    Okay.  And do you recall how much you were

15   making a month at the time you were arrested working for

16   Little Fellas?

17      A.    For Little Fellas, I can say I probably

18   made -- well, it depends on -- I can't average it.

19   Just ballpark, I probably made I'm going to just say

20   $3,500.

21      Q.    Per week?

22      A.    Yes, sir.

23      Q.    Okay.  And that's before taxes?

24      A.    Yeah, that's before taxes.

25      Q.    I don't want you to take offense to this.

1  I ask this of everybody in these kinds of cases.  Have

2  you ever been arrested before?

3       A.    Yes, sir.

4       Q.    Okay.  Do you recall about how many times

5  you've been arrested?

6       A.    No.  No, I don't.

7       Q.    I'll go ahead and tell you I've got your

8  criminal history.

9       A.    Yeah.

10       Q.    I just kind of want to run through it and

11  ask you some questions.  I'm not going to go into super

12  detail, but I do have to go over your criminal history.

13  But let's kind of start.

14            I know in your responses to our discovery,

15  you talked about a felony charge you got when you were a

16  juvenile for bringing a gun to school.  Is that right?

17       A.    It wasn't a gun.

18       Q.    What was it?

19       A.    It was a knife.

20       Q.    Okay.  And did this occur at Windsor

21  Forest?

22       A.    Yes, sir.

23       Q.    What grade were you in when it happened?

24       A.    No, that didn't occur at Windsor Forest.

25  That occurred at Southwest Middle School.

1        Q.    Okay.  So you were in middle school when

2  you got charged?

3        A.    Yes, sir.

4        Q.    Okay.  How old were you?

5        A.    I was in sixth grade.  Probably around 12.

6        Q.    Okay.  And did you end up having to go to

7  juvie for that?

8        A.    Yes, sir.

9        Q.    Okay.  How long were you there for?

10       A.    Probably like two, three weeks.

11       Q.    Okay.

12       A.    Yes.

13       Q.    And then you just returned back to your

14  middle school?

15       A.    No.  They put me in Scott Alternative

16  school.

17       Q.    How long were you at the alternative school

18  for?

19       A.    Until I got to ninth grade.

20       Q.    Okay.  Any other felony arrests?

21       A.    No.

22       Q.    The rest were just misdemeanors?  Is that

23  your understanding?

24       A.    Yeah, misdemeanors.

25       Q.    Let's see.  I have a misdemeanor arrest in

1  2011 for providing a false name to law enforcement.  Do

2  you recall that?

3       A.    Yes, sir.

4       Q.    What happened?

5       A.    During that time, me and my mom had a

6  dispute.  It wasn't me and my mom.  It was me and my

7  stepdad, but it was through me and my mom.  So I had

8  left.  I was a minor during that time -- well, no, I

9  wasn't a minor.  But I thought my mom called the police

10 when I left.  So by the time I seen the police coming,

11 I'm like, okay, I'm going to turn around.  I turned

12 around.  And the police, I guess he got suspicious, and

13 he turned and he blue-lighted me.  And he asked my

14 name, and I gave him a false name.

15      Q.    Okay.  And that was it?

16      A.    Yeah, that was it.

17      Q.    Did you end up getting ultimately charged

18 with anything?

19      A.    I think probation.

20      Q.    Okay.  And then I've got a couple

21 misdemeanors for theft by shoplifting, one in 2012 and

22 one in 2013.

23      A.    Uh-huh (affirmative).

24      Q.    What happened on the one in 2012?

25      A.    2012 was with me and my brother.  That was

1    with me and my brother, and we was -- we seen video

2    games.  We had video games.  We was young, and we

3    wanted to get them.  We had money to get them.

4          Q.    Where did that occur?

5          A.    Walmart.

6          Q.    Then the one in 2013?

7          A.    That one, I don't remember.

8          Q.    Okay.  And do you remember if you were

9    ultimately convicted of the shoplifting?

10         A.    If I was, it probably was probation.

11         Q.    Okay.  I have a note in here that the one

12   in -- actually, let me take that back.  Did the one in

13   2013 involve a Publix?

14         A.    Oh, Publix, yes.  During that time, my

15   wife was pregnant.  And there wasn't no work.  So I had

16   to try to come up with some food.

17         Q.    Okay.

18         A.    Yes.

19         Q.    And according to your record, you got

20   12 months probation.  Does that sound right?

21         A.    Yes, I think so.

22         Q.    And then in 2014, do you recall being

23   arrested for theft of lost or mislaid property?

24         A.    Theft of mislaid property?  Oh, that was

25   at the health department.  That was dealing with the --

1    it was a wallet that was on the ground.

2         Q.    Okay.  And it appears you may have served

3    some jail time for that?

4         A.    I don't think I served jail time for that.

5    I know I had probation at the end of it.

6         Q.    Okay.  So you didn't -- my understanding,

7    you were still on probation when that occurred.  There

8    was a probation violation.  Do you recall serving jail

9    time for a probation violation?

10        A.    I don't recall it.  But if it says it,

11   then it's true.

12        Q.    Let me ask you this:  Other than the jail

13   time you spent in this particular case, have you gone to

14   jail on other occasions?

15        A.    Driving without a license.

16        Q.    Okay.

17        A.    You know, nothing major.  It's like no

18   robberies or murder or anything like that.

19        Q.    So the only other time you've been to jail

20   was for driving without a license?

21        A.    Yes.

22        Q.    Then I've got another shoplifting charge in

23   2015.  Do you recall that one?

24        A.    No, sir.

25        Q.    Okay.

1    A.    Hold on.  Was that at Target, the Target

2  one?

3    Q.    I don't know.

4    A.    I don't -- I don't think so.  I know one

5  of them was at Target.  But I know that Target one had

6  got dismissed.

7    Q.    Okay.  And what happened at the Target?

8    A.    There wasn't nothing that happened at the

9  Target.  At that time, that was an accusation.

10    Q.    So you ultimately were not convicted for

11  that one?

12    A.    Yeah.

13    Q.    All right.  And I think this is the driving

14  without a license you referenced in 2015.  It appears

15  you were arrested for driving without a license and

16  willful obstruction of a law enforcement officer.  What

17  happened in that incident?

18    A.    I don't know about the obstruction part.

19  I don't know -- remember the driving without a license

20  part.  But I know I got arrested for driving without a

21  license.  But I don't know what happened.  It was

22  probably two or three times this happened to me.

23    Q.    And you don't recall ever resisting arrest

24  or doing something to prevent the law enforcement

25  officer --

1    A.    No.  As a matter of fact, I think I know

2    which one that is.  I think that's the one when we got

3    into an accident on Truman.  The police -- we actually

4    took a plea deal.  We actually took a plea deal because

5    the lady came -- the detective came on the grounds and

6    said that the seat was laid back.  So it had to be

7    driving.  When my window was down, dirt all over me,

8    covered me, and her window was up.  She was the only

9    one without dirt on her.

10           But we just took the plea deal because the

11   officer said, okay, well, we have no other way of --

12   not the officer, but the lawyer said, we cannot prove

13   this, then we were going to get time.  During that

14   time, I was young.  I didn't know nothing about the

15   law.

16   Q.    So in that instance, you got in a car

17   wreck, cop showed up, and you didn't have a license and

18   they thought you were driving?

19   A.    Yes.

20   Q.    Okay.  All right.  Then there's another

21   charge in 2016 for driving without a license and then

22   along with another willful obstruction of law

23   enforcement officers.  Do you recall a second instance

24   in which you were charged with driving without a

25   license?

1    A.    It's been too long.  I don't remember too

2    many of them.

3    Q.    Okay.  So you don't know why you would have

4    been charged with willful obstruction in 2016?

5    A.    No.

6    Q.    All right.  In 2016, there's another arrest

7    for theft by shoplifting and criminal trespass.  Do you

8    recall that arrest in December of 2016?

9    A.    Probably -- probably.  That was Walmart, I

10   probably think.  Yeah, I think that was Walmart.

11   Q.    Okay.  And did they charge you with

12   criminal trespass because you had been previously banned

13   from Walmart?

14   A.    Yeah, I've been banned from Walmart.

15   Q.    Are you still banned from Walmart today?

16   A.    I don't think so.

17   Q.    Okay.

18   A.    I never had a life ban from anyplace ever.

19   Q.    I've got another theft by shoplifting in

20   2017.  Do you know what that might have been about?

