

**Exhibit L to Memorandum in Support of The Mayor and Aldermen of the City of Savannah's Motion for Summary Judgment**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | |
|---|---|
| MARQUIS RAQUEL PARRISH and TYESHA LOVE, | ) ) ) |
| Plaintiffs, | ) CIVIL ACTION NO. ) |
| v. | ) 4:23-CV-00261 ) |
| ASHLEY WOOD, in her individual capacity and in her official capacity as an employee of the Savannah Police Department, NICOLE KHAALIS, in her individual capacity and in her official capacity as an employee of the Savannah Police Department, and THE MAYOR AND ALDERMEN OF THE CITY OF SAVANNAH, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) |

DEPOSITION OF
ZACHARY BURDETTE

April 26, 2024, 12:32 p.m.

200 East St. Julian Street
Savannah, Georgia

Mynjuan P. Jones, RPR, CCR-B-1422

**Gilbert & Jones**
Certified Court Reporters

P. O. Box 1894 (31521)
1607 Norwich Street
Brunswick, GA 31520

gilbertandjones1@gmail.com
912.264.1670

P. O. Box 14515 (31416)
7505 Waters Avenue, F3
Savannah, GA 31406

1                    <u>APPEARANCES OF COUNSEL</u>

2

   On behalf of the Plaintiffs:
3
        JAMES E. SHIPLEY, JR., Esq.
4       Manly Shipley
        Post Office Box 10840
5       Savannah, Georgia  31412

6

   On behalf of the Defendant The Mayor and Aldermen of
7  the City of Savannah:

8       TAYLOR L. DOVE, Esq.
        Hunter, Maclean, Exley & Dunn
9       200 East St. Julian Street
        Savannah, Georgia  31401

10

11 On behalf of the Defendant Ashley Wood:

12      CHARLES E. COX, JR., Esq.
        Charles E. Cox, Jr., LLC
13      Post Office Box 67
        Macon, Georgia  31202

14

15                        - - -

16

17

18

19

20

21

22

23

24

25

## INDEX TO EXAMINATIONS

| Examination | Page |
|---|---|
| Examination by Mr. Shipley | 4 |
| Examination by Mr. Cox | 55 |
| Examination by Mr. Dove | 59 |

- - -

## INDEX TO EXHIBITS

| Plaintiffs' Exhibit | Description | Page |
|---|---|---|
| Exhibit 7 | Administrative investigation incident report | 18 |
| Exhibit 8 | Various e-mails | 44 |

(Original Exhibits 7 and 8 have been attached to the original transcript.)

1       (Reporter disclosure made pursuant to

2       Article 10.B. of the Rules and Regulations of

3       the Board of Court Reporting of the Judicial

4       Council of Georgia.)

5                   ZACHARY BURDETTE,

6  having been first duly sworn, was examined and

7  testified as follows:

8            MR. SHIPLEY:  This is going to be the

9       deposition of Zachary Burdette, taken pursuant

10      to notice and by agreement of counsel, for all

11      purposes allowed under the Federal Rules of

12      Civil Procedure.

13           I suggest we reserve all objections except

14      as to form of the question and responsiveness of

15      the answers if that's agreeable to counsel

16      present.

17           MR. DOVE:  Fine by me.

18           MR. COX:  That's fine.

19                   EXAMINATION

20  BY MR. SHIPLEY:

21      Q.   We met briefly, Detective Burdette, when

22  you came in.  My name is Jim Shipley and my partner

23  and I represent a man named Marquis Parrish and his

24  wife, Tyesha Love, in a lawsuit that's filed.

25           It's currently pending in the Southern

1    District of Georgia, in federal court, against Ashley

2    Wood and Sergeant Khaalis and the mayor and aldermen

3    of the City of Savannah.

4         A.    Okay.

5         Q.    Obviously the mayor and aldermen of the

6    City of Savannah is I guess the proper defendant for

7    the Savannah Police Department.

8         A.    Okay.

9         Q.    I know you're somewhat familiar with the

10   case.  My understanding is you didn't have a lot of

11   involvement in this particular case and we'll get

12   into that later but I do want to ask you certain

13   questions today.

14              Have you ever had your deposition taken

15   before?

16        A.    Yes, I have unfortunately, yes.

17        Q.    So you've had it done a few times?

18        A.    Yes.

19        Q.    I'm asking questions.  We've got a court

20   reporter who's taking down a transcript.  She's going

21   to take down everything you say.  You can get a copy

22   of it or you can waive your signature, whatever you

23   would like.

24        A.    Okay.

25        Q.    You can make that choice at the end,

1 depending on how the deposition goes.

2     A.    Okay.

3     Q.    Obviously, like I said earlier, I

4 represent Marquis Parrish.  He was arrested for the

5 murder of Charles Vinson back in I think it was May

6 of 2021.

7     A.    Okay.

8     Q.    Spent two years in county jail until he

9 was eventually released and all charges were

10 dismissed against him.

11     A.    Okay.

12     Q.    Just so you're understanding, you

13 understand the case we had filed against the police

14 department along with Detective Wood and others,

15 stating he's been wrongfully accused and wrongfully

16 arrested and prosecuted and some Civil Rights charges

17 over there?

18     A.    Okay.

19     Q.    I'm here just because I get one chance to

20 take your deposition and find out what kind of

21 knowledge you have in the case, and if you ever don't

22 understand a question that I ask, sometimes I phrase

23 them poorly, don't be afraid to tell me and I'll

24 rephrase it hopefully in a way you understand.

25     A.    Okay.

1    Q.    You're doing great as far as allowing me
2  to get the question out and waiting on the answer.
3  Just keep that up.
4    A.    Yes, sir.
5    Q.    If you need a break at any time, like I
6  said, I don't think it's going to last too long, just
7  let me know.
8    A.    Yes, sir.
9    Q.    I just want to talk about you here in the
10  beginning a little bit in case this matter goes to
11  trial.  Can you give me your full name.
12    A.    It's Zachary, Z-a-c-h-a-r-y, Burdette,
13  B-u-r-d-e-t-t-e.
14    Q.    Detective Burdette, did you review any
15  documents in preparation for this deposition?
16    A.    No, sir.
17    Q.    Did you watch any videos or anything like
18  that?
19    A.    No, sir.
20    Q.    Did you speak to anyone about the
21  deposition?
22    A.    Just Mr. Dove.
23    Q.    I don't want to know what the substance of
24  your conversation was.  Let's talk about where you're
25  from.

1    A.    I am I guess technically from Savannah.

2  I've lived here since I was about five years old.

3    Q.    Did you go to high school here?

4    A.    Yes, sir.

5    Q.    Where did you graduate?

6    A.    Johnson.

7    Q.    What year?

8    A.    2001.

9    Q.    Once you graduated from Johnson, did you

10 attend college or secondary school?

11    A.    Yes, sir.

12    Q.    Where did you go?

13    A.    I went to -- I don't know if I can tell a

14 joke.  I say Georgia Southern of the South.  I went

15 to Armstrong.  Before it changed to Georgia Southern,

16 I went to Armstrong.

17    Q.    That's pretty good.  Did you graduate from

18 Armstrong?

19    A.    Yes.

20    Q.    What was your degree in?

21    A.    Financial economics.

22    Q.    Did you do anything with that degree right

23 out of college or did you --

24    A.    Kind of.  I worked in a couple small

25 finance companies but both of them very short-term

1   because I didn't care too much for kind of the way

2   they treated their customers.  Because it was more of

3   we're going to give you very small loans at very high

4   interest rates and a lot of it was to people who

5   couldn't necessarily afford the higher payments so I

6   was like I'm going to get out of this.

