**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION**

| | |
|---|---|
| MARQUIS RAQUEL PARRISH and TYESHA LOVE, <br><br> Plaintiffs, <br><br> v. <br><br> ASHLEY WOOD, in her individual capacity and in her official capacity as an employee of the Savannah Police Department, and THE MAYOR AND ALDERMEN OF THE CITY OF SAVANNAH, <br><br> Defendants. | Civil Action No. 4:23-CV-00261-JRH-CLR |

**PLAINTIFFS' RESPONSE TO THE MAYOR AND ALDERMEN OF THE CITY OF SAVANNAH'S MOTION FOR SUMMARY JUDGMENT**

**COME NOW** Plaintiffs Marquis Raquel Parrish ("Mr. Parrish") and Tyesha Love ("Mrs. Love") (collectively, the "Plaintiffs"), by and through undersigned counsel, and hereby file their Response to the Mayor and Aldermen of the City of Savannah's (the "City") Motion for Summary Judgment, representing to the Court as follows:

**<u>INTRODUCTION</u>**

At all times relevant to this lawsuit, Savannah Police Department ("SPD"), the law enforcement department of the City, maintained a policy, practice, procedure, and custom of suppressing evidence and refraining from filing search warrant returns with the court until trial neared and the DA's Office informed SPD discovery was being given. The intent and actual effect of such policies was to prevent criminal defendants and their counsel from reviewing search warrant returns; ascertaining what evidence was obtained pursuant to those returns, including

*Marquis Raquel Parrish, et al. v. Ashley Wood, et al.*, 4:23-CV-00261-JRH-CLR
Plaintiffs' Response to the City's Motion for Summary Judgment
Page **1** of 26

potentially exculpatory evidence; requesting access to and testing evidence; and using evidence to contest the probable cause allegedly supporting their arrest and ongoing detention, establishing their innocence, and securing their release sooner rather than later. Such policies ultimately result in criminal defendants being jailed for months and years without probable cause and all while evidence which would have required their release remained in the possession of SPD and hidden from review and scrutiny.

In this case, the lead detective assigned to investigate the murder of Charles Vinson and Mr. Parrish's purported involvement therein, acting pursuant to City and SPD policy, neglected to file a single search warrant return with the court, of which there were thirty-four (34), effectively suppressing the evidence obtained therefrom, and failed to turn over exculpatory evidence to the Chatham County District Attorney's Office (the "DA's Office") or Mr. Parrish for nearly two (2) years. Without the search warrant returns, Mr. Parrish had no knowledge of the evidence seized pursuant thereto, much of which proved to be exculpatory or otherwise demonstrated an absence of probable cause to search, arrest, and continue to detain Mr. Parrish. Instead, Mr. Parrish lost two (2) years of his life in jail while the evidence that ultimately secured his freedom remained untested and unscrutinized in the possession of SPD. Because sufficient evidence exists which would permit a reasonable jury to find that such City policies existed and caused Mr. Parrish to suffer violations of his constitutional rights, the City's Motion for Summary Judgment must be denied.

## **FACTUAL BACKGROUND**
### *Arrest and Detention of Plaintiff Parrish*

On April 27, 2021, Charles Vinson was reported missing, and five days later, he was found deceased from gunshot wounds on the 2900 block of Julia Law Street in Savannah, Georgia. [ECF 35, ¶12]. Defendant Ashley Wood, a detective with SPD, was assigned as lead detective on Mr.

*Marquis Raquel Parrish, et al. v. Ashley Wood, et al.*, 4:23-CV-00261-JRH-CLR
Plaintiffs' Response to the City's Motion for Summary Judgment
Page **2** of 26

Vinson's case, [ECF 64-3, p. 9], and applied for and obtained thirty-four (34) search warrants as part of her investigation into Mr. Vinson's murder. [ECF 64-4]. Said search warrants authorized the search and seizure of, among other things, multiple cellphones, social media accounts, DNA, cell phone tower dumps, vehicles, and residences, and were supported by the averments of Defendant Wood. [ECF 64-4]. Based on information purportedly gathered during Defendant Wood's investigation, Mr. Parrish was arrested on or about May 6, 2021, in relation to the murder of Mr. Vinson, [**Exhibit "1"**, Wood Report], and a Chatham County grand jury ultimately indicted Mr. Parrish for the murder of Mr. Vinson on July 8, 2021. [ECF 35-2]. Detective Wood was the only witness before the grand jury and every count of the indictment was based solely on her testimony. [ECF 64-8, p. 143-144].[1]

Following Mr. Parrish's arrest, Defendant Wood presumably continued her investigation of Mr. Vinson's murder, and on February 8, 2022, Assistant District Attorney Jillian Gibson with the "DA's Office" requested Defendant Wood provide her a copy of the investigative file. [ECF 64-8, p. 144]. Three (3) days later, an SPD employee created a formal evidence.com[2] case file related to its investigation of the murder of Mr. Vinson, and Defendant Wood provided Ms. Gibson a link to access it. [ECF 64-5]. By that point, at least some evidence concerning the murder of Mr. Vinson had been uploaded to evidence.com, and on February 15, 2022, Defendant Wood delivered a hard copy of her case file consisting of two (2) binders to the DA's Office. [ECF 64-6]. A few months later, on May 26, 2022, the DA's Office made its first discovery disclosure to Mr. Parrish's

---

[1] Plaintiffs note that any reference to a page number of an electronically filed document refers to the page number assigned by the Court's electronic filing system and as such may not correspond directly to any page number originally reflected on the document.

[2] Evidence.com is a cloud-based platform used by SPD to store and share case files and information. [ECF 64-8, p. 37-38].

*Marquis Raquel Parrish, et al. v. Ashley Wood, et al.*, 4:23-CV-00261-JRH-CLR
Plaintiffs' Response to the City's Motion for Summary Judgment
Page **3** of 26

attorney, Solomon Amusan, and included, at a maximum, all evidence Defendant Wood had by that point disclosed to the DA's Office via evidence.com or the two (2) binders. [ECF 64-7].

Following the May 2022 discovery disclosure, Mr. Amusan served as Mr. Parrish's attorney for just two months. Mr. Parrish was thereafter unrepresented until mid-November 2022, when Katie Kelly with the Chatham County Public Defender's Office took over his case. *See* **Exhibit "2"**, Criminal Docket. Ms. Kelly immediately initiated efforts to obtain and review all discovery relevant to Mr. Parrish's case, filed a Motion to Suppress certain search warrants, and a hearing was scheduled thereon for March 22, 2023. [ECF 35, ¶28; **Exhibit "3"**, Motion to Suppress; **Exhibit "4"**, Suppression Hearing Transcript]. Leading up to the hearing on Mr. Parrish's Motion to Suppress and in Ms. Kelly's review of the discovery provided by the DA's Office subsequent to the filing of such motion, it became clear that evidence was missing. *See* **Exhibit "4"**, generally. Defense counsel and the State explicitly informed Judge Morse at the suppression hearing that neither had copies of the search warrant returns and no knowledge of what information had been seized pursuant thereto. *Id.*, p. 11-12.

