# EXHIBIT 11

1  SUPERIOR COURT OF CHATHAM COUNTY

2  EASTERN JUDICIAL CIRCUIT OF GEORGIA

3

Recorded for Record
Daniel W. Massey
Clerk of Superior Court CCGA
Caseno: CR140156
Judge: WALMSLEY(J2)
8/3/2015 11:16:55 AM

4  STATE OF GEORGIA           )
                              )
5                             )
                              )          CASE NUMBER:   CR14-0156-J2
6  vs.                        )
                              )          False statements and
7                             )           writings (7)
                              )          Violation of oath by
8  MALIK ABDUL KHAALIS,       )           public officer (2)
                              )
9          Defendant.         )
   _____ )

10

11

12

13  Transcript of the proceedings heard during a
    SHOW CAUSE HEARING in the above-styled case at the Chatham
    County Courthouse, Savannah, Georgia, on the 17th day of
14  July, 2015, before The Honorable Timothy R. Walmsley, Judge,
    Superior Court, Eastern Judicial Circuit, State of Georgia.

15

16

17  APPEARANCES:

18

            For the State:        JEROME M. ROTHSCHILD, JR., Esq.
19                                 CHRISTINE S. BARKER, Esq.
                                   Assistant District Attorney
20                                 Savannah, Georgia

21

            For the Defendant:    MICHAEL G. SCHIAVONE, Esq.
22                                 Savannah, Georgia

23

24

25

1                          I N D E X

2                                                    Page

3    Preliminaries.......................................  3

4    WITNESSES:

5    CHRISTINE S. BARKER

6    Direct Examination by Mr. Rothschild..............  5

7    Cross-Examination by Mr. Schiavone................ 41

8
     JEROME M. ROTHSCHILD, JR.
9
     Direct Examination by Ms. Barker.................. 53
10
     Cross-Examination by Mr. Schiavone................ 55
11
     Redirect Examination by Ms. Barker............... 57
12
     Recross-Examination by Mr. Schiavone............. 62
13

14   Motion for mistrial............................... 64

15   Motion for mistrial granted....................... 73

16   Certificate of Reporter........................... 82

17
                          - - -
18
                      E X H I B I T S
19
     Hearing
20   Exhibit                     Tendered   Admitted

21    1 -   E-mail between Ms. Barker     14        14
             and Lt. Gavin
22
      2 -   E-mail between Ms. Barker     38
23           and Ms. Herman

24    3 -   CD/DVD dated June 3, 2010     40

25    4 -   Envelope, thumb drive         40
             PowerPoint

1         THE COURT:  All right.  Good morning.  Okay.

2    We're on.  There were some developments yesterday that

3    I want to get on the record, and I want to get clear

4    before we proceed any further with the trial of the

5    Khaalis matter.

6         The Court, yesterday, continued the case until

7    Monday to allow the Defense to review a CNT file that

8    appeared for the first time yesterday morning.  As is

9    documented already in the record, this was a file

10   that's not known to the district attorney's office, was

11   not known to Mr. Schiavone, and the Court found that

12   there was cause to go ahead and provide the Defense

13   with the remedy of some additional time.  I had denied

14   a motion for mistrial.

15        Been some additional developments since then.  Let

16   me touch on what they, at least to my knowledge, are.

17   And on one of these issues, I may need some additional

18   information.  The Court continued the case.  I want to

19   say it was about eleven o'clock.  I know it was just

20   before lunch.  And I know it was just before lunch

21   because at lunchtime yesterday, I was informed by some

22   courtroom personnel that, I believe it was Sergeant

23   Thompson, had appeared some time around 11:30 or twelve

24   o'clock with a thumb drive that had some type of

25   evidence on it.

3

1          It's my understanding that actually may have been

2     the PowerPoint associated with the testimony of Peter

3     Delatorre --

4          MR. ROTHSCHILD:  Yes.

5          THE COURT:  -- on Wednesday.  In addition, at

6     about three o'clock yesterday, Mr. Rothschild and Ms.

7     Barker came to chambers and asked for a conference call

8     with Mr. Schiavone because apparently sometime within

9     the hour or so of that meeting, the District Attorney's

10    office had been provide with a recorded statement of

11    the Defendant.

12         MR. ROTHSCHILD:  All true.

13         THE COURT:  And what I would like to do is find

14    out exactly where we are, what has been produced, and

15    then I may have some questions and some additional

16    inquiry.

17         MR. ROTHSCHILD:  In that vein, rather than just

18    state in my place, I have significant -- I'd like to

19    put some witnesses up, not only about what happened

20    yesterday, but about the history of that statement

21    because I think it might shed more light on it than me

22    just telling you.  We do have witnesses as to that.

23         THE COURT:  All right.  Now, to be clear, the

24    Court requested the parties to be here for a show

25    cause.  Mr. Schiavone, upon appearing today, did come

                                                        4

1    to chambers and ask about witnesses that were present.

2    The Court did not call for an evidentiary hearing on

3    these issues.  But I do think as part of the Court's

4    inquiry into what is going on in this case, and

5    specifically the production of documents, I'm going to

6    go ahead and hear from some of these witnesses.

7        Mr. Schiavone, if you wish to cross-examine them,

8    you're welcome to do so.  The Court may have questions

9    for them.  But this is not at this point a noticed

10   evidentiary hearing on the issue.

11       Mr. Rothschild.

12       MR. ROTHSCHILD:  The State would call, and ask to

13   be sworn ADA Christy Barker.

14   (Witness sworn.)

15                   DIRECT EXAMINATION

16  BY MR. ROTHSCHILD:

17   Q.    Good morning.

18   A.    Good morning.

19   Q.    If you would, even though I know it, tell me your

20  name and your job.

21   A.    Christy Barker.  And I am an assistant district

22  attorney in Chatham County.

23   Q.    Are you the trial partner to me and some other

24  folks on the Judge Walmsley trial team?

25   A.    Yes.

1        Q.     Are you also fifty percent of the police

2    corruption unit in our office?

3        A.     Yes.

4        Q.     Me being the other half?

5        A.     Yes.

6        Q.     When did you become, if at all, involved in the

7    Khaalis matter and, in fact, in police corruption matters in

8    general in this office?

9        A.     It would have been January of 2014.  I gathered --

10   I was brought into the District Attorney Meg Heap's office.

11   Apparently there had been investigation ongoing already that

12   I was totally unaware of.  Some of it was, obviously in the

13   paper, regarding these ex-FBI guys, the MDBI folks,

14   interviewing and doing an inquiry into what was going on at

15   Savannah-Chatham Metropolitan Police Department.  I

16   gathered from the --

17       Q.     Let me stop you.  When you say MDBI guys, do they

18   have names?

19       A.     John Insogna and George Murray.

20       Q.     One of whom has sat with us as case agent in this

21   trial?

22       A.     That would be John Insogna, yes.

23       Q.     And George Murray sat with you and me as case

24   agent in the Trina Mayes trial?

25       A.     That's correct.

1      Q.     What were they tasked with doing?

2      A.     They were tasked with basically examining the

3  Savannah-Chatham Metropolitan Police Department for possible

4  corruption.  I gather that there -- it was fairly wide

5  ranging and that they had interviewed lots and lots of

6  folks.

7      Q.     Well, did they eventually -- once you became

8  involved in the police corruption stuff, do we get referred

9  various files of possible names of prosecution as to

10 corruption?

11     A.     We did.  And actually when I got into this case,

12 you and, I believe, Investigatory Becker had already been

13 doing some investigative work on this, specifically with

14 respect to this Defendant Malik Khaalis.

15     Q.     Investigator Becker is who exactly?

16     A.     He is one of our DA office investigators.  So when

17 I came in, this is probably a month before we went to grand

18 jury on this case.

19     Q.     To be fair, before Malik Khaalis was indicted you

20 became involved?

21     A.     Yes.

22     Q.     All right.  And we'll probably get back to that in

23 a minute.  But we're here specifically about some stuff

24 that's happened.

25         A PowerPoint that was discussed at some length

7

1    that became available late, and a video -- let me back up.

2            How long have you been in this job, longer than me

3    even?

4        A.    Twenty-one years.

5        Q.    And I came to the office maybe two or three years

6    after you?

7        A.    Yes.

8        Q.    During that twenty-one years before the current

9    effort to restructure IA at SCMPD, how many times were you

10   ever referred a file for prosecution on a policeman by IA

11   ever?

12       A.    Never.

13       Q.    Never.  Was it common practice for them to refer

14   us anything as to police corruption?

15       A.    Not as police corruption.  I -- over the 20 years,

16   there were a couple of cases David Lock prosecuted that

17   were --

18       Q.    Who is David Lock?

19       A.    David Lock was our chief assistant for years.  And

20   David prosecuted a couple of officer-involved shootings, but

21   nothing involving police corruption that I'm aware of.

22       Q.    As far as you're aware in your twenty-one years in

23   the office, what we ever got were IA were police-involved

24   shootings?

25       A.    Yes.

                                                              8

1    Q.    And maybe one sex crime?

2    A.    Yeah.  Maybe a vehicular homicide.  I think there

3    was one of those.

4    Q.    Something where somebody got died or molested?

5    A.    Yes.  Uh-huh.

6    Q.    No lying, no corruption, no fraud, no property?

7    A.    Exactly.

8    Q.    All right.  So is one of the things that happened

9    with the police department corruption investigation with the

10   outside consultants eventually a restructuring of the IA

11   Department?

12   A.    Yes.

13   Q.    Top to bottom?

14   A.    Absolutely.

15   Q.    Was Timmy Johnson a sergeant in IA under the old

16   Willie Lovett regimen?

17   A.    Yes.

18   Q.    Was a guy named Hank Wiley a captain over the IA

19   unit under the old Willie Lovett regimen?

20   A.    Yes, he was.

21   Q.    Was Andre Oliver a lieutenant or other ranking

22   official under the IA regimen under Willie Lovett?

23   A.    He was a lieutenant.

24   Q.    Timmy Thompson was forced out of the unit --

25   A.    Yes.

1     Q.     -- as they restructured?

2     A.     Yes.

3          MR. SCHIAVONE:  I mean, unless she was there

4     and -- I mean, that's all hearsay at this point --

5          MR. ROTHSCHILD:  (Inaudible) this is a hearing,

6     Judge.

7          MR. SCHIAVONE:  -- and I'm not prepared to rebut

8     all this.

9          MR. ROTHSCHILD:  Well --

10         MR. SCHIAVONE:  And I don't want to take it as

11    truth if I don't have a chance to find out -- if it is,

12    in fact, true, because I don't know anyone.

13         MR. ROTHSCHILD:  It's a rule --

14         THE COURT:  Just her testify to her personal

15    knowledge.  Again, my plan is not to spend the day

16    listening to all of the various problems that may have

17    been associated with -- my ultimate inquiry has to do

18    with what we have now and the trial of Mr. Khaalis.

19         MR. ROTHSCHILD:  Sure.

20    BY MR. ROTHSCHILD:

21    Q.     Why don't we move ahead to January-ish 2014, as to

22    Khaalis, and all the other cases we had.  Did you make some

23    effort to ensure that the State had been provided with

24    everything from the Internal Affairs Department or anything

25    else that the City of Savannah had?

10

1    A.    Yes.  When I got involved Greg McConnell, who was

2    our chief assistant, had given me things he had received

3    from the GBI.  We had MDBI reports.  We had --

4    Q.    What's the GBI?  Is that the outside consultants?

5    A.    Yes.  And we had some of the IA files.  I wanted

6    to make sure we had everything.