21   A.    You've got to refresh my memory.  I'm

22   sorry.

23   Q.    It was in November of 2017.  You were

24   arrested for theft by shoplifting.  Doesn't ring a bell?

25   A.    No.

1      Q.    Okay.  And then I've got a charge out on

2  Tybee Island in 2018 for carrying a weapon without a

3  valid license.

4      A.    Yes.

5      Q.    So were you carrying a firearm?

6      A.    Yeah, I was carrying a firearm.  Yes, sir.

7  But the firearm was broken.  I found the firearm out

8  there on Tybee.  And when we just so happened to get

9  pulled over during the time, it didn't fire or wasn't

10  firing or nothing like that.  The hammer part was

11  actually off of it.

12      Q.    But it was not your firearm?

13      A.    Yeah, it was not my firearm.

14      Q.    But you didn't have a concealed weapons

15  permit?

16      A.    Yeah.

17      Q.    In 2021, I have an arrest for theft by

18  taking.  It was a felony charge.  Do you recall that?

19      A.    Theft by taking, felony?  No, I don't

20  recall that.

21      Q.    Okay.  In May of 2021?

22      A.    Oh, that's -- that was the case that was

23  trying to merge with this case.  I'm sorry.  I forgot

24  all about that.  That was the case -- they tried to

25  merge that case with this case.  And that was with --

1   that was with someone I was buying -- I actually was

2   try -- that case is not even closed yet.  So I don't --

3   yeah, I don't really want -- that case --

4                MR. SHIPLEY:  Is there anything pending on

5   it?

6                MS. KELLY:  Yeah, that's pending.

7                MR. DOVE:  Is he going to plead the Fifth?

8                MS. KELLY:  Yes.

9                MR. DOVE:  Can I ask generally what they're

10  alleging he took?

11               MS. KELLY:  I'm going to advise my client

12  to plead the Fifth on anything to do with that case.

13       Q.    And I'm just going to -- just for the

14  record, it's my understanding your counsel has

15  instructed you to plead the Fifth related to any

16  questions that may deal with a theft by taking arrest

17  from May 1st of 2021.  Is that correct?

18       A.    Yes, sir.

19       Q.    Okay.  And if we go to trial in this case,

20  do you again plan on pleading the Fifth related to this

21  particular charge?

22       A.    Yes, sir.

23               (Whereupon Defendant's Exhibit 1 was marked

24  for identification.)

25       Q.    All right.  We got through that.  Good.

1          I'm going to hand you a document which I

2    will mark as Defendant's Exhibit 1.  I'll represent to

3    you this is discovery responses that were provided by

4    your counsel to myself for interrogatory responses,

5    which are a series of questions for which you were

6    supposed to provide answers to, to the best of your

7    knowledge.  Have you seen this document before?

8          A.    Yes, sir.

9          Q.    Okay.  And you've reviewed the answers that

10   were provided?

11         A.    Yes, sir.

12         Q.    Okay.  If you will for me, turn to Page 10.

13   If you'll look at Interrogatory No. 13 for me.  Feel

14   free to browse through your response, if you'd like.

15   I'm going to have a few questions about it.  Just let me

16   know when you're ready to talk about it.

17              (Whereupon off-the-record discussions

18   ensued.)

19         Q.    As we go through it, we can probably take a

20   look at them.

21         A.    All right.

22         Q.    In this particular interrogatory, we were

23   asking you for a description and the basis for the

24   damages you're claiming in this case.

25         A.    Yes, sir.

1      Q.    And I kind of just want to talk through a

2   few of them.  The first bullet point says, "Prior to

3   Plaintiff's arrest, indictment and incarceration, he was

4   in the process of building a business in carpentry and

5   landscaping but was forced to abandon this business

6   venture once he was incarcerated."

7            Is this referring to Little Fellas?

8      A.    Yes, sir.

9      Q.    Okay.  And you have since revived that

10  business; correct?

11     A.    Yes, sir.

12     Q.    Okay.  And so it's my understanding, and

13  correct me if I'm wrong, Little Fellas would have been

14  out of business just from the time you were arrested to

15  the time you got out of jail?

16     A.    Repeat that question for me.

17     Q.    So did Little Fellas not exist --

18     A.    During that time?

19     Q.    Yes.

20     A.    Yes, it didn't exist.

21     Q.    And when you got out of jail, did you go

22  right back to work in Little Fellas?

23     A.    First I tried to do Texas Roadhouse.  I

24  was trying to find actual work.  Then I said, okay.

25  Well, let me go ahead and pick up -- try to pick back

1   up on doing Little Fellas.

2        Q.    Okay.

3        A.    Yeah.

4        Q.    So --

5        A.    So not immediately.

6        Q.    Sure.  So after Roadhouse is when you

7   decided, hey, I want to bring Little Fellas back?

8        A.    Yes, sir.

9        Q.    Okay.  And is that business making as much

10  money as it did prior to your arrest?

11       A.    No, sir.

12       Q.    Okay.  How much less do you think it's

13  making now than it did before?

14       A.    I could say thousands.  I can really tell

15  you, it's -- like right now, last month, I probably

16  made $800 in one month.

17       Q.    Okay.  And what were you -- you said you

18  were typically making $3,500 --

19       A.    Yes, sir.

20       Q.    -- a month --

21       A.    Yes, sir.

22       Q.    -- the prior --

23       A.    Yes, sir.

24       Q.    Do you expect you'll be able to build that

25  business back up to that level?

1     A.    Yes, eventually.  Yes, sir.

2     Q.    Do you have any expectation of how long

3 that might take?

4     A.    No.  Just the planning.  I've got to get

5 all my tools back.  All the tools I had was actually

6 damaged, water damaged.  Some of them was lost.  Some

7 of them was stolen.  So I came back home to very little

8 tools.

9     Q.    And are you doing the same type of

10 marketing that you were doing previously?

11     A.    Yes, sir.  I had -- the only thing

12 different, like I had -- as far as then, I had business

13 cards.  I had everything lined up.  I was getting on

14 the venture of putting a website up and doing the LLC.

15 That was that year.  2021, I was supposed to be doing

16 the LLC.

17     Q.    Okay.  But again, you're hoping to get back

18 to that?

19     A.    Get back to that, yes, sir.

20     Q.    And you're doing everything you can to make

21 sure that happens?

22     A.    Yes, sir.

23     Q.    All right.  Second bullet point, it says

24 you were forced to engage legal representation to

25 represent you in the murder charges, and the legal fees

1    required were approximately $15,000.

2            A.    Yes, sir.

3            Q.    So is it your -- did you spend $15,000?

4            A.    Yes, on Solomon.

5            Q.    Okay.

6            MR. SHIPLEY:  I'm sorry.  Did you say on

7    Solomon?

8                  THE WITNESS:  Yes.  It was on Solomon.

9                  MR. SHIPLEY:  Okay.

10                  (Whereupon Defendant's Exhibit 2 was marked

11    for identification.)

12            Q.    I'm going to hand you a series of documents

13    I'm going to mark as Defendant's Exhibit 2.  So I

14    believe these are handwritten letters you've sent to the

15    court and the judge while you were incarcerated.  Is

16    that accurate?

17            A.    Yes, sir.

18            Q.    Okay.  In here -- just on the first page,

19    you're writing to the chief judge of Chatham County.

20    And you said, "I paid Attorney Solomon Amusan $9,000.

21    We agreed to that price for full services."

22            A.    Yes.

23            Q.    So did you pay him $9,000, or did you pay

24    him $15,000?

25            A.    No.  It was -- it was supposed to be 15.

1   We put $9,000 down.

2       Q.    Okay.

3       A.    It was nine -- not $9,000 down, but we

4   paid $9,000 altogether.  We didn't pay all $15,000, but

5   we was in the payment process.

6       Q.    Got you.  So you were only out of pocket

7   $9,000?

8       A.    Yeah.

9       Q.    Okay.  And did he ever return any of that

10  money to you?

11      A.    No.  No, sir, not at all.

12      Q.    Did you ask him to return that money?

13      A.    Yes, sir.

14      Q.    You can put these aside for now.  We'll

15  probably come back to them.