7        Q.    That was right around the time of the

8   mortgage arms and things --

9        A.    Yes, sir.

10       Q.    -- before the crash.  When you got out,

11  did you begin working with the Savannah Police

12  Department?

13       A.    I worked a couple of odds and end jobs

14  until I talked to some family members of mine that

15  worked in law enforcement who told me to try it and

16  see if I liked it and then I applied.

17       Q.    What year was that that you applied?

18       A.    I applied in 2009.

19       Q.    Did you go through training then in '09?

20       A.    I started training at the end of 2009 and

21  finished the academy in I believe it was March of

22  2010.

23       Q.    2010?

24       A.    Yes, sir.

25       Q.    Did you start off with -- we talked about

1   this some in the prior depositions -- as just a

2   police officer, like a PD officer?

3       A.   Yes.  When I got out of the academy, I

4   went to the southside precinct and I was patrol

5   officer there.

6       Q.   How long did you stay patrol officer at

7   southside?

8       A.   I was a patrol officer until September of

9   2012.

10      Q.   Okay.

11      A.   And then I got transferred from patrol to

12  the crime suppression unit.  That was at the

13  southside precinct.

14      Q.   Tell me what the crime suppression unit

15  is.

16      A.   When I was on it, it was a unit that

17  focused our attention on certain areas of the

18  precinct based on daily crime trends.

19           So, for instance, if we had a lot of

20  entering autos, we would focus our schedule, like our

21  schedule would change daily, and then we would come

22  in at night if we were having a lot of entering autos

23  and focus on the area where a lot of entering autos

24  were happening, and the same things with burglaries,

25  auto thefts.

1          Back then we didn't have a lot of violent

2     crime on the southside.  It was more property crime

3     driven.  We would also focus on warrants.  So if any

4     detective had warrants, we would go out and try to

5     locate people who had warrants.

6          Q.    So it was more information gathering and I

7     guess a job where you provided information to

8     officers so they would have kind of direction on

9     certain crimes in the areas to focus in on?

10         A.    Yes.

11         Q.    But you weren't out there in the field

12    making the arrests during that period of time?

13         A.    We would make arrests but it wasn't nearly

14    as often as you would as a patrol officer.

15         Q.    You mentioned one thing too, warrants,

16    which is -- tell me what your role was with warrants.

17         A.    If a detective would send us warrant

18    information, that somebody lived in the precinct,

19    they would send us information on the person and, you

20    know, their address or frequently known locations and

21    we would see if we can find them and pick them up for

22    the detectives.

23         Q.    Warrants that had already been executed by

24    a judge or something like that?

25         A.    Yes.

1      Q.    It was an executed warrant.  They wanted

2  you just to go and see if you could find that person?

3      A.    Yes, sir.

4      Q.    After you worked with the suppression

5  unit, tell me what your next step --

6      A.    I then got transferred to the property

7  crimes unit.  So I was a detective doing property

8  crimes, you know, doing entering auto investigations,

9  auto thefts, burglaries, basic thefts.

10     Q.    Probably I would assume the most difficult

11  to solve?

12     A.    Yes.

13     Q.    What was your next division that you began

14  working with?

15     A.    After property crimes?  I was transferred

16  to the homicide unit.

17     Q.    Is that something you applied for or did

18  they recruit you for it?

19     A.    No, sir.  It was a Friday afternoon I got

20  a call from the criminal investigation division major

21  saying, hey, congratulations, you're being

22  transferred to homicide on Monday.

23     Q.    Who was that?

24     A.    Richard Zapal.

25     Q.    What year was that?

1      A.    That was in 2016.

2      Q.    Was Sergeant Santoro there at that point?

3      A.    Yes, sir.

4      Q.    Was he over the unit then?

5      A.    Yes, sir.

6      Q.    I know and I think I've read through some

7 of the administrative reports you were with the

8 homicide unit for a period of time.  Did you get

9 promoted or move at some point and then come back?

10     A.    Yes, sir.  I got promoted to sergeant in

11 March of 2018 and was transferred back to patrol.

12     Q.    Was that considered a promotion out of the

13 homicide unit?

14     A.    Yes.

15     Q.    Okay.

16     A.    The way our department works most of the

17 time is if you put in for a promotion to a higher

18 rank, and when you get promoted, they'll move you

19 back to patrol to kind of understand the basic

20 fundamentals of that new job position.  Because

21 you're going to learn more about being a sergeant on

22 patrol than you would in investigations.

23     Q.    I got you.  Was it always the goal for you

24 to get back to the homicide unit after that or did

25 you not know at that point?

1          A.     At that point I did not know.  I'm married

2     and my wife was pregnant with our first child so

3     trying to get into a more normalized schedule was

4     kind of what I was looking -- well, not looking for,

5     but when I got promoted, it was something we were

6     excited about because being a homicide detective

7     you're all over the place all the time.

8          Q.     Yes, strange hours; is that right?

9          A.     Yes.

10         Q.     When did you come back to the homicide

11    unit?

12         A.     I was transferred back to the homicide

13    unit in October of 2019.

14         Q.     When you got back there, you were

15    sergeant.  Were you put over the homicide unit when

16    you came back in 2019 as a supervisor?

17         A.     Yes, me and Sergeant Santoro.

18         Q.     Did y'all share responsibilities?

19         A.     Yes.

20         Q.     Equal as far as that goes?  I know he had

21    more experience there probably at that point?

22         A.     Yes, sir.

23         Q.     Equal titles?

24         A.     Yes.

25         Q.     And y'all oversaw the homicide division?

1    A.    Yes.

2    Q.    What was Khaalis's role at that point?

3    A.    At that point she had been transferred out

4    of the homicide unit to internal affairs I believe

5    where she went for a couple months and then they

6    transferred her back to patrol.

7    Q.    Was it your understanding she was sent

8    over to internal affairs because she had the issues

9    about harboring a criminal at her house?

10            MR. DOVE:  Object to the form.

11            THE WITNESS:  Say that again.

12    Q.    (By Mr. Shipley)  Was it your

13    understanding she was sent out of the homicide unit

14    because there were allegations of her harboring or

15    associating with criminals?

16    A.    It's my understanding that she -- the

17    commander over internal affairs wanted her to come

18    over there and that's why she was transferred from

19    homicide to internal affairs.

20    Q.    I'm not going to hold you to it.  I

21    understand.  It's in the record --

22    A.    I think that happened after she had been

23    transferred into internal affairs.  I think that's

24    why they transferred her out of the internal affairs

25    back into patrol.

1     Q.     She came back to the homicide unit, right?

2     A.     Yes, sir.  She came back to the homicide

3  unit after Santoro left the department.

4     Q.     When did he leave approximately?

5     A.     I want to say --

6     Q.     You came back in '19, right?

7     A.     It was in 2020.

8     Q.     Okay.

9     A.     Maybe mid-2020 sometime.

10    Q.     Okay.  I won't hold you to it.  So then

11  after that, Khaalis comes back after Santoro leaves,

12  right?

13    A.     Yes.

14    Q.     So then at that point it's you and Khaalis

15  that's overseeing homicide?

16    A.     Yes.

17    Q.     Was that, I guess, the chain of command in

18  the homicide unit during the time of the Charles

19  Vinson murder and the Tyesha Love attack?

20    A.     Yes.

21    Q.     Reading through it, you tell me if I'm

22  wrong, was the setup that you would oversee certain

23  individuals in the homicide unit and then Khaalis

24  would oversee certain people?