The day before the March 22nd suppression hearing, the DA's Office directed one of its investigators, Alan Sammons, to review all evidence then in the possession of the DA's Office pertaining to the murder of Mr. Vinson and determine what, if anything, appeared to be missing. [ECF 64-8, p. 59-60]. A week later, Investigator Sammons met with Defendant Wood to essentially compare notes and discover what information and evidence was in the possession of Defendant Wood but had not been provided to the DA's Office, and as a result, Mr. Parrish. [*Id.*, p. 61]. Such efforts revealed that, Defendant Wood, (1) as of March 27, 2023, had yet to file the thirty-four (34) search warrant returns with the court, [*Id.*, p. 60-61, 67,]; (2) maintained undisclosed evidence concerning the murder of Mr. Vinson on her SPD issued laptop, [*Id.*, p. 63-

*Marquis Raquel Parrish, et al. v. Ashley Wood, et al.*, 4:23-CV-00261-JRH-CLR
Plaintiffs' Response to the City's Motion for Summary Judgment
Page **4** of 26

65]; and (3) by the end of the March 27th meeting, was still unable to account for information collected in relation to at least six (6) of the thirty-four (34) search warrants. [*Id*., p. 67-68].

Significantly, Defendant Wood had yet to provide the District Attorney's office with any Cash App records, Facebook and other social media posts and messages, and cellular records and cell phone tower dumps purportedly seized pursuant to the thirty-four (34) search warrants. [*Id*., p. 74-75]. Investigator Sammons further discovered that several items of physical evidence, much of which included ballistic evidence and DNA swabs obtained pursuant to the thirty-four (34) search warrants,[3] remained in the possession of SPD and had never been delivered to the Georgia Bureau of Investigation ("GBI") for testing. [*Id*., p.76-77]. Lastly, Investigator Sammons determined that Defendant Wood's search warrant affidavit and reports contained several inaccuracies and false statements. [*See id*., p. 87-94]. A few of which were as follows:

- Defendant Wood erroneously averred in her search warrant affidavit that Mr. Parrish claimed he had never been inside the red rental car believed to be involved in the murder of Mr. Vinson. Mr. Parrish had, however, admitted that he drove the rental car to the airport. [*Id*., p. 91-92].

- Defendant Wood falsely claimed in her search warrant affidavit that Mr. Parrish requested Antwane Snipe, the renter of the car, extend the rental. Such request was actually made by another of Mr. Parrish's co-defendants, Carlos Roundtree. [*Id*., p. 92-94].

---

[3] A list of some of the physical evidence belatedly submitted to the GBI for testing in late March 2023 is included in email correspondence between the DA's Office, Defendant Wood, and the GBI. *See* **Exhibit "5"**, Emails. Significantly, as of March 2023, shell casing found in the rental car and DNA evidence collected from the suspects, the rental car, the victim's phone, the victim's gun holster, and a pistol believed to have been stolen from the victim as well as two (2) additional firearms remained in the possession of SPD and untested. *Id*. Further, several photographs and body camera recordings, ownership and tracing information for at least one firearm, and recordings of any interviews taken during the investigation of Mr. Vinson's missing persons case had yet to be produced. *Id*.

The exculpatory nature of such evidence is demonstrated by defense counsel's April 25, 2023 Addendum to her Motion to Suppress noting the State's agreement that absent the already proven false statements of Defendant Wood, the only piece of evidence remaining that could potentially incriminate Mr. Parrish was a message purportedly sent by Mr. Parrish to Antwane Snipe the morning of April 26th, 2021, requesting she extend the rental car term. *See* **Exhibit "8"**, Motion to Suppress Addendum. It has since been proven that Carlos Roundtree, not Mr. Parrish, sent such message. [ECF 64-8, p. 92-94]. Further, the State filed a Motion to Nolle Prosequi the charges against Mr. Parrish on June 16, 2023, stating it found Mr. Parrish to be truthful concerning his lack of involvement in the Vinson murder and indicating it was still not in possession of any evidence to prove Mr. Parrish participated in the murder. [ECF 35-3].

*Marquis Raquel Parrish, et al. v. Ashley Wood, et al*., 4:23-CV-00261-JRH-CLR
Plaintiffs' Response to the City's Motion for Summary Judgment
Page **5** of 26

- Defendant Wood incorrectly swore in her search warrant affidavit that Antwane Snipe saw Mr. Parrish in possession of a firearm on or about the night of the Vinson murder. Ms. Snipe never mentioned Mr. Parrish possessing a firearm. *See* **Exhibit "6"**, Sammons Email.

Ultimately, due to the various inaccuracies in Defendant Wood's search warrant application, her failure to timely file her search warrant returns, and her suppression of significant and exculpatory evidence, the DA's Office elected to drop all charges against Mr. Parrish and filed a motion to that effect on June 16, 2023. [ECF 35-3]. By that time, Mr. Parrish, an innocent man, had already spent two (2) years of his life in jail. While wrongfully incarcerated, Mr. Parrish missed the birth of his youngest child and was unable to provide assistance and financial support to his wife, Plaintiff Love, and their five (5) children. [ECF 35, ¶ 32-35]. As a result, Mr. Parrish's wife and children were driven into homelessness, and due to the dangers associated with the accusations leveled against Mr. Parrish and his arrest and incarceration, Plaintiff Love was afraid for the welfare of herself and her children and was forced into hiding. [ECF 35, ¶ 32-35].

### *Internal Affairs Investigation, Policy of Suppression, and Termination of Defendant Wood*

Upon learning of Defendant Wood's actions, SPD's Internal Affairs ("IA") launched an investigation into her handling of the Charles Vinson matter. [ECF 64-11]. Throughout its investigation, IA discovered, in addition to those misstatements already noted above, Defendant Wood falsely stated or swore as follows:

- Defendant Wood erroneously reported that in relation to a subsequent shooting seeming to have some connection to Mr. Vinson's murder, Plaintiff Tyesha Love identified Jarvaris Roundtree, a co-defendant in Mr. Parrish's criminal case, as the shooter. Mrs. Love never identified the shooter. [ECF 64-11, p. 2-3].

- Defendant Wood stated in her search warrant affidavit that she reviewed Walmart surveillance footage and saw Mr. Parrish purchasing cleaning supplies with the other suspects accused of Mr. Vinson's murder. Defendant Wood never saw Mr. Parrish on the security camera footage. [ECF 64-11, p. 8].

*Marquis Raquel Parrish, et al. v. Ashley Wood, et al.*, 4:23-CV-00261-JRH-CLR
Plaintiffs' Response to the City's Motion for Summary Judgment
Page **6** of 26

IA further determined that Defendant Wood neglected to send evidence to the GBI for testing and improperly failed to file the search warrant returns with the court in violation of SPD's written policy requiring search warrant returns be filed within five (5) days of executing the search warrant. [*Id*., generally]. As a result, IA cited Defendant Wood for several policy violations, [ECF 64-11, p. 9-11], and Defendant Wood was subsequently terminated by SPD. [64-12]. She has since been indicted by the DA's Office on several counts of perjury and violating her oath of office. *See* **Exhibit "7"**, Wood Indictment.