7    Q.    And did you make some steps, including e-mails and

8    telephone calls, and other things?

9    A.    Yes.

10    Q.    Tell the Court what those were.

11    A.    And it may have been actually at that initial

12    meeting.  Lieutenant Gavin with Savannah-Chatham

13    Metropolitan Police Department was made the replacement

14    lieutenant over IA.  He was brand new at that point.

15         And we had a discussion about making sure that we

16    got everything, you know, an oral discussion at that point

17    about making sure we got everything from IA, so that we

18    could make sure that we had everything we needed to

19    prosecute these cases.

20    Q.    Why was that important?

21    A.    Well, obviously, we needed all the evidence.  And,

22    of course, there's also an element of, you know, in some

23    situations there may be Brady information in there.  We

24    needed to make sure we had everything.

25    Q.    Whether inculpatory or exculpatory, you wanted it?

11

1      A.    Right.

2      Q.    As you got involved in the Malik Khaalis case --

3   actually let me go ahead and, if I could, mark this as

4   State's Exhibit.  I assume it's State's Exhibit, not Court's

5   Exhibit, 1.  I've showed it to counsel.

6      A.    Right.  And I do want to clarify too that I was

7   told by Lieutenant Gavin, and he is here, that they had a

8   paralegal who copied everything, and that I should e-mail

9   him and ask for everything that we needed.

10     Q.    Apart from -- I'll get to that.  E-mailing the

11  paralegal as you go to the top and discuss it with Gavin?

12     A.    Yes.

13          THE COURT:  Hold on a second.  For the purposes of

14      this record, this transcript is separate from the trial

15      transcript.

16          MR. ROTHSCHILD:  Yes, sir.

17          THE COURT:  This is marked as State's 1 in a

18      separate transcript.  It will simply just be --

19          MR. ROTHSCHILD:  Hearing.

20          THE COURT:  -- hearing.

21          MR. ROTHSCHILD:  Sure.

22  BY MR. ROTHSCHILD:

23     Q.    And I want to talk about the e-mails and stuff,

24  but at the top of it, Gavin was in charge of IA?

25     A.    Yes.

1      Q.     Did you make clear to Gavin we needed everything?

2      A.     Yes.  And he was very cooperative.  I mean, he was

3    -- he said we'll give you everything we've got.

4      Q.     And I'll show you State's 1.  Take a look at

5    State's 1.  What does that purport to be?

6      A.     This is part of an e-mail chain that I had with

7    James Dail.  I think it's actually Jay Brian Dail who is the

8    paralegal at IA.  I say that it's partial.  I want to

9    clarify that.  It shows going back to January 24th of 2014.

10   This is a copy that I received from him yesterday.  My

11   e-mails don't go that far back.

12     Q.     "Him" being who?

13     A.     Mr. Dail.

14     Q.     And who is Dail again?

15     A.     He is the paralegal over at IA, the person who

16   makes copies.

17     Q.     To be clear before you were at the paralegal

18   level, you had already been to the top --

19     A.     Yes.

20     Q.     -- with Gavin?  Did he direct you to this guy

21   Dail?

22     A.     Yes.

23     Q.     Why don't you tell me about this -- first of all,

24   does that e-mail appear to be what purports to be an e-mail

25   chain between you and Dail?

13

1       A.    It does.  I don't know that I had responses to

2    this last e-mail that's on here but, yes.

3       Q.    That said, is what's in front of you a fair and

4    accurate copy of what purports to be an --

5       A.    Yes.

6       Q.    -- e-mail between y'all?  It's tendered as State's

7    1 for this hearing.

8            MR. SCHIAVONE:  No objection.

9            THE COURT:  It's admitted.

10   BY MR. ROTHSCHILD:

11      Q.    Tell the Court about that e-mail, and any other

12   recollections you have of further e-mails or telephonic

13   conversations with Dail.

14      A.    I e-mailed Mr. Dail on January 24th of 2014, and

15   said we need complete OPS files.  OPS files meaning the IA

16   file on -- a list of --

17      Q.    What does OPS mean?

18      A.    Pardon me?

19      Q.    What's OPS?

20      A.    It's their IA files, their number.

21      Q.    Okay.

22      A.    And I gave a list of names.  There are some

23   subsequent e-mails from me.  And, again, these are e-mails

24   not just to Mr. Dail, but they're also to Mr. -- to

25   Lieutenant Gavin asking for some additional folks to be

                                                            14

1    added to the list.

2        Q.    Important to me and perhaps everyone here, is was

3    Malik Khaalis in this e-mail --

4        A.    Yes.

5        Q.    -- of people who you wanted everything they had

6    on?

7        A.    Yes.

8        Q.    Tell me about the correspondence between y'all,

9    and what was said.

10       A.    The last e-mail that is on here, and again, this

11   came from Mr. Dail, is him saying that I'm giving you an

12   electronic version of the paper file.  I have not included

13   any audio or video files at this time.  After you review

14   this, if you e-mail me again, I'll give them to you.

15       Q.    Had you already asked for everything one time?

16       A.    I had.  And it also talks about, and I want to

17   clarify this too, he said you can send a runner over here

18   now.  I knew -- I was sending an investigator over to pick

19   this disk up.  I picked up the phone and called them.  Now,

20   I don't know if I spoke to Mr. Dail or Lieutenant Gavin, but

21   I --

22       Q.    You called IA?

23       A.    I called IA, and I said, I'm going to need all of

24   these recordings.  Let me know when they're going to be

25   ready.  I'm sending someone over now.

                                                              15

1      Q.    You weren't going to ask twice.  You wanted it all

2   immediately, right?

3      A.    Yes.

4      Q.    All right.  Did we ever receive either a

5   PowerPoint for Timmy Thompson, and that might be a separate

6   inquiry, or a video of -- or any kind of statement of the

7   defendant that was recorded?

8      A.    No.

9      Q.    Moving aside from that, did you review all the

10  documents and help me prepare discovery in this case?

11     A.    Yes.

12     Q.    And is one of the discovered documents that was

13  turned over a report by someone named Sergeant Timmy

14  Thompson, formerly of IA?

15     A.    Yes.

16     Q.    Did he refer to an interview that is the interview

17  in question of roughly June 3rd, 2010 --

18     A.    Yes.

19     Q.    -- in the statement?  Have you reviewed the

20  statement?

21     A.    I have.

22     Q.    The statement indicated that there was a recording

23  of it?

24     A.    Yes.

25     Q.    Were we concerned about that?

1      A.     Yes.

2      Q.     What evidence was there that it existed or had

3   disappeared?  Go ahead and clear that up.

4      A.     And I'm trying to make sure that I'm responsive to

5   your question.

6      Q.     Let me make it a broader question.  Tell me

7   everything you can remember about trying to find whether or

8   not there was a video.

9      A.     Okay.  Like I said, the first thing I did was I

10  asked for everything.

11     Q.     Right.

12     A.     There were -- during this period of time when

13  Lieutenant Gavin first came in, we had a bunch of meetings

14  about this.  And when I hadn't gotten anything, I brought it

15  up to him again.  Look, we've got Khaalis.  We're taking it

16  to grand jury.  I need all this stuff.  And he indicated to

17  me that he felt that Captain Wiley, that was Hank Wiley who

18  was head of IA, had destroyed it.

19     Q.     That's Hank Wiley who was formerly under Lovett,

20  correct?

21     A.     That's correct.

22     Q.     Not for nothing, is one of the people on that

23  e-mail chain that we're investigating Captain Hank Wiley?

24     A.     Yes.

25     Q.     For potential corruption or false statements --

17

1     A.    Yes.

2     Q.    Additionally you're told they think it's missing

3  or been destroyed, but wherever it is they don't have it?

4     A.    Right.  And I would add too --

5          MR. SCHIAVONE:  Which one are we talking about?

6          MR. ROTHSCHILD:  Let me ask that better.

7          MR. SCHIAVONE:  The PowerPoint or --

8          THE COURT:  Well, I understand this has to do with

9     the June 3rd, 2010 statement.

10         MR. ROTHSCHILD:  Yes.

11         MS. BARKER:  Yes.

12  BY MR. ROTHSCHILD:

13    Q.    This is a potential possibly Garrity-informed

14  interviewed by IA with Malik Khaalis, right?

15    A.    Yes.  Yes.  And we also had the MDBI reports.  And

16  the copy that we had gotten when had met with John and

17  George, again --

18    Q.    Those were ex-FBI agents who were sent down to --

19    A.    Yes.  Again, a couple of times.  And it came up in

20  their reports as well.  And there were notes on the side of

21  the reports saying, where is this taped statement.  They

22  didn't have it.

23    Q.    All right.  And when up say notes on the side of

24  the report, Timmy Thompson wrote a report, right?

25    A.    Right.  Yeah.  This is not a note on his report.

18

1     It's a note on their reports, on John and George's reports.

2          Q.     But what -- I think I'm losing you.  They reviewed

3     Timmy Thompson's report?

4          A.     Yes.

5          Q.     Timmy Thompson's report referenced recording this

6     interview?

7          A.     Yes.

8          Q.     There's evidence in their own notations they

9     wanted the interview --

10         A.     Yes.

11         Q.     -- and their notes were where is this?

12         A.     Right.

13         Q.     So they have authority to get everything with the

14    city, they can't get it either?

15         A.     Right.  And they interviewed Timmy Thompson and,

16    again, he said he didn't know.

17         Q.     All right.  Gavin -- Gavin thinks it's destroyed,

18    but doesn't know where it is?

19         A.     Right.

20         Q.     The ex-FBI agents who are tasked with

21    restructuring IA can't get it?

22         A.     Right.

23         Q.     You asked for you?

24         A.     Yes.

25         Q.     James Dail didn't provide it?

1    A.    Correct.

2    Q.    All right.  Make sure I'm not leaving anyone

3    else -- oh, right.  Did you talk to Timmy Thompson about

4    this?

5    A.    About the June 3rd, 2010 recording, I did not.

6    Q.    Okay.

7    A.    I talked to him about PowerPoint.

8    Q.    Okay.  Well, I'll get back to that in a minute.  I

9    just want to make sure I run this thread all the way out.

10         Is there anyone else you can think of that's

11   important to the Court that you spoke to trying to track

12   down -- we're obviously led to believe the thing doesn't

13   exist.

14   A.    Yes.

15   Q.    Is there anyone else that we talked to about it?

16   A.    Well -- and I wanted to clarify what happened

17   yesterday.

18   Q.    I'll get to that.

19   A.    Okay.

20   Q.    Fine.  Go ahead.  Yesterday.  Tell me about

21   yesterday.  Different styles.  Go ahead.

22   A.    Yes.  And I'm sorry.  We were actually reviewing

23   the PowerPoint that we heard yesterday.

24   Q.    And this is by the way, what, day four of the

25   trial against Malik Khaalis.  Have we ever seen a video, the

20

1   State?

2       A.    No.  Oh, and I'm sorry, you did want to talk about

3   that.  Excuse me.

4       Q.    Well, we'll get there.  How long have you been a

5   prosecutor?

6           THE COURT:  You all may know what you're talking

7       about.

8           MR. ROTHSCHILD:  Right.  I'll make this clear.

9           THE COURT:  Okay.  But as far as the Court is

10      concerned, I can't speak for Mr. Schiavone, but given

11      the look on his face, I assume he also is having

12      trouble following this.