16            If you go to Page 11 on Exhibit 1, the

17  second bullet point says that "Plaintiff Parrish was

18  incarcerated for nearly two years for a crime he did not

19  commit, but suffered the humiliation and negative impact

20  of being treated as a murderer."

21            What is some of the humiliation and

22  negative impact that you've experienced?

23      A.    The first thing was it was broadcast all

24  over the news to my family, loved ones, people that

25  even know I wouldn't do anything like that.  It's a

1    second view for them.  You hear what I'm saying?  And

2    some of that stuff, you cannot take back.  Like once

3    it's on the news, to most people, the news is

4    everything.

5         Q.    Sure.

6         A.    Like the other stuff like humiliation, I

7    had to go in there.  I had to be in jail.  He has

8    family members in jail.  So I had a lot of fights in

9    there that I didn't have to have.  I had a lot of

10   people coming in my doors and stuff like that when I --

11   you know what I'm saying?  So that's -- it's a lot

12   behind that.

13        Q.    Okay.  Are there any specific examples of

14   family members or friends who just no longer talk to you

15   or want no relationship with you?

16        A.    No, sir, not as far as that.  It's just

17   they keep their distance.  They really keep their

18   distance from me.

19        Q.    Okay.  The next bullet point says you

20   missed the birth of your last child.  Which child is

21   that?

22        A.    One more thing before we go to that.

23        Q.    Sorry.

24        A.    On the one you was just talking about,

25   that's just like even if I go knock on somebody's door,

1  it's a couple people I knocked on doors for and they

2  remembered my face.  They remembered my face from the

3  news.  I just wanted to add that in there for you.

4      Q.    And just on that, is it your testimony

5  that -- well, let me ask you this:  Did you ultimately

6  not get the job with those doors you knocked on?

7      A.    Yes.  Some of them.  Now, it depends on

8  which community I was in.

9      Q.    Okay.

10     A.    Some communities, they look at it and they

11  say, oh, that's a sad situation, I'm going to try to

12  help him out.  You know, it's two alternatives behind

13  it.

14     Q.    Okay.  But some people have turned you

15  down?

16     A.    Yeah.  Who would want somebody that got

17  labeled as a murderer on their yard or in their house?

18     Q.    Do you have any approximation of how much

19  revenue you may have lost because of that?

20     A.    Not approximately, no, sir.

21     Q.    Okay.  All right.  Next bullet point says

22  you missed the birth of your last child.  Which child is

23  that?

24     A.    The one that's in there, Kaylon Love --

25  no, Parrish, not Love.

1          Q.     When was he born?

2          A.     Kaylon was born on December the 2nd.

3   December the 2nd.

4          Q.     Okay.  Of 2021?

5          A.     2021, yes, sir.

6          Q.     Okay.  And were you present for the birth

7   of all your other children?

8          A.     Yes, sir.  I was present for every birth.

9          Q.     All right.  The next bullet point says,

10  "Upon his final release from jail Plaintiff Parrish was

11  unable to return to his home, as his family was evicted

12  from their residence in Ascend Apartments due to his

13  arrest for murder."

14          Why do you believe they were evicted

15  because of your arrest?

16          A.     Because that was actually the landlord

17  that actually put us out there because of that.

18          Q.     Okay.

19          A.     Out of the whole situation, when it blew

20  over the news, it was more of a, no, that's not going

21  on.  My name was on the lease and all that.  So part of

22  that is you cannot be a convicted felon or you cannot

23  have a felony on your name while this is happening and

24  all that.  So she evicted us.  We're actually trying to

25  go after them as all because that case wasn't resolved

1  before she did it.

2          (Whereupon Defendant's Exhibit 3 was marked

3  for identification.)

4      Q.    Okay.  I'm going to hand you what I've

5  marked as Defendant's Exhibit 3.  I'll represent to you

6  these are filings in the Magistrate Court of Chatham

7  County related to your eviction.

8      A.    Uh-huh (affirmative).

9      Q.    If you look at the first page, this is

10  from -- it's filed January of 2021, which you would not

11  have been arrested at this point; correct?

12      A.    Yes.

13      Q.    Okay.  And it appears Ascend at Savannah

14  filed a dispossessory warrant against yourself,

15  Ms. Love, and Ms. Love's mom for unpaid rent.  Do you

16  see that?

17      A.    Yes, sir, I see it.

18      Q.    Okay.  You ultimately did catch that rent

19  up?

20      A.    Yes.  That rent -- we actually paid that.

21      Q.    Right.  So this matter got resolved?

22      A.    Yes, sir.

23      Q.    Okay.  And if you look at Page 2, this one

24  is filed May 14th of 2021.  So this would have been

25  shortly after you were arrested; is that right?

1      A.    Yes, sir.

2      Q.    Okay.  And if you look at the affidavit --

3  or the dispossessory warrant, it says, "Tenant has

4  violated the terms of the lease by shooting on property,

5  Case number 210501027."

6      A.    Yes, sir.

7      Q.    And --

8            MR. SHIPLEY:  Let's wait on the question.

9      A.    That was on the one with Javaris.

10           MR. SHIPLEY:  Hold on.

11           MS. KELLY:  Stop talking.

12     A.    Oh, I'm sorry.

13           MR. DOVE:  Can we go off the record real

14  quick?

15           MR. SHIPLEY:  Yeah.

16           (Whereupon off-the-record discussions

17  ensued.)

18     Q.    So again, I'm not going to ask you about

19  the particular details of the shooting that was alleged

20  to have occurred at this property, and I don't want you

21  to go into details of that either.

22     A.    Okay.

23     Q.    But do you see on this dispossessory

24  warrant where the landlord is claiming that you guys

25  violated the terms of the lease because there was a

1   shooting on the property?

2        A.    Yes, sir.

3        Q.    Okay.  So is it your understanding that you

4   were evicted because there was a shooting on the

5   property?

6        A.    Yes.

7        Q.    Okay.  And -- okay.  It also indicates on

8   here that there was past due rent of $959, plus court

9   costs.  Do you see that?

10       A.    Yes, sir.

11       Q.    Do you know if that rent was ever paid?

12       A.    Yes, sir.

13       Q.    Okay.  So you did catch up the rent?

14       A.    Yes, sir.

15       Q.    But they still evicted you because of the

16  lease violation?

17       A.    Yes, sir.

18       Q.    Okay.  You can put that aside for now.

19             All right.  If you go to the third-to-last

20  bullet point on Page 11, back to Defendant's Exhibit 1,

21  it says, "Plaintiff Parrish and Plaintiff Love's

22  children had to adjust to a new life without their

23  father for almost two years with no stable home and a

24  mother who was forced to work multiple jobs to provide

25  for herself and her children."

1          Do you see that?

2     A.    Yes, sir.

3     Q.    Have your children had a tough time

4  adapting post arrest?

5     A.    Yes.

6     Q.    Okay.

7     A.    Yes, sir.

8     Q.    And give me some examples of how they

9  aren't adjusting well.

10     A.    Showing out at school as far as like over

11  behavior.  You have breaking things, crying,

12  depression.  There's a lot of things they did.  Like my

13  oldest son went to his grandma, and he was telling her

14  about -- well, it's like -- he was saying about

15  suicide.  He didn't want to be here.  He didn't say

16  "suicide," but he was just saying he don't want to be

17  here.

18     Q.    Okay.

19     A.    I had actually talked to him on -- you can

20  really pull up my visitations and tell.  You could pull

21  up the conversation I had with him.

22     Q.    Okay.  Next bullet point says, "Plaintiff

23  Parrish continues to be harassed by family members and

24  friends of Charles Vinson."

25          Is that still continuing today?

1     A.    Yes, sir.

2     Q.    Okay.  Is there any particular instances

3  that stand out to you of Mr. Vinson's family members and

4  friends harassing you?

5     A.    As far as -- they're not just harassing me

6  at this point.  They're harassing my family as well.

7     Q.    Okay.  Do you have any specific examples

8  that you can recall?

9     A.    Like I was just mentioning to them, my

10  brother had -- he's in a situation right now to where

11  he just got shot by a family member.  Yes, sir.  He's

12  trying to handle that and solve that up now.  But they

13  actually stay in the same neighborhood.

14     Q.    Okay.  So your family and the Vinson family

15  live in the same neighborhood?