25    A.     So the way the homicide unit is set up is

1    you have two sergeants and a varying number of

2    detectives.

3         If I'm not mistaken, we had eight

4    detectives and so there were four detectives who

5    would be under each sergeant but that was more for

6    kind of team purposes for callouts.

7         Q.    Right.

8         A.    So that certain detectives would get

9    called out by me and certain detectives would get

10   called out by Sergeant Khaalis but ultimately we both

11   communicated equally with all the detectives all the

12   time because we would both work various hours.

13        Q.    Okay.

14        A.    If that makes sense.

15        Q.    Yes.  Just reading through some of the

16   notes, it seemed as if Khaalis was in a more

17   supervisory role over Wood in this particular

18   situation or at this time.  Is that --

19        A.    Sorry.  I didn't mean to start talking.

20        Q.    No.

21        A.    Detective Wood worked on her team per se.

22   So she was one of the people that would get called

23   out on team sides with Sergeant Khaalis.

24        Q.    Okay.  I got you.

25        A.    If that makes sense.

1      Q.    Is Khaalis still there as well?

2      A.    Yes.

3      Q.    So you both share supervisory roles in the

4   homicide unit right now?

5      A.    Oh, no, sir.  I misunderstood your

6   question.  Sergeant Khaalis is still in the homicide

7   unit as sergeant.

8            Her partner now is Sergeant Kenneth

9   Whitcomb.  I am the lieutenant over the homicide

10  unit.  So I am now their supervisor.

11     Q.    Okay.  So you supervise the entire

12  homicide unit at this point?

13     A.    Yes, sir.  I supervise the homicide unit,

14  forensics unit, cold case, and property crimes.  I

15  kind of oversee their operations.

16            MR. SHIPLEY:  What I want to show you

17        is -- I just want to run through it.  I'm sure

18        you've seen it before.

19            It is the Savannah Police Department's

20        administrative investigation report on Wood.  I

21        just wanted to ask you a few questions on there.

22            (Plaintiffs' Exhibit 7 was marked for

23        identification.)

24     Q.    (By Mr. Shipley)  This is a document which

25  I've marked Plaintiffs' Exhibit 7, administrative

1    investigation incident report of Corporal Ashley

2    Wood.

3           Take a look at that.  Just glance through

4    it.  I just want you to see if you've seen this

5    document or things that are contained within it.

6        A.    Yes, sir, I've seen this.

7        Q.    Okay.  Let's start off here at the

8    beginning.  I think the easiest thing to do if I jump

9    around, you see this filing number at the top, it's

10    kind of blue?

11        A.    Yes, sir.

12        Q.    It will have the page numbers, like Page

13    49 of so and so.  There's some pages missing because

14    they were duplicative in what was handed over to us.

15        A.    Yes, sir.

16        Q.    They do go in numerical order.  The first

17    page is dated December 23rd of '22 and it's by

18    Sergeant -- is it Kaishawn Samuell?

19        A.    Yes, sir.

20        Q.    And I'm not sure about this but it seems

21    to me that they may have gotten that year wrong

22    because if you look into the body of this text,

23    you're talking about dates like March 31st and at the

24    top it's got Ops Number 23.  Do you think this is

25    December 23rd of '23?

1          A.    Yes.

2          Q.    I don't want to hold you to it but

3    everything referenced in here are interviews that

4    occurred in '23.

5          A.    Yes, sir, I would assume this would be

6    from 2023.

7          Q.    So I just kind of want to run through

8    that.  Did you participate in this investigation at

9    all of Detective Wood?

10         A.    In the actual administrative

11   investigation, the only thing I did was I

12   interviewed by Sergeant Samuell in reference to some

13   administrative things with investigations.

14         Q.    Who is Sergeant Samuell?

15         A.    He's one of our internal affairs

16   investigators.

17         Q.    Internal affairs, is their role just to

18   make sure all of the employees and officers are

19   complying with certain, I guess, obligations, duties,

20   getting along, things like that, investigating

21   complaints within, complaints from citizens?

22         A.    Yes.  They're more so -- well, yes.  It's

23   very complex.  Their job is basically to investigate

24   major complaints from citizens and also internal

25   complaints if major issues arise within the

1 | department.

2 | They also internally administratively

3 | investigate officer-involved shootings and things

4 | that could result in policy violations and their role

5 | is to determine the facts of the complaint.

6 | Q.    I got you.  And it's your understanding

7 | when they're determining, you know, potential policy

8 | violations, you're talking about policies that are

9 | from the Savannah Police Department, correct?

10 | A.    Yes, sir.

11 | Q.    And those policies, are those the ones

12 | that are -- there's a lot of different policy -- it

13 | appears to be policies that are referenced within

14 | these reports.

15 | Are they, for instance -- let me see if I

16 | can find one here.  If you go to -- let's look at

17 | Page 55 of 114.

18 | A.    Yes, sir.

19 | Q.    At the bottom you got Wood, "upon

20 | completion of my investigation, Corporal Wood was

21 | cited with the following:  ADM-004, oath of office,

22 | ethics, and conduct."

23 | A.    Yes, sir.

24 | Q.    Are those the policies you're referring

25 | to?

1      A.    Yes, sir.

2      Q.    What do officers commonly refer to all of

3  these policies as?  Is there a book they're in?

4      A.    When I started they were in a binder kind

5  of like what you have there.

6      Q.    Okay.

7      A.    Now with technology the way that it is, we

8  actually have an app or a program where you can go

9  called Power DMS which holds all of our department

10  policies where you can go in there.

11      Q.    Okay.

12      A.    And we're required to review them and sign

13  them, saying that we understand what they say and

14  also they're there for easy access.  If you have a

15  question about something, you can go in there and

16  look at them.

17      Q.    How to handle a certain matter or

18  something like that?

19      A.    Yes.

20      Q.    Are they given to officers when they're

21  first being trained or hired by the organization?

22      A.    I was given them when I came on the

23  department so I'm assuming that they are given to the

24  officers.

25      Q.    If you don't know, please don't guess.  I

1  don't want you to get caught up in that.

2            Let's see here.  So it appears as if

3  this -- it's your understanding that Sergeant Samuell

4  was the one who has created this report to the best

5  of your understanding?

6        A.    Yes, sir.

7        Q.    And he says "the purpose of this

8  investigative narrative is to document an

9  investigation into Corporal Wood's investigation of

10  an aggravated assault and a homicide in which reports

11  and BWC footage was conflicting."  That's the

12  preamble to this.

13            If you flip pages to the second one, it's

14  Page 50 of 114.  I'm looking at the one, two, third

15  full paragraph down.

16            It seems as if Samuell writes "there is no

17  mention of search warrants, search warrant returns,

18  or evidence submission in Detective Wood's

19  investigative reports in reference to the aggravated

20  assault or the homicide in ARS."  Let me ask you

21  first, what does ARS stand for?

22        A.    That stands for the automated reporting

23  system.  That is where we submit our digital reports

24  or our reports.

25        Q.    All detectives are required to enter their

1   reports within the system?

2         A.     Every police report that's written,

3   non-accident, is written in this system.

4         Q.     Part of my side job is MVA's. I'm always

5   looking at motor vehicle reports but that is not in

6   the ARS --

7         A.     No, sir. That is written in a completely

8   separate program called GEARS.

9         Q.     So this has to do like, for instance, from

10   my side as a plaintiff's lawyer looking at a premise

11   liability case or like a shooting that occurred at

12   like the Berwick Kroger or something and I order a

13   bunch of prior reports, those would come out of the

14   ARS system, right?

15         A.     Yes.

16         Q.     So that's where homicide detectives enter

17   their reports?