When asked specifically by IA why she waited to file the search warrant returns in this case for nearly two (2) years (and not until after prompted to do so by the DA's Office), Defendant Wood stated that she was trained to hold search warrant returns until the case was nearing its trial date and right before defense counsel filed for discovery. [ECF 64-11, p. 4]. Defendant Wood informed IA that such practice was the standard operating procedure of the SPD homicide unit at that time. [ECF 64-11, p. 4]. Several other SPD officers confirmed that the entire SPD homicide unit had a pattern and practice of withholding search warrant returns and filing them with the court only once trial neared. Indeed, SPD Detective Jacob Hilderbrand testified in his deposition that "in 2021, it was the practice of the homicide unit to not return search warrants until the district attorney's office told [SPD] discovery was being given, at which point in time [SPD] would return all of the search warrants." [ECF 64-3, p. 38; *see also id*., p. 40, 42, 66, 70; ECF 64-11, p. 4-5].]. Similarly, SPD Lieutenant Zachary Burdette attested that he understood that such was the practice of the SPD homicide unit, [ECF 64-14, p. 37], and SPD Sergeant Nicole Khaalis testified and confirmed that such was the standard practice of at least some of the SPD homicide detectives and that SPD leadership was aware of and allowed the practice to continue. [ECF 64-15, p. 59-61; *see also* ECF 64-11, p. 6].

*Marquis Raquel Parrish, et al. v. Ashley Wood, et al*., 4:23-CV-00261-JRH-CLR
Plaintiffs' Response to the City's Motion for Summary Judgment
Page **7** of 26

## ARGUMENT AND CITATION TO AUTHORITY

### I.    Standard of Review

Rule 56(a) of the Federal Rules of Civil Procedure provides that a party may move for, and the court shall grant, summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the initial burden of showing the Court, by reference to materials on file, that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986). When the movant does not bear the burden of proof at trial, it may carry the initial burden in one of two ways – by negating an essential element of the non-movant's case or by showing that there is no evidence to prove a fact necessary to the non-movant's case. *See Clark v. Coats & Clark, Inc*., 929 F.2d 604, 606-08 (11th Cir. 1991) (*citing Adickes v. S.H. Kress & Co*., 398 U.S. 144, 90 S.Ct. 1598 (1970); *Celotex Corp*., 477 U.S. 317, 106 S.Ct. 2548).

If—and only if—the movant carries its initial burden, the non-movant may avoid summary judgment by "demonstrate[ing] that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc*., 929 F.2d 604, 608 (11th Cir.1991). "Only if after introduction of the non-movant's evidence, the combined body of evidence presented by the two parties relevant to the material fact is still such that the movant would be entitled to a directed verdict at trial—that is, such that no reasonable jury could find for the non-movant—should the movant be permitted to prevail without a full trial on the issues." *Id*. at 1116. In analyzing the evidence submitted by the movant and non-movant and reaching its decision, the Court must view the facts in the light most favorable to the non-moving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587, 106 S.Ct. 1348 (1986), and must draw "all justifiable inferences

*Marquis Raquel Parrish, et al. v. Ashley Wood, et al*., 4:23-CV-00261-JRH-CLR
Plaintiffs' Response to the City's Motion for Summary Judgment
Page **8** of 26

in [its] favor." *United States v. Four Parcels of Real Prop*., 941 F.2d 1428, 1437 (11th Cir.1991) (en banc) (internal punctuation and citations omitted). Nevertheless, issues of credibility, weighing of the evidence, and drawing legitimate inferences from the evidence are jury functions. *See Strickland v. Norfolk Southern Ry*., 692 F.3d 1151, 1154 (11th Cir. 2012) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict.") (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).

## II. The City is not entitled to summary judgment as to Mr. Parrish's *Monell* Liability Claim.

Mr. Parrish brings a *Monell* claim under 42 U.S.C. § 1983 against the City for its policy, practice, procedure, or custom of permitting employees to withhold search warrant returns and suppress material and exculpatory evidence. A government entity is subject to § 1983 liability "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell v. New York City Dept. of Soc. Servs*., 436 U.S. at 694. Specifically, a plaintiff must demonstrate: "(1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the [municipality's] policy or custom caused the violation." *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004). Mr. Parrish has alleged, and the City does not contest or otherwise argue, that his constitutional rights under the Fourth and Fourteenth Amendments were violated. [*See* ECF 64-2, p. 6].[4] Rather,

---

[4] Undoubtedly, where a criminal defendant is searched, arrested, and detained on the basis of false officer testimony and without probable cause, his Fourth Amendment right to be free from unreasonable search and seizure is violated. *See Franks v. Delaware*, 438 U.S. 154 (1978); *Holmes v. Kucynda*, 321 F.3d 1069, 1083 (11th Cir. 2003)

*Marquis Raquel Parrish, et al. v. Ashley Wood, et al*., 4:23-CV-00261-JRH-CLR
Plaintiffs' Response to the City's Motion for Summary Judgment
Page **9** of 26

the City claims first, there is no evidence that the City had a custom or policy of withholding search

warrant returns or suppressing evidence; second, there is no evidence of deliberate indifference to

Mr. Parrish's constitutional rights; and third, even if the alleged customs or policies existed, there

is no evidence that they caused the alleged violation of Parrish's Fourth or Fourteenth Amendment

rights. The City is incorrect on all fronts.

### A.  There is clear evidence that the City maintained an unconstitutional policy or practice.

The second element—that a municipal custom or policy exists that constitutes deliberate

indifference to a constitutional right—can be established in at least three (3) discernible ways, the

most relevant of which here is by showing a pervasive practice or custom. *Brown v. City of Fort

Lauderdale*, 923 F.2d 1474, 1480 (11th Cir. 1991) (citation omitted). To prove § 1983 liability

against a municipality based on custom, a plaintiff must establish "a widespread practice that,

although not authorized by written law or express municipal policy, is so permanent and well