13          MR. ROTHSCHILD:  Okay.

14  BY MR. ROTHSCHILD:

15      Q.    We're in the trial of Khaalis right now?

16      A.    Yes.

17      Q.    It was our assumption and belief based on all

18  evidence that there was no videotaped statement of the

19  Defendant?

20      A.    Correct.  Or that was destroyed actually.

21      Q.    Well, none that was available now?

22      A.    Yes.

23      Q.    Are those typically helpful to have in a

24  prosecution?

25      A.    Absolutely.

1    Q.    I mean, they're either incriminatory or

2    exculpatory typically, right?

3    A.    Yes.

4    Q.    Either way, you owe it to the other side?

5    A.    Yes.

6    Q.    And have you, by the way -- well, how do we come

7    to get it at all?

8    A.    We were reviewing the PowerPoint that Sergeant

9    Thompson brought by yesterday.

10    Q.    And by the way, we'll get to that, but that also

11    showed up yesterday in the middle of the trial?

12    A.    Yes.  While we were doing that, you actually got a

13    call from Lieutenant Gavin saying, I just got this subpoena.

14    There was subpoena that had been issued by Mr. Schiavone.

15    Apparently, it was one of the subpoenas that the Court had

16    previously ruled that the Court was not going to enforce.

17    Q.    Gavin's been out of town.  He gets back from

18    vacation in the middle of our trial?

19    A.    Right.  And the subpoena was not for these

20    interviews.  The subpoena was for interviews of Larry

21    Harris, Pete Delatorre, Mike Delatorre and Eric Broom.

22    Q.    So Gavin calls about some other subpoenas, right?

23    A.    Right.  And he says, I made the recordings.  I'm

24    taking them by Schiavone's office.  I'm going to bring you a

25    copy.  And I'm the one who's talking to him at this point.

22

1        Q.     Right.  When you're talking to him, we're still

2    talking about something else Schiavone has -- Mr. Schiavone

3    subpoenaed?

4        A.     Yes.

5        Q.     These are the so-called punishment for gossiping

6    about the chief interviews, right?

7        A.     Yes.

8        Q.     All right.  So you get those or you hear --

9        A.     Right.

10       Q.     -- that those exist?

11       A.     Right.  Right.  So he says he's, you know,

12   bringing them by.  I said, you know, the Court is not

13   enforcing those subpoenas, but I'd rather have you drop it

14   off than not drop it off.  We're being accused of hiding

15   stuff, so go ahead and provide it and we'll get our copies.

16            I mentioned to him, because we're being accused of

17   all this, I said, I just want to clarify with you, there is

18   not some secret recording of this IA interview with Malik

19   Khaalis.  And his response was, my understanding is Hank

20   Wiley destroyed it.  I'll double check.

21       Q.     Literally yesterday during the trial, we're still

22   being led to believe by the current head of IA as far as he

23   knows and everyone else knows, that's gone, doesn't exist?

24       A.     Right.

25       Q.     About what time of the day, and I know you weren't

                                                                    23

1    keeping a calendar of it, rough estimate, when are we

2    talking about yesterday?

3        A.    That was after one o'clock.

4        Q.    Afternoon you're told it doesn't exist?

5        A.    Right.  And so Michelle Halford, who is a sergeant

6    with IA, comes.  She brings the other recordings.  I gave

7    her the OPS number, the IA report number --

8        Q.    Right.

9        A.    -- for this case, for Malik Khaalis.

10        Q.    And just as a lark, you say to her what?

11        A.    Well, I tell her, look, can you double check and

12    make sure we don't have these.  And she said, I'll call you

13    as soon as I get there and you know -- but we -- I don't

14    know that she said that she didn't -- she just simply didn't

15    know whether they had them or not.

16        Q.    She doesn't know, but you sent her on an errand?

17        A.    Yes.

18        Q.    What happens?

19        A.    We start reviewing the recordings that we got

20    yesterday and --

21        Q.    Which are different.  We're still not talking

22    about the interview with Malik?

23        A.    Correct.  And she calls and says you need to talk

24    to Brian Dail.  We have them.

25        Q.    And when you say, talk to Brian Dail.  We have

1   them.  We have what?

2       A.    We have a recorded interview with Malik Khaalis

3   and with Willet Williams.

4       Q.    Were you surprised?

5       A.    I think I cursed.

6       Q.    I think we both did.  Then what happened?

7       A.    Well, I said, I need it.  I need it now.

8       Q.    Did we also say Mr. Schiavone needs it ASAP?

9       A.    Actually, I think it was not in the conversation

10  with -- and I should say this.  When I spoke to Brian Dail,

11  he told me that he had provided it to the city attorney's

12  office and to the former FBI guys.  And I said, they told us

13  they don't have it.

14      Q.    And we'll get back to this for a minute.  But did

15  you talk to the FBI guys again to make sure, the ex-FBI?

16      A.    Yeah.  Yeah.  And they're here too.

17      Q.    And they're here and we're going to hear from

18  them, but they're adamant they never got that?

19      A.    Yes.

20      Q.    And their job was looking into this case, all the

21  cases and restructuring IA?

22      A.    Yes.

23      Q.    So what do we do about this video?

24      A.    Actually, because I had not even thought to tell

25  Halford to make an extra copy for Mr. Schiavone, we called

1   Lieutenant Gavin.  Gavin made sure that that happened.  And

2   from my understanding, Lieutenant Gavin brought us our copy

3   after he brought one to Mr. Schiavone.

4        Q.    The point being, the minute we find out, you tell

5   Gavin to get it to Mike?

6        A.    Yes.

7        Q.    At some point, and the judge has referenced this,

8   and I may be getting the chronology mixed up, do we call

9   Mike, or I call Mike --

10       A.    Yes.

11       Q.    -- and we went down to see the judge?

12       A.    Yes.

13       Q.    Tell me about that.

14       A.    I wasn't part of that conversation but, you know,

15  you said I've got to call Mike right now.  You did.  We went

16  down to see the judge, and this -- you know, all of this

17  happened very quickly.

18       Q.    Right.  And made some effort to disclose to Mr.

19  Schiavone where we stood --

20       A.    Yes.

21       Q.    -- and eventually we got the indication to be here

22  today?

23       A.    Yes.

24       Q.    I hate to cut you off.  Sorry.  Did you have a

25  discussion or did I hear you start to say you had a

26

1    discussion yesterday with Brian Dail about the late

2    production of an important piece of evidence in this trial?

3         A.    Other -- I said, you know, where has this been.

4    We've been asking for this.

5         Q.    And he said what?

6         A.    And he said, well, I gave it to the city

7    attorney's office when these ex-FBI guys were here.

8         Q.    And you checked with the ex-FBI guys, and that

9    wasn't something they ever got?

10        A.    No.

11        Q.    All right.  So how did --

12        A.    And we also contacted the city attorney's office,

13   and Jen Herman's here.

14        Q.    And did you start -- is this how, after the Dail

15   conversation, you and he exchanged e-mails, right?

16        A.    No.  He just sent this to me.

17        Q.    All right.

18        A.    State's Exhibit 1.

19        Q.    Have you had any further discussion with Brian

20   Dail?

21        A.    No.

22        Q.    All right.

23        A.    I did speak with Lieutenant Gavin, but I did not

24   speak with him.

25        Q.    What was the nature of that?

1      A.    When Lieutenant Gavin brought the recordings to

2   our office, I spoke with him, and he said, well -- he said

3   that he gave it to everybody.  And there was a discussion

4   about this e-mail essentially placing the blame on me for

5   not following up enough to get these recordings.

6      Q.    And I want to be clear about that.  Your initial

7   e-mail was I want everything, right?

8      A.    Yes.

9      Q.    Couldn't have been clearer?

10     A.    Right.

11           THE COURT:  I heard it.

12           MR. ROTHSCHILD:  Okay.  I'll move on.

13   BY MR. ROTHSCHILD:

14     Q.    As far as -- is there anything else as yesterday's

15   chronology I'm forgetting before you go on the PowerPoint

16   that's --

17     A.    Right.  And I do want to clarify.  It was not

18   Lieutenant Gavin who was blaming me.  He said that Mr. Dail

19   was blaming me.

20     Q.    I understand.  But does that kind of play out the

21   string on the videotaped statement before I move on to the

22   PowerPoint?

23     A.    Not the content.

24     Q.    Well, let's talk about that.  Have you reviewed

25   the content with me?

                                                              28

1    A.    Yes.  Only as to this defendant.

2    Q.    Well, that's the only guy I'm caring about today

3  is the Malik Khaalis case.  I know there's another one.

4    A.    Yes.

5    Q.    And as far as Khaalis, have you reviewed this

6  video statement last night until like seven, 7:15 with me?

7    A.    Yes.

8    Q.    Is it a short or longer video?

9    A.    It's much longer than I would have anticipated

10  having read Sergeant Thompson's report.

11    Q.    Would you agree that it neatly tracks how

12  Thompson --

13        MR. SCHIAVONE:  Judge --

14        THE COURT:  Yeah.

15        MR. SCHIAVONE:  There's Garrity issues about that,

16     and I'm not prepared for all this.

17  BY MR. ROTHSCHILD:

18    Q.    Without getting into the content of it as far as

19  what was -- I understand that.  Without getting to what was

20  or wasn't said, you would have disclosed it out of discovery

21  obligations anyway, correct?

22    A.    Yes.

23    Q.    If we'd have had it?

24    A.    Yes.

25    Q.    Would it have been useful to the State in your

1    estimation to have had it in the beginning?

2         A.    Absolutely.

3         Q.    Would there have been a reason to suppress it if

4    one were so inclined to do something illegal?

5         A.    Absolutely not.

6               MR. SCHIAVONE:  Judge --

7               THE COURT:  We're not --

8               MR. SCHIAVONE:  Can't get --

9               THE COURT:  Hold on a second.

10              MR. ROTHSCHILD:  I'm not getting into the

11         contents.

12              THE COURT:  We are getting into the contents.  No.

13         That's not what this is about.  This is not what the

14         Court is prepared to listen to today.

15              All I'm trying to do is get some understanding of

16         what's out there and, ultimately, what steps, if any,

17         need to be taken by the Court to ensure that

18         Mr. Khaalis ultimately gets a fair trial in Superior

19         Court.

20    BY MR. ROTHSCHILD:

21         Q.    Bottom line, obviously, you would have turned it

22    over if you had it?

23         A.    Yes.  And we have a copy here for the Court should

24    the Court need to review it.

25         Q.    Yeah.  I want to move on to this PowerPoint thing.

30

1     A.     Yes.

2     Q.     Tell me -- I think that's actually in time before

3  the video thing.  The PowerPoint came up during the trial.

4          Tell me what you can tell me about the existence

5  of or the knowledge of the existence of a PowerPoint in this

6  case?

7     A.     Well, as probably everybody who's been in this

8  courtroom for this trial is aware, there was a discussion

9  about a PowerPoint.  Mr. Schiavone wanted to make sure that

10  the PowerPoint was in CNT's file, which is why we had the

11  CNT produced, or that's my understanding of why the CNT file

12  was produced yesterday --

13     Q.     Either way.

14     A.     -- and it was not in there.

15     Q.     All right.

16     A.     While I'm sitting in my office after court --

17     Q.     Well, let me back up on that.

18     A.     Yes.

19     Q.     There was some thought that it had been given to

20  Peter Delatorre that placed it in the CNT files?

21     A.     Right.

22     Q.     But when the file came to be in court, did we have

23  a PowerPoint?