16     A.    Yes, sir.

17     Q.    Has anything been directed to you

18  personally?

19     A.    It was mostly in stores as far as in -- if

20  my wife, she'll go in a store, she'll see the sister.

21  Or they catch me in a store and say something.  It's

22  only in public.  It don't be like somebody came to our

23  house.  It's only in stores --

24     Q.    So --

25     A.    -- or in public.

1     Q.    Sure.  So if a family member or friend of

2  Mr. Vinson were to run into you out on the street or

3  something, they would probably come say something to you

4  personally?

5     A.    Yes, sir, to me personally.

6     Q.    Again, is there any particular run-in that

7  stands out to you?  Was there ever any violence

8  involved?

9     A.    There wasn't nothing violent yet.  There

10  was nothing violent yet.

11     Q.    So far, it's mainly just been verbal

12  altercations?

13     A.    Yeah, verbal.

14     Q.    I think we talked about -- going to the

15  last bullet point, we talked a little bit about this.

16  It basically says, Plaintiff Parrish has missed out on

17  some job opportunities because of the background check

18  and the murder charges that show up.

19     A.    Yes, sir.

20     Q.    Where have you missed out on job

21  opportunities?

22     A.    I have websites that I can -- if you ever

23  need it, I'll give it to my lawyer to provide to you.

24  But I have applications I filled out.  I have -- for

25  several spots I filled out.

1    Q.    Did they tell you specifically that you

2    didn't get the job because of your background?

3    A.    Certain ones let me know it was because of

4    my background.  Some of them -- because they don't

5    supposed to disclose that.  Some of them will tell you

6    like, okay, it's no major felonies, and then I think

7    that's the only felony I have that's actually sitting

8    on my background.

9    Q.    Okay.  And do you recall which employers in

10   particular denied you because of your background?

11   A.    Just certain ones.  It hasn't been

12   recently.  Recently, I've just been focusing on Little

13   Fellas.  So I can't name all of the specifics.  Like I

14   tried at the hospital.  That was the one over there by

15   Savannah Mall.

16   Q.    St. Joseph's?

17   A.    St. Joseph's.  I tried to do janitorial

18   over there.  It's a couple of them.

19   Q.    Okay.  Do you know how many job

20   applications you submitted?

21   A.    Not altogether.  But it was a lot.  As I

22   said, if you ever need it, it's a website called Indeed

23   where you go on there and you fill out your websites.

24   Yes.

25   Q.    And you would be able to pull it up to say,

1  here's one I made an application to a certain job

2  posting or something?

3         A.    I don't know.  But I know that you can

4  pull up the actual application and all that.  I'm

5  pretty sure Indeed can do the same thing.

6         Q.    Okay.  Other than through Indeed, did you

7  go apply for any jobs anywhere?

8         A.    Yes.  It's handwritten ones.  It's certain

9  ones like the one on -- it's a Subway right down on

10  Waters.  I put in an application with them.  It's just

11  a lot of them.  It's a lot.  I'm not going to say a

12  lot, but every time I did, it's like, no, it wasn't

13  working out.

14             Texas Roadhouse, the only way I was able

15  to get Texas Roadhouse was because my mother worked

16  there, and she knew the manager.

17         Q.    If you flip to Page 12 for me, Paragraph 14

18  was just asking about some prior employers.  We've gone

19  through a number of them.  But I see on here it says,

20  "Plaintiff also worked at Baldinos, Mr. Pizza and Taco

21  Bell."

22         A.    Yes, sir.

23         Q.    When did you work for Baldinos?

24         A.    I worked for Baldinos -- that was 2013,

25  2014.

1     Q.    Okay.

2     A.    Yeah, 2013 going into 2014.  That's when I

3  had my first child.

4     Q.    And why did you leave Baldinos?

5     A.    It was trying to manage my family during

6  that time.  Baldinos was all the way on one side of

7  town.  I was all the way on the other side.

8     Q.    And then Mr. Pizza, where is Mr. Pizza?

9     A.    Mr. Pizza is right there on 17th.  Used to

10  be located right there on Largo -- not Largo but

11  Quacco Road where the gas station's at.

12     Q.    And how long did you work at Mr. Pizza?

13     A.    I worked at Mr. Pizza for about a year.

14  About a year, yes, sir.

15     Q.    And it was prearrest?

16     A.    Sir?

17     Q.    Pre May 2021 arrest?

18     A.    Oh, no.  That was over the years.  That

19  was probably -- that was way before I even met my wife.

20  That was when I was in high school.

21     Q.    Okay.  And what about Taco Bell?  When did

22  you work there?

23     A.    Taco Bell, I worked at Taco Bell in -- I

24  want to say I worked at Taco Bell in '18.

25     Q.    Okay.  Was this the Taco Bell on Victory

1    and Skidaway?

2          A.     No.  The one right there by Savannah Mall.

3          Q.     Okay.  All right.  Tell me a little bit

4    more about Coastal Pacific Construction Company.

5          A.     They frame houses.  He frames houses.  So

6    he goes from ground up.  Some of that stuff, I learned

7    a lot of stuff hands-on with him as far as in laying

8    concrete, framing walls, putting shingles up, doing

9    rafters, all types of things.

10         Q.     And what period of time did you work for

11   Coastal Pacific?

12         A.     That was -- that was in -- I think it was

13   '18, 2018, 2017.

14         Q.     Okay.

15         A.     It was -- I worked for him for a couple of

16   years.  It was a couple years I worked for him.

17         Q.     Okay.  I will tell you, I've looked at your

18   tax returns for 2020.  The only income I see in there is

19   from Coastal Pacific Construction Company.

20         A.     Yes.  That's because when I had talked to

21   my -- the lady that filed my taxes, she said best to

22   file altogether.  I notified him as well on that.  So

23   she said best to file altogether if you're going to do

24   the same thing with your business.  So I filed a 1096,

25   I think that is.

1      Q.    Okay.  1099?

2      A.    99.  There you go.

3      Q.    Okay.  So in 2020, were you making income

4  from both Coastal Pacific and Little Fellas?

5      A.    Yes, sir.

6      Q.    Okay.  And you just filed it all as one

7  income number?

8      A.    Yes, sir.

9      Q.    Okay.  I also noticed on your tax returns,

10  you only listed two of your children as dependents.

11      A.    Yes.  Because she listed the rest.  If I

12  don't list them, she lists them.

13      Q.    So your wife listed the other children as

14  dependents on her tax return?

15      A.    Yes, sir.  Yes, sir.

16      Q.    Okay.  I figured that was the case.  I just

17  wanted to confirm.

18            So if you flip to Page 17, as part of your

19  response, it indicates that you "used a Greendot Debit

20  card for receipts of payments related to said business."

21            I assume that's Little Fellas.

22      A.    Yes, sir.

23      Q.    What's a Greendot debit card?

24      A.    It's a Visa.  It's a Visa card.  You can

25  buy them from like Walgreens or -- well, any store.

1      Q.    Okay.  So what were you using those debit

2  cards for?

3      A.    No cash, save money, expenses as far as in

4  like equipment and anything like that.

5      Q.    Okay.  Are you able to pull those records

6  to see what you were buying and what money came in?

7      A.    Oh, yes.  I can call Greendot and I can

8  get my -- I got to pull my account up with them.

9      Q.    Okay.  Are you using that today?

10     A.    No, I'm not using that today.  No, sir.

11  Right now I'm working by money order and bank.

12     Q.    But did you use the Greendot debit card

13  prior to your arrest?

14     A.    Yes, sir.

15     Q.    Okay.  And you didn't use it after you got

16  out of jail?

17     A.    No.  No, sir.

18     Q.    Okay.  So if I were to get your Greendot

19  debit card records, it would just show the money coming

20  in and out prearrest?

21     A.    Pre, yes, sir.

22     Q.    Okay.  Getting close.

23           And just to put this on the record, I know

24  we talked about it up front, but to the extent I would

25  ask you any questions about the facts and circumstances

1   of Charles Vinson's murder, it's my understanding that

2   you intend to plead the Fifth Amendment.  Is that

3   correct?

4           A.    Yes, sir.  Yes, sir.

5           Q.    Would that be true should we have to go to

6   trial in this case?

7           A.    Yes, sir.

8           Q.    I am going to ask you a couple questions

9   about these letters you sent.