18         A.     Yes.

19         Q.     So it's true that Detective Wood would

20   have been required to enter a report in the ARS

21   system, right?

22         A.     Yes, sir.

23         Q.     By looking at this, it says that -- and

24   this is in '23 or we believe in December of '23 or

25   whatever it is in this report date, there's no

1    mention of a warrant in there or a return.

2           What does that mean in the ARS system?

3    Would it mean that the report -- maybe you've seen a

4    report?  I don't know.

5       A.    I may have looked at it a while back.

6    Basically that's just saying that in her detective

7    narrative that there's nowhere in there does it

8    mention her doing any search warrants, returning any

9    search warrants, or taking any evidence to the GBI.

10      Q.    Okay.  Okay.  I got you.  Would this ARS

11   system have -- I'm just trying to understand this.  I

12   know you do if you know it but I'm not privy to it

13   nor have I ever seen it.

14          When an officer types up a report

15   regarding a certain incident, is there a form that

16   you normally use to do it?  Like you fill that form

17   in or is it more of a Word document you fill out?

18      A.    Yes.  There's a -- it would be easier to

19   show you.  When you log into ARS, you type in the

20   case report number and it asks you if you are wanting

21   to just search that case report number or if you want

22   to type a supplemental report or the original report.

23          So you enter that information in the

24   original screen.  And then like if you're typing a

25   supplemental report, it will open up into a box that

1    literally walks you through, you know, the incident

2    type, the location, date, time.  There's a tab for

3    people where you would enter --

4        Q.    Not to interrupt you.  Is it the ones that

5    has little boxes where you can fill in and have a

6    date and the report comes up in the top right?

7        A.    Yes, sir.  There's like tab boxes that you

8    click on that kind of walk you through it.  And then

9    at the very end there's a narrative page.

10            A lot of detectives will type their

11   narratives in a Word document just because in the

12   system it's very hard to see more than -- I know this

13   isn't good.  Like a small box of what you've typed

14   versus a Word document where you can see a lot more

15   so they'll type the Word document and then kind of

16   copy and paste it into the actual report system.

17       Q.    Okay.

18       A.    In the narrative section.

19       Q.    So that's the initial report.  Would the

20   ARS also hold separately, for instance, the actual

21   warrant or the warrant returns in there?

22       A.    No, sir.

23       Q.    It would just be within the report, right?

24       A.    Yes.

25       Q.    Are those reports required to be filled

1  out within a certain time period after the initial

2  incident or response to the incident I guess?

3       A.    With homicides, no.  The detectives

4  normally will do their investigative report after the

5  investigation is done.

6            So they'll type small portions of their

7  investigative report if something major happened just

8  to notify of that, but for chronological purposes to

9  make sure that the report kind of flows and makes

10 sense, they'll type their whole narrative at the end.

11 Does that make sense?

12      Q.    At the end of the investigation?

13      A.    Yes.

14      Q.    Okay.

15      A.    Like once an arrest is made.

16      Q.    I got you.  I got you.

17      A.    Does that make sense?

18      Q.    Yes.  For instance, in here where these

19 individuals like, for instance, Mr. Parrish was

20 arrested.  Within that sort of time frame for her to

21 need to go ahead and fill out her report on her or

22 that arrest?

23      A.    Yes, sir, and then like with search

24 warrants and GBI submissions, those things can take

25 time to get that information back, so the detective

1  should write supplemental reports to show this was

2  done on this time and so forth.  They can add in

3  supplemental reports.

4  Q.    Okay.  If you can flip to the next page,

5  Page 51 of 114.  I'll represent to you the first

6  paragraph Wood talked about not reviewing footage but

7  typing it from memory.

8         Is that commonplace after a detective has

9  interviewed someone, that they don't review the body

10  cam or anything?

11  A.    That's not normal.  Most detectives will

12  either review their report of interview in our

13  interview rooms or a body camera.

14  Q.    You say interview rooms.  Do you have a

15  facility there at the precinct or wherever you are in

16  your offices where a detective can go and pull up

17  whatever, I guess, recording they made during an

18  interview?

19  A.    Yes.  It's changed in the last year I

20  believe.  We've gone -- because our headquarters are

21  being renovated.  We've gone from an older more

22  outdated system to the same company that we have our

23  body cameras through runs our interview room

24  recording system as well.

25  Q.    Pretty easy to bring up now?

1        A.    Yes.

2        Q.    Would you agree with me the purpose of

3   reviewing like these recordings and videos is for

4   accuracy, correct?

5        A.    Yes, sir.

6        Q.    Would you agree that that's the utmost

7   importance when a detective is writing a report that

8   they are accurate with their report?

9        A.    I would say so.

10       Q.    The accuracy has many purposes.  For

11  instance, the accuracy is important to the victim;

12  would you agree?

13       A.    Yes, sir.

14       Q.    It's also important to the accused as

15  well, correct?

16       A.    Yes, sir.

17       Q.    Now, it goes down.  The last sentence says

18  "when asked who her supervisors were at the time,

19  Corporal Wood stated Sergeant Khaalis and Lieutenant

20  Burdette were the supervisors of the unit at that

21  time.  When asked why a case file was not submitted

22  for the homicide and aggravated assault

23  investigations, Detective Wood responded by saying

24  that she had been transferred to the gang unit and

25  forgot to submit the case file."

1    Below that it says the incident occurred

2 in May of '21 and Wood was transferred to the gang

3 unit in October of '21.  Is that your recollection,

4 she was transferred I guess in October of '21?

5    A.    Yes, I believe that was when she was

6 transferred.

7    Q.    Do you know why she was transferred?

8    A.    I was no longer in the homicide unit at

9 that time so I'm not sure what the reason why.

10    Q.    You left in July of '21, right?

11    A.    Yes, sir.

12    Q.    You had gotten promoted to sergeant?

13    A.    Lieutenant.

14    Q.    When asked why a case file was not

15 submitted, what's the difference between initial

16 report and a case file?

17    A.    The case file is literally the file.  We

18 put them in binders like you have there.  That goes

19 to our case file management unit and where it

20 literally houses the whole entire investigation.

21    It's going to have all of your reports,

22 all of your search warrants, search warrant returns,

23 all of your digital evidence, you know, interviews,

24 video if there is any.

25    It's going to have photo lineups in it if

1    you did any of those.  Literally everything that you

2    did during the investigation would be in that file.

3        Q.    So anything that a detective did in

4    gathering evidence and making notes, things like

5    that, is it required to go into this case file?

6        A.    Yes.

7        Q.    When a detective begins a case file, are

8    they given like, for instance, a physical binder or

9    do they start it in a program that's, you know, on

10   their computer or doing the typing?

11       A.    So now both.

12       Q.    Yes.

13       A.    For the district attorney's office, they

14   do what we call a digital case file where they put

15   everything into evidence.com, but it is my

16   understanding that we have to, the department has to

17   keep a hard file which is why we still do the binders

18   and they're given kind of a table of contents for

19   things that are required to be in there.  And things

20   can not be in there.

21            For instance, in the table of contents, it

22   will have a section for digital evidence.  There's

23   sometimes where you don't get video from businesses

24   or whatever, so that obviously won't be in there, but

25   everything they collect is categorized in some way on

1     that file, on that table of contents to go into the

2     file.

3         Q.    Like, for instance, and these are not -- I

4     have table of contents right here where I have things

5     listed and tabs.  I just made these up.

6             For instance, these are issued notebooks

7     with table of contents, and if a document exists, is

8     it required to be in that notebook?