---

(noting that an "officer may be held liable under 42 U.S.C. § 1983 for submitting an application for an arrest warrant that contains false information"); *Howard v. Gee*, 538 F. App'x 884, 888 (11th Cir. 2013) ("Deputy Highsmith violated Howard's Fourth Amendments rights by filing a false incident report that led to Howard's arrest and prosecution."). Likewise, it is well established that persons present in this country have the right to receive material impeachment or exculpatory evidence. U.S. Const. Amend. XIV; *Mapp v. Ohio*, 367 U.S. 643 (1961); *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194 (1963); *McMillian v. Johnson*, 88 F.3d 1554, 1569 (11th Cir. 1996) ("an accused's due process rights are violated when the police conceal exculpatory or impeachment evidence."); *Wade v. Falls*, 2019 U.S. Dist. LEXIS 77784, at *8 (N.D. Ala. 2019) ("due process requires law enforcement to disclose material exculpatory evidence, and failure to comply with this requirement is a cognizable injury under the Due Process Clause"). Moreover, several federal circuits, including the Eleventh Circuit, have recognized that a failure to comply with the procedural requirements of Fed. Rule Crim. Proc. 41 concerning the issuance and execution of a search warrant amount to a Fourth Amendment violation sufficient to justify the suppression of evidence where the defendant demonstrates legal prejudice or that non-compliance with the rule was intentional or in bad faith. *United States v. Marx*, 635 F.2d 436, 441 (5th Cir. 1981); *see also United States v. Loyd*, 721 F.2d 331, 333 (11th Cir. 1983); *United States v. Williams*, 871 F.3d 1197, 1202 (11th Cir. 2017); Fed. Rule Crim. Proc. 41(d) (much like O.C.G.A. § 17-5-29, requires the executing officer to "promptly return it--together with a copy of the inventory--to the magistrate judge designated on the warrant").

       Violations of such rights occurred here where Mr. Parrish was arrested and detained for two (2) years pursuant to the false averments of Defendant Wood, the search warrant returns were intentionally withheld, and exculpatory evidence as well as evidence demonstrating the falsehoods purportedly supporting the search warrants and arrest of Mr. Parrish was suppressed. Every day that Mr. Parrish remained detained while both exculpatory evidence and evidence demonstrating a lack of probable cause to search and arrest him remained in the possession of SPD and undisclosed, Mr. Parrish's Fourth Amendment and Fourteenth Amendment rights were violated.

*Marquis Raquel Parrish, et al. v. Ashley Wood, et al.*, 4:23-CV-00261-JRH-CLR
Plaintiffs' Response to the City's Motion for Summary Judgment
Page **10** of 26

settled as to constitute a custom or usage with the force of law[.]" *Id.*, 923 F.2d at 1481 (internal citations and quotation omitted). "In other words, a longstanding and widespread practice is deemed authorized by the policymaking officials because they must have known about it but failed to stop it." *Id.*

### i. The City maintained a practice of withholding search warrant returns.

At all times relevant to this action, SPD maintained a practice of purposefully withholding and neglecting to file search warrant returns until trial neared and the DA's Office informed SPD discovery was being given. Rather than arguing that there was *no* such practice within its police department, the City essentially concedes the existence of the practice and instead argues that it was limited to just a few officers so as to not be considered "widespread." [*See* ECF 64-2, p. 7]. In making this argument, the City acknowledges select testimony of one SPD officer, Sergeant Khaalis, but wholly ignores the averments of others. While it is true that Sergeant Khaalis confirmed that it was the standard practice of at least some of the SPD homicide detectives to withhold search warrant returns as long as possible, Defendant Wood, SPD Detective Jacob Hilderbrand, and SPD Lieutenant Zachary Burdette all testified or otherwise stated that such was the standard practice of the ***entire*** SPD homicide unit. [ECF 64-11, p. 4-5; ECF 64-3, p. 66, 38, 40, 42, 66, 70, 75; ECF 64-14, p. 37].[5]

---

[5] SPD Detective Jacob Hilderbrand, [ECF 64-3, p. 66 (emphasis added)], specifically testified as follows:

Q: … You mentioned earlier that it was the practice of the ***entire homicide unit*** or division to file -- at the time in 2021 to wait to file search warrant returns until discovery began; is that correct?
   **A. That's correct.**
Q. Do you know that to be true for ***every single detective*** within the homicide unit?
   **A. At that time, yes, sir.**
Q. So it's your position that ***every detective*** followed the Santoro practice?
   **A. Yes, sir.**

*Marquis Raquel Parrish, et al. v. Ashley Wood, et al.*, 4:23-CV-00261-JRH-CLR
Plaintiffs' Response to the City's Motion for Summary Judgment
Page **11** of **26**

Moreover, Sergeant Khaalis testified that the SPD homicide unit supervisor, Sergeant Robert Santoro, initiated and instructed SPD detectives on this practice, [ECF 64-15, p. 59], and **SPD leadership was aware of and allowed the practice to continue**:

**Deposition of Sergeant Nicole Khaalis**, [ECF 64-15, p. 60-61]

*Discussing Sergeant Khaalis' contention that her chain of command knew of the search warrant return policy.*

Q. Who are these supervisors that didn't have a problem with it? Your chain of command.
   **A. I'm going to say because at that time I went through my supervisor, which was Lieutenant Jackson, and he's deceased, but Lieutenant Jackson and then Captain Gay. So, I thought that it was a problem because that's not what the [Standard Operating Procedure] said, but all detectives did not do that. It was just certain ones within the unit did that.**
Q. But you understood that certain detectives within the unit were not doing that or were doing that, correct?
   **A. Uh-huh.**
Q. And did you ever at any time say, no, we can't do this?
   **A. I send it up through my chain. Certain ones did it and certain ones didn't. Certain ones went through that. So, I can't say it was [Defendant Wood's] understanding that that's what they did and it was my understanding. But, like I said, if you would talk to some of the detectives that was there at the time, all detectives didn't do it.**
Q. But it was a practice for some detectives?
   **A. Yes, it was.**
Q. And it was allowed?
   **A. It was.**

[*See also* ECF 64-11, p. 6].

Thus, the record in this case includes sufficient independent proof in the form of sworn officer testimony establishing, or at the very least raising a jury question as to, the existence of a widespread practice within the City's police department of withholding search warrant returns and filing them with the court only once trial neared and the DA's Office informed SPD that discovery

*Marquis Raquel Parrish, et al. v. Ashley Wood, et al.*, 4:23-CV-00261-JRH-CLR
Plaintiffs' Response to the City's Motion for Summary Judgment
Page **12** of 26

was being given.[6] *See Fields v. Corizon Health, Inc.*, 490 Fed. Appx. 174 (11th Cir. 2012) (finding jury could have found that prison health facility had a of policy of delaying treatment based on nurse and corporate representative testimony that prison health facility did not allow nurses or physician's assistants to send inmates to hospitals, except in emergencies and the varying definitions of "emergency" employed by staff and corporate representatives).

### ii. The City maintained a practice of withholding or otherwise suppressing evidence.

Contrary to the City's contention, ample evidence exists demonstrating that SPD officers customarily withhold or suppress evidence, including exculpatory evidence, from criminal defendants. Indeed, SPD employees have previously been accused of practicing this accepted policy, practice, and custom. For instance, in *Trever Chase Cannon v. Robert J. Robinson, in his individual capacity and in his official capacity as an employee of the Savannah Police Department, and the Mayor and Aldermen of the City of Savannah*, Civil Action No. 4:18-cv-00176-RSB-BKE, a case strikingly similar to this action, Trever Cannon accused Detective Robinson of preparing reports containing materially false statements and thereafter suppressing evidence tending to prove the falsity of such reports, including body camera recordings of interviews with witnesses. *See* Cannon's Response to City's Motion for Summary Judgment attached hereto as **Exhibit "9"**.