24     A.     No.

25     Q.     All right.  So how, if at all, do we come to ever

1   see a PowerPoint in this case?

2       A.    I was sitting in my office.  I was, I think on the

3   phone, and Sergeant --

4       Q.    Was this also after court yesterday?

5       A.    Yes, after court yesterday.  And Sergeant Thompson

6   comes to my window and is putting his face against the

7   window.

8       Q.    All right.

9       A.    And he comes in and he has a thumb drive.  And I

10  went to find you.

11      Q.    And you come to find me, and don't -- let's not

12  get into the content, was it the PowerPoint that had been

13  requested?  Or was it a PowerPoint purporting to be about

14  this?

15      A.    In a way.  I mean, it's certainly the PowerPoint I

16  think that the Defense wants to talk about.

17      Q.    Okay.  And again, I want to be careful not getting

18  into content.

19      A.    And again, we have a copy of that as well.

20      Q.    A PowerPoint was produced?

21      A.    Yes.

22      Q.    For the first time?

23      A.    Yes.

24      Q.    And you looked at it?

25      A.    Yes.

1     Q.    What was -- did you talk to Thompson at all about

2  where it might have been?

3     A.    Yes.

4     Q.    What was his explanation of where it might have

5  been?

6     A.    He said -- well, he didn't actually tell me where

7  it might have been.  What he wanted to talk about is who he

8  gave it to.

9     Q.    Well, I guess that's related.  Tell me what he

10  said.

11     A.    He said that he thinks he may have given it to

12  Sergeant Cory Shaw who used to be at CNT, but he wasn't

13  sure.

14     Q.    Not Peter Delatorre?

15     A.    Well, it could have been Peter, or Mike, or

16  Sergeant Shaw.  He just was not clear at all.

17     Q.    All right.  And did he have -- how did he explain

18  having it yesterday if he gave it to Shaw?

19     A.    He didn't.

20     Q.    He just had it?

21     A.    Just had it.

22     Q.    Did he say where he got it yesterday?

23     A.    No.

24     Q.    All right.  And what steps did you take once you

25  became aware, and other than coming to run down the hall to

33

1    find me when I was about to leave, what did you do next?

2        A.    Well, aside from that, you know, we got it.  We

3    reviewed it.

4        Q.    Was a copy made for the Defendant?

5        A.    Yeah, a copy was made for the Defense.  We sent

6    Sergeant Thompson over to Mr. Schiavone's office with a

7    thumb drive so that he could have a copy.

8        Q.    All right.  Did we get that to Mr. Schiavone

9    yesterday?

10       A.    Absolutely.  Immediately.  Before lunch.  Yes.

11       Q.    All right.  So that's the PowerPoint.

12            THE COURT:  Let me just make sure it arrived.  Did

13        it arrive?

14            MR. SCHIAVONE:  It did arrive.

15   BY MR. ROTHSCHILD:

16       Q.    Thompson at least -- we can't speak to their end.

17   We sent Thompson with it immediately --

18       A.    Yes.

19       Q.    -- to give Mr. Schiavone a copy of it.  And I

20   think the phone call was made?

21       A.    Yes.

22       Q.    How long is it between the arrival of the

23   PowerPoint and then the acknowledgment that there is this

24   DVD, and the other piece of evidence?

25       A.    You mean the recorded statement?

34

1        Q.     Yeah.   Two things happened yesterday, the

2    PowerPoint and the recorded statement.

3        A.     The PowerPoint would have been before lunch, so

4    maybe -- lunch would have been late, so it would have been

5    in the 12:10 -- I mean --

6        Q.     Was this after we got back from lunch?

7        A.     The recorded statement came well after we got back

8    from lunch.

9        Q.     And then after the recorded -- and when was the

10   PowerPoint in relation to lunch?

11       A.     The PowerPoint would have been before lunch.   I

12   think Sergeant Thompson showed up in maybe the 11:50 range,

13   and then we sent him over maybe 12:10.

14       Q.     Uh-huh.   Am I forgetting anything about either of

15   these documents.   I'm not getting into the content before --

16       A.     Right.   And my only concern is, you know, that the

17   Court may need the copies to be tendered for review.

18       Q.     Right.   And let me just -- before I do that, let

19   me show Mr. Schiavone another e-mail.   You mentioned

20   something about the stuff being given to the city

21   attorney --

22       A.     Yes.

23       Q.     -- and then a conversation with Jen Herman.

24       A.     Yes.

25       Q.     Tell me what was turned over to whom as far as you

35

1    know.

2         A.    We got in touch with Jen Herman at the city

3    attorney's office as soon as Mr. Dail had told me that he

4    had given this to the city attorney's office.  And -- well,

5    probably talked to John and George first.  There were a

6    bunch of phone calls.

7         Q.    Right.  And we'd already cut them loose and sent

8    them back to Atlanta.

9         A.    Yes.  And got them back.

10        Q.    And got them to come back.

11        A.    Yes.

12        Q.    Well, tell me about the Jen Herman part.

13        A.    Jen Herman said that she was going to talk to

14   Lois, who is apparently their secretary and the person who

15   handles all these documents for them.

16        Q.    Right.

17        A.    We did not hear back from her until this morning

18   via e-mail.

19        Q.    "Her" being Lois?  "Her" being Jen Herman?

20        A.    Jen Herman.

21        Q.    All right.

22        A.    And the e-mail we received from her is actually

23   what Mr. Schiavone's reviewing right now.  According to Ms.

24   Herman -- and we spoke with her this morning and she is

25   here.  According to Ms. Herman, some sort of video was

                                                            36

1  provided to Shawn Kachmar.  And Shawn Kachmar apparently

2  does contract work.

3      Q.    Is Shawn Kachmar an attorney?

4      A.    Yes.  He does contract work with the city

5  attorney's office, and he was handling employment claims

6  made by this Defendant.

7      Q.    Right.

8      A.    So he had gotten some sort of recording that she

9  was going to get Lois, the secretary, to make -- to get from

10  him, make a copy of it, and bring it -- she brought it to

11  our office.  It appeared to be the IA recording.  I put it

12  in my computer.  There was no audio.

13     Q.    It appeared to be the same thing that we had

14  yesterday --

15     A.    Yes.

16     Q.    -- from Gavin late in the afternoon that we --

17     A.    Yes, but there was no audio on it.

18     Q.    Right.  But whether it functioned or

19  malfunctioned, we appear to be talking about the same

20  interview?

21     A.    Yes.

22     Q.    And the e-mail I'm showing Mr. Schiavone, is that

23  the e-mail memorializing this that we're talking about?

24     A.    Yes.  Yes.

25          MR. SCHIAVONE:  Judge, can I get copies of these

1        e-mails.

2              MR. ROTHSCHILD:  Yes.

3              MS. BARKER:  Sure.

4              THE COURT:  Yeah.  Let's also get on the record,

5        too, and I think lawyers in this room are aware that

6        Mr. Kachmar is a partner at Hunter Maclean.  And the

7        Court's position on Hunter Maclean matters, seeing as

8        I'm a former partner of Hunter Maclean, is that there

9        is no direct conflict of interest between this Court

10       and that law firm at this point.  There's no financial

11       connection or otherwise.  But I do want to make sure

12       that everybody is aware that that connection, for lack

13       of a better term, did exist at one time.

14             MR. ROTHSCHILD:  And I'll tender that with a

15       sticker.  Ms. Glaudel, the Court's law clerk, is making

16       a copy for the Defense at this time.  That will be

17       State's 2.

18  BY MR. ROTHSCHILD:

19       Q.    Also for the Court to have copies of, Ms. Barker,

20  I'm going to show you -- I think Mr. Schiavone's been given

21  copies yesterday what is styled as the Khaalis-Williams

22  interviews.  Are those the audiotape -- or audio DV- --

23       A.    There's a video of Mr. Khaalis.  There is an audio

24  of Willet Williams.

25       Q.    But this is --

                                                          38

1    A.    From IA.

2    Q.    And I understand Williams isn't before this Court,

3  but --

4    A.    Yes.

5    Q.    -- that's just what's on the title of it?

6    A.    Yes.

7    Q.    But that is the June 3rd, 2010, with audio and

8  video, interview with the Defendant by the Internal Affairs

9  people?

10   A.    Yes.

11   Q.    Who interviews?  And don't get into content, but

12  who actually did the interview?

13   A.    Andre Oliver, who was the lieutenant, and Sergeant

14  Timmy Thompson.

15   Q.    And showing Mr. Schiavone, this is the Court's

16  copy, of a thumb drive, and you've got a sticker in your

17  handwriting that says Tim Thompson --

18   A.    PowerPoint.

19   Q.    -- PowerPoint.  Is that the PowerPoint that came

20  to our attention yesterday?

21   A.    Yes.

22        MR. ROTHSCHILD:  I would probably mark these as

23     separate exhibits.  I'm not sure how to get a sticker

24     on this small thumb drive, other than to suggest maybe

25     an envelope.  But I guess this could be State's 3,

1       would be the interview on the envelope of the Khaalis.

2       It's marked Khaalis-Williams interview.  That will be

3       State's 3, which I'll tender as an exhibit.  And

4       State's 4, would be the Tim Thompson PowerPoint matter.

5       And State's 1 is already in, and I'll tender State's 2

6       when the Court's law clerk returns with a copy for Mr.

7       Schiavone.

8  BY MR. ROTHSCHILD:

9     Q.    Other than tendering those exhibits, Ms. Barker,

10  does that cover the timeline as far as we know for the items

11  that showed up yesterday?

12     A.    Yes.

13     Q.    Actually, here it is now.  Let me go ahead and

14  deal with that.

15       MR. ROTHSCHILD:  And this is -- thank you, Ms.

16       Glaudel.  I'm giving Mr. Schiavone copies of the Jen

17       Herman e-mail as State's Exhibit 2 is the first one.

18       I'm giving the Court State's 1 back, and I'm not sure

19       what happened to the original on State's --

20       THE WITNESS:  I would add one more thing.  Mr.

21       Dail, the paralegal...

22  BY MR. ROTHSCHILD:

23     Q.    Yes.

24     A.    Actually was part of the old regimen at IA.  I

25  don't know if that factors into his willingness or

1  unwillingness to share things with us.

2      Q.    Okay.  And I understand.  I won't know until I

3  know how his demeanor is today, but he's still in IA now?

4      A.    Yes.

5      Q.    And he was at IA as a paralegal before the

6  shake-up.  Is that fair to say?

7      A.    Yes.  I understand he's been there for quite some

8  time.

9          MR. ROTHSCHILD:  I'm just going to make sure I've

10         got everything marked right.  State's 1 should be the

11         James Dail correspondence between you and -- between

12         Ms. Barker and James Dail.  State's 2 is the Jen Herman

13         e-mail to me and Ms. Barker.  State's 3 is the DVD

14         styled Khaalis and Williams interviews, and State's 4

15         is an envelope now containing a thumb drive that

16         purports to be a PowerPoint.

17         Ms. Barker, you may have some questions from

18         Mr. Schiavone at this time.

19                     CROSS-EXAMINATION

20  BY MR. SCHIAVONE:

21      Q.    All right.  Ms. Barker, I think -- are you telling

22  me that the criminal -- you considered and the Virginia

23  company considered them to be criminal investigators?