10          A.    Okay.

11          Q.    If you'll go back to I think it was

12  Exhibit 2.

13          A.    Uh-huh (affirmative).

14          MR. DOVE:  Again, I don't know that I'm

15  going to -- I don't know that I'm going to actually have

16  any questions that get into the details of the murder.

17  It's more just his relationship with Mr. Amusan.  These

18  are all public record anyway.

19          MS. KELLY:  Right.

20          MR. DOVE:  So hopefully, we won't have to

21  have an objection.  But let me know if I cross a line.

22          MR. SHIPLEY:  Okay.

23          MS. KELLY:  Thank you.

24          Q.    Do you mind just kind of flipping through

25  these.  It's a compilation of several letters you sent.

1       A.      Yes, sir.

2       Q.      Do you recall writing these?

3       A.      Yes, sir.

4       Q.      And tell me generally what the context of

5    these letters were.

6       A.      Ineffective assistance of counsel.

7       Q.      Okay.

8       A.      Yes, sir.

9       Q.      Why did you claim Mr. Amusan was not

10   effective?

11      A.      Because when he first came, I had evidence

12   that he did not retrieve.

13      Q.      Okay.  And again, this is public record.

14   And on here, it's my understanding there were some

15   Parker's videos that he didn't get?

16              MS. KELLY:  He can answer that to the

17   extent it states in the letter.

18              MR. DOVE:  Okay.

19              MR. SHIPLEY:  Which letter are we on?

20              MR. DOVE:  Yeah, if you go on the first --

21   there's no page numbers, unfortunately.  It's just kind

22   of a compilation.

23              MR. SHIPLEY:  Go to the first one?

24              MR. DOVE:  Yeah.  If you go to the very

25   first page, second paragraph, it says, "Me and my

1  fiance [sic] have emails from a business we were present

2  at on camera at the same time as the alleged murder in

3  this case."

4            MR. SHIPLEY:  Okay.

5        Q.    Do you see that first sentence of the

6  second paragraph?

7        A.    Yes, sir.

8        Q.    Okay.  And was that the only reason you

9  believed he was ineffective?

10       A.    Yes, sir.  But to stand on that one as

11  well, because he hasn't showed -- he barely showed up

12  to talk to me or anything.  He said he had no clue --

13  he really don't know what's going on.  Every time he

14  talked to me, he -- every time I asked him for like the

15  discovery or anything like that, he never presented

16  anything to me.

17       Q.    Okay.  And do you know when Mr. Amusan

18  actually got discovery in your criminal case?

19       A.    It was in -- if you go through my jail

20  records, it's when he mailed it after I filed for

21  the -- we actually filed for him to be removed.  Yeah.

22       Q.    Okay.  Do you recall about when he was

23  actually removed?

24       A.    No, I don't recall.  I think it was

25  somewhere in '22.

1    Q.    Okay.  So I'll represent to you, and this

2    is public record, but the DA's office provided its

3    initial discovery to Mr. Amusan in May of 2022.  Were

4    you aware of that?

5    A.    No.

6    Q.    He didn't communicate that to you?

7    A.    No.  He didn't tell me any of that.

8    Q.    Do you think that's something he should

9    have told you?

10    A.    Yes, sir.

11    Q.    Okay.  And do you think had you been aware

12    of the discovery that had been produced in May of 2022,

13    that may have helped your case?

14    MR. SHIPLEY:  Objection to form.  Calls for

15    speculation.  Taylor, he -- he's already testified he

16    doesn't know what kind of discovery was produced.

17    MR. DOVE:  That's fine.

18    MR. SHIPLEY:  Yeah.

19    MR. DOVE:  Are you directing him not to

20    answer the question?

21    MR. SHIPLEY:  No.  I mean, I'm just saying

22    you're asking him to speculate about what was contained

23    in the discovery file he never saw --

24    THE WITNESS:  Yeah.

25    MR. SHIPLEY:  -- and whether or not it

1    would help his case.

2           MR. DOVE:  That's fine.  Then you can

3    object.  But he's still allowed to answer the question;

4    right?

5           MR. SHIPLEY:  Go ahead.

6      Q.    So do you know -- and I'll ask it again.

7    Do you know if you had had access to that discovery in

8    May of 2022 that it may have somehow changed the results

9    of your case?

10     A.    I'm going to object, plead the Fifth on

11   it.  I don't know.

12          MR. DOVE:  I'm going to object to the

13   responsiveness of the question.  But if you're going to

14   plead the Fifth, that's fine.

15          MR. SHIPLEY:  I'm going to go ahead and put

16   another objection on the record.  You know, somewhat it

17   calls for a legal conclusion in this matter.  He's not a

18   lawyer.  No. 1, he doesn't know what's in the file.  You

19   haven't presented him with anything that's in the file.

20   You're asking him to make a legal conclusion on whether

21   or not it would prove his innocence or guilt.  So that's

22   my objection.

23          MR. DOVE:  That's fine.  That was a

24   speaking objection, but that's okay.

25          MR. SHIPLEY:  Well, you objected to his

1    answer.

2                    MR. COX:  I'll object to the objections.

3                    MR. DOVE:  I think that's all I've got for

4    now.  I'll pass the witness to Mr. Cox over here.

5                    MR. COX:  Can we take a short break?

6                    MR. SHIPLEY:  Yeah.

7                    (Proceedings in recess, 11:18 a.m. to

8    11:28 a.m.)

9    EXAMINATION

10   BY MR. COX:

11        Q.    We're back on the record.  Mr. Parrish, my

12   name is Charlie Cox.  I'll be asking you a few questions

13   as well.  You're still under oath.

14                    I wanted to follow up on a few things that

15   you were asked in the questions by Mr. Dove.  I think at

16   some point you said that you believed you had made close

17   to $10,000 so far in 2024 from your business.  Is that

18   correct?

19        A.    Yes.

20        Q.    And you've made the comment I think that

21   Mr. Dove could confirm that by the bank records.  Is

22   that correct?

23        A.    Yeah.  Hold on.  Say that again.  I'm

24   sorry.

25        Q.    Did you -- did you tell Mr. Dove in

1    response to his questions that he could --

2         A.    Yeah.

3         Q.    -- confirm --

4         A.    Yes, sir.  I get it -- I get it now.

5    Sorry.

6         Q.    Yeah.  No, that's fine.  But make sure I

7    finish talking before you answer, because it's really

8    hard for the court reporter to keep track of who's

9    saying what, even when you know what I'm about to ask

10   you.

11        A.    Yes, sir.

12        Q.    So did you tell Mr. Dove that he could

13   confirm that amount by looking at your bank records?

14        A.    Yes.

15        Q.    And where do you deposit your business

16   income?

17        A.    On that that you just was talking about, I

18   wanted to -- I want to clarify that I was giving an

19   estimate.

20        Q.    Sure.

21        A.    Not a -- not an approximate answer.  Okay?

22   And now you can go to The First Bank, The First Bank.

23   It's right there located on Stephenson.

24        Q.    Okay.

25        A.    Yeah.  Stephenson and Abercorn.

1        Q.    And is that where you deposit your business

2  income?

3        A.    Yes, sir.

4        Q.    Is that account in your name?

5        A.    Yes, sir, under Little Fellas.

6        Q.    Is it -- is the account name Little Fellas?

7        A.    Yes, sir.

8        Q.    All right.  And is that where you deposit

9  all of your business income?

10       A.    Yes, sir.

11       Q.    And how long have you had that account?

12       A.    I had that account for four to

13  five months, something close -- similar to that.  Four

14  to five months.

15       Q.    Before you had that account, where did you

16  deposit your business income?

17       A.    It was cash and money orders.

18       Q.    All right, sir.  And so when you received

19  cash, what did you do with it?

20       A.    It was more so take care of bills and

21  stuff like that.  It wasn't no actual receipt behind

22  it.

23       Q.    Okay.  Did you keep any records of how much

24  income you brought in?

25       A.    As far as in books, I've got books at my

1  house, and I've got some books in the car right now.

2         Q.    Of how much income you've brought in?

3         A.    Yes, as far as my clients, price range,

4  weekly or every other week, stuff like that.  Yes, sir.