9         A.    Yes.  And they do tabs similar to what you

10    have there where they're numbered tabs where the

11    table of contents will say in Number 1 you have all

12    the police reports.

13        Q.    Okay.

14        A.    Number 2 you have all search warrants.

15        Q.    Okay.  When is this case file required to

16    be submitted?

17        A.    It's required to be submitted after an

18    arrest is made.  So once an arrest is made, you are

19    supposed to do your investigative reports and you're

20    supposed to put the file together and submit it to

21    that point.

22            And I say to that point, going back to

23    what I said earlier about there's going to be certain

24    things that aren't going to be there because you're

25    still waiting on information to come back.  Results

1    from the medical examiner, for instance, their

2    reports take months after they do autopsies.  The GBI

3    can take sometimes years to send you information

4    back.

5              So that stuff will get added later on but

6    we have to do the file so we can get it submitted to

7    the district attorney's office.

8         Q.    Where are these binders kept?

9         A.    We have a case file management unit who

10   has an office where once the case file is submitted

11   to the supervisor for review, the supervisor will

12   then turn it over to the case file management unit.

13        Q.    Put it on a shelf somewhere?

14        A.    Yes, sir.  Right.  Now they're stored in

15   boxes because they're not in their regular office.

16   When they're in their normal office, they have --

17   it's a massive place.  They just kind of stack them

18   in shelves based off the case report numbers.

19        Q.    And that's essentially all the evidence

20   the detective has gathered so that when the DA takes

21   over the case they're able to use all that evidence

22   in, I guess, deciding whether or not to indict

23   someone or, if they have been indicted, to try the

24   case; is that right?

25        A.    Yes.

1       Q.   I got you.  And is creating a case file to

2 give to the case file manager or management system,

3 is that a requirement of the Savannah Police

4 Department?

5       A.   Yes.

6       Q.   Not optional?

7       A.   It's not optional.  It's in our policy,

8 every major case investigation has to have a case

9 file.

10      Q.   Do these case files contain the warrants

11 that are taken out by detectives when they're

12 searching for certain materials?

13      A.   They're supposed to be there, yes.

14      Q.   That's what I wanted to ask you about too.

15 She says below that "Corporal Wood was then asked why

16 search warrant returns were just getting done in 2023

17 if the incident happened two years ago.  She replied

18 by saying that she was trained to hold off on doing

19 search warrant returns till the case was about to go

20 to trial and just before the defense attorney filed

21 for discovery.  She stated that was standard practice

22 for the homicide unit at the time.  She then stated

23 that the DA's office had a copy of the case file for

24 this incident."

25          Question:  How could the DA have a case

1   file copy of this if she never created one?  You

2   think she's just not telling the truth?

3        A.    So the detectives create two different

4   files.  One is for the district attorney's office and

5   then one is for case file management.  Does that make

6   sense?

7        Q.    They do duplicates?

8        A.    They're supposed to have the same exact

9   thing in both of them.

10       Q.    I'm trying to jibe those two together.

11  Wood is saying that the DA has a copy of the case

12  file but then she was also asked why a case file was

13  not submitted for the homicide and aggravated

14  assault.  She said I got transferred and forgot to

15  submit the case file.  Do you think it was just still

16  back there -- I mean, I don't know.  I can't

17  reconcile those two.

18       A.    I think she -- she submitted her case file

19  directly to -- the district attorney's copy to the

20  district attorney's office.

21             The case file that they're referencing

22  here that was never turned in, was the one that was

23  supposed to be in case file management.

24             So when they build case files, they build

25  two identical case files.  One goes to the district

1    attorney's office for prosecution and the other one

2    is held in case file management.

3        Q.    Who builds those?  The officer or the case

4    file manager?

5        A.    The detective.

6        Q.    Required to make two identical ones?

7        A.    Yes.

8        Q.    Is that a guess at what happened or your

9    best guess on there or do you know that for a fact?

10       A.    That is my best guess.

11       Q.    I understand.  Would you agree that it was

12   Sergeant Santoro's policy that she was trained to

13   hold off on doing search warrant returns?

14       A.    Yes.

15       Q.    Was that the policy that you understood to

16   be in place at the time when you started?

17       A.    The department policy?

18       Q.    I'm not saying Savannah Police Department

19   in general, but I'm saying the homicide unit.

20       A.    That was a Sergeant Santoro thing.

21       Q.    Okay.

22       A.    He firmly believed in that.

23       Q.    Tell me why did he believe in that.  Do

24   you have any insight on that?

25       A.    Yes.  His philosophy was if you did a

1    search warrant return and then you submitted it to

2    the clerk of court, then that search warrant return

3    would be available to anyone who wanted to go and

4    file a petition to get it.

5         Q.   Yes.

6         A.   Specifically with homicides, the search

7    warrants that they do, we do for Superior Court

8    search warrants because those involve more detailed

9    outlines of the investigation, his thoughts were

10   don't do those until discovery because you don't want

11   a defendant to be able to get it and know your entire

12   case but for discovery.

13        Q.   I got you.  Sometimes from search warrant

14   returns till the time the discovery begins, that

15   could be a significant period of time?

16        A.   Yes, sir.

17        Q.   Could it be years?

18        A.   It could be.

19        Q.   Have you changed that policy?

20        A.   The policy --

21             MR. DOVE:  Object to the form real quick.

22   Continue to answer.

23        Q.   (By Mr. Shipley)  Let me rephrase that.

24   The nonwritten but understood Sergeant Santoro policy

25   that was in effect when you began there, has that

1  policy been stopped?

2       A.    Yes.

3       Q.    Did you play a role in stopping that when

4  you came back and oversaw the unit?

5       A.    Yes.

6       Q.    Was that your decision?

7       A.    It was a collective decision but I had

8  always been against that kind of procedure that he

9  did for the purposes of the -- there's only eight

10 detectives in homicide and with the number of

11 homicides they are assigned each year on top of other

12 cases that they work, it's very easy to forget things

13 and so it's been changed to where when you get the

14 information returned on the search warrant you will

15 submit a search warrant return.

16      Q.    Were there any other persons other than

17 you that talked this thing out and said, hey, we've

18 got to change this policy, it's just not working?

19      A.    It was myself, Captain Tobar, Major Herron

20 who's our criminal investigation major, and I believe

21 Assistant Chief Adams.

22      Q.    That was after Santoro left?

23      A.    Yes.

24      Q.    And you mentioned, and I appreciate that,

25 you said that not including search warrant returns

1    and things like that, it's easy for people to forget

2    to go back and do these type things?

3          A.    Yes.

4          Q.    Is that the only reason you had that you

5    thought it needed to be changed?

6          A.    Yes, that's the main reason.  I also have

7    personal feeling that there's no need to hold out on

8    doing them.

9                My personal opinion is Sergeant Santoro

10   felt like crime in Savannah was more organized

11   than -- to where he felt like every person that may

12   have committed a crime was going to try to figure out

13   if detectives had something on a case.  I have never

14   personally heard of that happening, so where he came

15   up with that idea --

16         Q.    Criminals were a lot smarter in his brain

17   than they truly were?

18         A.    In my opinion, yes.

19         Q.    I understand.  Do you see any issues or

20   problems with the accused not having access to these

21   returns under Santoro's policy?

22         A.    The return itself, no, because a lot of

23   times the information that they -- they're going to

24   get the return in discovery when their attorney gets

25   it from the DA's office.