---

[6] The City further attempts to make some argument that even if there existed a practice of withholding search warrant returns "until shortly before discovery", Defendant Wood did not act in accordance with such policy as she failed to file the search warrant returns until instructed to do so by the DA's Office. [ECF 64-2, p. 7]. Such argument, however, misunderstands SPD's practice. As detailed in the various testimony provided in this case, it was the City's practice, through SPD, to withhold search warrant returns until it received some communication or notification from the DA's Office to provide it with all evidence and information, including, but not limited to, search warrant returns. [*See* ECF 64-3, p. 38-39, 70 (Detective Hilderbrand testified that the practice was to withhold search warrant returns: "until the district attorney's office told us discovery was being given"; "until we were informed by the district attorney's office, hey, discovery is being handed out; until they "were notified discovery was going to be given"]. From all evidence available, Defendant Wood complied with this practice and filed the search warrant returns after receiving notification from the DA's Office to provide it any additional evidence related to the Vinson murder. [*See* ECF 64-8, generally]. Such notification just unfortunately came in March of 2023 after Mr. Parrish had been detained for nearly two (2) years.

*Marquis Raquel Parrish, et al. v. Ashley Wood, et al.*, 4:23-CV-00261-JRH-CLR
Plaintiffs' Response to the City's Motion for Summary Judgment
Page **13** of 26

Based on Detective Robinson's false report, the State of Georgia pursued and ultimately secured criminal charges against Mr. Cannon for vehicular homicide. *Id.* at p. 8. The police department maintained throughout the course of the prosecution and trial that it was unable to locate the body camera recordings of the witness interviews. *Id.* at p. 7-8. However, a member of the police department's major accident investigation team was deposed in a related civil action, and following her deposition, returned to the police department and quickly retrieved five missing interview recordings. *Id.* at p. 9. After Mr. Cannon spent roughly two and half years in prison, his defense counsel was able to use such recordings to secure him a new trial and finally a dismissal of all charges against him. *Id.* at p. 9-10. Mr. Cannon's subsequent § 1983 claim against the City and Detective Robinson was settled. *See* Cannon Docket attached hereto as **Exhibit "10"**.

Around the same time Mr. Cannon was being prosecuted, another Chatham County resident, Malik Khaalis, was also facing criminal charges. *See State of Georgia v. Malik Abdul Khaalis*, Superior Court of Chatham County, Georgia, Case No. CR14-0156-J2. During the prosecution of the Khaalis case, the City failed to furnish several pieces of important evidence to defense counsel, including a videotape of the defendant's statement, until three days into the criminal trial, forcing presiding Judge Walmsley to declare a mistrial. In a lengthy speech, Judge Walmsley shared his displeasure with the situation: "[I]t creates a great deal of angst with this Court when I hear that a year and a half into a case that things haven't been provided that may need to be." *See* Khaalis Transcript attached hereto as **Exhibit "11"**, at p. 75. "To say I'm disappointed that we reached this point is an understatement." *Id.* at p. 79. "It's troubling to me that there are files, entire files…that just nobody thought about producing. That a Defendant's statement just sort of disappears into the ether until the third day of trial. These things shouldn't happen…" *Id.* at p. 77.

*Marquis Raquel Parrish, et al. v. Ashley Wood, et al.*, 4:23-CV-00261-JRH-CLR
Plaintiffs' Response to the City's Motion for Summary Judgment
Page **14** of **26**

As demonstrated by the *Cannon* and *Khaalis* cases, the City's practice of suppressing evidence is so widespread that Judge Walmsley felt in necessary to admonish the City and its police officers when declaring a mistrial in the *Khaalis* case. He noted that such a situation had arisen previously and stated, "I'm not going to say it's unique to this case. It has happened before, which is one of the reasons that I'm speaking my mind at this point, where things just don't get provided…[T]his is not a game…It's a very serious thing that we do here." *Id*. at p. 76. Mr. Parrish's case simply shows yet another instance of SPD's suppression of evidence and demonstrates that this practice is still ongoing. Furthermore, after the *Cannon* and *Khaalis* cases and the reprimanding given by Judge Walmsley, the City was well aware of this practice. The City unfortunately just failed to correct it, and "[a] municipality's 'policy of inaction' in light of actual or constructive notice 'that its program will cause constitutional violations is the functional equivalent of a decision by the [city] itself to violate the Constitution.'" *Buckler v. Israel*, 680 F. App'x 831, 834-35 (11th Cir. 2017) (*quoting Connick v. Thompson*, 563 U.S. 51, 61-62 (2011). In the present case, it is evident that the City had fallen into a frequent practice of mishandling evidence in criminal cases and failing to provide material to defense counsel. So much so that Judge Walmsley previously berated representatives of the City for such failures and reminded them of the serious nature of criminal prosecutions. Despite these failures, the City failed to take any action to remedy the problem, culminating in important exculpatory evidence being withheld from Mr. Parrish's defense attorney and resulting in his unlawful detention for nearly two (2) years.[7]

---

[7] Indeed, as of March 2023, shell casing found in the rental car and DNA evidence collected from the suspects, the rental car, the victim's phone, the victim's gun holster, and a pistol believed to have been stolen from the victim as well as two (2) additional firearms remained in the possession of SPD and untested. *See* **Exhibit "5"**. Further, several photographs and body camera recordings, ownership and tracing information for at least one firearm, and recordings of any interviews taken during the investigation of Mr. Vinson's missing persons case had yet to be produced. *Id*.; *see also* FN 3, *supra* (concerning exculpatory nature of evidence withheld).

*Marquis Raquel Parrish, et al. v. Ashley Wood, et al*., 4:23-CV-00261-JRH-CLR
Plaintiffs' Response to the City's Motion for Summary Judgment
Page **15** of **26**

Therefore, based on the record before this Court and viewing the evidence in light most favorable to Mr. Parrish, the City maintained a policy of evidence suppression, or, at a minimum, there exists a triable issue for the jury.

### B.  The City acted with deliberate indifference.

In addition to proving the existence of a policy or practice, a plaintiff seeking to establish *Monell* liability against a municipality must show that the municipality's custom or policy constituted deliberate indifference to a constitutional right. A policy may be deliberately indifferent if it is facially unconstitutional or where the policy is implemented with "deliberate indifference as to its known or obvious consequences." *McDowell*, 392 F.3d at 1291. Stated differently, under the custom or practice theory of § 1983 liability, a municipality can be held liable even where it has failed to act affirmatively at all, so long as the need to take some action to control the agents of the government "is so obvious, and the inadequacy [of existing practice] so likely to result in the violation of constitutional rights, that the policymake[r]…can reasonably be said to have been deliberately indifferent to the need." *Canton v. Harris*, 489 U.S. 378, 390, 109 S.Ct. 1197, 1205, 103 L.Ed.2d 412 (1989). Such a policy choice may be inferred even without a pattern of acts by subordinate officers, so long as the need for action by the policymaker is so obvious that the failure to act rises to deliberate indifference. *Id*., at 390, n. 10, 109 S.Ct., at 1205, n. 10.