24      A.    It's kind of both.  They were initially supposed

25  to do an internal investigation into police corruption.  I

1    think that with -- and if you're trying to get into Garrity

2    issues or anything like that, I don't think that that --

3    what I'm saying should be taken one way or another for

4    that --

5        Q.    Well, I think I am taking it that way.

6        A.    Well --

7              THE COURT:  This is not --

8              MR. SCHIAVONE:  Well, no --

9              THE COURT:  Hold on.  I'm talking.  And this --

10       before we get too far into that.  This is not going to

11       turn into an evidentiary free-for-all.  And I'll cut it

12       off where I need to in order to satisfy that the Court

13       intended this to be, and that's simply a status of

14       whatever the existing production of documents would be.

15             Now, whatever Ms. Barker testified to, I had a

16       number of -- a number of hearings in this case already

17       on the Garrity issues, as well as the selective

18       prosecution issues.  I heard the evidence.

19             How she might couch that particular interview in

20       terms of this hearing does not affect what the Court

21       has heard in the totality of evidence within the court

22       itself.

23             So let's not expand this beyond where it needs to

24       go.  I'm not exactly sure where it needs to go, but we

25       don't need to go over all of the Garrity issues.

1          MR. SCHIAVONE:  No, I wasn't going to get into

2      that.

3          THE COURT:  But I am going to give you some

4      latitude because I do understand the Defense's position

5      is that all probability at this point.

6          MR. SCHIAVONE:  This is all news to me, Judge.

7          THE COURT:  Yeah.  Go ahead.

8  BY MR. SCHIAVONE:

9      Q.   But the only reason I'm asking that, is that how

10  they considered that the criminal investigation, that's how

11  it started against my client.

12      A.   I don't know that I can answer that.  I really

13  don't know that I can answer that.  And I'll be honest with

14  you, things were referred to our office.  Mr. Rothschild and

15  Investigator Becker started what would be the official

16  criminal investigation subsequent to the FBI and CNT, and

17  all those other investigations we've already talked about.

18          So I really -- MDBI was doing an internal affairs

19  investigation about police corruption or public corruption.

20  That information was also forwarded to us as part of, you

21  know, hey, this needs to be look at criminally.

22      Q.   Was that -- who did that come from?

23      A.   I'm sorry?

24      Q.   Who sent you that from -- somebody sent you that

25  from SPD?

43

1      A.     The MDBI stuff?  No, that came from the city

2    attorney's office.

3      Q.     That came from where?

4      A.     The city attorney's office.

5      Q.     So they're the ones that sent that to you

6    initially?

7      A.     Sent the MDBI reports -- you have to understand,

8    Mr. Schiavone, I wasn't involved in this initially.  I came

9    into it after Mr. Rothschild did.  So who sent it to my boss

10   Meg Heap, I can't say.

11     Q.     Now, are you telling me the city attorney's office

12   was recommending criminal prosecution of individuals?

13   That's how it started?

14     A.     No.  The city attorney's office was sharing with

15   us the results of MDBI's investigation for whatever we

16   wanted to do with it.

17     Q.     So they just sent you the report?

18     A.     Yes.

19     Q.     Okay.  The report that I received, was that the

20   entire report, or were there stuff about other officers and

21   stuff?  Or do you remember?

22     A.     I don't -- you're asking me -- because there have

23   been multiple discovery disclosures in this case, Mr.

24   Schiavone, and most of those were done by Mr. Rothschild.  I

25   can't answer that.

1      Q.     As I understand it, one of the exhibits

2   established was that, in fact, information was sent to the

3   city's attorney.  Because in the original discovery, it was

4   claimed the city attorneys all said they never received

5   anything from Chief Lovett and Internal Affairs.  And that's

6   what's throwing me off --

7      A.     I --

8      Q.     -- (inaudible) that something was.

9             THE COURT:  Let's refer to the actual disclosure.

10       That may be the case in the record.  Let's see if she

11       knows about it because from this point forward, we're

12       going to be as clear as we possibly can about exactly

13       who had what and when.

14             MS. BARKER:  Okay.

15   BY MR. SCHIAVONE:

16      Q.     You do recall that in the discovery?

17      A.     I'm sorry?

18      Q.     Do you recall that in the discovery?

19      A.     Recall what in discovery?

20      Q.     That the city attorneys were interviewed and asked

21   about having received Internal Affairs documents and video?

22      A.     Oh.  We're talking about two completely different

23   things, Mr. Schiavone.  MDBI, in their investigation of

24   Mr. Khaalis' IA investigation, received a letter of

25   transmittal, which is the thing that closes out the IA

1    investigation.  This would have been in -- the letter itself

2    is dated 2010.  That letter discusses things that happened

3    in 2010 -- or that purportedly happened in 2010.

4         So that L-O-T, the letter of transmittal, refers

5    to -- and it says on the bottom of it.  Apparently it's a

6    memo from Hank Wiley.  It says on the bottom of it that the

7    city attorney's office had, quote, unquote, reviewed the IA

8    investigation as to Mr. Khaalis and found no criminal

9    wrongdoing.

10        The investigation from MDBI into that L-O-T

11   included interviews with Hank Wiley, and interviews with

12   Willie Lovett, and also interviews with Peter Giusti.  Mr.

13   Rothschild and I interviewed Peter Giusti with respect to

14   did you ever see this man's IA file, or did you -- or

15   Mr. Blackburn, who were the city attorneys in 2010 when this

16   would have happened, and the answer was no.  And that they

17   would never have come to them, and that in -- they would not

18   have reviewed anything for criminal prosecution because they

19   aren't qualified.  They only do civil work.

20   Q.   Oh.  So these are just -- was any reduced to

21   writing about these interviews, because I didn't -- this is

22   the first I've heard of them.

23   A.   Peter Giusti's interview is part of the MDBI file.

24   Q.   All right.

25   A.   And Hank Wiley's and Willie Lovett's.  They're all

1    in there.

2    Q.    Right.  But not the city attorneys?

3    A.    Peter Giusti is the city attorney that --

4    Q.    But you also --

5    A.    You're talking about in 2010.  What I'm talking

6    about, what these recordings -- and I'm trying to make this

7    very, very clear, and maybe I'm failing.

8         You're talking about did the city attorney's

9    office ever review this IA file.  In 2010, they did not.  In

10   2013, when MDBI was called in, things were sent to them.

11   That's what this Jen Herman e-mail is about.  The Jen Herman

12   e-mail actually says that the person who -- the only person

13   at the city attorney's office who received any recording

14   from IA of an interview with Malik Khaalis was in the

15   context, not of the MDBI investigation, but in the

16   employment investigation when Mr. Khaalis filed a lawsuit

17   against them.  So the only person who received it was Shawn

18   Kachmar.  It was not shared with MDBI.  That's my

19   understanding.

20   Q.    All right.  Who -- did you request the GBI file?

21   You testified you --

22   A.    There were GBI files --

23   Q.    Somebody said Virginia, the Virginia men, the GBI

24   files and Internal Affairs files.

25   A.    The GBI files dealt with other individuals we were

1    investigating.  And I can get into their names, but some of

2    them may still be pending.

3        Q.    But there was an investigation in this case by the

4    GBI?

5        A.    Not as to Malik Khaalis, not that I'm aware of.  I

6    mean, if there's something in discovery, then there is.  But

7    I'm not personally aware of it, no.

8        Q.    Well, I did receive something in discovery.

9        A.    And that may be.  I -- I -- the last time I looked

10   at those GBI files was probably January of last year.

11       Q.    All right.  Who would have requested -- you did

12   this yourself or someone in your office?

13       A.    The GBI files?

14       Q.    Yes, ma'am.

15       A.    No.  Greg McConnell had them and gave them to me.

16   And when he got them, I couldn't tell you.

17       Q.    So you think he might have been the one who

18   requested them?

19       A.    Or Meg Heap.  I don't know.  I really don't know.

20       Q.    Okay.  And that would apply also to the GBI

21   investigation?

22       A.    Yes.

23       Q.    It would have been one of the two of them?

24       A.    Most likely, yes.

25       Q.    All right.  And the Internal Affairs files?

48

1      A.    The Internal Affairs files I personally requested.

2    Now, I think -- I know for a fact that the MDBI guys

3    requested them multiple times, but I personally requested

4    them multiple times.

5      Q.    All right.  Who would have requested the entire

6    CNT file?

7      A.    Mr. Rothschild.

8      Q.    All right.

9      A.    Because I was looking at bigger picture stuff.  I

10   wasn't just looking at this.  And I'm not saying he was just

11   looking at this, but we also had Trina Mayes.  We had a

12   number of other people we were looking at.

13     Q.    So you can't speak to who requested that prior to

14   trial?

15     A.    I know I did not.

16          MR. SCHIAVONE:  All right.  I don't have any

17       further questions.  I may need to put Jerry up.

18          MR. ROTHSCHILD:  For that limited thing I have an

19       answer.  I can happily answer.

20          THE COURT:  All right.  You can go ahead and step

21       down.

22          MR. SCHIAVONE:  But they can call whoever else

23       they have.

24          THE COURT:  Well, let's figure out where this is

25       going.  What I have, as I understand it, at this point

                                                              49

1     is I know that after I recessed yesterday, a thumb

2     drive appeared, and a recorded statement, apparently a

3     lengthy recorded statement, of the Defendant from 2010

4     appeared.

5          I understand both of those documents have been

6     provided to Mr. Schiavone; is that correct?

7          MR. SCHIAVONE:  Yes, sir.

8          THE COURT:  All right.  I just want to make sure

9     that we're clear about that.  Beyond the testimony of

10    Ms. Barker, Mr. Rothschild, what would the State intend

11    to present to the Court.

12         MR. ROTHSCHILD:  As of the last question, I

13    suppose I need to take the stand to answer Mr.

14    Schiavone's last question or two.

15         Additionally, we've got in the hallway -- just to

16    flesh out the video matter.  If the Court needs to hear

17    from George Murray and John Insogna, who I think would

18    testify about the same way about what they got and

19    being told they got everything from the city.  And also

20    Brian Dail who is the person on the other end of the

21    e-mail correspondence with Ms. Barker.  Tim Thompson as

22    to the PowerPoint, if that's necessary.  And who am I

23    leaving out here?  Jen Herman's here, Rob Gavin as well

24    who's head of IA who's been discussed.  And now I don't

25    think it's necessary, but Peter Delatorre, just out of

                                                        50

1     abundance of caution because there's some discussion of

2     him having ever had the PowerPoint.

3         So those are who we've got here today.  Myself,

4     Christy, John Insogna, George Murray, Jen Herman, Rob

5     Gavin, Brian Dail, Tim Thompson, I suppose Pete

6     Delatorre.

7         MR. SCHIAVONE:  Can we approach the bench.

8     (The following transpired at the bench:)

9         MR. SCHIAVONE:  I'm going -- I don't want to do it

10     in the middle of the court at this point, but I push

11     hard that I ask the Court to declare a mistrial.  I

12     mean, there's more, so much more information that I'm

13     never going to be able to accomplish before Monday and

14     Tuesday.

15         Additionally, the CNT file is also an issue,

16     because I -- that wasn't turned over to the District

17     Attorney apparently, and obviously, I didn't see it

18     until it was brought to court.  I do have questions

19     about how that's done to the District Attorney's

20     office, how they request that.  Are there e-mails

21     requesting that that entire file be brought to them?