5         Q.    And I think I've located and Mr. Dove has

6  asked you some questions about your tax returns for -- I

7  saw a 2021 tax return, a 2020 tax return, and a 2019 --

8  or excuse me, a 2018 tax return.  Did you file taxes for

9  the year 2019?

10         A.    Yes.  I filed for 2019, but there was

11  some -- that -- something happened in that to where --

12  to where it didn't go through.

13         Q.    What do you mean by that?

14         A.    I really can't clarify it.  I just know if

15  you give me some time, I can go to my -- the person --

16  H & R Block is who files my taxes.  So you can get the

17  information from them if you need to.

18         Q.    Are -- are you saying that for 2019, for

19  whatever reason, no return was actually submitted to the

20  Internal Revenue Service?

21         A.    No.  That's not what I'm saying.  What I'm

22  saying, it actually returned, but in their system, it

23  was showing that it was not returned.

24         Q.    In the IRS's system, it's showing --

25         A.    No, not the IRS.  In H & R Block's system,

1    it's showing it's not returned.

2          Q.    Okay.  All right.  Do you have any type of

3    licenses other than a driver's license?

4          A.    No, sir.  As in -- far as in?

5          Q.    Like a business license --

6          A.    No.

7          Q.    -- for your business?

8          A.    No.  He asked that.  I don't have it.  I

9    was working to get my -- working on getting my LLC and

10   all.

11         Q.    And any type of contractors license or

12   anything like that?

13         A.    No, sir.

14         Q.    When you say you were working on getting

15   your LLCs, what were you doing to accomplish that?

16         A.    Right now, I was mainly focused on the

17   clientele, the equipment, everything that I need so

18   that way, when I do that part, then I can handle

19   straight business.  Like the insurance, the --

20   everything as far as the LLCs and all.

21         Q.    And I'm sorry if Mr. Dove asked this and I

22   just didn't hear it.  Do you have anybody that works

23   with you for Little Fellas?

24         A.    No, sir.  No, sir.

25         Q.    When Mr. Dove was asking you about your

1    criminal history, he asked you about a 2011 charge of

2    giving a false name to the police.  Do you recall that?

3         A.    Yes, sir.

4         Q.    Why did you lie to the police about your

5    name when you were stopped?

6         A.    Because I thought that my mom called the

7    police on me.  Yes, sir.

8         Q.    And so what were you hoping to accomplish

9    by lying to the police?

10        A.    See, during that time, I didn't know that

11   that was an actual crime.  But when it happened, like I

12   say, I just thought that they was just going to go on

13   about their way and they wasn't going to bother me.

14   But I thought it was -- I thought that my mom had

15   called the police on me, you know.  So I thought I was

16   to wind up going to jail and all this.  But yeah.

17        Q.    Why did you think your mother would have

18   called the police on you?

19        A.    Because of the altercation that I had with

20   her husband.

21        Q.    And so if I'm understanding correctly,

22   there had been an altercation with her husband, and you

23   were concerned that she may have called the police on

24   you about that altercation.  Is that correct?

25        A.    Yes.  It was a physical altercation.

1    Q.    And so when you lied --

2    A.    Not physical, but -- not physical.  A

3    verbal altercation.  I'm sorry.

4    Q.    And so when you got stopped by the police,

5    you gave them a false name; correct?

6    A.    Yes, sir.

7    Q.    And you did that because you didn't want

8    them to be able to connect you with that altercation

9    that you thought your mom had called the police about;

10   correct?

11   A.    No.  That's not correct.  I did not --

12   Q.    Then why did you give --

13   A.    I did --

14   Q.    Then why did you give them a false name?

15   A.    I just -- I gave them a false name in

16   hopes of not going to jail.  I gave them a false name

17   in hopes of not going to jail, not for no connection.

18   I gave them a false name, was hoping of not going to

19   jail.

20   Q.    Because if you gave them a correct name,

21   they would know who your mother was; correct?

22   A.    No.

23   Q.    I don't understand how giving them a false

24   name would keep you from going to jail.

25   A.    I did not know that was a crime.  During

1    the time, I did not know that was a crime, sir.  I just

2    thought that when my mom -- when we got into it, I just

3    thought -- I left the house and I thought she called

4    the police on me.

5         Q.   Okay.

6         A.   I thought if I gave them a false name -- I

7    was young.  I was -- I was still in school.  I didn't

8    know nothing -- nothing about police and all the --

9    none of that stuff.  So when I gave the name, I'm

10   thinking he's going to be like, okay, well, this name,

11   there's nothing going on, okay, go on ahead.  Yeah, I

12   thought that was going on.

13        Q.   Okay.

14        A.   When he pulled my name up, even if you go

15   look into the record, I had no warrants.  I had no

16   nothing.  I already knew that part.  I just didn't want

17   to go to jail.

18        Q.   You were asked about the carrying a

19   weapon with --

20        A.   I'm sorry.  My son was right there.

21        Q.   Oh.  I didn't know what you were pointing

22   to.  Sorry about that.  Let's start over.

23        A.   Yes, sir.

24        Q.   You were asked about carrying a weapon

25   without a license, that arrest that occurred out on

1    Tybee Island.  Do you recall that?

2          A.    Say it again.

3          Q.    Do you recall Mr. Dove asking you about

4    your arrest for -- was it carrying a weapon without a

5    license?

6          A.    Carrying a concealed weapon without a

7    license.

8          Q.    And when was that?

9          A.    I think that was in '17 or '18.  Sometime

10   around like that, yes, sir.

11               MR. SHIPLEY:  Let me -- let me ask you

12   this:  Is that case over with and it's been adjudicated?

13               THE WITNESS:  Yeah, that -- that -- that

14   case is over with.

15               MR. SHIPLEY:  Go ahead.  Sorry.

16         Q.    All right.  Where was the weapon when the

17   police found it?

18         A.    It was in my pocket.

19         Q.    Okay.  And where were you on Tybee when you

20   were stopped by the police?

21         A.    By the pier.

22         Q.    And where did you find the weapon?

23         A.    I found the weapon on -- all right.  So

24   when you go to that store, I think it's a BP or

25   whatever, it's -- it was right there during that time.

1    So it was actually on the ground dismantled.  And when

2    I put it in my pocket, like even in his description, he

3    used to say it was dismantled.  But it -- the firearm

4    was not used.  It -- it wasn't -- in my eyes, it

5    wasn't -- it could -- you couldn't even fire it.  You

6    couldn't do nothing.

7            Q.    And why did you stick it in your pocket?

8            A.    Oh, I was going to take it home with me.

9    Yes, sir.

10            Q.    And what were your plans of what you were

11    going to do with it?

12            A.    Oh, there wasn't no plans.  I just looked

13    at it as a project.  I like hands-on stuff.  So just

14    rebuilding it would have been a thing for me.

15            Q.    The 2017 theft by taking arrest, that case

16    is still pending?

17            A.    Say it again.

18            Q.    The 2017 theft by taking arrest --

19            A.    No, sir.

20            Q.    -- is that case still pending?

21            A.    No, sir.

22            Q.    Do you still have these letters,

23    Defendant's Exhibit 2, in front of you there?

24            A.    Yes, sir.

25            Q.    If you could look at the second paragraph

1   where it says, "Me and my fiance [sic] have emails from

2   a business we were present at on camera at the same time

3   as the alleged murder in this case."

4        A.   Yes, sir.

5        Q.   Do you see that?

6        A.   Yes, sir.

7        Q.   And I think you produced some emails with

8   Parker's; is that correct?

9        A.   Yes, sir.

10       Q.   And what was the specific time you were

11  trying to get videos from Parker's?

12       A.   I don't remember.  I have no recollection.

13            MS. KELLY:  That's getting into that case.

14            MR. SHIPLEY:  Yeah.

15       A.   I take the Fifth.

16       Q.   Okay.  When you say that you were present

17  on camera at the same time as the alleged murder, what

18  time did the murder actually occur?

19       A.   I take the Fifth.

20       Q.   How did you know what time the murder

21  occurred?

22       A.   I take the Fifth.

23       Q.   You were asked some questions by Mr. Dove

24  about whether you did or didn't receive discovery from

25  one of your prior attorneys in the criminal case.  Do

1    you recall, when was the first time you actually did

2    receive any discovery in your murder charge case to be

3    able to review?