1        A lot of things that we get in search

2   warrants, it's invaluable information anyway.  So in

3   my opinion I think a lot of times they would just be

4   spinning their wheels by saying, oh, man, I can't

5   believe they took this out of my house or, you know,

6   this.

7        Whether or not they did something or not,

8   a lot of stuff that we get is not actual valuable

9   information.  Does that make sense?

10  Q.    Yes, it does.  I think what I'm thinking

11  is but without -- do you agree with me that that

12  allows homicide detectives to write reports and draw

13  conclusions that may or may not be supported by

14  actual physical evidence that the other side can use

15  to challenge those conclusions?

16        MR. DOVE:  Object to the form.  You can

17        answer.

18        THE WITNESS:  I'm not understanding what

19        you're asking.

20  Q.    (By Mr. Shipley)  Let me give you a

21  hypothetical.  So there is one search warrant out

22  there that allowed in this case Officer Wood or

23  someone on the force to go out and take swabs off of

24  Charles Vinson's phone, take a swab off of Marquis

25  Parrish's belt, looking for DNA samples.  Have you

1    seen those?

2         A.    Have I seen those search warrants?

3         Q.    Yes.

4         A.    No, I have not.

5         Q.    Would that be something that's typically

6    done, swabs are done for DNA samples --

7         A.    Yes.

8         Q.    Wouldn't it be almost necessary for an

9    accused or their attorney to be aware that those

10   swabs were taken so that they could request that

11   maybe their own tests could be done on these things?

12        A.    Yes, I think that would be necessary but

13   that's something that should also be documented in

14   their investigative report aside from the search

15   warrant.  Does that make sense?

16        Q.    Just, what, a reference to say --

17        A.    Sure.

18        Q.    What would it say?  Tell me.

19        A.    So it should -- in their investigative

20   report, it should say on February 22nd at 11:00 a.m.

21   I went and executed a search warrant for Zachary

22   Burdette's DNA from his person, I swabbed or I went

23   to our property room and took out my cell phone and

24   swabbed it for DNA.  An outline of what they did

25   should be in their --

1      Q.    In the narrative?

2      A.    Yes, in the narrative.

3      Q.    But that is not necessarily required, that

4   information to be in the narrative, and an officer

5   has some discretion on whether or not -- and they may

6   99 percent of the time, that some -- if they leave it

7   out, nobody is going to know, there's no checking,

8   right?

9      A.    If they leave it out, it's -- to me you

10  have an issue there with them not providing a full

11  detail of their investigation.

12     Q.    Let's say that that occurs.  Like, for

13  instance, the officer forgets to put in there they

14  took a swab of Marquis Parrish's belt, right?

15     A.    Yes.

16     Q.    So then the next thing we can do to

17  determine whether or not a swab has been taken would

18  be contained within the warrant return; is that

19  right?

20     A.    Yes.

21     Q.    And if the warrant return doesn't exist,

22  then nobody knows if that swab was potentially taken,

23  right?

24     A.    Yes.

25     Q.    So Mr. Parrish or one of his attorneys

1    would have no idea a swab taken that could be

2    exculpatory evidence to say, hey, I have none of the

3    deceased's DNA on me or blood samples or anything

4    like that, correct?

5        A.    Yes.

6        Q.    And that could cause a problem?

7        A.    Yes.

8        Q.    Okay.

9        A.    At that point a search warrant return

10    should have been done.

11        Q.    Should have been done?

12        A.    Yes.

13        Q.    It sounds like you've gotten rid of this

14    policy and yours is that search warrant returns have

15    to be in place now, right?

16        A.    Yes.

17        Q.    And I asked the prior deponent, Corporal

18    Hilderbrand, the same question.  We talked about it

19    briefly.  Sometimes these accuseds are arrested and

20    they're put in jail for a long period of time,

21    correct.

22        A.    Yes.

23        Q.    If you don't have a search warrant return

24    where there's no evidence that, you know, maybe

25    exculpatory evidence was taken from a certain site,

1    whether it was a car or clothing and things like

2    that, and it's only available under Santoro's rules

3    that it comes out during discovery, you could have

4    somebody in jail for two years before his attorney or

5    himself is aware that that evidence is available,

6    right?

7          A.    Yes.

8          Q.    And that could cause somebody to stay in

9    jail for a long time?

10         A.    I would say so.

11               MR. SHIPLEY:  I've got it marked as --

12         bear with me one second.  I'm getting towards

13         the end here.

14               (Plaintiffs' Exhibit 8 was marked for

15         identification.)

16         Q.    (By Mr. Shipley)  I'll represent to you

17   these are just a series of e-mails that were given to

18   us in the process of discovery.

19               This is a variety of e-mails that have

20   come in.  Turn to the page at the bottom Bates

21   stamped Savannah 121.

22         A.    Okay.

23         Q.    This is in April of '23.  You've got Alan

24   Sammons.  Who is he?

25         A.    He is an investigator for the district

1   attorney's office.

2       Q.   And he e-mails Richard Wiggins.  He says

3   "after reviewing the evidence submission to GBI from

4   3/30/23 delivered by Detective Wood, there are other

5   items that needed to be delivered as well.  They are

6   listed below.  Please let me know if we need to do

7   anything to help facilitate the transfer of the

8   evidence to GBI."

9           And I've noted a number of items.  You've

10  got Marquis Parrish buccal swab, swabs from holster,

11  all swabs from pistols.

12          If you flip, .45 caliber shell casings

13  recovered in car.  More buccal swabs.  Swabs from

14  Charles Vinson, the deceased's cell phone?

15          Do you have any idea based on your

16  experience in this case and with Wood, where were all

17  those items?

18      A.   Being the fact that these items have --

19  you see the tag number?

20      Q.   Yes, sir.

21      A.   I would assume that those would be in our

22  property room.

23      Q.   Okay.

24      A.   Because when we log property into the

25  property room, it gets a bar code label with the tag

1    number.

2        Q.    Would the officer mark them or is there

3    somebody in charge of that too?

4        A.    It's auto generated through the report

5    system.

6        Q.    Okay.

7        A.    Through the automated report system.

8        Q.    Would the detective who's taking these --

9    Wood, is she the one who took the swabs or anything

10   like that?

11       A.    I don't know who took them.  She could

12   have if they were in her possession.  Like if she's

13   the one that took the swab, she could have taken them

14   but another detective who worked in the unit could

15   have done the swabs and took them.

16       Q.    Would you agree with me a number of these

17   things, obviously these could be evidence that would

18   support, you know, I guess the arrest or conviction

19   of these individuals, right?

20       A.    Yes.

21       Q.    They could also be evidence that is

22   exculpatory and proves the innocence of these victims

23   too, right?

24       A.    Yes.

25       Q.    This evidence is very important to an

1    accused, correct?

2        A.    Yes, sir.

3        Q.    Very important to law enforcement,

4    correct?

5        A.    Yes, sir.

6        Q.    And it should have been sent to the GBI

7    earlier, right?

8        A.    Yes.

9        Q.    The next one, if you go to Page 178,

10   appears to be Ashley Wood sending e-mails to the CID

11   Recap.  Do you see that?

12            It's in '21, May 7th of '21.  It's right

13   around the time of Vinson's murder.  So she sent out

14   an e-mail that says CIDRecap@Savannahga.gov.  Subject

15   is homicide investigation, update.  What is CID

16   Recap?

17       A.    That is an e-mail group that -- I cannot

18   tell you how many people are in the one from 2021 but

19   it is an e-mail group that contains most detectives

20   within criminal investigations and supervisors, the

21   executive command staff of the police department, and

22   typically a few members of the district attorney's

23   office.