Here, the City's practices of directing its officers to suppress evidence and withhold search warrant returns was implemented with deliberate indifference to their known and obvious consequences, and the City knew or should have known that such practices could and would amount to evidence, including exculpatory and impeachment evidence and evidence tending to show a lack of probable cause to search and arrest, being withheld from criminal defendants for

*Marquis Raquel Parrish, et al. v. Ashley Wood, et al*., 4:23-CV-00261-JRH-CLR
Plaintiffs' Response to the City's Motion for Summary Judgment
Page **16** of **26**

significant amounts of time. As noted previously, it is well established that persons present in this country have the right to be free from unreasonable search and seizure as well as the right to receive any impeachment or exculpatory evidence. *See* FN 4, *supra*. Generally, the first avenue by which an accused may exercise his right to review the evidence against him and assess whether exculpatory evidence or evidence tending to show a lack of probable cause to search and arrest exists is through reviewing search warrant affidavits and returns. Accordingly, Georgia law requires search warrant returns, *including an inventory of any instruments, articles, or things seized*, be filed with the court "without unnecessary delay". O.C.G.A. § 17-5-29[8]; *see also United States v. Dudek*, 530 F.2d 684, 691 (6th Cir. 1976) ("The requirement of prompt return serves, among other purposes, to make sure that the warrant and its affidavit are available to counsel for inspection in preparation for trial.").

The intended purpose of the City's practice of withholding search warrant returns was to thwart the requirements of O.C.G.A. § 17-5-29, hide the ball, and limit an accused's access to any and all evidence obtained pursuant to a search warrant until as close to trial as possible. Indeed, every SPD officer stated as much,[9] and when a criminal defendant has no access to search warrant returns, it necessarily follows that he has no knowledge of the evidence collected and cannot further inspect it. As exemplified by the following testimony, the possibility that such practice would directly frustrate and delay for months and years on end an accused's right to defend himself, including his right to review the evidence against him and the means by which it was obtained and

---

[8] *See also* O.C.G.A. § 17-5-22 ("The warrant, the complaint on which the warrant is issued, the affidavit or affidavits supporting the warrant, and the returns shall be filed with the clerk of the court...at the time the warrant has been executed or has been returned 'not executed'…").

[9] [*See* ECF 64-3, p. 38-39; ECF 64-11, p. 4; ECF 64-15, p. 61, 62; ECF 64-14, p. 37-38].

*Marquis Raquel Parrish, et al. v. Ashley Wood, et al*., 4:23-CV-00261-JRH-CLR
Plaintiffs' Response to the City's Motion for Summary Judgment
Page **17** of **26**

assess and test any exculpatory evidence, is so shockingly obvious, that when presented with

simple hypotheticals, SPD detectives easily identified the resulting violations:

**Deposition of Detective Jacob Hilderbrand**, [ECF 64-3, p. 58-59]

Q. What about, for instance, if there's four guys riding in a car and this car belongs to Bob Smith but, you know, and Mr. Parrish is accused of being in that car, you say that the warrant is often left within that vehicle, right?
    **A. Yes.**
Q. How does Marquis Parrish understand that there was a search of blood stains within Bob Smith's car?
    **A. He may not.**

**Deposition of SPD Lieutenant Zachary Burdette**, [ECF 64-14, p. 42].

Q. Wouldn't it be almost necessary for an accused or their attorney to be aware that those [DNA] swabs were taken so that they could request that maybe their own tests could be done on these things?
    **A. Yes, I think that would be necessary…**

*Specifically discussing situations where a detective's investigative report is not so detailed as to contain a full description of all evidence obtained pursuant to a search warrant* [ECF 64-14, p. 43-45]

Q. Let's say that that occurs. Like, for instance, the officer forgets to put in there they took a swab of Marquis Parrish's belt, right?
    **A. Yes.**
Q. So then the next thing we can do to determine whether or not a swab has been taken would be contained within the warrant return; is that right?
    **A. Yes.**
Q. And if the warrant return doesn't exist, then nobody knows if that swab was potentially taken, right?
    **A. Yes.**
Q. So Mr. Parrish or one of his attorneys would have no idea a swab taken that could be exculpatory evidence to say, hey, I have none of the deceased's DNA on me or blood samples or anything like that, correct?
    **A. Yes.**
Q. And that could cause a problem?
    **A. Yes.**
Q. Okay.
    **A. At that point a search warrant return should have been done.**
Q. Should have been done?
    **A. Yes.**

**…**

*Marquis Raquel Parrish, et al. v. Ashley Wood, et al.*, 4:23-CV-00261-JRH-CLR
Plaintiffs' Response to the City's Motion for Summary Judgment
Page **18** of 26

Q. …Sometimes these accused are arrested, and they're put in jail for a long period of time, correct.

**A. Yes.**

Q. If you don't have a search warrant return where there's no evidence that, you know, maybe exculpatory evidence was taken from a certain site, whether it was a car or clothing and things like that, and it's only available under Santoro's rules that it comes out during discovery, you could have somebody in jail for two years before his attorney or himself is aware that that evidence is available, right?

**A. Yes.**

Q. And that could cause somebody to stay in jail for a long time?

**A. I would say so.**

*Directly discussing the implications of Mr. Parrish's case* [ECF 64-14, p. 55]

Q. And I'm just going to ask you this. Do you think what happened to Marquis Parrish was wrong?

**A. Yes.**[10]

Thus, the consequences of the City's practice of withholding search warrant returns until the start of discovery and as close as possible to trial were obvious. If you interfere with an accused's knowledge of and access to search warrant returns until the start of discovery, the accused will have no knowledge of the evidence seized pursuant thereto which may be exculpatory or otherwise show that no probable cause existed to search, seize, and/or detain the accused. And while the accused waits for discovery to begin, he remains detained for months or years and loses

---

[10]Testimony given in this case likewise demonstrates a widespread understanding among SPD officers that criminal trials and discovery therein may be delayed for years at a time, resulting in the detention of an accused for significant periods:

**Deposition of Detective Jacob Hilderbrand**, [ECF 64-3, p. 54]

**A. But as the return was done, the return was done two years after the case, which is not at the time abnormal. Because --**

Q. That discovery may not begin for two years after an arrest was made?

A. **Correct.**[10]

**Deposition of SPD Lieutenant Zachary Burdette**, [ECF 64-14, p. 38].

Q. …Sometimes from search warrant returns till the time the discovery begins, that could be a significant period of time?