22     Did he -- I mean --

23         MR. ROTHSCHILD:  I can answer it at sidebar.  I

24     can tell you.

25         THE COURT:  Well, we might as well get it on the

```
1    record.  You can ask those questions.
2         MS. BARKER:  Yeah.  And we have a number of
3    arguments against a mistrial.
4         MR. ROTHSCHILD:  We might not be at that point
5    yet.
6         THE COURT:  I haven't heard it formally moved for
7    it at this point so...
8         MS. BARKER:  Sure.
9         MR. SCHIAVONE:  I didn't know if you wanted me
10   to -- I mean, I don't know if there's somebody I'm
11   going to need to subpoena from CNT in reference to
12   that, so that's why I'm not prepared to do this, I
13   mean.
14        THE COURT:  Let's do one step at a time.  It
15   sounds like we need to put Mr. Rothschild up.  Why
16   don't you go ahead and ask your questions of
17   Mr. Rothschild, and then wherever this goes, this goes.
18        MS. BARKER:  Sure.
19        MR. SCHIAVONE:  I may need to reserve to a later
20   date putting up additional witnesses on the CNT file.
21   I just was not prepared for this.
22        THE COURT:  I understand.
23   (End of bench conference.)
24        MS. BARKER:  The State would call Jerry
25   Rothschild.
```

1        (Witness sworn.)

2                    DIRECT EXAMINATION

3    BY MS. BARKER:

4        Q.    Would you state your name for the record, please.

5        A.    My name is Jerome M. Rothschild, Jr.  Everyone

6    calls me Jerry.

7        Q.    Where do you work?

8        A.    I'm assistant district attorney since 1997.  I've

9    been practicing law 20 years.

10       Q.    Okay.  Mr. Rothschild, the issue just came up with

11   respect to the CNT file.

12       A.    Yes.

13       Q.    I think we are -- just to clarify talking about

14   this Percy Anderson CNT file that we got yesterday?

15       A.    Right.

16            MR. SCHIAVONE:  It wasn't.  It was James Williams

17        was on the file, not Percy Williams.

18            MS. BARKER:  It's both.

19            MR. ROTHSCHILD:  Well --

20            MR. SCHIAVONE:  I don't know then.  I'm sorry.

21            THE COURT:  Okay.  Let's clarify it.  We're

22        talking about the file that was produced yesterday

23        morning, and it had a CNT file number on it.  I

24        believe, it had to do with the Williams, Percy -- I

25        can't remember his last name.  Y'all just said it.

                                                            53

1          MS. BARKER:  Anderson.

2          THE COURT:  The surveillance associated with those

3     two individuals.  I don't think there's any dispute.

4     We're going to create an issue.  There's no dispute

5     what we're talking about is the documents and the file

6     that appeared in this court yesterday morning for the

7     first time that neither the district attorneys trying

8     the case, nor the Defense have seen.

9          Ms. Barker.

10 BY MS. BARKER:

11    Q.    Mr. Rothschild, did you try to get that file

12 before?

13    A.    I need to back up.  I relied -- as I think you did

14 as well.  I was aware that there is a apparent thorough

15 investigation being done by SCM -- about SCMPD corruption.

16 George Murray and John Insogna who are retired FBI agents

17 who contracted with the City to look into it.

18          Certainly Investigator Becker of our office tried

19 to track down some stuff.  But the thing that might be lost

20 here is those guys did get CNT stuff.  A lengthy report by

21 Peter Delatorre was referenced and gotten, so I relied on

22 those guys to get that.  I didn't really go behind that.  We

23 asked for everything from the City.

24          And since Malik Khaalis had been a city employee,

25 even though he's attached to a county multi-jurisdictional

1   task force, those guys had authorization to get that and,

2   indeed, provided some stuff as to that.  I didn't go behind

3   that and say is there also some other file with the same

4   case number that would exist back when we were putting this

5   together pre-indictment to answer your question.

6           MS. BARKER:  Okay.  That's all the questions I

7       have.

8                       CROSS-EXAMINATION

9   BY MR. SCHIAVONE:

10      Q.    Jerome?

11      A.    Yes.

12      Q.    All right, Jerome.

13      A.    Although I typically hear that and think of my

14  father but, yes.

15      Q.    Even though you knew that this was a CNT

16  investigation --

17      A.    "This" being the?

18      Q.    This case.  I mean, the only witnesses in the case

19  have been predominately CNT agents at the time?

20      A.    Many of them assigned from SCMPD and -- yes.

21      Q.    But it was Roy Harris at the time.  He was the

22  head of CNT?

23      A.    Yes.

24      Q.    Rusty Smith, supervisor?

25      A.    Yes.

1      Q.     Charles Guyer?

2      A.     Yes.

3      Q.     These are all in the counts were mainly CNT agents

4  at the time?

5      A.     Those guys were.

6      Q.     All right.  And you knew that you had a 37-page

7  document that showed an investigation, that was told to me

8  in court, that it was the investigation of Malik Khaalis?

9      A.     I think we turned over the 37-page report.

10     Q.     I understand.

11     A.     I think I got that from the IA -- from the -- I

12 believe I got that from George Murray and John Insogna, but

13 I think we also got it another way too but, yeah.

14     Q.     But it was made clear it was CNT with a CNT case

15 number?

16     A.     Yeah, absolutely.

17     Q.     And that was the investigative files, supposedly

18 the investigative file on Malik Khaalis?

19     A.     It was the report that I knew existed.

20     Q.     All right.  But you made no effort through

21 e-mails, telephone calls, or personally going out to CNT to

22 acquire their entire file in the investigation of Malik

23 Khaalis?

24     A.     I was led to believe through the investigators

25 that were handling this had everything.  I don't know what

1    else to tell you other than I'm aware there was a James

2    Williams' surveillance.  But I was not necessary aware that

3    there was a separate file that would not have anything about

4    Khaalis in it, but would have the other in.

5              I'm aware of who Percy Anderson is.  If you'd

6    reviewed the discovery, you'll see an audiotaped interview

7    between myself, Investigator Becker and Percy Anderson.

8              MR. SCHIAVONE:  All right.  No further questions.

9              THE WITNESS:  And that was turned over to counsel.

10                      REDIRECT EXAMINATION

11   BY MS. BARKER:

12       Q.    And just briefly as a follow up.

13             You did actually go out and get the entire file on

14   the wiretap aspect of this?

15       A.    I think we just asked for everything.  I don't

16   know that I physically drove to CNT.  We just asked for what

17   existed.

18       Q.    Well, right.  But you did provide all -- I think

19   we're talking about two -- apples and oranges.

20       A.    All I can tell you is that everything that those

21   FBI guys are investigating that was pertinent to Malik

22   Khaalis we asked to be turned over and provided to

23   counsel --

24             MR. SCHIAVONE:  Who are we talking about?  Who was

25        asked?

1      MR. ROTHSCHILD:  The people, John Insogna and

2   George Murray, who were investigating police

3   corruption, one of the people that came up was Malik

4   Khaalis.  They had plenty of already together

5   documents.

6      And I'm the investigator, I'm a prosecutor.  So as

7   they put everything together and sent it to our office,

8   we rely on that.  I went behind it insofar as we did

9   witness interviews with Josh Varner in prison.  "We"

10  being me and Investigator Becker, we spoke to Percy

11  Anderson.  I can't remember everybody, but they're all

12  on the witness list.

13     MR. SCHIAVONE:  A better question to you was that

14  you went out there.  Is she talking about CNT?

15     THE WITNESS:  I don't know what she's asking, but

16  I can respond.

17     THE COURT:  Okay.  Let's --

18     MR. SCHIAVONE:  I'm sorry.

19     THE COURT:  I realize everybody is very familiar

20  with each other.  Right now, the witness is being asked

21  questions by Mr. Schiavone.  If there's --

22     MS. BARKER:  I actually didn't get to finish.

23     MR. SCHIAVONE:  Oh, I'm sorry.  I thought she was

24  finished.

25     THE COURT:  Oh.

1          MS. BARKER:  He started asking questions before I
2     was done.
3          MR. SCHIAVONE:  I'm sorry.
4          THE COURT:  All right.  Let me flip that around.
5     Mr. Schiavone, if you could just give Ms. Barker an
6     opportunity.
7  BY MS. BARKER:
8     Q.    I just want to clarify, Mr. Rothschild.  As part
9  of the discovery in this case, you provided the entire --
10 and I think it's an external hard drive worth of stuff in
11 the wiretap?
12    A.    We provided everything we had is all I can tell
13 you.
14    Q.    Yes.  And the FBI --
15    A.    I can't go through it by heart, but everything
16 that we knew that was relevant to Khaalis that we got from
17 the investigation was turned over.
18    Q.    Okay.
19    A.    And while we're on it, we did something else too.
20 Mr. Schiavone and I go way back.  I typically have an open
21 file discovery.  And at least once within the last month,
22 and maybe twice at some earlier time, Mr. Schiavone came by
23 to make sure he had stuff.  I opened up my file.  There's
24 nothing to hide.  Have what you want.  He went through it.
25          And although a lot of the stuff I already sent, he

1    wanted other copies or he just wanted to make sure he had

2    it, so he went to the DA's office copy machine, made copies

3    of what he felt like he needed to make sure he had.

4         This is not a stranger-on-stranger situation.

5    And, you know, there's not open file for everybody, but

6    particularly Mr. Schiavone's welcome to make an appointment

7    and come find out whatever.  So it's not like we didn't talk

8    about it.

9         And I want to be clear the things we're talking

10   about, the PowerPoint, didn't know about it until yesterday.

11   The video, obviously, the same thing.  Mr. Schiavone went

12   through my file.  He didn't see it.  I didn't see it.  I

13   mean, this is an unusual situation.

14   Q.    Right.  And I just want to back up too.

15         Okay.  We're talking about two items.  This

16   recorded interview from IA, which we've already talked about

17   trying to get.

18         But the PowerPoint itself, did you even know that

19   existed until Pete Delatorre was cross-examined about it?

20   A.    I think the first I heard of a PowerPoint -- I

21   can't say it was when Pete was examined.  It came up during

22   the trial.  I was unaware of it or its importance.

23         And actually Mr. Schiavone may have mentioned it

24   at some point it's important.  It might be.  But as far as

25   actually knowing the specifics.  The video interview that is

60

1    of Malik Khaalis, we were aware Malik Khaalis had been

2    interviewed by IA.  We were aware of a couple reasons.  We

3    talked to Timmy Thompson about it.  The FBI agent Josh

4    Hayes, and mentioned it immediately after his non-recorded

5    interview.  Those guys, those guys being the IA

6    investigators, interviewed Khaalis at CNT.  That's two

7    reasons we knew.

8         Thompson reduced a report to writing, wherein he

9    referenced an interview with the Defendant Malik Khaalis,

10   and indicated in his written statement that the thing was

11   recorded.  And then you've already testified, and I kind of

12   agree with everything you said about what we were told by

13   the various levels of people that if it existed, it no

14   longer existed, and most people included Thompson who didn't

15   know where it was.

16   Q.    You actually spoke to Sergeant Thompson about it?

17   A.    At some point over the last two years.  He didn't

18   know where it was.  Gavin, who as recently as yesterday was

19   of the belief that if it existed, it had been destroyed or

20   lost.