4            A.    I don't remember.  No, sir.

5            Q.    At some point, were you provided discovery

6    by one of your attorneys?

7            A.    Yes, sir.

8            Q.    And is that the attorney who's with you

9    today?

10           A.    No, sir.

11           Q.    Did you receive discovery before you were

12   released from prison?

13           A.    Yes, sir.

14           Q.    Okay.

15           A.    And it was jail.  I didn't -- not prison.

16           Q.    I'm sorry.

17           A.    Yeah.

18           Q.    You're correct.  Prison denotes you were in

19   the Georgia Department of Corrections.  You were just

20   being detained on the arrest -- on the murder charge in

21   the jail.

22           A.    Yes, sir.

23           Q.    All right.  In the indictment in this case,

24   you're charged with the malice murder of Charles Vinson

25   on or about April -- April 27 of 2021.  And what I want

1    to ask you is:  Do you recall where you were and who you

2    were with on April 26th of 2021?

3         A.    I plead -- I plead the Fifth.

4         Q.    Did you do any jobs for any customers of

5    Little Fellas on April 26th of 2021?

6         A.    I plead the Fifth.

7         Q.    Did you do any jobs for any customers for

8    Little Fellas on April 27th of 2021?

9         A.    I plead the Fifth.

10        Q.    Where were you during the 24-hour period

11   that encompasses April 27th, 2021?

12        A.    I plead the Fifth again.

13        Q.    During April 26th of 2021 or April 27th of

14   2021, were you with Javaris Roundtree at all?

15        A.    I plead the Fifth.

16        Q.    Were you with -- during that same time

17   period, were you with Carlos Roundtree at all?

18        A.    I plead the Fifth.

19        Q.    During that same time period of April 26th

20   and April 27th of 2021, did you have any communication

21   with Aalyiah Duncan?

22        A.    I plead the Fifth.

23        Q.    Other than any attorney who's ever

24   represented you -- I'm not ever trying to ask you about

25   anything you've ever discussed with an attorney.  But

1    other than any attorney, have you talked with anyone

2    about the murder of Charles Vinson that happened on --

3         A.    I plead the Fifth again.

4         Q.    Yeah.  -- that happened or about April 27th

5    of 2021?

6         A.    I plead the Fifth.

7         Q.    After you were arrested in connection with

8    the murder of Charles Vinson, were you housed in the

9    Chatham County jail along with Mr. Roundtree?

10         A.    As in around -- what do you mean?

11         Q.    Were you in --

12         A.    I was in Chatham County jail.

13         Q.    And -- and was Javaris Roundtree in Chatham

14    County jail as well?

15         A.    Yes.

16         Q.    Were you and Mr. Roundtree able to speak to

17    each other?

18         A.    No, sir.

19         Q.    Where were you living on May 2nd of 2021?

20         A.    Ascend, Apartment 14-C.

21         Q.    On -- was there a shooting that -- or an

22    attempted shooting that occurred at Apartment 14-C on or

23    about May 2nd of 2021?

24         A.    I don't remember the date, but yeah, it

25    was an attempted shooting.

1      Q.    Do you recall Detective Wood coming to

2  Apartment 14-C to speak with you and Ms. Love?

3      A.    No, sir.

4      Q.    Do you recall being at your apartment,

5  14-C, while the shooting was being investigated by

6  Savannah Police Department?

7      A.    Yes, sir.

8      Q.    And did you speak to anyone while the

9  police were there?

10     A.    No, sir.

11     Q.    Did you tell anyone what you knew about

12  that shooting?

13     A.    No.  I'll plead the Fifth.

14     Q.    Do you know whether Javaris Roundtree was

15  involved in that shooting?

16     A.    I plead the Fifth.

17     Q.    While law enforcement was present at your

18  apartment on May 2nd of 2021, were you arrested on an

19  outstanding warrant?

20     A.    Yes.

21     Q.    And what was that outstanding warrant for

22  which you were arrested?

23     A.    The accusations of that theft by taking

24  they was talking about.

25     Q.    Okay.  Is that that 2017 theft by taking

1  charge?

2        A.    No, sir.

3        Q.    It's a different theft by taking?

4        A.    The one that they're saying was a felony

5  that they tried to merge with the case.

6        Q.    Okay.  Do you recall what the circumstances

7  of the theft by taking --

8        A.    I plead the Fifth.

9        Q.    -- charge are that you were -- for which

10 you were arrested?

11       A.    I plead the Fifth.

12       Q.    That's fine.  It's very unnatural to wait

13 until somebody finishes talking.

14       A.    I'm sorry.

15       Q.    No, it's -- it's unnatural because you know

16 what you're going to say so you just want to get it out.

17 It's hard to do.

18             Were you involved in any way with the

19 killing of Mr. Vinson?

20       A.    I plead the Fifth.

21       Q.    Were you involved in any way with helping

22 someone else cover up the killing of Mr. Vinson?

23       A.    I plead the Fifth.

24       Q.    You testified to Mr. Dove that there were

25 fights and confrontations with members of Mr. Vinson's

1 family while you were in jail.  Do you recall that?

2       A.    Yes, sir.

3       Q.    Do you know if there were any reports

4 generated as a result of any of those fights or

5 confrontations while you were in jail?

6       A.    No, sir.  No, sir, I don't.

7       Q.    Did you ever report that to any jail

8 official?

9       A.    I don't know how their report system works

10 or anything like that.  Nine times out of ten, it was

11 inside of a room.

12       Q.    And can you tell me who these Vinson family

13 members were who confronted you or had fights with you

14 while you were inside the Chatham County jail?

15       A.    I don't want to release no names and cause

16 no tension.  No, sir.

17       Q.    That's really not an option to -- to

18 withhold that information.  So I'm asking you:  Can you

19 tell me who the family members of the Vinson family were

20 that had fights and confrontations with you while you

21 were in the Chatham County jail?

22       MR. SHIPLEY:  I'm going to -- you know, I'm

23 going to object.

24       I mean, if -- if you don't want to answer

25 that question, we can get in front of the judge.  Do

1    you -- do you have a reason why you don't want to answer

2    it?

3                THE WITNESS:  Yes.  I -- I got a family to

4    think about.  Yes, sir.

5                MR. DOVE:  And I'll -- I'll just go ahead

6    and object to the responsiveness --

7                MR. SHIPLEY:  I understand.

8                MR. DOVE:  -- of the answer.

9                MR. SHIPLEY:  I understand.

10                MR. COX:  Are you instructing him not to

11    answer?

12                MR. SHIPLEY:  Yeah.  Based on his fear of

13    retaliation, it sounds like, I'm going to instruct him

14    not to answer.  I mean, if we need to get in front of

15    the judge, we can.

16                MR. DOVE:  That's fine.

17                MR. COX:  Well, do you want to break now

18    and try to do it?

19                MR. SHIPLEY:  Do you want to call the

20    judge?

21                MR. COX:  I mean, I think it's a legally

22    frivolous objection, and it's improper to ask him to not

23    answer.

24                MR. SHIPLEY:  Yeah, I mean, what's going to

25    be the response?  He's not going to do it.  Not to

1    get -- Charlie, I don't want to get in an argument about

2    it, but --

3            MR. DOVE:  Could we at least just hold the

4    depo open until resolution of that particular question?

5            MR. SHIPLEY:  Certainly.

6            MR. DOVE:  The judge isn't going to view it

7    right this second.  I can promise you that.

8            MR. SHIPLEY:  We can put it in front of the

9    judge and see what he says.  But you know, if he -- if

10   he's fearful for retaliation against his family in --

11   in -- in naming names, I mean, there may be some

12   other -- I guess, you know, what would fix this is if

13   it's -- if it's a subject that we can't bring up at

14   trial as far as the damages go or something like that,

15   then -- then that may be an issue.  But I -- we can't

16   force him to -- to name names.

17           MR. COX:  Well, technically, we can.

18           MR. SHIPLEY:  Well, I mean, you can't force

19   him.  It's just --

20           MR. DOVE:  The judge can force him.  But my

21   suggestion would be just we agree to hold this depo open

22   until we get in front of the judge to get that Order.

23           MR. COX:  We've eight minutes until 12:00.

24           MR. DOVE:  That's my suggestion.  We can't

25   compel him to answer the question.  A judge can.  We

1   can't.