24       Q.    Okay.

25       A.    That kind of get the recaps through

1    investigations.

2        Q.    This has to do with pretty serious crimes,

3    felonies, things like that?

4        A.    Yes, sir.

5        Q.    This isn't, you know, hey, we apprehended

6    the guy that spray painted Manly Shipley's building

7    down there the other day.

8        A.    Correct.

9        Q.    They did.  You wouldn't say like, hey, we

10   apprehended the guy that spray painted Jim Shipley's

11   building, right?

12       A.    No, sir.

13       Q.    Okay.

14       A.    Typically not in this.

15       Q.    So these are violent crimes, felonies,

16   things of that --

17       A.    Property crimes will send recaps out on

18   these but more so if it's a more serious auto crime

19   like an auto theft, burglaries.

20       Q.    And then you get a reply back from Tobar

21   that says good work.  Who is Tobar?

22       A.    Currently he's the captain over criminal

23   investigations.

24       Q.    And then the next one, it's the same

25   e-mail that she sent out, Detective Wood, you know,

1       talking about the arrest of Parrish and some other

2       arrests.  And then you get one from Allen Childs

3       saying once again good job, Sis.  Who's Childs?

4            A.    He works for the police department.  He

5       was a homicide detective.  He is currently not.  He's

6       back on patrol now.

7            Q.    And another May 7th -- I mean, it's the

8       same e-mail that went out May 7th of '21.  You've got

9       Minter, great job, Ashley.  Who is that, Roy Minter?

10           A.    He is the former police chief.

11           Q.    Then we've got excellent work, Detective

12      Wood.  That's from Mercer.  Who is Mercer?

13           A.    That's Raymond Mercer.  He was a homicide

14      detective.

15           Q.    And then outstanding by all, job by all,

16      Robert Gavin to Ashley Wood?

17           A.    He's our assistant police chief.

18           Q.    And then there's some more.  There's Roy

19      Minter again, outstanding work everyone.

20                 You know, I guess my question on here is

21      if you're a homicide detective, your job is to solve

22      crimes, correct?

23           A.    Yes.

24           Q.    And solving crimes meaning finding the

25      person who committed these felonies, whether they are

1    murders or assaults and things like that, correct?

2         A.    Yes, sir.

3         Q.    And when that happened, it seems as if,

4    you know, e-mails go out, is that correct, notifying

5    people?

6         A.    Yes, sir.

7         Q.    And congratulations are given.  Is that

8    normal?

9         A.    Not so much now.  That was more common

10   several years ago than it is now.

11        Q.    Why was it more common several years ago?

12   Just because of the crime rate?

13        A.    My best guess is the leadership is more of

14   a pat you on the back now versus it's -- I'm not

15   saying that we expect people but we almost expect

16   people to do their jobs and to do them properly.

17             You know, internally if one of our

18   detectives makes an arrest, they'll still send out an

19   update to this effect but I'm not going to respond

20   and say good job.  Typically we'll just tell the

21   detective, hey, you know, good job on that

22   investigation.

23        Q.    Back during this time period with the

24   leadership, was it kind of -- were there higher

25   expectations of finding the criminals, arresting

1 them?

2     A.    I just think it was more based off of

3 staffing and things like that, we're just going to

4 give people a pat on the back every time they do

5 their job.

6     Q.    Was there lower staffing back then?

7     A.    It's about the same now.  Ever since the

8 pandemic we've been fairly short staffed.

9     Q.    Solving these cases and making an arrest,

10 it helps build someone's résumé, correct?

11     A.    In terms of?

12     Q.    Potential promotions down the line.

13     A.    Several years ago maybe.  Now the way that

14 we do promotions, it's based off of the way that you

15 test and how well you score through the testing

16 process versus how much somebody may know you.

17     Q.    Okay.  Got you.  Let me ask you this just

18 kind of in closing.  Your understanding was that

19 Detective Wood was terminated; is that correct?

20     A.    Yes.

21     Q.    I meant to ask you this.  Your name is

22 on -- if we could go back to what I have as Exhibit 8

23 that you have there -- is that eight?

24     A.    Seven.

25     Q.    Investigation file.  Let me see if I can

1    find it.  For instance, the first one, it looks like

2    it's authored by Samuell, but then there's a memo.

3    It's from May 24th of '23 from Zachary Burdette.

4         A.    Yes, sir.

5         Q.    Tell me how you came about authoring this.

6    Did you write it together?  Did you pull documents

7    from --

8         A.    So what happens is the internal affairs

9    does their fact-finding investigation.  And then once

10   they do that, we have a program called Blue Team

11   which is a software tracking program where they then

12   send all of the information that they got or they get

13   to include the report at the beginning of this

14   document.

15        Q.    Okay.

16        A.    To someone within the chain of the person

17   who's being investigated and that person then looks

18   at the report, looks through all of the documentation

19   in the file, and then writes one of these documents

20   which is called a letter of transmittal, or LOT, and

21   this is a document where the initial person who

22   writes it, being me, goes through the investigation,

23   determines based off the investigation if a policy

24   was actually violated or not and then makes a

25   punishment recommendation based off of the policy

1   violations.

2        Q.    I got you.  So you're basically looking

3   through the individual who did -- excuse me.  The

4   administrative investigation, you're looking at their

5   findings and then you make a determination in your

6   brain on whether or not this person should be

7   suspended, terminated, not have any penalties

8   whatsoever but you're not ultimately making that

9   decision, you're just making a suggestion to your

10  higher-ups?

11       A.    Right.  In this I make a recommendation

12  and then I send it to Captain Tobar who then kind of

13  does the same thing I do.

14            He doesn't have to write a whole memo.  He

15  reviews what I write.  He determines whether or not

16  he agrees or disagrees with my recommendation.  They

17  can add their space there where they can add comments

18  and it goes all the way up to the chief.

19       Q.    I got you.  I was wondering if you -- it

20  seemed like there was another team that put the

21  information together but your role in this was to

22  make recommendations?

23       A.    Yes.

24       Q.    Was your recommendation termination for

25  Detective Wood?

1    A.    Yes.

2    Q.    Why was that your recommendation that she

3 be terminated?

4    A.    For the multitude of policy violations.

5 Mostly for the inconsistencies between what was

6 viewed in the body camera footage and what was

7 written in the reports and the lack of doing the

8 investigative followup that was required for this

9 case.

10    Q.    I mean, essentially she was -- did it

11 appear to you that she was untruthful in some of the

12 statements that she put in her report after reviewing

13 the video versus what was in her report?

14    A.    To me it appeared that she was untruthful.

15    Q.    Do you think she suppressed evidence in

16 this case by failing to turn over search warrant

17 returns, not sending evidence to the GBI?

18    A.    Yes.

19    Q.    And I'm just going to ask you this.  Do

20 you think what happened to Marquis Parrish was wrong?

21        MR. DOVE:  Object to form.  Go ahead.

22        THE WITNESS:  Yes.

23        MR. SHIPLEY:  That's all the questions I

24    have.

25

1          EXAMINATION

2    BY MR. COX:

3         Q.    My name is Charlie Cox.  I represent

4    Ms. Wood.  I didn't pay attention to what rank you

5    are --

6         A.    Whatever you want to call me.  I'm a

7    lieutenant.

8         Q.    You probably don't want to leave it at

9    whatever I want to call you.

10               Anyway, Lieutenant Burdette, quickly you

11   said that you think she suppressed evidence; is that

12   right?

13        A.    Yes.

14        Q.    Why do you think she suppressed evidence?

15        A.    I do not think she did a proper followup

16   with the evidence that she collected in terms of

17   getting it submitted for examination.