A. **Yes, sir.**

Q. Could it be years?

A. **It could be.**

*Marquis Raquel Parrish, et al. v. Ashley Wood, et al.*, 4:23-CV-00261-JRH-CLR
Plaintiffs' Response to the City's Motion for Summary Judgment
Page **19** of **26**

meaningful time and opportunity to contest the sufficiency and veracity of the search and arrest warrant affidavits; request the invalidation of warrants issued without probable cause; attempt to exclude any evidence collected pursuant to an improperly issued and executed search warrant; and seek to have the charges against him dismissed based on lack of evidence and/or exculpatory evidence. Mr. Parrish suffered such obvious consequences and spent two (2) years of his life in jail on the basis of the false averments of the lead detective and while exculpatory evidence went undisclosed and untested.[11] The same is true for suppressing evidence in general, and as discussed Section II(A)(i-ii), the City was well aware of and allowed SPD's practices of withholding search warrant returns and suppressing evidence to continue. The City therefore implemented such practices with "deliberate indifference as to its known or obvious consequences," or, at a minimum, there exists a triable issue for the jury.

### C. The City's practices caused the violation of Mr. Parrish's Constitutional Rights.

Lastly, a plaintiff seeking to establish *Monell* liability against a municipality must show that the municipality's policy or custom caused the violation of his Constitutional rights. A plaintiff may prove causation by demonstrating that the municipality's "deliberate conduct…was the 'moving force' behind [his] injury…" *Brown*, 520 U.S. at 404, 117 S.Ct. 1382. The City argues there can be no causal link between any alleged wrongful practice of suppressing evidence and belatedly filing search warrant returns and the violation of Mr. Parrish's Constitutional rights because (1) the filing of search warrant returns is a purely procedural process that does not affect the accused's substantive rights, and (2) investigating officers have no duty under the Fourteenth

---

[11] *See* FN 7, *supra*.

*Marquis Raquel Parrish, et al. v. Ashley Wood, et al.*, 4:23-CV-00261-JRH-CLR
Plaintiffs' Response to the City's Motion for Summary Judgment
Page **20** of **26**

Amendment to disclose evidence to a criminal defendant. The City, however, chooses to ignore the ample evidence and law to the contrary.

### i. The City's practices caused the violation of Mr. Parrish's Fourth Amendment rights.

The City argues there can be no causal link between any alleged wrongful policy of belatedly filing search warrant returns and the violation of Mr. Parrish's Constitutional rights because the filing of search warrant returns is a purely procedural process that does not affect the accused's substantive rights. In making such argument, the City relies on cases declining to suppress evidence based solely on an officer's failure to make or file an inventory of the articles seized where no intentional misconduct was alleged and no prejudice resulted to the accused. *United States v. Baty*, 486 F.2d 240, 243 (5th Cir. 1973); *Williams v. State*, 125 Ga. App. 170, 171, 186 S.E.2d 756, 757 (1971); *Manemann v. State*, 147 Ga. App. 747, 747, 250 S.E.2d 164, 165 (1978).[12]

The City, however, ignores case law noting that a failure to comply with the procedural requirements concerning the issuance and execution of a search warrant, including the filing of a search warrant return, can amount to a Fourth Amendment violation sufficient to justify the suppression of evidence where the defendant demonstrates legal prejudice or that non-compliance with the rule was intentional or in bad faith. *See, e.g., United States v. Marx*, 635 F.2d 436, 441 (5th Cir. 1981); *see also United States v. Loyd*, 721 F.2d 331, 333 (11th Cir. 1983); *United States v. Williams*, 871 F.3d 1197, 1202 (11th Cir. 2017); Fed. Rule Crim. Proc. 41(d) (much like

---

[12] Interestingly, the criminal defendant in *Manemann v. State*, 147 Ga. App. 747, 747, 250 S.E.2d 164, 165 (1978), sought to suppress evidence seized from his hotel room on the basis that the search warrant return indicated the search had been carried out prior to the issuance of the warrant and the obtaining officer's alleged impeachment or perjury. The Georgia Court of Appeals declined to disturb the trial court judge's decision to deny the motion to suppress but nevertheless noted that the evidence was sufficient to authorize a decision by the trial court to either suppress or decline to suppress the evidence. *Id*. 147 Ga. App. at 747-48.

*Marquis Raquel Parrish, et al. v. Ashley Wood, et al*., 4:23-CV-00261-JRH-CLR
Plaintiffs' Response to the City's Motion for Summary Judgment
Page **21** of **26**

O.C.G.A. § 17-5-29, Rule 41(d) requires the executing officer to "promptly return [a search warrant return]--together with a copy of the inventory--to the magistrate judge designated on the warrant"). Federal courts examining the "prompt"-filing and other requirements for federal returns, similar to Georgia courts reviewing the requirement of O.C.G.A. § 17-5-29 that returns be filed "without unnecessary delay", have found them to be ministerial but, focusing on law enforcement misconduct as well as prejudice, have held that suppression is available for prejudice or for intentional or deliberate disregard of the requirements. *See, e.g., U.S. v. Motz*, 936 F.2d 1021, 1025 (9th Cir.1991) (10–week delay and failure to list seized marijuana plants); *United States v. Marx* (5th Cir.1981) 635 F.2d 436, 441 (copy not timely delivered to defendant); *cf. U.S. v. Johns*, 948 F.2d 599, 603–606 (9th Cir.1991) (prejudice shown where agents intentionally did not give notice of search).

In the case at hand, Defendant Wood's failure to file the search warrant returns for nearly two (2) years was clearly an *intentional* and *deliberate* disregard for the requirements of Georgia law that returns be filed without unnecessary delay. Indeed, Defendant Wood neglected to file the search warrant returns pursuant to a City policy maintained within SPD in direct violation of O.C.G.A. § 17-5-29. [ECF 64-11, p. 4-5; ECF 64-3, p. 66, 38, 40, 42, 66, 70, 75; ECF 64-14, p. 37; ECF 64-15, 59-61]. Likewise, Defendant Wood's failure to file the search warrant returns resulted in prejudice to Mr. Parrish. The requirement of prompt return serves, among other purposes, to make sure that the warrant and its affidavit are available to counsel for inspection in preparation for trial. *United States v. Dudek*, 530 F.2d 684, 691 (6th Cir.1976). Because the search warrant returns were not filed, they were unavailable to Mr. Parrish and his defense counsel for inspection, causing Mr. Parrish to be unaware of the exculpatory evidence seized pursuant thereto. If such returns and knowledge of the evidence collected had been made available to Mr. Parrish

*Marquis Raquel Parrish, et al. v. Ashley Wood, et al.*, 4:23-CV-00261-JRH-CLR
Plaintiffs' Response to the City's Motion for Summary Judgment
Page **22** of **26**

and his counsel in a timely manner, Mr. Parrish could have more promptly requested copies of certain evidence, demonstrated to the court the lack of probable cause to search and arrest him, and requested testing of the various DNA and ballistics evidence that instead sat seemingly forgotten for two (2) years while Mr. Parrish remained in custody. The failure of Defendant Wood to file the search warrant returns being an intentional and deliberate disregard for the requirements of Georgia law and resulting in prejudice to Mr. Parrish, it is clear that the City's practice of withholding search warrant returns caused a violation of Mr. Parrish's Fourth Amendment rights.