21        And Murray and Insogna who during -- and obviously

22   was involved before you were, my discussions with them, were

23   led to believe if it existed, it had come to be destroyed or

24   lost.  And I'll let them speak to why they thought that, but

25   I'll say they were investigating an IA department under

1    Willie Lovett that they found to be lacking.

2         MS. BARKER:  Okay.  That's all the questions I

3    have.

4                    RECROSS-EXAMINATION

5    BY MR. SCHIAVONE:

6    Q.    You remember my continued request for the

7    surveillance logs with the CNT?

8    A.    You've asked for a bunch of stuff.  I mean, that

9    could be one of the things.

10   Q.    But is it your testimony that no one at CNT was

11   ever asked about that prior to trial?

12   A.    All I can tell you is that I can't speak to

13   specifics that prior to trial we asked for everything they

14   had through the investigators that we had, which would have

15   been George and John.

16   Q.    Okay.

17   A.    I don't know how else to answer your question.

18   Q.    So CNT -- you never contacted CNT directly?

19   A.    I think I spoke to David Arbizo, who'd been the

20   case agent on the actual wiretap at one point, asking for

21   everything.  And it was -- this is -- you're asking me from

22   memory, so I don't know if I'm prepared to answer.

23        I want to say that Varner wiretap had been

24   prosecuted and done for a while.  And what they could track

25   down, they could track down.  What they couldn't, they

                                                          62

1    couldn't.  I can't give you specifics.

2        Q.    All right.  Can you tell me who he is?

3        A.    David Arbizo is a policemen who is a case agent.

4        Q.    CNT --

5        A.    Actually, I'm sorry.  Peter -- I'm sorry.  Mike

6    Delatorre would have been the case agent on his wiretap, but

7    he wasn't at CNT anymore, so I think I spoke to David Arbizo

8    who's just a cop at CNT.

9        Q.    Okay.

10       A.    He's also a cop.  I can't speak specifics as to

11   that.  Sorry.

12       Q.    So there was some conversation with someone at CNT

13   about this?

14       A.    At some point certainly.  But I don't want to sit

15   here and tell you on a certain day, I asked so and so.  I

16   can tell you that primarily we relied on the investigators

17   who were looking into the Khaalis matter to get us those

18   documents.  And I interviewed witnesses with Investigator

19   Becker, so I wouldn't be doing it alone so there would be a

20   witness who came for that.

21           MR. SCHIAVONE:  Okay.  I don't have any further

22       questions.

23           MS. BARKER:  I have nothing further.

24           THE COURT:  Thank you, Mr. Rothschild.  You can

25       step down.

1          MR. SCHIAVONE:  Obviously I -- now I need to talk

2     to this witness.  He becomes critical to where this

3     file was prior to trial.  I'd like to get that marked

4     as an exhibit and introduce it in this motion hearing.

5          THE COURT:  What is that?

6          MR. SCHIAVONE:  The file from CNT.

7          THE COURT:  It's already a part of the record --

8          MR. SCHIAVONE:  Okay.

9          THE COURT:  -- in the trial.

10         MR. SCHIAVONE:  But how do I get it part of the

11    record in this motion hearing?

12         THE COURT:  We can do it through cross-reference.

13    Well, actually -- I mean, why don't we just reference

14    it a trial exhibit, Court's 3.

15         MR. SCHIAVONE:  Court's 3.  And that would be part

16    of the motion hearing --

17         THE COURT:  Right.  That's incorporated into the

18    motion hearing.

19         MR. SCHIAVONE:  Judge, I -- you know, I have more

20    issues about this that I just need to investigate,

21    Judge, in reference to these documents.  I renew my

22    motion that I made at the sidebar.

23         I mean, at this point, there's no possible way I

24    can continue in this trial in light of these matters.

25         THE COURT:  Okay.  The motion's for a mistrial?

64

1          MR. SCHIAVONE:  Yes, sir.

2          THE COURT:  All right.

3          MR. ROTHSCHILD:  Ms. Barker.

4          MS. BARKER:  Your Honor, the documents that we're

5     talking about, this file that came up yesterday, the

6     Court's already reviewed it.  The Court's already

7     denied a mistrial as to it.  I don't think that that

8     suddenly factors into this in any way.

9          What we're talking about are two items that came

10    yesterday, the PowerPoint and the recorded statement,

11    which we have provided to the Court.  The Court has not

12    allowed us to get into the contents of it or discuss

13    the contents of it.  And it's the State's position that

14    none of this is in any way exculpatory, and would not

15    be Brady material.

16         As to the Defendant's statement, first of all, he

17    knew he made the statement.  He was there on June the

18    3rd of 2010, and he knows the contents of the

19    statements.  There is a written report provided by

20    Sergeant Thompson, which is all we had.

21         Based on that written report, even though we had

22    never gotten the report and then asked for it over and

23    over again, the written report would have suggested

24    that it was protected by Garrity.

25         Once we got it, we found out that, in fact, it is

                                                          65

1    not exculpatory.  And I don't want to get into too much

2    more with it since the Court doesn't want us to get

3    into the content of it.  But this would have been

4    something we would have like to have had in drafting an

5    indictment.

6         The folks from MDBI, and we have them here, they

7    didn't get this recording either.  We're providing it

8    as soon as we got it.  Before that -- you know, we

9    notified everybody the second we got it.

10        There's no bad faith on the part of the State

11   here.  We did not withhold this because we wanted to

12   withhold it.  We didn't withhold it because it -- it's

13   not exculpatory.  And what he's asking for is a very

14   extreme remedy.

15        What the Court can also do is exclude it, which is

16   fine.  Exclude its use in any way.  Or allow them to

17   stipulate and put it into evidence.  That's fine.  And

18   I'm talking about the recorded statement.

19        The PowerPoint we have some concerns about that

20   there is protected confidential informant information

21   on that PowerPoint.  We have concerns about the

22   publishing of that.  But to get into other parts of the

23   content, cross-examining Agent Delatorre about it,

24   bringing it through Sergeant Thompson, whatever would

25   be fine.  It's just the publishing of the confidential

1    informant information would be a problem.

2         MR. SCHIAVONE:  Judge, there are so many other

3    witnesses I need to interview now that become critical

4    of the case.  This is a false statement case.  I had in

5    these reports claims that the city attorney's office

6    never received videos.  Those are false statements by

7    somebody.  It was either Internal Affairs said they

8    gave them to them.  Now I know that they gave them to

9    somebody.  I'm not sure who the individuals from Hunter

10   Maclean.  This is the first I've ever heard of that.

11   That raises some other issues, as the Court knows, in

12   reference to my obligation to my client.

13        If I had known that --

14        THE COURT:  Just so that we're clear, there is no

15   automatic recusal by this Court.

16        MR. SCHIAVONE:  No, I understand that.  But I'm

17   not saying that there's even basis for that, but I

18   certainly have an obligation to know this stuff before

19   I start a trial.

20        In addition, I now know that somebody at CNT was

21   asked something about their files.  And here's the

22   problem, the way I -- why I believe it's -- when I say

23   prosecutorial misconduct, I'm not referring to the

24   District Attorney's because they didn't receive it, and

25   I believe that they did not receive it.  But this

1    wasn't given to them.  If there was conversations with

2    someone from CNT, all of this stuff should have been

3    given to the District Attorney and given to me.

4        What's troubling about this, and why they would

5    not want to give it to me, is on the second page.  It

6    makes clear all the evidence in the case was destroyed.

7        Now, the CNT number on Pete Delatorre's 37-page

8    report was -- and according to his testimony at trial,

9    this was the investigation of Malik Khaalis.  This is

10   supposed to be Malik Khaalis' file and everything

11   should be in it.  His 37-page report is not in here.

12   Why?  Because they destroyed all the evidence.  And

13   this was destroyed before trial.  That's why they

14   didn't want me to see this.  That is exculpatory.

15       And I subpoenaed this document.  As the Court

16   knows, that subpoena should be in the record somewhere,

17   in which I asked for the case file on the same number

18   as his report because that was the Malik Khaalis

19   investigation.  This is what was produced as being the

20   file on Malik Khaalis.  So everything as to Malik

21   Khaalis, statements, if they had statements of Malik

22   Khaalis that showed that he told the truth in these

23   counts, it's all been destroyed.  That's what the Brady

24   issue's about.  That's what's exculpatory.  And that's

25   why my client has been denied a fair trial.

68

1           I would strongly urge the Court to grant the

2     motion for mistrial.

3           MR. ROTHSCHILD:  If the State could respond?

4           THE COURT:  I guess we're splitting the argument.

5           MR. ROTHSCHILD:  If I may?

6           THE COURT:  Okay.

7           MR. ROTHSCHILD:  Actually, if the Court looks,

8     he's correct.  It's the same case number on the Court's

9     3, the yellow document.  But that actually is entitled

10    Defendant's name James Williams.

11          And as I know the Court knows counsel has a job to

12    do it.  But if you look at this, it doesn't actually

13    deal with Malik Khaalis.  It deals with the target

14    James Williams and the entire Percy Anderson, James

15    Williams' sideshow we had the other day.  And when

16    counsel says the evidence was destroyed against Malik

17    Khaalis, that's actually not so.

18          What you're going to see is a case closing report

19    as to James Williams when he was never charged after a

20    search warrant that yielded a de minimis amount of

21    weed, a cocaine test kit, and a marijuana test kit.

22          The agents testified, at least one of them did,

23    they ended up, after the search warrant of the

24    residence that was surveilled of James Williams, not

25    having enough to charge him.  And three years later in

69

1    2012, signing off on what will turn out to be, if this

2    comes up at trial, a routine destruction of evidence in

3    a case where nobody got charged.

4         As the Court knows at some point after prosecution

5    is closed out, the evidence is destroyed after the

6    appeal.  In this case, there was no appeal and no

7    prosecution because James Williams was never

8    prosecuted.

9         It is inaccurate to suggest that this is a

10   destruction of reports.  What this was, was the

11   destruction of the evidence in the James Williams' case

12   after James Williams was never prosecuted.  I

13   understand they have an argument to make but --

14        THE COURT:  Well, let -- listen.  Y'all are

15   arguing to -- I mean, this is not an issue that's

16   currently before the Court.

17        MR. ROTHSCHILD:  I just wanted to respond.

18        MR. SCHIAVONE:  It just goes to my motion for

19   mistrial.

20        MR. ROTHSCHILD:  I understand.

21        THE COURT:  All right.  We're going to take a

22   ten-minute recess.  Let me get my thoughts in order and

23   come back with a ruling.

24        (Court recessed at 12:11 p.m., reconvened at 12:17

25   p.m., and the following transpired:)

1       THE COURT:  All right.  The -- I indicated I was

2  going to take a little time to think through what I

3  have.  But honestly, I got back into the chambers and

4  decided I've got a pretty clear idea on what's going on

5  and probably what needs to be done.

6       Just let me first say that I don't necessarily

7  disagree with part of the State's argument on this

8  motion for new trial.  And that is that individually

9  the issues that have come before the Court may not

10  demand a mistrial, but that's not what I have here.

11       And I think as part of my ruling, I am going to

12  ask that the officers, that I understand to be sitting

13  in the hallway, come into the courtroom to hear what

14  the Court has to say.  Because ultimately I do think it

15  becomes important to ensure that ultimately the

16  Defendant gets a fair trial in Superior Court.  And I

17  may not need all of them, but whoever's in a

18  supervisory capacity and IA.  I understand the city

19  attorney's office may be out there, but I think

20  everybody needs to hear what's going on.