2              MR. SHIPLEY:  Right.  Yeah.

3              MR. COX:  That's fine.

4              MR. SHIPLEY:  Yeah.

5              MR. DOVE:  I can tell you --

6              MR. SHIPLEY:  We'll -- we'll -- we'll --

7   you know, we can get in front of the judge.  I can have

8   a discussion with him about it after.  So we'll leave

9   that open.

10             MR. COX:  All right.

11        Q.   Did you write or email -- and I'm sorry.

12   We're back with me asking you questions.

13             Did you write or email any family members,

14   any of your family members, about these fights or

15   confrontations you said you had with the Vinson family

16   while you were in the Chatham County jail?

17        A.   No, sir.

18        Q.   While you were locked up in the Chatham

19   County jail, did you talk to anybody over the telephone

20   about fights or confrontations that you'd had with

21   members of the Vinson family while in the jail?

22        A.   Could I do this?  Can I rephrase that?  I

23   put it as I don't know, because that -- during that

24   jail, there was so much stuff going on, so I cannot

25   remember every phone call, every -- I been on the phone

1   every day.  I've been on that email thing every day.

2   So I don't want to put it as I don't know.

3          Q.    Okay.  You have no specific recollection of

4   either emailing or speaking with a family member --

5          A.    Oh, no.  I -- you're talking about --

6          Q.    Let -- let me finish.

7          A.    Sorry.

8          Q.    You have no specific recollection of

9   emailing or speaking with one of your family members

10  about any of these confrontations or fights with members

11  of the Vinson family; is that correct?

12         A.    Yes, sir.

13         Q.    And I guess what you're telling me is, it's

14  conceivable that you could have done that.  You just

15  don't recall?

16         A.    Yes, sir.

17         Q.    Okay.

18         A.    I could have talked to the -- the officers

19  as well and let the officers know.  I'm saying I just

20  cannot recollect, is what I'm saying.

21         Q.    Okay.  You testified that your brother has

22  been shot by a Vinson family member?

23         A.    Yes, sir.

24         Q.    And which brother is that?

25         A.    It was family or friend.  I don't -- don't

1  know specifics.  But that was my brother, Kori Parrish.

2        Q.    And when did that shooting occur?

3        A.    I think it was last month.

4        Q.    And who was the person that shot him?

5        A.    I plead the Fifth on that one.  I don't

6  want to say no names.

7        Q.    Are you pleading the Fifth because you

8  believe a truthful answer to that question would

9  incriminate you?

10       A.    No, sir.

11       Q.    Okay.  So you just don't want to give a

12  name?

13       A.    Yeah.  I have six kids I got to think

14  about.  I'm sorry.  Six.  I got five kids I've got to

15  think about.  And I got to think about their lives and

16  their safety.  I got to think about her life and her

17  safety.  I got to think about my life and my safety.

18             MR. DOVE:  And I'll lodge a responsiveness

19  objection.  And I'd say this is another one we might

20  take up with the judge.

21             MR. SHIPLEY:  Yeah, the judge.  I mean, a

22  lot of this is going to have to do with relevance too,

23  you know, regarding -- you know, we can deal with the

24  judge on that.

25             MR. COX:  All right.

1      Q.    You've talked about this harassment from

2   the Vinson family that has happened in stores.  Do you

3   remember telling Mr. Dove that?

4      A.    Yes, sir.

5      Q.    What stores has this happened in?

6      A.    Such as like Parker's, Enmarkets.  Just

7   normal round-the-way places.

8      Q.    And have you -- other than speaking about

9   it in the deposition today, have you reported any of

10  this harassment to anybody?

11     A.    No, sir.

12     Q.    You talked about that you had missed out on

13  jobs because of this murder charge.  Do you recall that

14  testimony?

15     A.    Yes, sir.  Yes, sir.

16     Q.    Did any employer tell you specifically that

17  it was the murder charge that caused them to not extend

18  a job offer to you?

19     A.    Not in those words specifically, but they

20  remember me from the news.

21     Q.    Do you know whether any employer who did

22  not offer you a job knew of the rest of your criminal

23  history other than the murder charge?

24     A.    No, sir.

25     Q.    Do you know whether it was your prior

1  criminal history that may have caused employers to not

2  offer you a job?

3      A.    I know that for a fact.  Nobody knows my

4  criminal history.  No round-away neighbor or anything

5  like that would just know my criminal history.

6      Q.    Right.  I'm asking about employers.

7      A.    Oh, employers?  Yeah, those are minor

8  charges.  Those are not felonies or anything violent or

9  anything like that.  Those are minor charges.  I had

10 better jobs than that with -- with those charges right

11 there by themselves.  I never had a problem getting a

12 job.

13     Q.    Okay.

14     A.    Yes, sir.

15     Q.    You were talking about applying for jobs on

16 Indeed.

17     A.    Yes, sir.

18     Q.    Is it your understanding that you could go

19 to Indeed and find all the job applications that you

20 made through Indeed?

21     A.    Yes, from my understanding.

22     Q.    Okay.  Have you tried to do that?  Have you

23 tried to go back into Indeed to find out all the

24 applications that you've submitted?

25     A.    No, sir.

1            MR. COX:  Okay.  I don't have any other

2    questions.  Thank you.  Seconds to spare.

3            MR. DOVE:  No, I don't have any more

4    questions unless y'all have anything.

5            MR. SHIPLEY:  No.

6            (Proceedings adjourned, 11:59 a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      ERRATA SHEET

2         I, the undersigned, MARQUIS RAQUEL PARRISH, do

3      hereby certify that I have read the foregoing

4      deposition and find it to be a true and accurate

5      transcription of my testimony, with the following

6      corrections, if any:

7      PAGE    LINE              CHANGE              REASON

8      _____

9      _____

10     _____

11     _____

12     _____

13     _____

14     _____

15     _____

16     _____

17     _____

18     _____

19     _____

20     _____

21     _____

22

23         _____

       MARQUIS RAQUEL PARRISH       Date

24

25     CA

1                         CERTIFICATE

2       STATE OF GEORGIA:

3       CHATHAM COUNTY:

4               I, Christopher M. Artman, Certified Court

5       Reporter for the State of Georgia, do hereby certify:

6               That the foregoing deposition was taken

7       before me on the date and at the time and location

8       stated on Page 1 of this transcript; that the witness

9       was duly sworn to testify to the truth, the whole

10      truth and nothing but the truth; that the testimony

11      of the witness and all objections made at the time of

12      the examination were recorded stenographically by me

13      and were thereafter transcribed by computer-aided

14      transcription; that the foregoing deposition, as

15      typed, is a true, accurate and complete record of the

16      testimony of the witness and of all objections made

17      at the time of the examination.

18              I further certify that I am neither

19      related to nor counsel for any party to the cause

20      pending or interested in the events thereof.

21              Witness my hand, I have hereunto affixed

22      my official seal this 4th day of September 2024 in

23      Savannah, Chatham County, Georgia.

24

25              _____
                CHRISTOPHER M. ARTMAN, CCR B-2325

1                    COURT REPORTER DISCLOSURE

2

3          Pursuant to Article 8.B. of the Rules and
   Regulations of the Board of Court Reporting of the
   Judicial Council of Georgia, I make the following
4  disclosure:

5

6          I am a Georgia Certified Court Reporter.  I am
   here as an employee of McKee Court Reporting, Inc.

7

8          I am not disqualified for a relationship of
   interest under the provisions of O.C.G.A. Section
9  9-11-28 (c).

10         McKee Court Reporting, Inc. was contacted by
   HunterMaclean to provide court reporting services for
11 this deposition.

12

13         McKee Court Reporting will not be taking this
   deposition under any contract that is prohibited by
   O.C.G.A. 15-14-37(a) and (b).
14

15         McKee Court Reporting, Inc. has no exclusive
   contract to provide reporting services with any party to
16 the case, any counsel in the case, or any reporter or
   reporting agency from whom a referral might have been
17 made to cover the deposition.

18

19         McKee Court Reporting, Inc. will charge its usual
   and customary rates to all parties in the case, and a
   financial discount will not be given to any party to
20 this litigation, except in circumstances as agreed on a
   case-by-case basis.
21

22

23

24 _____      Date:  September 4, 2024
   CHRISTOPHER M. ARTMAN
25 CCR B-2325