18        Q.    Did she do a poor job?

19        A.    I believe so.

20        Q.    Do you think that poor job is what

21   resulted in the suppression of evidence?

22        A.    Yes.

23        Q.    Do you believe she was intentionally

24   trying to suppress evidence in order to violate any

25   of Marquis Parrish's rights?

1        A.      No.

2        Q.      When you were asked a question about if

3   you thought she had -- I think the question was if

4   she had made any false statements in her report.  Is

5   that what you were asked?  Is that your recollection

6   of what you were asked on the record?

7        A.      Yes.

8        Q.      And I believe you said that you thought

9   she had made some false statements; is that correct?

10       A.      Yes.

11       Q.      Can you identify for me now what those

12  statements are that you believe to be false?

13       A.      The exact statement or the nature of them?

14       Q.      Well, unless you have them in front of

15  you, probably you wouldn't remember them exactly.

16  You know, what you remember those statements to be.

17       A.      There was one in particular where she was

18  doing an interview with a female about an incident

19  where she was asking the female questions about

20  whether or not she saw the person shooting.

21            And the report said that the female told

22  her that she did look out the window and see the

23  person shooting whereas the video from her body

24  camera of the interview the female never physically

25  said that she saw the person shooting.

1      Q.    And that's the interview with Ms. Love?

2      A.    I believe so.

3      Q.    Are they asking Ms. Love about somebody

4 who goes by the name of Scooter?

5      A.    I believe that's correct.

6      Q.    How many videos of that interview existed?

7      A.    I know for sure there's one.  I know there

8 were two people there but I don't remember if

9 Detective Hilderbrand's camera was on or not but I

10 know for sure there was one.

11      Q.    And I think when you were answering my

12 question you said that when you reviewed the video

13 that the witness never physically stated that she saw

14 who shot; is that correct?

15      A.    Yes.

16      Q.    What you mean by that is the witness never

17 audibly stated, she didn't vocalize who it was,

18 correct?

19      A.    If my memory is correct, she said that

20 when she heard the gunshot she laid on the floor and

21 never went to the window but that she assumed it was

22 Scooter because who else could it have been.

23      Q.    Okay.  And you identified that as one

24 statement that you believe to be false, correct?

25      A.    Yes.  It was inaccurate.

1    Q.    All right.  You believe a more accurate

2  way to describe that statement would have been to

3  state that Ms. Love stated she believed it was

4  Scooter?

5    A.    Factually I think the better way to

6  describe it would be she did not know because the

7  words that she used were something to the effect of

8  who else could it have been, implying that she

9  doesn't know anybody else that would have shot at her

10 apartment.

11   Q.    Other than that statement, were there

12 other statements that you believe were inaccurate or,

13 as you described them in response to questions from

14 Mr. Shipley, that they were false?

15   A.    There was also something written where she

16 said that she watched video from Wal-Mart and saw

17 Mr. Parrish on the video, which he was not on the

18 video.

19   Q.    And it's your recollection that her

20 statement was that she actually saw Mr. Parrish on

21 the video at Wal-Mart?

22   A.    Yes.

23   Q.    And it's because you recall her statement

24 to be that she saw Mr. Parrish on the video at

25 Wal-Mart and then him subsequently not being on that

1 video, that's the reason why you believe that

2 statement is false or inaccurate, correct?

3     A.    Yes.

4     Q.    Any other statements that you were

5 thinking of when you told Mr. Shipley you thought she

6 had made false statements?

7     A.    Not that I can directly think of right

8 now.

9     Q.    Those were the two statements that were

10 kind of the driving force in your mind, correct?

11     A.    That I can think of right now, yes.

12     MR. COX:  I don't have any other

13     questions.  Thank you.

14                     EXAMINATION

15 BY MR. DOVE:

16     Q.    I just have a couple about the search

17 warrant returns.  Am I correct in saying that the

18 filing of a search warrant return does not provide

19 physical evidence to anyone, correct?

20     A.    Correct.

21     Q.    So earlier when Mr. Shipley asked you

22 whether the filing of search warrant returns and not

23 submitting items to GBI, was your answer that both

24 the filing of the search warrant return and the

25 failure to submit evidence to GBI would amount to

1    evidence suppression?

2        A.    No.

3        Q.    If I were to ask you is the failure to

4    file a search warrant return tantamount to evidence

5    suppression, what would your answer be?

6        A.    I would say the filing of the return would

7    not be evidence suppression.

8        Q.    So the failure to file it is not evidence

9    suppression in your mind?

10       A.    Correct.

11             MR. DOVE:  That's it.

12             MR. SHIPLEY:  No questions.  We're all

13       done.

14             (Deposition concluded at 1:47 p.m.)

15    (Pursuant to Rule 30(e) of the Federal Rules of Civil

16    Procedure and/or O.C.G.A. 9-11-30(e), signature of

17    the witness has been waived.)

18

19

20

21

22

23

24

25

1          CERTIFICATE OF COURT REPORTER

2

3    STATE OF GEORGIA:

4    COUNTY OF CHATHAM:

5

6    I hereby certify that the foregoing transcript was
     reported as stated in the caption and the questions
     and answers thereto were reduced to writing by me;
7    that the foregoing 60 pages represent a true,
     correct, and complete transcript of the evidence
8    given on Friday, April 26, 2024, by the witness,
     ZACHARY BURDETTE, who was first duly sworn by me.
9    I certify that I am not disqualified
     for a relationship of interest under
10   O.C.G.A. 9-11-28(c); I am a Georgia Certified Court
     Reporter here as an employee of Gilbert & Jones, Inc.
11   who was contacted by Manly Shipley to provide court
     reporting services for the proceedings; I will not be
12   taking these proceedings under any contract that is
     prohibited by O.C.G.A. 15-14-37(a) and (b) or
13   Article 7.C. of the Rules and Regulations of the
     Board; and by the attached disclosure form I confirm
14   that neither I nor Gilbert & Jones, Inc. are a party
     to a contract prohibited by O.C.G.A. 15-14-37(a) and
15   (b) or Article 7.C. of the Rules and Regulations of
     the Board.
16   This 6th day of May, 2024.

17

18

19

20

                                   *Mynjuan Jones*

22                        _____
                          Mynjuan Jones, RPR, B-1422
23

24

25

GILBERT & JONES

1                    DISCLOSURE OF NO CONTRACT

2     I, Debbie Gilbert, do hereby disclose pursuant to
      Article 10.B of the Rules and Regulations of the
3     Board of Court Reporting of the Judicial Council of
      Georgia that Gilbert & Jones, Inc. was contacted by
4     Manly Shipley to provide court reporting services for
      these proceedings and there is no contract that is
5     prohibited by O.C.G.A. 15-14-37(a) and (b) or
      Article 7.C. of the Rules and Regulations of the
6     Board for the taking of these proceedings.
      There is no contract to provide reporting services
7     between Gilbert & Jones, Inc. or any person with whom
      Gilbert & Jones, Inc. has a principal and agency
8     relationship nor any attorney at law in this action,
      party to this action, party having a financial
9     interest in this action, or agent for an attorney at
      law in this action, party to this action, or party
10    having a financial interest in this action.  Any and
      all financial arrangements beyond our usual and
11    customary rates have been disclosed and offered to
      all parties.
12    This 6th day of May, 2024.


                       _Debbie Gilbert_

15                    _____
                      Debbie Gilbert, FIRM
16                    REPRESENTATIVE
                      Gilbert & Jones, Inc.

17

18

19

20

21

22

23

24

25