### ii. The City's practices caused the violation of Mr. Parrish's Fourteenth Amendment rights.

Lastly, the City contends there can be no causal link between any alleged wrongful practice of suppressing evidence and the violation of Mr. Parrish's Fourteenth Amendment rights because investigating officers have no duty under the Fourteenth Amendment to disclose evidence, including exculpatory evidence, to a criminal defendant. This argument, however, ignores the fact that investigators have a duty under *Brady* to turn exculpatory and impeachment evidence over to the prosecutor. *McMillian v. Johnson*, 88 F.3d 1554, 1567 (11th Cir. 1996). Certainly, an investigator only satisfies her obligations under the Fourteenth Amendment and *Brady* when she actually turns exculpatory and impeachment evidence over to the prosecutor or has reason to believe that the prosecutor already has the exculpatory and impeachment evidence. *Id*. (citation omitted). In this case, there can be no doubt that Defendant Wood, acting pursuant to City policy, failed to turn over exculpatory evidence and impeachment evidence to the prosecutor in violation of *Brady*. Specifically, a jury could find that Defendant Wood withheld exculpatory evidence from the prosecutor based on the following:

- Defendant Wood, (1) as of March 27, 2023, had yet to file the thirty-four (34) search warrant returns with the court, [ECF 64-8, p. 60-61, 67,]; (2) maintained undisclosed evidence concerning the murder of Mr. Vinson on her SPD issued laptop, [*Id*., p. 63-

*Marquis Raquel Parrish, et al. v. Ashley Wood, et al*., 4:23-CV-00261-JRH-CLR
Plaintiffs' Response to the City's Motion for Summary Judgment
Page **23** of **26**

65]; and (3) by the end of the March 27th meeting, was still unable to account for information collected in relation to at least six (6) of the thirty-four (34) search warrants. [*Id*., p. 67-68].

• Defendant Wood did not provide the DA's Office with any Cash App records, Facebook and other social media posts and messages, and cellular records and cell phone tower dumps purportedly seized pursuant to the thirty-four (34) search warrants. [*Id*., p. 74-75].

• Several items of physical evidence, much of which included ballistic evidence and DNA swabs also obtained pursuant to the thirty-four (34) search warrants, remained in the possession of the SPD and had never been delivered to the Georgia Bureau of Investigation for testing. [*Id*., p. 76-77]. *See* **Exhibit "5"**.

• Defendant Wood did not provide supplemental reports to the DA's Office in reference to what was received from the execution of search warrants. [ECF 35-4, p. 57].

• Investigator Sammons (discussing the motion hearing on June 13, 2023) testified that Mr. Parrish did not have complete discovery of all of Defendant Wood's case file: "You didn't have the data because we didn't have the data. Therefore, we could not have provided it in discovery. So we didn't even know whether it existed or didn't exist." [ECF 64-8, p. 73].

Importantly, the exculpatory nature of such undisclosed evidence is demonstrated by defense counsel's April 25, 2023 Addendum to her Motion to Suppress noting the State's agreement that absent the already proven false statements of Defendant Wood (as discussed below), the only piece of evidence remaining that could potentially incriminate Mr. Parrish was a message purportedly sent by Mr. Parrish to Antwane Snipe the morning of April 26th, 2021, requesting she extend the rental car term. *See* **Exhibit "8"**. Had Defendant Wood disclosed the cellar records, they would have conclusively demonstrated that the purported evidence did not exist, providing critical exculpatory material sufficient to undermine the probable cause for Mr. Parrish's continued confinement.

It is therefore clear, despite the City's arguments to the contrary, that Defendant Wood did not satisfy her *Brady* obligations when she provided the DA's Office *some* evidence in February 2022, and the DA's Office undoubtedly could not have given defense counsel and Mr. Parrish that

*Marquis Raquel Parrish, et al. v. Ashley Wood, et al.*, 4:23-CV-00261-JRH-CLR
Plaintiffs' Response to the City's Motion for Summary Judgment
Page **24** of **26**

which it did not have. As a result, Mr. Parrish did not receive several items of material and exculpatory evidence until March 2023 or thereafter, and such delay is directly attributable to Defendant Wood's suppression of evidence in accordance with City policy. Accordingly, evidence exists in this case which at the very least raises a jury question as to whether the City had a custom or policy that constituted deliberate indifference to Mr. Parrish's constitutional rights and whether such policy or custom caused a violation of Mr. Parrish's constitutional rights. The City is therefore not entitled to summary judgment on Plaintiffs' *Monell* claim.

**III.    The City is not entitled to Summary Judgment as to Plaintiff Tyesha Love's Loss of Consortium Claim.**

As the City acknowledges, in Georgia, "a wife has an independent cause of action for the loss of consortium of her husband due to a tortious injury inflicted upon him." *Walden v. Coleman*, 105 Ga. App. 242, 243 (1962). Accordingly, a loss of consortium claim is generally held to be a "derivative" claim arising out of a tort committed against the plaintiff's spouse. *Canberg v. City of Toccoa*, 255 Ga. App. 890, 892 (2002). Because the City is not entitled to summary judgment as to Mr. Parrish's underlying *Monell* claim, it is also not entitled to summary judgment as to Plaintiff Love's derivate claim for loss of consortium.

<u>**CONCLUSION**</u>

For the foregoing reasons, Plaintiff Parrish respectfully request that the Court deny the City's Motion for Summary Judgment as to all remaining claims.

Respectfully submitted this 17th day of February, 2025.

Post Office Box 10840                                     **MANLY SHIPLEY, LLP**
Savannah, Georgia 31412                              */s/ James E. Shipley, Jr.*
T: (912) 495-5360                                          JOHN B. MANLY
F: (844) 362-4952                                          Georgia Bar No. 194011
john@manlyshipley.com                              JAMES E. SHIPLEY, JR.
jim@manlyshipley.com                                Georgia Bar No. 116508
                                                                      *Attorneys for Plaintiffs*

*Marquis Raquel Parrish, et al. v. Ashley Wood, et al.*, 4:23-CV-00261-JRH-CLR
Plaintiffs' Response to the City's Motion for Summary Judgment
Page **25** of 26

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this day a copy of the foregoing Plaintiffs' Response to the City's

Motion for Summary Judgment has been served upon all parties via the Court's CM/ECF system.

This 17th day of February, 2024.

**MANLY SHIPLEY, LLP**

<u>*/s/ James E. Shipley, Jr.*</u>
JOHN B. MANLY
Georgia Bar No. 194011
JAMES E. SHIPLEY, JR.
Georgia Bar No. 116508
*Attorneys for Plaintiffs*

Post Office Box 10840
Savannah, Georgia 31412
T: (912) 495-5360
F: (844) 362-4952
john@manlyshipley.com
jim@manlyshipley.com

*Marquis Raquel Parrish, et al. v. Ashley Wood, et al*., 4:23-CV-00261-JRH-CLR
Plaintiffs' Response to the City's Motion for Summary Judgment
Page **26** of **26**