21       THE DEPUTY:  All supervisors involved in this case

22  need to come into the courtroom.

23       MR. ROTHSCHILD:  He said supervisors.  I think the

24  Court wants everybody.

25       THE COURT:  Why don't you check the hallway.

1          MR. ROTHSCHILD:  Actually he wants everybody.  He

2     said he wants everybody.

3          THE DEPUTY:  Everybody needs to come in that's

4     involved in this case.  Make sure your cell phones off.

5          That's all, Your Honor.

6          THE COURT:  All right.  I just want to make sure

7     everybody's here because I don't want there to be any

8     miscommunication about what exactly the Court's intent

9     is with regard to the ruling that I'm about to put on

10    the record.

11         I just indicated to the -- well, first for those

12    that were not in here, there's a motion for mistrial

13    made in this case based on the -- and I'll just

14    describe it as late production of a significant amount

15    of material associated with the -- or potentially

16    associated with the prosecution of the Defendant in

17    this case.

18         What I'd indicated before everybody came in was

19    that individually all of the issues that have been

20    presented to the Court, and just to touch on the four

21    that pop right out of the page at me -- well, three I

22    should say.

23         There's a PowerPoint that appeared yesterday.

24    There's a CNT file that appeared yesterday, and there's

25    a statement of the Defendant that appeared yesterday.

1    And this was three days into the trial at this matter.

2          All of these things, I think, can be explained and

3    possibly be recoverable with regard to the State's case

4    on the motion for mistrial.  The Court finds that the

5    totality of the circumstances that that is -- there is

6    way too much going on in this case at this point to

7    proceed, and I am going to grant a mistrial.

8          I'm going to make a couple statements, and I'm

9    going order some things be done.  Now, I don't think

10   there can be any dispute from the lawyers in this case

11   that this Court has a great deal of respect for the

12   police function in this community and, really, police

13   function generally.

14         I've had a number of cases involving, for example,

15   injury to officers, or assaults on officers, and I

16   think I've dealt with them in a way that makes it very

17   clear that this community should not tolerate that type

18   of thing with police officers because police officers

19   have a role in this community.

20         And the role in this community on a very base

21   level is to prevent the chaos.  There has to be a core

22   level of trust in the community.  That's really one of

23   things that this case is about.

24         We've heard a lot of testimony about the Defendant

25   potentially being involved in drug issues and other

1    things, but when it comes right down to it, what we're

2    talking about is the community's confidence in the

3    ability of individual officers, and the department

4    generally, to ensure the safety of the citizens here in

5    this community.

6        And when an officer is charged in this court with

7    a violation of those duties, as we have here, this is

8    not a game.  This is a very serious thing.  This is not

9    just about an individual sitting before the Court and

10   hearing a bunch of evidence.  This is something that,

11   as we can tell from the cameras that are here, is

12   something that is very important to the community

13   because there's an underlying trust in the department

14   that is at issue.

15       And what has unfortunately happened is we have

16   been informed, despite the fact that this case has been

17   ongoing for over a year and a half, I think, that

18   numerous documents that may, in fact, be critical to

19   the case.  I don't know whether they are, and I'm not

20   saying they are, but maybe, didn't appear until the

21   third day of this trial.

22       There can be a variety of issues for that.  I

23   understand that there are a variety of fingers being

24   pointed back and forth about who would be responsible

25   for what, what needed to produce to whom, how that was

1       to occur.  There were a number of different

2       investigations ongoing, and maybe some folks in one

3       investigation had documents that they weren't turning

4       over.  I don't know.  There's a number of explanations

5       for what has happened here.

6              But I've got to sit here and give this Defendant a

7       fair trial.  And in order to do so, I have to have

8       confidence that the entities that are prosecuting the

9       individual have all of the information that they're

10      supposed to have, one.  And then really, two, that they

11      have been provided all of the information that they are

12      supposed to have.

13             Now, I tell my lawyers that come in here regularly

14      know that I don't have a lot of rules in this court,

15      although, it may seem very different.  I run a very

16      formal court, and I acknowledge that.  But that's

17      because all I expect from my lawyers is to be

18      professional and prepared.

19             And it is very difficult to be professional and

20      prepared when you're not given what you need, whether

21      that's a defense lawyer, or a prosecutor for that

22      matter, to do your job here.  And it creates a great

23      deal of angst with this Court when I hear that a year

24      and a half into a case that things haven't been

25      provided that may need to be.

1          It is -- I'm not going to say it's unique to this
2     case.  It has happened before, which is one of the
3     reasons that I'm speaking my mind at this point, where
4     things just don't get provided.  And, again, it gets
5     back to this issue, and this is not a game.  This is an
6     individual's freedom and livelihood that we have at
7     issue, that I have to ultimately ensure is properly
8     presented in a way that gives the defendant, again, a
9     fair trial, and gives the State the opportunity to
10    provide the evidence that they think is sufficient to
11    take that livelihood and take that freedom away.  It's
12    a very serious thing that we do here.
13         Which, again, gets me to the point where I just
14    cannot understand how things such as the statement of
15    the Defendant that was in the Internal Affairs file
16    doesn't appear until the third day of trial.  I just --
17    I don't understand.
18         What I've heard from the District Attorney's
19    office where there were attempts to get the entire
20    file, and I'll just describe it that way.  Whether
21    those were sufficient or not, I guess is secondary to
22    the bigger problem that I see, which is this, and this
23    may not be limited to this case quite honestly.  And
24    that is that there seems to be a lack of systematic --
25    or a lack of system to ensure that everybody has what

1      they need when they come to this court to prosecute an

2      individual.  That's something at some point I would --

3      I would encourage the District Attorney's office, the

4      Metropolitan Police Department, CNT, whoever else may

5      be involved, to take a look at the systems that they

6      have to ensure that things like what is happening here

7      do not occur.

8           It's troubling to me that there are files, entire

9      files, that were marked as Court's Exhibit 3 yesterday,

10     that just nobody thought about producing.  That a

11     Defendant's statement just sort of disappears into the

12     ether until the third day of trial.  These things

13     shouldn't happen, and there has to be some way to

14     correct that.

15          And the Court's going to grant the mistrial.  Let

16     me back up a little bit to the beginning of this trial.

17     Mr. Schiavone at the beginning of this trial issued

18     subpoenas, and those subpoenas were, in effect,

19     disallowed by this Court.  The subpoenas were intended

20     to assure Mr. Schiavone that he had been provided with

21     all of the documents that may be relevant in this case.

22          I went on the record and said, essentially, no,

23     you can't have that.  And I did that because I trusted

24     that the discovery process that's in effect in the

25     Superior Court would ensure that there were no

1     surprises.  Or if there was a surprise, it was limited.

2     In other words, the collateral damage would be limited.

3     I did not expect that things like the statement of the

4     Defendant, his PowerPoint, an entire CNT file simply

5     would not be produced.

6          So we're going to do the following.  I'm issuing a

7     rule nisi.  I'm issuing a rule nisi that is scheduling

8     a hearing on Wednesday, July 22nd at ten o'clock

9     pursuant to O.C.G.A. 15-13-4, which is directed to

10    officials within the county.

11         Specifically I'm directing a rule nisi to the

12    Chatham County Metropolitan Police Department, the

13    Chatham County Counter Narcotics Team, and the City of

14    Savannah.

15         Those entities are to produce all documents,

16    records, and files related to the investigation of the

17    Defendant for alleged misconduct at CNT, including but

18    not limited to, CNT and Metro case files, Internal

19    Affairs files, OPS files, city investigative files, and

20    related documents, or show cause why they have not been

21    produced at that hearing.

22         Should any document be produced at the hearing

23    that was not produced in discovery in the above

24    referenced case, that being this case, that the party

25    shall show cause as to why those documents were not

1      produced on a timely basis to this Court.  Failure to

2      comply with the order is going to subject the offending

3      parties to the contempt power of the Court.

4          In addition, I am going to ask that Mr. Schiavone

5      reissue his subpoenas.  I'm going to ask that those

6      subpoenas be reissued with one modification, and that

7      is that the documents be produced to the court for in

8      camera review.  They are not to be simply produced in

9      open court.  They are to be produced to the Court.

10         Based on the mistrial, one of the reasons I wanted

11     to take a recess, I wanted to see when my next

12     available date was.  Based on the mistrial, this case

13     is going to be scheduled for October 12th, first out.

14         I'm going to assume that the subpoena date will

15     provide -- well, I'm going to have to get a date for

16     the production on the subpoenas.  I'll have to provide

17     that to Mr. Schiavone.

18         To say I'm disappointed that we reached this point

19     is an understatement.  To be clear, this is not

20     directed in whole at the district attorneys that are

21     before me or the District Attorney's office.  I've

22     gotten an explanation this morning on the role of the

23     attorneys in this case.  Both of them appeared before

24     me before and I have no reason to not believe what I

25     have been informed of, which if anybody has any

79

1       questions about it are going to be contained in a

2       transcript of this proceeding that is available.

3               I, again, encourage the entities that are involved

4       in the Court's show cause order now to work diligently

5       to ensure that any documents that may be related to

6       this case are produced at that hearing.

7               And in the long run, I encourage and hope those

8       entities get together with the District Attorney's

9       office and some system is put in place to ensure that

10      we do not run into a problem such as this at any point

11      in the future.

12              Anything from the State?

13              MS. BARKER:  Your Honor, the only thing I can

14      think of, CNT being a county agency, I don't think we

15      have anybody here from the county that would have

16      gotten notice of this --

17              THE COURT:  I'm going to issue a rule nisi.

18              MS. BARKER:  Yes.

19              THE COURT:  It's going to be -- it will be -- we

20      will go through all the formalities.

21              MS. BARKER:  Yes, sir.

22              THE COURT:  And the rule nisi will be issued on

23      all of those entities.

24              Any questions beyond that?

25              MS. BARKER:  No.

1          THE COURT:  Mr. Schiavone?

2          MR. SCHIAVONE:  So there will be a written order

3    of what you just ordered?  I can get a copy of that to

4    make sure I do it right.

5          THE COURT:  And the rule nisi will be issued, and

6    all parties here will also get a copy.  The rule nisi

7    is under the Khaalis' case, but it's in re Savannah

8    Chatham Metropolitan Police Department, Chatham County

9    Narcotics and the City of Savannah.

10         MR. SCHIAVONE:  Yes, sir.

11         THE COURT:  All right.  We're in recess.

12    (The proceedings adjourned at 12:32 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        C E R T I F I C A T E

2

3

4

5          I, Amy Jo Kaska, Certified Court Reporter, State of

6    Georgia, do hereby certify:

7          That the foregoing eighty-one (81) pages of

8    typewritten material were taken down and transcribed by me

9    and that the same contain a true and accurate transcript of

10   the proceedings as stated in the caption.

11         I further certify that I am not of kin nor counsel to

12   any of the parties hereto, nor am I an interested party to

13   these proceedings.

14         This, the 30th day of July, 2015.

15

16

17

18   _____
     AMY JO KASKA, CCR-2531
19   California CSR No. 12572
     133 Montgomery Street, Room 511
20   Savannah, Georgia 31401
     courtreporter@chathamcounty.org

21

22                              CERTIFIED COPY

23                    This document is a certified copy of
                      the original document placed on record in
                      the office of the Clerk of Superior Court,
24                    Chatham County, GA. Given under my hand
                      and seal this 30 day of August 20 19.

25
                      Deputy Clerk, S.C.C.C., GA